Elizabeth Kramer, State Bar No. 293129 (elizabeth@eko.law)
Kevin Osborne, State Bar No. 261367 (kevin@eko.law)
Julie Erickson, State Bar No. 293111 (julie@eko.law)
**Erickson Kramer Osborne LLP**
44 Tehama Street
San Francisco, CA 94105
Phone: 415-635-0631
Fax: 415-599-8088

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENNETH DONOVAN and HUSSIEN KASSFY, individually and on behalf of others similarly situated,<br><br>　　　　Plaintiffs,<br><br>vs.<br><br>GMO-Z.COM TRUST COMPANY, INC.; COINBASE GLOBAL, INC.; and COINBASE INC.<br><br>　　　　Defendants. | Case No.: 3:22-cv-2826<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**<br><br>**COMPLAINT FOR**<br>1.  Negligence of Defendant GMO-Z.com Trust Company, Inc.<br>2.  Negligence of Defendant Coinbase Global, Inc. and Coinbase Inc.<br>3.  Negligence Per Se<br>4.  Negligent Misrepresentation<br>5.  Conversion<br>6.  Violation of the New York General Business Law § 349<br>7.  Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq.<br>8.  Violation of § 5 and § 12(a)(1) of the Securities Act<br>9.  Violation of § 12(a)(2) of the Securities Act |

Plaintiffs KENNETH DONOVAN and HUSSIEN KASSFY ("Plaintiffs"), on behalf of themselves and others similarly situated ("the Class"), bring this action against Defendants GMO-Z.COM TRUST COMPANY, INC. ("GMO Trust"), COINBASE GLOBAL, INC., and COINBASE INC. (together, "Coinbase") (collectively, "Defendants"), for actual damages suffered by Plaintiffs and the Class, for an order enjoining the behavior described herein, and for other recovery specified herein for harm caused by Defendants relating to GYEN cryptocurrency. Plaintiffs allege the following based upon information and belief, except as to their own actions, the investigation of counsel, and the facts that are a matter of public record, as follows:

## I. <u>INTRODUCTION</u>

1. Since the introduction of Bitcoin in late 2008, digital assets have evolved from a technological curiosity into a market of over 6,000 digital financial instruments used by millions of ordinary Americans. Today there are over 11,000 separate digital asset tokens in existence, with a market capitalization of over $1.5 trillion. An estimated 20-46 million Americans own Bitcoin and other digital assets, and that number is growing rapidly.

2. GYEN is a cryptocurrency issued by Defendant GMO Trust and traded on the exchange operated by Defendant Coinbase. It is in a class of cryptocurrency referred to as a "stablecoin" because, unlike Bitcoin, it is collateralized with an actual underlying hard asset. GYEN is purportedly "pegged" to the Japanese yen at a rate of one-to-one. Because it is backed by a "fiat currency" (meaning government-issued currency), and specifically one that is historically considered steady, it is marketed as a type of investment that can "virtually eliminate volatility."

3. In the one year since it was first issued, GYEN has been anything but stable. GMO Trust fails to disclose to its buyers that the GYEN asset is susceptible wild fluctuations in value. While the Japanese yen has fluctuated only 7 percent against the U.S. dollar since January 2021, GYEN fluctuated over 200 percent against the U.S. dollar.

4. Defendant Coinbase holds itself out as a centralized marketplace for cryptocurrency traders, but is essentially an unregistered broker-dealer of unregulated financial

instruments. In 2021, GMO Trust used "partner" exchanges, including Defendant Coinbase, to create markets where GYEN could be traded. GMO Trust's partnership with Coinbase allowed GMO Trust to issue GYEN tokens to more investors and generated commissions for GMO Trust and Coinbase to share.

5.      To promote GYEN, Coinbase mimicked GMO Trust's claims that GYEN was pegged one-to-one in value to the yen. Both entities knew, based on a prior destabilizing event, that GYEN's peg to the yen was prone to break and that such an event would be likely, if not certain, when GYEN opened for trading on Coinbase. Both entities withheld this information from investors.

6.      In November 2021, when Coinbase first allowed GYEN trading on its exchange, the asset immediately came untethered from the yen and rose sharply in value. Investors placed orders believing the coin's value was, as advertised, equal to the yen, but the tokens they were purchasing were worth up to seven times more than the yen. Just as suddenly, the GYEN's value plunged back to the peg – falling 80 percent in one day.

7.      As the GYEN's value was cratering back to the yen, Coinbase compounded the harm by restricting many customers' ability to sell the asset, then abruptly suspended all trading of the asset without explanation.

8.      Both GMO Trust and Coinbase ignored or shrugged off demands for an explanation and recompense, each insinuating that the other was responsible for the collapse. In truth, both contributed to the debacle as both deceived investors regarding the nature of the asset.

9.      As a result of Defendants' deceit, Plaintiffs and the Class, composed of hundreds of GYEN purchasers, collectively lost untold millions in a matter of hours.

## II.  FACTUAL ALLEGATIONS

### Cryptocurrency and Stablecoin

10.      Cryptocurrency is a digital medium of exchange designed to work like fiat currency but without the control or oversight of a centralized government authority. It is referred to as a "digital asset" and is issued or transferred using a distributed blockchain ledger. This is a

peer-to-peer database spread across a network of thousands of computers and that records all transactions publicly.

11.  The earliest decentralized cryptocurrency, Bitcoin, was created in late 2008 and first became available in 2009. Bitcoin is a collection of theoretical coins that, when generated or acquired, go into an owner's digital "wallet." The wallet serves the same function as a bank account but is maintained by the owner and not by a bank. The coins can, in theory, be used to buy and sell goods and services with no involvement from banks or other intermediaries.

12.  Bitcoin was lauded as an end to banks and centralized currency. This is because Bitcoin, and cryptocurrency generally, offers the same anonymity as physical cash but is resistant to bank-caused cash crises like supply shortages or hyperinflation. In the years since Bitcoin's creation, however, cryptocurrencies have not done much if anything to replace banks because, in part, cryptocurrencies are inefficient as a means of exchange. Transactions involving cryptocurrency can be slow while the value of cryptocurrency coins is highly volatile – so volatile that the value of a coin is prone to change in the time it takes for a digital transaction to be completed. As a result, the only markets where cryptocurrency has served the purpose of replacing fiat currency is in markets where anonymity is valued more than efficiency, such as the "silk road," where market participants mostly engaged in illicit transactions.

13.  But cryptocurrency has thrived in other ways. Instead of becoming a new means of exchange, cryptocurrencies have been an investment darling for market speculators. Those generating cryptocurrency are required to dedicate a tremendous amount of computing resources to the endeavor, making the coins both scarce and expensive. Additionally, as mentioned, the value of cryptocurrency relative to fiat currency is highly volatile, with many of the most traded cryptocurrencies fluctuating more than 100 percent in value in a single year. These fluctuations give daredevil investors opportunities to amass fortunes overnight.

14.  In an apparent attempt to bring stability to cryptocurrency and wrangle it back to its originally intended use as a means of exchange, in 2014 companies began marketing a type of cryptocurrency called "stablecoins." Stablecoin issuers counteract the instability of cryptocurrency by tethering the asset's value to an underlying "hard" asset, like a commodity or

a fiat currency. For each coin issued, the issuer maintains a pegged value by holding an equal amount of underlying hard asset in reserve.

15. In a report authored by The Block Research and commissioned and published by GMO Trust in March 2021, stablecoins were described as follows:

> stablecoins are mostly viewed as bearer monetary assets designed to mimic the price of fiat currencies by utilizing a stabilization mechanism. Essentially, stablecoins are a digital representation of fiat currency that lives on blockchains.

16. Tethering a stablecoin to a hard asset creates a distinction between stablecoins and other cryptocurrencies. While stablecoins are "collateralized" (meaning they are backed by an underlying asset), other types of cryptocurrencies are generally "uncollateralized" and are valued only by the market for the asset itself. This distinction may have implications in the regulatory regime that controls stablecoins.

## Regulatory Background

17. Digital assets, including stablecoins, are the subject of numerous proposed legislations, but continue to evade a comprehensive legal framework. It is presently unclear whether cryptocurrencies generally, and stablecoin assets specifically, are legally regarded as securities, currencies, or some other type of financial instrument. Thus, different digital assets must be regarded individually under different regulatory regimes to determine the regulatory framework(s) under which they fit.

18. The U.S. Securities and Exchange Commission ("SEC") applies what is known as the "*Howey* test," developed by the Supreme Court in *SEC v. W.J. Howey Co.,* 328 U.S. 293 (1946), to evaluate whether a given digital asset qualifies as a security. Under the *Howey* test, an asset is a security and not another type of financial instrument if transactions of that asset qualify as "investment contracts." A transaction is an investment contract if: (1) it is an investment of money; (2) the investment of money is in a common enterprise; and (3) there is an expectation of profits from the efforts of a promoter, sponsor, or third party.

19. Cryptocurrencies, including stablecoins, meet the first two prongs of the *Howey* test because they are purchased or otherwise acquired in exchange for a thing of value, whether in the form of currency or other consideration, and their issuance and redemption

are part of a common enterprise because the fortunes of digital asset purchasers have been linked to each other or to the success of the promoter's efforts.

20.     The last prong of the *Howey* test requires an analysis of each digital asset individually. Whether there is an expectation of profits from the investment and whether those profits come from the effort of a promoter or third party will differ depending on the digital asset under examination. It is, potentially, here where stablecoins and other cryptocurrencies diverge. Guidance from the SEC suggests stablecoins are issued with an expectation of profit because they are typically traded on or through a secondary market or platform; they are offered broadly to potential purchasers instead of only to users of specific services; and they are marketed using the expertise of promoters or third parties based on future functionality as opposed to current functionality. Digital assets with these characteristics are likely to be considered securities subject to the SEC's requirements.

21.     In practice, the SEC has argued the *Howey* test should be applied in a manner that frequently results in cryptocurrencies being deemed securities. *See e.g., Sec. & Exch. Comm'n v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 358 (S.D.N.Y. 2020); *Sec. & Exch. Comm'n v. Ripple Labs, Inc., et al.*, Case No. 20-CV-10832 (S.D.N.Y.).

22.     To the extent a digital asset is classified as a security, its issuers are subject to securities-specific regulations. Issuers of securities must comply with the Securities Act of 1933. Section 12(a)(1) of the Securities Act prohibits the sale, or the facilitation of the sale, of unregistered securities. Section 12(a)(2) of the Securities Act prohibits issuers and sellers of securities from making statements in offering materials or communications that are false and misleading, contain untrue statements of material fact, omit facts necessary to make the statements not misleading, or omit to state material facts required to be stated therein.

23.     The U.S. Commodity Futures Trading Commission (the "CFTC"), has taken a different tack than the SEC. Per the CFTC, "[its] jurisdiction is implicated when a virtual currency is used in a derivatives contract or if there is fraud or manipulation involving a virtual currency traded in interstate commerce." The CFTC has used this broad mandate to forcefully label all cryptocurrencies "commodities" under the Commodities Exchange Act. In so doing, the

CFTC has exercised jurisdiction in several cases involving investor fraud and requiring entities to register as a regulated exchange or intermediary.

24. In a 2015 order following the enforcement action of *In the Matter of: Coinflip, Inc., d/b/a Derivabit, and Francisco Riordan*, CFTC Docket No. 15-29, the CFTC claimed "[t]he definition of a 'commodity' is broad [...] Bitcoin and other virtual currencies are encompassed in the definition and properly defined as commodities." Subsequent regulatory orders and court findings have followed suit. *See*, *e.g.*, *CFTC v. McDonnell*, 287 F. Supp. 3d 213, 217 (E.D.N.Y. 2018) ("Virtual currencies can be regulated by CFTC as a commodity [...]. They fall well-within the common definition of 'commodity' as well as the [Act's] definition of 'commodities' as 'all other goods and articles [...].'"); *CFTC v. My Big Coin Pay, Inc.*, 334 F. Supp. 3d 492, 495– 98 (D. Mass. 2018) (ruling a virtual currency was a "commodity" under the Act); *In re Coinflip, Inc.*, CFTC No. 15-29, 2015 WL 5535736, at *2 (Sept. 17, 2015) (consent order) ("[...] bitcoin and other virtual currencies are encompassed in the definition [the Commodities Exchange Act] and properly defined as commodities.")

25. The CFTC has also concluded that Tether's USDt, the first marketed stablecoin, is a commodity under CFTC jurisdiction. (*In the Matter of: Tether Holdings Limited, Tether Operations Limited, Tether Limited, and Tether International Limited*, CFTC Docket No. 22-04.) Tether was fined $41 million by the CFTC in October 2021 for misrepresentations and omissions regarding its asset, which it claimed was backed by U.S. dollars at the rate of one-to-one. (*Id.*)

26. At the state level, cryptocurrency regulation varies greatly. Some states, like New York, impose strict laws. In 2021, New York enacted Codes, Rules and Regulations, Title 23, section 200, *et seq*., which allowed the State Department of Financial Services to oversee and grant licenses and charters to New York-based companies to engage in "virtual currency business activity" within the State. Among other things, the law requires those under its authority to establish anti-money laundering and cybersecurity programs, meet transparency requirements, and comply with truth-in-advertising rules. The regulation states, "[i]n all advertising and marketing materials, each licensee and any person or entity acting on its behalf, shall not,

directly or by implication, make any false, misleading, or deceptive representations or omissions."

27.     In May 2022, California's governor signed an executive order directing several state agencies including the Department of Financial Protection and Innovation and the Business, Consumer Services and Housing Agency to draft regulations for digital currencies, including guidelines for disclosures by companies when they offer financial products and services related to cryptocurrencies. The order announced that the State's goal shall be to create a transparent business environment for companies operating in blockchain, including digital assets and related financial technologies, that harmonizes federal and California laws.

28.     Based on information and belief, no agency or court of law has issued an opinion regarding the status of the digital asset that is the subject of this lawsuit. GMO Trust was, however, granted a charter for the purpose of issuing digital assets by the New York Department of Financial Services. Accordingly, as allowed under Rule 8 of the Federal Rules of Civil Procedure, Plaintiffs contend liability under alternative theories where appliable.

### GMO Trust & the GYEN Stablecoin

29.     GMO Internet Group is a Tokyo-based internet services industry company founded in 1991. It is one of the largest internet conglomerates in the world. It owns or operates over 100 companies worldwide with over 5,000 employees and combined revenues exceeding $1 billion annually. The conglomerates' services range from web hosting to online advertising. It also operates the world's largest online foreign exchange trading platform.

30.     In 2020, GMO Internet Group created GMO-Z.com Trust Company, Inc. ("GMO Trust"). GMO Trust is a limited purpose trust company formed in the State of New York under the Department of Financial Services' Virtual Currency Law. GMO Trust was the seventh company to be granted this charter by the Department.

31.     After receiving its charter on December 29, 2020, GMO Trust began marketing GYEN, which it called the "world's first regulated Japanese YEN-pegged stablecoin." The GYEN stablecoin was touted as offering the anonymity and freedom of cryptocurrency with

additional advantages for those who would usually seek the benefits of investing in foreign currencies. GMO Trust's GYEN White Paper, issued January 14, 2021, claimed:

> Today's payment infrastructure is plagued by high fees and slow speeds, with average fees of $35 plus foreign exchange rates, and 2-5 business days in settlement time. We seek to greatly reduce these.

32.     One of the stated purposes of GYEN was to offer speculators benefits generally available for foreign currency investments. According to the GYEN White Paper,

> [c]urrency trading strategies are popular methods to gain yield and/or hedge for institutional and retail traders. As we expand currency pairs, traders will be able to leverage these strategies […]."

**Representations and Omissions Regarding the GYEN's "Peg"**

33.     In addition to statements about GYEN's stability and efficiency, GMO Trust held GYEN out as "pegged" to the Japanese yen.

34.     According to GMO Trust's white paper on GYEN:

> GYEN anchors its value to the price of the Japanese Yen […].
>
> […]
>
> [P]egged 1-to-1 with fiat currency, we can virtually eliminate volatility, while still benefiting from the advantages of digital assets, such as high transaction speeds matched with low costs.

35.     GMO distributed promotional videos on LinkedIn and YouTube promoting GYEN's stability and one-to-one peg to the Japanese yen:

> GYEN is the first stablecoin pegged 1:1 to the Japanese YEN and is fully regulated by the New York Department of Financial Services (NYDFS). Enjoy the creditworthiness and stability of the Japanese YEN, while trading with dozens of liquidity venues across the globe – both retail and institutional.



**GYEN is the first stablecoin pegged 1:1**

**to the Japanese YEN and is fully**

**regulated by the New York Department of Financial Services**

36.     GMO Trust published numerous statements and documents on the stablecoin.z.com website repeating the claims that the asset is pegged at a rate of one-to-one to the Japanese yen. These include a statement on the landing page reading GMO Trust is "The World's First Regulated JPY-Pegged Stablecoin Issuer," and a carousel of linked articles titled "New York Regulator Licenses GMO Internet to Issue the First JPY-Pegged Stablecoin" and "Japanese Internet Giant Licensed to Issue First JPY-Pegged Stablecoin in New York." The site's "FAQ" page includes the statement "the exchange rate for GYEN/JPY […] will always be 1:1 through GMO-Z.com Trust Company's official Purchase/Redemption process." The site further posted several "independent accountant report" documents from May 2021 to April 2022 stating GYEN is "the world's first regulated Japanese yen-pegged stablecoin," and is "pegged 1:1 to the Japanese yen." The report notes that this information is "provided by GMO-Z.com Trust Company, Inc."

37.     GMO Trust's materials omitted facts that were critically important and would be material to any potential GYEN purchaser. GMO Trust omitted from its whitepaper, marketing, disclosures, and publicly-filed documents, that the asset's value was liable to fall out-of-line with the one-to-one peg to the Japanese yen. Purchasers seeing GMO Trust's marketing would believe the value of a GYEN token was necessarily equal to the value of one Japanese yen. In truth, the value of GYEN depended on the liquidity of GYEN itself and had little connection at all to the value of the yen. This general fact was true because of a litany of other facts, similarly omitted from GMO Trust's disclosures, including:

- The value of GYEN was subject to fluctuations completely independent of the Japanese yen when traded on third-party exchange platforms;

- An insufficient supply of minted GYEN to meet demand for the asset subjected the asset to low liquidity, particularly when it was first made available for purchase on third-party exchanges;

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

10

- When the asset's low liquidity coincided with a period of high demand, such as when it was initially promoted and introduced on a third-party exchange, its value was prone to rise relative to the Japanese yen such that it became "unpegged;"

- Investors could place buy orders for GYEN at a time when the asset's value appeared pegged to the Japanese yen, but delays in filling the order could cause the price they actually paid for the asset to be higher than the value of the yen;

- Purchasers of GYEN who entered into purchase contracts when the asset was unpegged were purchasing an asset that was not, in fact, valued at a ratio of one GYEN-to-one Japanese yen;

- Purchasers whose orders for GYEN were filled at times when the asset was unpegged from the Japanese yen had no right to redeem the asset, which they had been misled to believe was valued at a one-to-one ratio with the Japanese yen when they purchased it, at a one-to-one value when it later returned to the peg.

38. These facts were known to GMO Trust, but intentionally withheld from potential purchasers to preserve the asset's "stablecoin" moniker.

39. On March 1, 2021, GMO Trust officially launched the sale of GYEN. The asset was sold directly by GMO Trust and on third-party exchanges dealing in cryptocurrencies. GMO Trust created "partnerships" with some of these exchanges, at times offering purchasers incentives to buy through the exchange, such as 7 percent interest returns on GYEN deposits. GMO Trust's CEO, Ken Nakamura, was quoted as saying "[i]t provides a less volatile and compelling way to earn meaningful yield in today's interest rate world simply by holding historical safe haven currencies like JPY and USD in digitized form." In truth, it pushed the market for the asset to the exchanges, which received commissions on transactions and shared them as a part of their partnership agreements with GMO Trust.

**The Coinbase Cryptocurrency Exchange**

40. Coinbase is a centralized online marketplace for cryptocurrency traders. Through its website, Coinbase operates two digital asset exchanges, "Coinbase" and "Coinbase Pro," where its customers place orders to buy and sell cryptocurrencies.

41.     Once a customer buys an asset, the asset's digital information remains stored in Coinbase custody, and the encryption key a cryptocurrency owner would typically hold is instead held by Coinbase itself. As an alternative, the company offers a "Coinbase Wallet" where customers can hold custody over their own cryptocurrencies and encryption keys.

42.     Coinbase offers its U.S. customers the power to trade over 90 cryptocurrencies and was at all relevant times the largest cryptocurrency exchange in the U.S. by volume.

43.     Coinbase acts as a broker-dealer but is unregistered with FINRA or the SEC as such. It is also unregistered as a securities exchange. It is, however, the holder of a "Virtual Currency & Money Transmitter" license under the New York Department of Financial Services' Virtual Currency Law.

44.     When Coinbase offers trading of a cryptocurrency, it publicly posts information regarding the asset. This information includes a description of what the asset is, which Coinbase products support it (i.e. Coinbase, Coinbase Pro, or Coinbase Wallet), and which geographical regions allow customers to purchase it. In a separate branch of the Coinbase website referred to as "Price charts," Coinbase provides historical data regarding the asset, including the asset's historical pricing, trading activity, market cap, and the number of times the asset has been mentioned on social media in recent days. It also links to the asset's white paper and website, where applicable.

**The GYEN Peg Breaks**

45.     On November 10, 2021, GMO Trust introduced GYEN on Coinbase. At first, only Coinbase Pro customers were allowed to transfer GYEN tokens they already owned into their Coinbase accounts; they could not buy or sell the asset on the exchange. Coinbase claimed it would open trading to all Coinbase customers for GYEN once it had confirmed adequate supply.

46.     On November 16, 2021, it became fully open for trading. Almost immediately, its value came completely untethered from the yen. GYEN's liquidity was so low that that value of the asset rose in value to more than seven times the value of the yen. The peg was broken. At one point, Coinbase reported the value of a single GYEN token reached $5,353.87 (this statement

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

12

was later removed by Coinbase, which now claims the all-time high value was $0.34). The yen, meanwhile, was completely stable, never rising above a value of 0.87 cents.



47.     While the GYEN was untethered, investors who bought what they believed were GYEN tokens equal in value to the Japanese yen were actually buying tokens worth far more than the yen – and paying for them at correspondingly high prices.

48.     By November 19, 2021, the price of the GYEN plummeted back to the value of the yen, losing its value by orders of magnitude. Those left holding the stablecoin as it fell lost as much as 80 percent of their investment in hours.

49.     Amidst the turbulence, Coinbase compounded the problem by restricting its customers' ability to trade GYEN. It first issued an "alert" to its customers warning, "[d]ue to unusual market activity for GYEN, you may have trouble trading GYEN on Coinbase.com. We apologize for any inconvenience caused by this." By the time of the alert, however, many Coinbase customers who saw the asset's instability were already restricted by Coinbase from placing orders to sell it. Instead, they had to watch as its value plunged back to the yen and their investments were lost.

50.     At 4:00 p.m. eastern standard time on November 19, 2021, Coinbase suspended all GYEN trading activity.

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

51.     While Coinbase was at first silent about the debacle, it eventually acknowledged it had restricted GYEN trading and then suspended it completely.

> [B]etween 15th - 19th November 2021, GYEN on Coinbase experienced unexpected behavior due to unusual market conditions. On 19th November, this was further complicated and for technical reasons, Coinbase disabled trading for GYEN.

It later claimed in an "incident post-mortem" report that the break in parity, which peaked on November 17th and 18th, was unrelated to the total suspension of trading on November 19th. The reason for the blanket suspension on November 19th, according to Coinbase, was an isolated technical issue. According to the incident report, a data source update caused customers to see a decimal error in their web interface showing either 100x or 1/100th of the actual amount of GYEN in their account, and this error, not the break in the peg, triggered the trading suspension. It was mere coincidence, Coinbase advised, that the suspension of GYEN trading happened within hours of the stablecoin coming wildly untethered from the yen.

52.     Many purchasers refused to believe Coinbase's claim and publicly accused the exchange of bearing responsibility for the GYEN collapse. Coinbase accepted no responsibility whatsoever, indicating it was caused by the nature of GYEN. Coinbase informed the purchasers it had no control over the assets sold on its platforms and issued a statement through its blog claiming:

> When Coinbase listed GYEN, there was significant demand for GYEN that could not be matched by supply. The surge in buyer demand for GYEN, coupled with the insufficient supply of GYEN across all markets (not just Coinbase), ultimately caused the break in parity. [...] The break in parity occurred because of these market conditions specific to the GYEN digital asset unrelated to Coinbase operations.

53.     Coinbase customer service responded in similar fashion to investors requesting reimbursement for their losses, telling them it would not reimburse any losses related to GYEN's collapse.

Take note, we cannot change the status of this account and we cannot reimburse for the transaction in question as this issue occurs during the sudden price fluctuation of GYEN tokens happened on November 19, 2021.

Coinbase customer service response to GYEN purchaser's request for reimbursement.

54. GMO Trust was similarly unwilling to accept fault or reimburse loss. Its CEO stated, "we have no visibility to what happens within the exchange." Alex Russell, deputy CCO at GMO Trust, stated that the transactions were "through an exchange," thus, GMO Trust had "no role" in the matter and the activity was "not associated with GMO Trust."

55. Investors realized they had invested in GYEN based on a completely false promise of stability. Those who reached out to Coinbase found no means of live customer support and had to send instant messages or emails to an automated help desk that took days to respond. GMO Trust was similarly unresponsive, offering buyers no means of contacting it whatsoever. Thus, investors had to watch helplessly as their investments dived, then when they sought explanations and help, they found both GMO Trust and Coinbase unresponsive and indifferent. Over the coming days, investors started online groups to draft petitions demanding explanations and refunds from GMO Trust and Coinbase.

56. The November 2021 collapse was foreseeable to both GMO Trust and Coinbase, as a similar collapse had occurred just months prior. In May 2021, GYEN became available on other GMO Trust-partner exchanges, including the non-U.S. division of the Binance exchange. As would happen again later, low liquidity caused the peg to break and the price of GYEN to rise dramatically. Those GYEN purchasers whose orders took time to fill after opening or who mistakenly bought when the asset was untethered from the yen lost as much as 99 percent of their purchase value within hours.

57. The May 2021 incident was well-publicized among the cryptocurrency investment community. The CEO of GMO Trust directly discussed the event with investors and potential exchange partners, including Coinbase, at the time it occurred. Later in the year when Coinbase listed GYEN in November 2021, both GMO Trust and Coinbase were aware of the volatility GYEN had demonstrated earlier in May 2021. They knew GYEN was prone to break

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

from its one-to-one peg. Moreover, they knew that if GYEN had insufficient liquidity, it would again undergo the price shocks it experienced before.

58.     Prior to the November 2021 collapse, both GMO Trust and Coinbase withheld from investors the fact that GYEN was likely to break from its peg to the yen. Instead, even after the May 2021 price shock, GMO Trust kept all claims that GYEN was pegged to the yen in its website content, marketing material, video content, and publications. Coinbase parroted the claims of GMO Trust, stating "GYEN is a stablecoin running on Ethereum that's intended to maintain a value of one Japanese Yen" and linked to the GYEN White Paper and website, which touted the asset's one-to-one value peg.

Coinbase Help Center  >  Getting started  >  GYEN (GYEN)

# GYEN (GYEN)

### What is GYEN (GYEN)?

GYEN is a stablecoin running on Ethereum that's intended to maintain a value of one Japanese Yen. The company behind GYEN, GMO-Z.com Trust Company, claims to hold reserves that fully back each GYEN.

59.     As a consequence of GMO Trust's false claims of the GYEN's one-to-one peg to the yen, Coinbase's adoption of those false claims, both entities' omission of the fact that GYEN was not designed to hold a value pegged to the yen, and Coinbase's restriction prohibiting investors from liquidating their GYEN as it plummeted, several hundred purchasers lost vast sums, some losing hundreds of thousands of dollars in just hours, causing them grief, anxiety, stress, and outrage.

## III.  <u>JURISDICTION AND VENUE</u>

60.     This action is brought as a class action for monetary damages and equitable relief due to the Defendants' unlawful conduct.

61.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), because this case is a class action where the aggregate claims of all members of

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

the proposed Classes exceed $5,000,000, exclusive of interest and costs, and Plaintiffs and a substantial number of the members of the proposed Classes are citizens of states different from Defendants.

62.     Jurisdiction of this Court is further founded upon 28 U.S.C. § 1331 because the Complaint asserts claims under the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77e, 77*l*(a)(1). This Court further has jurisdiction over the Securities Act claims pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v.

63.     The Court has personal jurisdiction over GMO Trust and over Coinbase because each engages in substantial business in the state of California, maintains substantial contacts, or committed overt acts in furtherance of the alleged unlawful conduct in California. The conduct by each Defendant giving rise to this litigation has been directed at, and has had the intended effect of, causing injury to persons residing or located in California. Additionally, Coinbase in headquartered in this District.

64.     Venue is proper in this District under 28 U.S.C. § 1391 because GMO Trust and Coinbase are each subject to personal jurisdiction in this District for the claims alleged and a substantial part of the events and omissions giving rise to these claims occurred in this District.

## IV.  **THE PARTIES**

65.     Plaintiff Kenneth Donovan is a resident of the state of New York. Plaintiff Donovan believed, based on claims the GYEN coin was pegged "one-to-one" to the Japanese yen, that he was putting his money in a stable financial tool. Plaintiff Donovan paid approximately $335,000 to order approximately 38 million GYEN tokens in 2021. Unknown to Plaintiff Donovan, at the time his order was placed, the GYEN's value was not pegged to the Japanese yen. Within hours after the order was filled, his GYEN tokens lost more than 80 percent of their value, which was never recovered. In addition to financial loss, the episode caused stress, anxiety, and other forms of emotional distress.

66.     Plaintiff Hussien Kassfy is a resident of the state of California. Plaintiff Kassfy believed, based on claims the GYEN coin was pegged "one-to-one" to the Japanese yen, that he was putting his money in a stable financial tool. Plaintiff Kassfy paid approximately $118,000 to

order approximately 13 million GYEN tokens through Coinbase in 2021. Unknown to Plaintiff Kassfy, at the time his order was placed, the GYEN's value was not pegged to the Japanese yen. Within hours after the order was filled, his GYEN tokens lost more than 40 percent of their value, which was never recovered. In addition to financial loss, the episode caused stress, anxiety, and other forms of emotional distress.

67.     Defendant GMO Trust is a New York Limited Purpose Trust Company engaged in financial services for retail customers, organized and existing under the laws of the State of New York, with its principal place of business located at 150 East 52nd Street, Suite 7003, New York City, New York. It is a wholly owned subsidiary of GMO Internet Group.

68.     Defendant Coinbase Global, Inc. is a Delaware corporation.

69.     Defendant Coinbase Inc. is a Delaware corporation headquartered in San Francisco, California. Coinbase Inc. is a wholly-owned subsidiary of Coinbase Global, Inc.

70.     Coinbase Global, Inc. and Coinbase Inc. are operated as a single company and users have no visibility into which entity they are transacting with. Coinbase refers to the two entities jointly as the "Company" in its SEC filings. Coinbase created and operates a website from which customers can buy and sell digital assets – the Coinbase platform, on which GYEN was traded.

71.     This complaint refers to both Coinbase Global, Inc. and Coinbase Inc. as "Coinbase."

## V.  CLASS ALLEGATIONS

72.     Plaintiffs bring this lawsuit as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3).

73.     Plaintiffs seek certification of a class defined as:

**Class**: All persons who purchased or acquired GYEN in the United States or its territories at a time when the GYEN was unpegged from the Japanese yen, and lost money thereby.

74.     Plaintiffs seek certification of the following subclass:

**Coinbase Subclass**: All members of the Class whose transactions of GYEN were conducted through Coinbase.

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

18

75.     Plaintiffs reserve the right to amend the class definitions if discovery or further investigation demonstrate that they should be expanded or otherwise modified.

76.     The members of the Class are so numerous that joinder of all members would be impracticable. On information and belief, over 500 persons are members of the Class or Subclass. The Class members are identifiable from information and records, much or all of which is in the possession of or available to one or more of the Defendants. Notice of this action can be provided to all members of the Class, and the disposition of their claims in a single action will provide substantial benefits to all parties and to the Court.

77.     Plaintiffs' claims are typical of the claims of other members of the Class. Plaintiffs and each Class member invested in GYEN and were subject to the wrongful conduct alleged in this complaint.

78.     Plaintiffs are members of the Class and will fairly and adequately represent and protect the interests of the Class. Plaintiffs have no interest contrary to or in conflict with the interests of the other Class members, and are not subject to any unique defenses.

79.     Plaintiffs' counsel is competent and experienced in class action and investment-related litigation and will pursue this action vigorously.

80.     There are questions of law and fact common to the members of the Class that predominate over any questions affecting only individual members, including:

      a.      Whether GMO Trust owed duties to Plaintiffs and the Class;

      b.      Whether Coinbase owed duties to Plaintiff Kassfy and the Coinbase Subclass;

      c.      Whether GMO Trust and Coinbase breached those duties;

      d.      Whether GMO Trust and Coinbase negligently mispresented GYEN to Plaintiffs and Class members;

      e.      Whether Coinbase substantially interfered with Plaintiff Kassfy's and Coinbase Subclass members' property rights to their GYEN;

      f.      Whether GMO Trust and Coinbase violated § 5 of the FTC Act;

g.      Whether GMO Trust and Coinbase violated § 200.18(d) of the New York Virtual Currency Law;

h.      Whether GMO Trust engaged in deceptive acts and practices constituting violations of New York General Business Law § 349;

i.      Whether Coinbase engaged in unlawful, unfair, or fraudulent business practices in connection with GYEN trading on the Coinbase exchange;

j.      Whether GYEN constitutes a security under the federal securities laws;

k.      Whether GMO Trust and Coinbase sold or facilitated the sale or delivery of GYEN by interstate means;

l.      Whether GMO Trust and Coinbase made material misstatements and omissions in offering documents and communications in connection with the offer or sale of GYEN; and

m.      Whether, in view of their investment losses, Plaintiffs and the Class members are entitled to damages and equitable relief.

81.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons:

a.      It is economically impractical for members of the class to prosecute individual actions;

b.      The Class and Subclass are readily ascertainable and definable;

c.      Prosecution as a class action will eliminate the possibility of repetitious litigation; and

d.      A class action will enable claims to be handled in an orderly and expeditious manner, will save time and expense, and will ensure uniformity of decisions.

82.      Plaintiffs do not anticipate any difficulty in the management of this litigation as a class action.

# VI.  CAUSES OF ACTION

## First Cause of Action

## Negligence

## (against GMO Trust on behalf of the Class)

83.  Plaintiffs incorporate the above allegations as if fully set forth herein.

84.  GMO Trust owed a duty to Plaintiffs and Class members to exercise reasonable care in ensuring that GYEN's value maintained a stable link to the Japanese yen to which it was "pegged." More specifically, this duty included, among other things: (a) designing, maintaining and testing the GYEN token prior to introducing it to the market to ensure its value would remain stable and pegged to the Japanese yen; (b) ensuring GMO Trust carried a sufficient supply of minted GYEN to meet demand for the asset; (c) ensuring GMO Trust kept adequate collateralized fiat in custody with a third-party trustee; (d) implementing processes that would detect if the GYEN became unpegged from the Japanese yen; (e) timely acting upon warnings and alerts regarding the GYEN becoming unpegged; and (f) ensuring the truthfulness of its statements made to potential investors as to the nature and characteristics of GYEN.

85.  GMO Trust's duty to use reasonable care arose from several sources, including but not limited to those described below.

86.  GMO Trust had a common law duty to prevent foreseeable harm to others. A duty existed here because it was foreseeable that the GYEN would become unpegged from the Japanese yen and that Plaintiffs and Class members would be harmed thereby. As such, GMO Trust had a duty to exercise reasonable care to prevent these foreseeable harms or otherwise warn of the risks.

87.  GMO Trust's duty also arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair or deceptive acts or practices in or affecting commerce." This includes acts or practices that are likely to cause substantial injury to consumers, which cannot be reasonably avoided by consumers, and which are not outweighed by countervailing benefits to consumers or competition. It also includes material representations,

omissions, or practices that are likely to mislead a reasonable consumer. In addition, individual states have enacted statutes based upon the FTC Act that also created a duty.

88.     GMO Trust's duty also arose under Section 200.18(d) of the State of New York Department of Financial Services' Virtual Currency law, which prohibits "false, misleading, or deceptive representations or omissions" in advertising and marketing materials. 23 CRR-NY § 200.18(d). As an entity engaged in a virtual currency business activity, GMO Trust is subject to this duty, along with all other duties imposed by the Virtual Currency Law. *See* 23 CRR-NY §§ 200.2(q), 200.3(a).

89.     GMO Trust's duty also arose from GMO Trust's special relationship with Plaintiff and the Class. The New York Department of Financial Services (NYDFS) granted a special purpose charter to GMO Trust allowing it to issue GYEN. In obtaining this charter, GMO Trust assumed a special relationship vis-à-vis the purchasers. Investors were and continue to be powerless to protect their investment's peg to the Japanese yen, as the peg is controlled, at least in part, by GMO Trust.

90.     GMO Trust breached the duties it owed Plaintiffs and Class members described above and thus was negligent. GMO Trust breached these duties by, among other things, failing to exercise reasonable care to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate processes, controls, policies, procedures, protocols, and software and hardware systems to ensure that GYEN maintained a stable link to the Japanese yen to which it was pegged, despite a reasonably foreseeable risk that such failure would result in harms and losses to Plaintiffs and the Class. The foreseeability of this risk was even more apparent following the GYEN initial offering and destabilization in May 2021. Following this event, GMO Trust was aware of the likelihood that GYEN would again become unpegged when introduced through other exchanges. That is exactly what happened when the GYEN was introduced on the Coinbase exchange in November 2021.

91.     As a direct and proximate cause of GMO Trust's negligence, Plaintiffs and Class members have been injured as described herein and are entitled to all damages available under the law in an amount to be proven at trial.

**Second Cause of Action**

**Negligence**

**(against Coinbase on behalf of the Coinbase Subclass)**

92.     Plaintiffs incorporate the above allegations as if fully set forth herein.

93.     Coinbase owed a duty to Plaintiff Kassfy and Coinbase Subclass members to exercise reasonable care in investigating and monitoring GMO Trust and the GYEN and ensuring its customers had the ability to transact and access their digital assets, including GYEN. More specifically, this duty included, among other things: (a) conducting due diligence on GMO Trust as an issuer and GYEN as a stablecoin before listing it on the Coinbase exchange; (b) testing the GYEN token prior to introducing it on the Coinbase exchange to ensure its value would remain stable and pegged to the Japanese yen; (c) implementing processes that would detect if the GYEN became unpegged from the Japanese yen; (d) timely acting upon warnings and alerts regarding the GYEN becoming unpegged; (e) designing, implementing, and maintaining a platform that would ensure its users always had access to and control over their digital assets; and (f) ensuring the truthfulness of its statements made to its users and potential users.

94.     Coinbase's duty to use reasonable care arose from several sources, including but not limited to those described below.

95.     Coinbase had a common law duty to prevent foreseeable harm to others. A duty existed here because it was foreseeable that GYEN would become unpegged from the Japanese yen and that Plaintiff Kassfy and Coinbase Subclass members would be harmed thereby. Following the GYEN initial offering and subsequent destabilization in May 2021 on other third-party exchanges, Coinbase was aware of the likelihood that the GYEN would again become unpegged when introduced on its platform. It was also foreseeable that Plaintiff Kassfy and Coinbase Subclass members would be harmed if prevented from accessing and/or trading their GYEN stored in their Coinbase accounts. As such, Coinbase had a duty to exercise reasonable care to prevent these foreseeable harms.

96. Coinbase's duty also arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair or deceptive acts or practices in or affecting commerce." This includes acts or practices that are likely to cause substantial injury to consumers, which cannot be reasonably avoided by consumers, and which are not outweighed by countervailing benefits to consumers or competition. It also includes material representations, omissions, or practices that are likely to mislead a reasonable consumer. In addition, individual states have enacted statutes based upon the FTC Act that also created a duty.

97. Coinbase's duty also arose under Section 200.18(d) of the State of New York Department of Financial Services' Virtual Currency law, which prohibits "false, misleading, or deceptive representations or omissions" in advertising and marketing materials. 23 CRR-NY § 200.18(d). As an entity engaged in a virtual currency business activity, Coinbase is subject to this duty, along with all other duties imposed by the Virtual Currency Law. *See* 23 CRR-NY §§ 200.2(q), 200.3(a).

98. Coinbase's duty also arose from Coinbase's relationship with Plaintiff Kassfy and Coinbase Subclass members. Coinbase held the unique position as the largest third-party exchange to offer GYEN and was akin to a broker-dealer. Because of its critical role within the cryptocurrency exchange market, Coinbase was in a superior position to protect against the harm suffered by Plaintiff Kassfy and Coinbase Subclass members.

99. Coinbase breached the duties it owed Plaintiff Kassfy and Coinbase Subclass members described above and thus was negligent. Coinbase breached these duties by, among other things, failing to conduct due diligence on GMO Trust as an issuer and GYEN as a stablecoin before listing it on the Coinbase exchange, and failing to test the GYEN token prior to introducing it on the Coinbase exchange to ensure the asset would perform consistent with representation made by GMO Trust and Coinbase. Coinbase further breached its duties by listing GYEN on the Coinbase exchange and making representations as to its stability and 1-to-1 peg to the Japanese yen despite a reasonably foreseeable risk that the GYEN would become unpegged and cause harms and losses to Plaintiff Kassfy and Coinbase Subclass members. Coinbase also

breached its duties by failing to reasonably act upon warnings and alerts regarding the GYEN becoming unpegged.

100. Coinbase further breached its duties by restricting GYEN trading in Coinbase accounts, or otherwise restricting access to Coinbase accounts in a manner that prevented Plaintiff Kassfy and Coinbase Subclass members from GYEN trading, despite a reasonably foreseeable risk that such restrictions would cause harm.

101. Coinbase's wrongful actions resulted in Plaintiff Kassfy's and Coinbase Subclass members' damages in the form of monetary losses, time spent attempting to understand and seek recourse for Coinbase's negligent acts, and physical and emotional harm resulting from the sudden, unexpected, and catastrophic losses GYEN incurred.

102. As a direct and proximate cause of Coinbase's negligence, Plaintiff Kassfy and Coinbase Subclass members have been injured as described herein and are entitled to damages available by law, in an amount to be proven at trial.

**Third Cause of Action**

**Negligence *Per Se***

**(against GMO Trust on behalf of the Class and**

**against Coinbase on behalf of the Coinbase Subclass)**

103. Plaintiffs incorporate the above allegations as if fully set forth herein.

104. Defendants owed Plaintiffs and the Class a duty imposed by statute, including Section 5 of the FTC Act and 23 CRR-NY § 200.18(d).

105. Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair or deceptive acts or practices in or affecting commerce." This includes acts or practices that are likely to cause substantial injury to consumers, which cannot be reasonably avoided by consumers, and which are not outweighed by countervailing benefits to consumers or competition. It also includes material representations, omissions, or practices that are likely to mislead a reasonable consumer.

106. GMO Trust violated Section 5 of the FTC Act (and similar state statutes) by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit

appropriate processes, controls, policies, procedures, protocols, and software and hardware systems to ensure that GYEN maintained a stable link to the Japanese yen to which it was pegged, despite a reasonably foreseeable risk that such failure would result in harms and losses to Plaintiffs and the Class.

107. Coinbase violated Section 5 of the FTC Act (and similar state statutes) by failing to conduct due diligence on GMO Trust as an issuer and GYEN as a stablecoin before listing it on the Coinbase exchange, and failing to test the GYEN token prior to introducing it on the Coinbase exchange to ensure the asset would perform consistent with representations made by GMO Trust and Coinbase, and by listing GYEN on the Coinbase exchange and making representations as to its stability and 1-to-1 peg to the Japanese yen despite a reasonably foreseeable risk that the GYEN would become unpegged and cause harms and losses to Plaintiff Kassfy and Coinbase Subclass members. Coinbase also violated Section 5 by restricting GYEN trading in Coinbase accounts, or otherwise restricting access to Coinbase accounts in a manner that prevented Plaintiff Kassfy and Coinbase Subclass members from GYEN trading.

108. Section 200.18(d) of the New York Virtual Currency Law states that "[i]n all advertising and marketing materials, each licensee and any person or entity acting on its behalf, shall not, directly or by implication, make any false, misleading, or deceptive representations or omissions." 23 CRR-NY § 200.18(d).

109. Defendants violated Section 200.18(d) of the New York Virtual Currency Law by (i) falsely representing that GYEN stablecoins were pegged to the Japanese yen, and would remain pegged to the Japanese yen at a 1-to-1 ratio, and therefore constituted a safe investment with virtually no volatility; and (ii) omitting that the GYEN stablecoins were in fact not pegged to the Japanese yen, or had the propensity to become unpegged from Japanese yen, thereby failing to disclose fully and truthfully all material facts regarding the GYEN stablecoin's nature, purpose, value, volatility, and risk.

110. Defendants' violations of the above cited laws constitute negligence *per se*.

111. Plaintiffs and Class members are consumers within the class of persons the laws cited above are intended to protect.

112.  Moreover, the harm that has occurred is the type of harm the laws cited above are intended to guard against.

113.  As a direct and proximate result of Defendants' negligence, Plaintiffs and the Class members have been damaged in an amount to be determined at trial.

**Fourth Cause of Action**

**Negligent Misrepresentation**

**(against GMO Trust on behalf of the Class and**

**against Coinbase on behalf of the Coinbase Subclass)**

114.  Plaintiffs incorporate the above allegations as if fully set forth herein.

115.  Defendants represented to Plaintiffs and the Class that GYEN stablecoins were pegged to the Japanese yen, and would remain pegged to the Japanese yen at a 1-to-1 ratio, and therefore constituted a safe investment with virtually no volatility. These statements were false.

116.  Defendants also omitted any mention that the GYEN stablecoins were in fact not pegged to the Japanese yen, or had the propensity to become unpegged from the Japanese yen. In doing so, Defendants misrepresented material facts regarding the GYEN stablecoin's nature, purpose, value, volatility, and risk. These omissions rendered Defendants' affirmative representations deceptive and likely to mislead. These facts were known or accessible only to Defendants, who knew they were not known to or reasonably discoverable by Plaintiffs and the Class.

117.  Defendants had no reasonable grounds for believing the misleading statements described above were true at the time they were made. Defendants failed to conduct reasonable and diligent investigation of the representations they made to Plaintiffs and the Class to ensure that those statements were true and that there was no omission of material facts required to make the representations not misleading. Defendants, in the exercise of reasonable care, should have known that their statements and omissions were misleading, including because Defendants knew GYEN stablecoins were in fact not pegged to the Japanese yen or had the propensity to become unpegged from Japanese yen.

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

118.    Defendants each owed a duty to Plaintiffs and Class members to speak with care and explain fully and truthfully all material facts regarding the GYEN stablecoin. This duty arose from several bases. Defendants' duty arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "deceptive acts or practices in or affecting commerce." This includes material representations, omissions, or practices that are likely to mislead a reasonable consumer. In addition, individual states have enacted statutes based upon the FTC Act that also created a duty.

119.    Defendants' duty to speak truthfully and with care also arose under Section 200.18(d) of the State of New York Department of Financial Services' Virtual Currency law, which prohibits "false, misleading, or deceptive representations or omissions" in advertising and marketing materials. 23 CRR-NY § 200.18(d). As entities engaged in virtual currency business activities, Defendants are subject to this duty, along with all other duties imposed by the Virtual Currency Law. See 23 CRR-NY §§ 200.2(q), 200.3(a).

120.    Defendants' duty to speak with care arose from their special relationships with Plaintiffs and the Class. With respect to GMO Trust, the New York Department of Financial Services (NYDFS) granted it a special purpose charter allowing it to issue GYEN. In obtaining this charter, GMO Trust assumed a special relationship vis-à-vis GYEN purchasers such as Plaintiffs and the Class. Coinbase also had a special relationship with Plaintiff Kassfy and Coinbase Subclass members. Coinbase held the unique position as the largest third-party exchange to offer GYEN and was akin to a broker-dealer. Because of its critical role within the cryptocurrency exchange market, Coinbase was in a superior position to protect against the harm suffered by Plaintiff Kassfy and Coinbase Subclass members. Additionally, Coinbase's duty to disclose arose from its privity relationship with Plaintiff Kassy and the Coinbase subclass.

121.    The above-described relationships between Defendants and Plaintiffs are such that, in morals and good conscience, Plaintiffs and the Class had the right to rely upon Defendants for information. Defendants were in a special position of confidence and trust with Plaintiffs and the Class such that their reliance on Defendants' negligent misrepresentations was justified.

122.     Defendants knew, or reasonably should have known, that Plaintiffs and the Class would rely on their misrepresentations and omissions in purchasing GYEN. Coinbase's conduct in restricting GYEN trading in Coinbase accounts, or otherwise restricting access to Coinbase accounts in a manner that prevented Plaintiff Kassfy and Coinbase Subclass members from GYEN trading demonstrates Coinbase's awareness that Plaintiff Kassfy and the Coinbase Subclass relied on its representations and omissions. GMO Trust knew that, as the issuer of the "world's first regulated JPY stablecoin" it was essentially the sole source of information about GYEN, and knew that Plaintiffs and the Class would therefore rely on its representations. For example, GMO Trust made representations in connection with offering GYEN to investors, including through a GYEN whitepaper published on GMO Trust's website.

123.     The negligent misrepresentations and omissions made by Defendants, upon which Plaintiffs and Class members reasonably and justifiably relied, were intended to induce, and actually induced, Plaintiffs and Class members to purchase GYEN.

124.     As a direct and proximate cause of their reliance on Defendants' representations, Plaintiffs and Class members have been injured as described herein and are entitled to damages available by law, in an amount to be proven at trial.

**Fifth Cause of Action**

**Conversion**

**(against Coinbase on behalf of the Coinbase Subclass)**

125.     Plaintiffs incorporate the above allegations as if fully set forth herein.

126.     Plaintiff Kassfy and Coinbase Subclass members gave money to Coinbase to effectuate the purchase of GYEN via Coinbase's exchange. Plaintiff Kassfy and Coinbase Subclass members were the rightful owners of the GYEN tokens that were purchased. Coinbase retained possession of this GYEN.

127.     As alleged above, Coinbase restricted GYEN trading in Coinbase accounts, or otherwise restricted access to Coinbase accounts in a manner that prevented Plaintiff Kassfy and Coinbase Subclass members from accessing and trading their GYEN. Plaintiff Kassfy and Coinbase Subclass members did not consent to or authorize Coinbase's restrictions. By the time

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Coinbase removed the restrictions, the value of Plaintiff Kassfy and Coinbase Subclass members' GYEN had plummeted, resulting in significant economic losses.

128.     By taking possession of Plaintiff Kassfy and Coinbase Subclass members' GYEN and then preventing them from having access to it, Coinbase substantially interfered with Plaintiff Kassfy and Coinbase Subclass members' property rights to their GYEN.

129.     As a direct and proximate cause of Coinbase's unauthorized interference with their GYEN, Plaintiff Kassfy and Coinbase Subclass members were damaged in an amount to be proven at trial.

**Sixth Cause of Action**

**Violation of the New York General Business Law § 349**

**(against GMO Trust on behalf of the Class)**

130.     Plaintiffs incorporate the above allegations as if fully set forth herein.

131.     Plaintiffs and Class members are "persons" within the meaning of N.Y. Gen. Bus. § 349(g).

132.     GMO Trust is a "person, firm, corporation, or association" within the meaning of N.Y. Gen. Bus. § 349(b).

133.     GMO Trust engaged in deceptive acts and practices in the conduct of business, trade, and commerce by falsely representing that GYEN stablecoins were pegged to the Japanese yen, would remain pegged to the Japanese yen at a 1-to-1 ratio, and therefore constituted a safe investment with virtually no volatility.

134.     GMO Trust further engaged in deceptive acts and practices by omitting that the GYEN stablecoins were in fact not pegged to the Japanese yen, or had the propensity to become unpegged from the Japanese yen. GMO Trust thereby misleadingly failed to disclose fully and truthfully all material facts regarding the GYEN stablecoin's nature, purpose, value, volatility, and risk.

135.     A reasonable consumer, and a reasonable investor, would be misled by these deceptive acts and practices.

136.     These deceptive acts and practices were consumer-oriented because they had a broad impact on investors at large. GMO Trust made GYEN available to the general public, including through websites (public, online services, not unique to the parties), and through marketing and sale not limited to a single transaction, but instead aimed at a robust consumer and investor base and the marketplace in general.

137.     The alleged deceptive acts and practices occurred in New York, where GMO Trust operates its principal place of business. Moreover, the New York Department of Financial Services granted the license pursuant to which GMO Trust issued GYEN, and thus New York has a significant interest in enforcing the regulations associated with that license, including New York Codes, Rules and Regulations, Title 23, § 200, *et seq,* and in enforcing its consumer protection statutes, including New York General Business Law § 349.

138.     Plaintiffs and Class members were injured as a direct and proximate result of GMO Trust's deceptive acts and practices because, among other reasons, they lost money in connection with investing in GYEN. Absent GMO Trust's deceptive acts and practices, Plaintiffs and Class members would not have purchased GYEN, or would not have purchased GYEN at the price paid.

139.     Plaintiffs and Class members are entitled to injunctive relief and to actual damages or fifty dollars per violation (at their election) because of GMO Trust's deceptive acts and practices. *See* N.Y. Gen. Bus. § 349(h). Plaintiffs and Class members are also entitled to treble damages because these actions were willful and knowing.

140.     Plaintiffs and Class members are entitled to reasonable costs and attorney's fees. *See* N.Y. Gen. Bus. § 349(h).

## Seventh Cause of Action

### Unlawful, Unfair, and Fraudulent Business Practices, Cal. Bus. & Prof. Code §17200

### (against Coinbase on behalf of the Coinbase Subclass)

141.     Plaintiffs incorporate the above allegations as if fully set forth herein.

142.     Coinbase is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

143. By engaging in the above-described unfair business acts and practices, Coinbase committed and continues to commit one or more acts of unlawful, unfair, and fraudulent conduct within the meaning of Cal. Bus. & Prof. Code §§ 17200, *et seq*. ("UCL"). These acts and practices constitute a continuing and ongoing unlawful business activity defined by the UCL, and justify the issuance of an injunction, restitution, and other equitable relief pursuant to the UCL.

144. Defendants' acts and practices constitute a continuing and ongoing unlawful business activity defined by the UCL. Coinbase failed to conduct due diligence on GMO Trust as an issuer and GYEN as a stablecoin before listing it on the Coinbase exchange, failed to test the GYEN token prior to introducing it on the Coinbase exchange to ensure the asset would perform consistent with representations made by GMO Trust and Coinbase, and failed to act upon warnings and alerts regarding the GYEN becoming unpegged. Coinbase further engaged in unlawful conduct by restricting GYEN trading in Coinbase accounts, or otherwise restricting access to Coinbase accounts in a manner that prevented Plaintiff Kassfy and Coinbase Subclass members from GYEN trading, despite a reasonably foreseeable risk that such restrictions would cause harm. Additionally, Coinbase made and continues to make misrepresentations to customers regarding the nature, quality, and characteristics of GYEN.

145. The foregoing conduct is in violation of, *inter alia*, the following laws:

    a.    Negligence as defined in California Civil Code section 1714;

    b.    Violations of Section 5 of the Securities Act, 15 U.S.C. § 77e;

    c.    Violations of Section 12(a)(1) of the Securities Act, 15 U.S.C. § 77*l*(a)(1);

    d.    Violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2);

    e.    Violations of Section 5 the FTC Act, 15 U.S.C. §45;

    f.    Violations of the New York General Business Law, N.Y. Gen. Bus. § 349; and

    g.    Violations of New York's Virtual Currency Law, 23 CRR-NY § 200.18(d).

146. The foregoing acts and practices by Coinbase constitute a continuing and ongoing unfair business activity defined by the UCL. Defendants' conduct is contrary to the public welfare as it transgresses civil statutes of the State of California designed to protect individuals' statutory

right to fair and honest business practices, violates established public policy, and has been pursued to attain an unjustified monetary advantage for Coinbase by creating personal disadvantage and hardship to its customers. As such, Coinbase's business practices and acts have been immoral, unethical, oppressive and unscrupulous and have caused injury to customers far greater than any alleged countervailing benefit.

147. Coinbase's acts and practices constitute a continuing and ongoing fraudulent business activity defined by the UCL. Coinbase made and continues to make the false representations set forth above, including that GYEN stablecoins were pegged to the Japanese yen, would remain pegged to the Japanese yen at a one-to-one ratio, and therefore constituted a safe investment with virtually no volatility.

148. These false representations were, and continue to be, material and likely to deceive the public and reasonable consumers. Coinbase, at all times when it made these representations, knew them to be false and intended to, and did, induce reliance upon these false representations by Plaintiffs and the Coinbase Subclass, who reasonably relied upon the aforementioned statements and representations and, as a consequence, suffered economic harms and losses.

149. Coinbase's acts, practices, and omissions at issue in this matter were directed and emanated from its headquarters in California.

150. Coinbase generated revenue by way of commissions and fees when customers executed trades or purchased GYEN on the Coinbase platform. Absent Coinbase's acts, practices, and omissions, Plaintiffs and Coinbase Subclass members would not have purchased GYEN, or would not have purchased GYEN at the price paid.

151. As a direct and proximate consequence of the actions as identified above, Plaintiffs and the Coinbase Subclass suffered and continue to suffer harms and losses including but not limited to economic loss, lost time dedicated to the investigation of and attempt to recover the loss of funds, and the need for future expenses and time dedicated to the recovery of lost funds.

152. Plaintiffs seek an order of this Court awarding restitution and injunctive relief and all other relief allowed under the UCL, including interest and attorneys' fees pursuant to, *inter*

*alia*, Code of Civil Procedure section 1021.5, and to such other and further relief as this Court may deem just and proper.

**Eighth Cause of Action**

**Violations of § 5 and § 12(a)(1) of the Securities Act**

**(against GMO Trust on behalf of the Class**

**and against Coinbase on behalf of the Coinbase Subclass)**

153.    Plaintiff incorporates the above allegations as if fully set forth herein.

154.    Section 5(a) of the Securities Act states: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale." 15 U.S.C. § 77e(a).

155.    Section 5(c) of the Securities Act states: "It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title." *Id.* § 77e (c).

156.    GYEN stablecoins are, and at all relevant times have been, securities within the meaning of Section 2(a)(1) of the Securities Act. *Id.* § 77b(a)(1). No registration statements have been filed with the SEC or have been in effect with respect to GYEN sold by GMO Trust or listed on Coinbase.

157.    GMO Trust promoted, solicited, offered, and sold GYEN to Plaintiffs and members of the Class. Because of the structure of GMO Trust with respect to transactions of GYEN stablecoin, GMO Trust is in privity with Class members.

158. In addition, by offering GYEN to Plaintiffs and members of the Class, GMO Trust solicited these purchases, and in doing so were motivated at least in part by a desire to serve its own financial interests or the financial interests of owners GYEN. GMO Trust received a direct financial benefit from each purchase of GYEN. GMO Trust further benefits from purchases of GYEN because such purchases support a trading market for GYEN stablecoins, which in turn makes GMO Trust a more competitive, lucrative, attractive, and credible issuer.

159. Likewise, Coinbase promoted, solicited, offered, and sold GYEN to Plaintiff Kassfy and members of the Coinbase Subclass. Because of the structure of the Coinbase platform, Coinbase Global and Coinbase, Inc. are in privity in every sale of a GYEN stablecoin on the Coinbase platform. Customers on Coinbase transact with Coinbase itself, and Coinbase is thus a seller of the GYEN stablecoins.

160. In addition, by offering GYEN to Plaintiff Kassfy and members of the Coinbase subclass, Coinbase Global and Coinbase, Inc. solicited these purchases, and in doing so were motivated at least in part by a desire to serve their own financial interests or the financial interests of owners GYEN. Coinbase Global and Coinbase, Inc. received a direct financial benefit, in the form of transaction fees, from each purchase of GYEN on Coinbase. Coinbase Global and Coinbase, Inc. further benefit from purchases of GYEN on Coinbase because such purchases support a trading market for GYEN stablecoins, which in turn makes Coinbase more attractive to investors and issuers.

161. Coinbase and GMO Trust thus directly or indirectly made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell unregistered securities, or to carry or cause such unregistered securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

162. Section 12(a)(1) of the Securities Act provides in relevant part: "Any person who offers or sells a security in violation of section 77e of this title ... shall be liable ... to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon,

less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." *Id.* § 77*l*(a)(1).

163.    Accordingly, Defendants have violated Sections 5(a), 5(c), and 12(a)(1) of the Securities Act, *id.* §§ 77e(a), 77e(c), 77*l*(a)(1), and are liable for rescission and/or compensatory damages.

**Ninth Cause of Action**

**Violation of § 12(a)(2) of the Securities Act**

**(against GMO Trust on behalf of the Class**

**and against Coinbase on behalf of the Coinbase Subclass)**

164.    Plaintiffs incorporate the above allegations as if fully set forth herein.

165.    This Count is brought against GMO Trust and Coinbase pursuant to § 12(a)(2) of the Securities Act, 15 U.S.C. § 77(l)(a)(2).

166.    Section 12(a)(2) states, in pertinent part, that any person who offers or sells a security by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements not misleading shall be liable to the person purchasing such security from him.

167.    Defendants offered or sold GYEN by means of a prospectus or communication that was materially misleading, including as described above.

168.    This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct. This Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of this count, Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a §12(a)(2) claim.

169.    By means of the offering materials and communications described above, Defendants sold securities to Plaintiffs. Hence, Plaintiffs acquired GYEN pursuant to the offering materials or communications.

170. Defendants were both statutory sellers of securities offered and sold pursuant to the offering materials and communications. Defendants solicited sales of these securities for financial gain and benefited financially from those sales.

171. The offering materials contained untrue statements of material fact and failed to disclose material facts. GMO Trust and Coinbase each owed Plaintiffs the duty to make a reasonable and diligent investigation of the statements contained in the offering materials and communications to ensure that those statements were true and that there was no omission to state a material fact required to be stated to make the statements not misleading. GMO Trust and Coinbase, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the offering materials and communications.

172. By omitting from these materials and communications any mention that the GYEN stablecoins were in fact not pegged to the Japanese yen, or had the propensity to become unpegged from the Japanese yen, Defendants misleadingly failed to disclose fully and truthfully all material facts regarding the GYEN stablecoin's nature, purpose, value, volatility, and risk.

173. Defendants' statements that the GYEN was stable and would remain pegged to the Japanese yen, and other misleading statements alleged herein, conflicted with information in each Defendant's possession at the time it made those statements. Each Defendant lacked a reasonable basis for making these statements. As a result, each Defendant statements were materially false and misleading, in violation of the Securities Act.

174. By reason of the conduct alleged herein, Defendants violated § 12(a)(2) of the Securities Act. As a direct and proximate result of such violations, Plaintiffs who acquired the GYEN stablecoins pursuant to the offering materials and communications sustained substantial damages in connection with their acquisition. Accordingly, Plaintiffs have the right to rescind and recover the consideration paid for their GYEN stablecoin, with interest thereon. For GYEN stablecoins sold, Plaintiffs seek damages to the extent permitted by law.

## VII.  **PRAYER FOR RELIEF**

Plaintiffs, on behalf of themselves and the Class, pray for relief and judgment against Defendants as follows:

a. For an order certifying the proposed class pursuant to Federal Rules of Civil Procedure, Rule 23;

b. For an order appointing Plaintiffs and their counsel to represent the class;

c. For actual and compensatory damages according to proof;

d. For an order enjoining the conduct of Defendants described herein, including making misrepresentations and deceiving the Class and the public regarding the asset described in this complaint;

e. For punitive damages;

f. For pre-judgment and post-judgment interest;

g. For an award of attorneys' fees, costs, and expenses as authorized by applicable law; and

h. For such other and further relief as this Court may deem just and proper.

## VIII. <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs, on behalf of themselves and the Class, demand a trial by jury on all issues so triable.

Dated this 12th day of May 2022.          Erickson Kramer Osborne, LLP

_____
Elizabeth Kramer
Kevin Osborne
Julie Erickson
Attorneys for Kenneth Donovan
and Hussien Kassfy

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

# **PLAINTIFF CERTIFICATION**

1. I have reviewed the complaint with my counsel and authorize its filing.

2. I did not acquire the GYEN that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3. I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4. I made the transactions attributed to me as described in the complaint.

5. I will not accept payment for serving as a representative beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

6. I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

Dated: May 12, 2022

_____

Kenneth Donovan

DocuSign Envelope ID: E70A20E0-E679-4DA9-8565-E419EF57658C

**PLAINTIFF CERTIFICATION**

1. I have reviewed the complaint with my counsel and authorize its filing.

2. I did not acquire the GYEN that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3. I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4. I made the transactions attributed to me as described in the complaint.

5. I will not accept payment for serving as a representative beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

6. I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.


Dated: May 12, 2022

DocuSigned by:

*HK*

87A11B997AFB4DA...

Hussien Kassfy