MEREDITH R. DEARBORN (SBN 268312)
mdearborn@paulweiss.com
RANDALL SCOTT LUSKEY (SBN 240915)
rluskey@paulweiss.com
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone: 628-432-5100
Facsimile: 628-232-3101

KRISTINA A. BUNTING (NY SBN: 5510847; *pro hac vice*)
kbunting@paulweiss.com
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3503
Facsimile: (212) 757-3990

Attorneys for Defendants
COINBASE GLOBAL, INC. and COINBASE, INC.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| KENNETH DONOVAN, HUSSIEN KASFY, and JOHN BRAMBL, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GMO-Z.COM TRUST COPMANY, INC.; COINBASE GLOBAL, INC. and COINBASE, INC.,<br><br>Defendants. | Case No. 3:22-cv-02826-TLT<br><br>**DEFENDANTS COINBASE GLOBAL, INC. AND COINBASE, INC.'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date: January 10, 2023<br>Time: 2:00 p.m.<br>Dept.: Courtroom 9, 19th Floor<br>Judge: Hon. Trina L. Thompson |

# TABLE OF CONTENTS

I. INTRODUCTION .......... 1
II. STATEMENT OF ISSUES TO BE DECIDED .......... 2
III. FACTUAL BACKGROUND .......... 2
IV. LEGAL STANDARD .......... 5
V. ARGUMENT .......... 7
A. Plaintiffs and Coinbase Agreed to Final and Binding Individual Arbitration. .......... 7
B. The User Agreement Clearly and Unmistakably Delegates Questions of Arbitrability to the Arbitrator. .......... 9
C. The 2022 User Agreement Is Valid, Enforceable, and Encompasses Plaintiffs' Claims. .......... 11
1. The 2022 User Agreement Is Presumptively Valid and Enforceable. .......... 11
2. Plaintiffs' Claims Fall Within the Scope of the Arbitration Clause .......... 13
D. This Action Should Be Stayed Pending Completion of Plaintiffs' Individual Arbitration Proceedings. .......... 16
VI. CONCLUSION .......... 16

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alfia v. Coinbase Global, Inc.*, 2022 WL 3205036 (N.D. Cal. July 22, 2022) ..... 8, 11, 13

*AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011) ..... 11

*AT&T Techs., Inc. v. Commc'n Workers of Am.*, 475 U.S. 643 (1986) ..... 7

*Azeveda v. Comcast Cable Comcn's LLC*, 2019 WL 5102607 (N.D. Cal. Oct. 11, 2019) ..... 14

*B.D.* v. *Blizzard Ent., Inc.*, 76 Cal. App. 5th 931 (2022) ..... 7

*Bielski v. Coinbase, Inc.*, 2022 WL 1062049 (N.D. Cal. Apr. 8, 2022) ..... 12, 13

*Brennan v. Opus Bank*, 796 F.3d 1125 (9th Cir. 2015) ..... 6, 10, 11

*Britt v. ContextLogic, Inc.*, 2021 WL 1338553 (N.D. Cal. Apr. 9, 2021) ..... 10

*BrowserCam, Inc. v. Gomez, Inc.*, 2009 WL 210513 (N.D. Cal. Jan. 27, 2009) ..... 16

*Cape Flattery Ltd. v. Titan Maritime, LLC*, 647 F.3d 914 (9th Cir. 2011) ..... 14

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126 (9th Cir. 2000) ..... 6

*Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52 (2003) (per curiam) ..... 5

*Davis v. Einstein Noah Rest. Grp., Inc.*, 2019 WL 6835717 (N.D. Cal. Oct. 23, 2019) ..... 15

*Epic Sys., Corp. v. Lewis*, 138 S. Ct. 1612 (2018) ..... 11

*In re Facebook Biometric Information Privacy Litigation*, 185 F. Supp. 3d 1155 (N.D. Cal. 2016) ..... 8

*Fridman v. Uber Techs., Inc.*,
2019 WL 1385887 (N.D. Cal. Mar. 27, 2019) .......... 10

*Gerlach v. Tickmark Inc.*,
2021 WL 3191692 (N.D. Cal. July 28, 2021) .......... 10

*Gilmer v. Interstate/Johnson Lane Corp.*,
500 U.S. 20 (1991) .......... 6, 11

*Goldman, Sachs & Co. v. City of Reno*,
747 F.3d 733 (9th Cir. 2014) .......... 7

*Green Tree Fin. Corp. v. Randolph*,
531 U.S. 79 (2000) .......... 12

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
139 S. Ct. 524 (2019) .......... 9

*Holl v. United Parcel Service, Inc.*,
2017 WL 11520143 (N.D. Cal. Sept. 18, 2017) .......... 2, 16

*J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*,
863 F.2d 315 (4th Cir. 1988) .......... 2

*Jones v. Deja Vu, Inc.*,
419 F. Supp. 2d 1146 (N.D. Cal. 2005) .......... 4

*Jones v. Waffle House, Inc.*,
866 F.3d 1257 (11th Cir. 2017) .......... 14

*Levin v. Alms & Assocs., Inc.*,
634 F.3d 260 (4th Cir. 2011) .......... 15

*Levin v. Caviar, Inc.*,
146 F. Supp. 3d 1146 (N.D. Cal. 2015) .......... 7, 14

*Marselian v. Wells Fargo & Co.*,
514 F. Supp. 3d 1166 (N.D. Cal. 2021) .......... 2

*McLellan v. Fitbit, Inc.*,
2018 WL 1913832 (N.D. Cal. Jan. 24, 2018) .......... 7

*Mohamed v. Uber Techs., Inc.*,
848 F.3d 1201 (9th Cir. 2016) .......... 10

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983) .......... 11

*Neurosigma, Inc. v. De Salles*,
2014 WL 12803168 (C.D. Cal. Jan. 31, 2014) .......... 14

*Nghiem v. NEC Elec., Inc.*,
25 F.3d 1437 (9th Cir. 1994)........................................................................................ 7

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014).................................................................................... 7, 9

*Oracle Am., Inc. v. Myriad Grp. A.G.*,
724 F.3d 1069 (9th Cir. 2013)...................................................................................... 10

*Peter v. DoorDash, Inc.*,
445 F. Supp. 3d 580 (N.D. Cal. 2020) .......................................................................... 8

*Portland Gen. Elec. Co. v. U.S. Bank Trust Nat'l Ass'n*,
218 F.3d 1085 (9th Cir. 2000)........................................................................................ 5

*Rent-A-Center, West, Inc. v. Jackson*,
561 U.S. 63 (2010)............................................................................................... 6, 9, 12

*Sam Resifeld & Son Import Co. v. S.A. Eteco*,
530 F.2d 679 (5th Cir. 1976).......................................................................................... 2

*Savetsky v. Pre-Paid Legal Services, Inc.*,
2015 WL 604767 (N.D. Cal. Feb. 12, 2015) .................................................................. 8

*Sellers* v. *JustAnswer LLC*,
73 Cal. App. 5th 444 (2021) ...................................................................................... 8, 9

*Shearson/Am. Express, Inc. v. McMahon*,
482 U.S. 220 (1987) ..................................................................................................... 11

*United States v. Sutcliffe*,
505 F.3d 944 (9th Cir. 2007)........................................................................................... 6

*Tiri v. Lucky Chances, Inc.*,
226 Cal. App. 4th 231 (2014) .......................................................................................... 9

*Tracer Research Corp. v. Nat'l Envtl. Servs. Co.*,
42 F.3d 1292 (9th Cir. 1994)........................................................................................ 13

*Trudeau* v. *Google LLC*,
349 F. Supp. 3d 869 (N.D. Cal. 2018) .......................................................................... 15

*Trujillo v. Gomez*,
2015 WL 1757870 (S.D. Cal. Apr. 17, 2015)................................................................ 14

*In re Verisign, Inc.*,
531 F. Supp. 2d 1173 (N.D. Cal. 2007) ........................................................................ 14

*Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Jr. Univ.*,
489 U.S. 468 (1989)........................................................................................................ 6

**Statutes**

Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* ........................................................................ *passim*

**Other Authorities**

Rule 14(a) of the AAA Consumer Arbitration Rules ............................................................ 10, 11

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on January 10, 2023, or as soon thereafter as this matter may be heard, in the courtroom of the Honorable Trina L. Thompson, located in Courtroom 9, 19th Floor of the United States Courthouse, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendants Coinbase Global, Inc. and Coinbase, Inc. (together "Coinbase") will and hereby do move this Court to compel Plaintiffs' claims against Coinbase to individual arbitration and to stay this action as against Coinbase pending completion of those arbitration proceedings.

Coinbase makes this Motion under the Federal Arbitration Act, 9 U.S.C. §§ 1–16 ("FAA") and Federal Rule of Civil Procedure 12(b)(1) on the basis of Plaintiffs' agreement to submit to individual arbitration the claims asserted against Coinbase in this case. This Motion is based on this Notice of Motion, the following Memorandum of Points and Authorities, the Declarations of Suellen Black and Hamzah Zia and the exhibits attached thereto, the pleadings and other documents on file in this case, all other matters of which the Court may take judicial notice, and any other argument or evidence that may be received by the Court upon hearing of this Motion.

Dated: October 6, 2022

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: *<u>/s/ Randall S. Luskey</u>*
RANDALL S. LUSKEY
MEREDITH R. DEARBORN

Attorneys for Defendants COINBASE GLOBAL, INC. and COINBASE, INC.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Well before the Complaint in this case was filed, Plaintiffs Hussien Kassfy and John Brambl each expressly and affirmatively agreed to Coinbase's 2022 User Agreement. In doing so, they made three commitments relevant to this motion. First, they agreed that any dispute arising out of or relating in any way to their use of Coinbase's services, products sold or distributed through the Coinbase website, or communications they received from Coinbase would be resolved by binding arbitration, rather than in court—including "claims and disputes that arose . . . before the effective date" of the 2022 Agreement. Declaration of Suellen Black ("Black Decl."), Ex. F ("2022 User Agreement"), Appendix 5, § 1.1. Second, they agreed that an arbitrator, not this Court, would determine whether a dispute fell within the scope of the parties' arbitration agreement. *Id.*, Appendix 5, § 1.6. Third, they agreed that they would bring any and all legal claims "only on an individual basis and not on a class . . . basis . . . ." *Id.*, Appendix 5, § 1.3. Despite those unambiguous agreements, Plaintiffs Kassfy and Brambl now bring claims against Coinbase in federal court, purportedly on behalf of a nationwide class.[1]

Plaintiffs' alleged claims fall within the broad scope of the arbitration agreement in the 2022 User Agreement. Plaintiffs allege that Coinbase made a cryptocurrency called GYEN available for trading through the Coinbase site but failed to conduct adequate diligence on the stability of GYEN, made misrepresentations about the stability of GYEN, and then improperly restricted trading in GYEN when its value dropped, all resulting in financial harm to individuals like Kassfy and Brambl who allegedly made GYEN transactions on Coinbase's platform. *See generally* Dkt. 46, Class Action Complaint ("CAC"). These allegations and Plaintiffs' legal claims all relate to Coinbase's services, trades in GYEN that Plaintiffs made (or would have made) on Coinbase, and to Coinbase's communications about GYEN. This isn't a close call—Plaintiffs' claims against Coinbase are squarely within the scope of the User Agreement's arbitration clause. And to the extent there is

[1] It appears that Plaintiff Kenneth Donovan also agreed to Coinbase's User Agreement, but he does not allege any claims against Coinbase. Should he do so in the future, Coinbase reserves the right to move to compel Donovan to arbitrate any claims against Coinbase for the same reasons discussed herein.

any doubt, that doubt is to be resolved by an arbitrator pursuant to the User Agreement's delegation clause.

Before filing this motion, Coinbase provided Plaintiffs with evidence of their agreements to arbitrate and encouraged them to stipulate to arbitration of their claims. Plaintiffs refused. Coinbase respectfully requests that the Court order Plaintiffs to abide by their User Agreement with Coinbase and compel Plaintiffs to submit their meritless claims against Coinbase to individual arbitration. To the extent there is any dispute about whether Plaintiffs' claims against Coinbase are covered by the arbitration agreement or whether the arbitration agreement is enforceable, those disputes should also be sent to arbitration under the terms of the delegation clause to which Plaintiffs unmistakably agreed.

## II. STATEMENT OF ISSUES TO BE DECIDED

The Court must decide whether to (1) compel arbitration of Plaintiffs' claims against Coinbase, including gateway questions of arbitrability, and (2) stay this action as against Coinbase pending completion of arbitration.

## III. FACTUAL BACKGROUND

Coinbase Global, Inc.[2] is the parent company of wholly owned subsidiary Coinbase, Inc. Black Decl. ¶ 3. Coinbase, Inc. operates an online platform for buying, selling, and transferring cryptocurrencies like Bitcoin and GYEN, the stablecoin at the center of Plaintiffs' claims. Black Decl. ¶ 2.

To access Coinbase's services and make cryptocurrency transactions, prospective users are first required to create an account and accept the Coinbase User Agreement. Black Decl. ¶¶ 5, 7. Mr. Kassfy created his account and first accepted the Coinbase User Agreement in 2021. Black

[2] Coinbase Global, Inc. has no independent business relationship with the Plaintiffs, is not a proper defendant in this case, and would not be a proper defendant in any arbitration. Nevertheless, Plaintiffs' meritless claims against Coinbase Global, Inc. are subject to arbitration because "charges against a parent company and its subsidiary [that] are based on the same facts and are inherently inseparable" are arbitrable "even if the parent is not formally a party to the arbitration agreement." *Marselian v. Wells Fargo & Co.*, 514 F. Supp. 3d 1166, 1172 (N.D. Cal. 2021) (quotation marks omitted). And for good reason. "If the parent corporation was forced to try the case, the arbitration proceedings would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted." *Sam Resifeld & Son Import Co. v. S.A. Eteco*, 530 F.2d 679, 681 (5th Cir. 1976); *accord J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 321 (4th Cir. 1988).

Decl. ¶ 9 & Ex. A. And Mr. Brambl created his account and first accepted the User Agreement in 2020. Black Decl. ¶ 10 & Ex. B. Plaintiffs Kassfy and Brambl allege that they placed orders for GYEN through Coinbase's platform in 2021 and lost money when GYEN's value fell in November 2021. CAC ¶¶ 45, 46, 65–67.

Coinbase updated its User Agreement in 2022,[3] and Plaintiffs Kassfy and Brambl each agreed to those updated terms. Once the 2022 User Agreement went live, existing Coinbase users were routed to a landing page when logging into their accounts that presented the terms of the updated Agreement. Declaration of Hamzah Zia ("Zia Decl.") ¶ 6. The landing page announced that Coinbase was "updating our User Agreement," and prompted the user to "[r]eview [the] terms." *Id.* ¶¶ 6–8 & Exs. G & H. As shown below, users were directed to "review and accept [the] updated terms and conditions to continue using [their] Coinbase account." *Id.* Immediately beneath that prompt was a scroll-box containing the full text of the updated Agreement. *Id.* At the bottom of the page was a large blue button that users could click to "[a]ccept terms." *Id.* Users could not access their Coinbase account without accepting the updated 2022 User Agreement. *Id.* ¶ 6.







*See* Zia Decl., Ex. G; *see also id.*, Ex. H (legacy iOS app view).

---

[3] The version of the User Agreement to which each Plaintiff initially agreed when creating their Coinbase accounts specifically provided that Coinbase had the right to "amend or modify [the User] Agreement at any time by," among other things, "providing a copy" of the revised Agreement to the user. *See* Black Decl., Exs. C & D, § 1.2.

Coinbase's records reflect that Mr. Kassfy logged into his account using a mobile device and accepted the updated User Agreement by clicking the large blue acceptance button on February 3, 2022. Black Decl., Ex. A; Zia Decl. ¶ 8 & Ex. I. Mr. Brambl did the same on February 4, 2022. Black Decl., Ex. B; Zia Decl. ¶ 8 & Ex. J. Plaintiffs' assent to the 2022 User Agreement was recorded in Coinbase's systems, as shown below.

| User | Action | Device | Resolution | IP | Location | Source | When |
|---|---|---|---|---|---|---|---|
| Hussien Kassfy | accepted user agreement | | -- | [redacted] | | api | 2022-02-03 8:49 PM PST |
| Hussien Kassfy | accepted user agreement | | -- | [redacted] | | api | 2021-01-31 3:29 PM PST |

Black Decl., Ex. A (Kassfy).

| User | Action | Device | Resolution | IP | Location | Source | When |
|---|---|---|---|---|---|---|---|
| john brambl | accepted user agreement | -- | | [redacted] | | api | 2022-02-04 5:37 PM PST |
| john brambl | accepted user agreement | -- | | [redacted] | | api | 2020-12-21 7:46 AM PST |

Black Decl., Ex. B (Brambl).

Appendix 5 of the updated 2022 User Agreement contains the arbitration agreement. Black Decl., Ex. F, Appendix 5. At the immediate outset, Section 1.1 ("Applicability of Arbitration Agreement") states: "Subject to the terms of this Arbitration Agreement, you and Coinbase agree that any dispute, claim, disagreements arising out of or relating in any way to your access to or use of the Services or of the Coinbase Site, any Communications you receive, any product sold or distributed through the Coinbase Site, the Services, or the User Agreement and prior versions of the User Agreement, including claims and disputes that arose between us before the effective date of these Terms (each, a '**Dispute**') will be resolved by binding arbitration, rather than in court . . . ." *Id.*, § 1.1. That section later excepts from arbitration claims brought in small claims court and claims for equitable relief for infringement or other misuse of intellectual property, but neither exception applies here. *Id.*

Section 1.3 of the Agreement contains a waiver of class and other non-individualized relief that provides:

> **YOU AND COINBASE AGREE THAT, EXCEPT AS SPECIFIED IN SUBSECTION 1.8, EACH OF US MAY BRING CLAIMS AGAINST THE OTHER ONLY ON AN INDIVIDUAL BASIS AND NOT ON A CLASS, REPRESENTATIVE, OR COLLECTIVE BASIS, AND THE PARTIES HEREBY WAIVE ALL RIGHTS TO HAVE ANY DISPUTE BROUGHT, HEARD, ADMINISTERED, RESOLVED, OR ARBITRATED ON A CLASS, COLLECTIVE, REPRESENTATIVE, OR MASS ACTION BASIS. ONLY INDIVIDUAL RELIEF IS AVAILABLE, AND DISPUTES OF MORE THAN ONE CUSTOMER OR USER CANNOT BE ARBITRATED OR CONSOLIDATED WITH THOSE OF ANY OTHER CUSTOMER OR USER.**

*Id.*, Appendix 5, § 1.3 (emphasis in original). Finally, Section 1.6 clarifies the scope of disputes falling under the arbitrator's authority:

> The arbitrator shall have exclusive authority to resolve any Dispute, including, without limitation, disputes arising out of or related to the interpretation or application of the Arbitration Agreement, including the enforceability, revocability, scope, or validity of the Arbitration Agreement or any portion of the Arbitration Agreement . . . .

*Id.*, Appendix 5, § 1.6. In other words, this section vests the arbitrator with exclusive authority to resolve not only disputes related to Coinbase's services, but also disputes regarding the interpretation and enforceability of the Arbitration Agreement itself.

## IV. LEGAL STANDARD

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq.*, which governs the 2022 User Agreement's arbitration clause, applies to "any written provision in a 'contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract.'" *Portland Gen. Elec. Co. v. U.S. Bank Trust Nat'l Ass'n*, 218 F.3d 1085, 1089 (9th Cir. 2000) (quoting 9 U.S.C. § 2). The term "involving commerce" is the "functional equivalent of the more familiar term 'affecting commerce'[,]" which represents the "broadest permissible exercise of Congress' Commerce Clause power." *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003) (per curiam) (citation omitted).

Here, the alleged transactions involved interstate commerce because Plaintiffs and Coinbase are residents of different states and contracted to do business over the internet. CAC ¶¶ 65–70. The use of internet technologies to purchase or transfer digital currencies satisfies the "involving

interstate commerce" requirement. *See United States v. Sutcliffe*, 505 F.3d 944, 953 (9th Cir. 2007) ("[T]he Internet is an instrumentality and channel of interstate commerce." (internal quotation marks and citation omitted)). Accordingly, the FAA governs the 2022 User Agreement's arbitration clause, as the parties agreed. *See* Black Decl., Ex. F, Appendix 5 § 1.4 ("[T]he Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, will govern the interpretation and enforcement of this Arbitration Agreement and any arbitration proceedings.").

The FAA provides that an agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Supreme Court has emphasized that the FAA creates a strong, liberal federal policy that favors arbitration. *See, e.g.*, *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991). Any ambiguities relating to the scope of the arbitration clause must be resolved in favor of arbitration. *See Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Jr. Univ.*, 489 U.S. 468, 476 (1989).

Against that backdrop, this Court's role in deciding Coinbase's motion to compel arbitration is narrow. "[T]he [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (quotation marks and citation omitted). Generally, the Court has authority to examine two "gateway" issues only: "(1) whether a valid agreement to arbitrate exists and . . . (2) whether the agreement encompasses the dispute at issue." *Id.* Here, however, the parties expressly agreed to delegate to the arbitrator questions related to the interpretation, scope, and enforceability of the arbitration agreement. Black Decl., Ex. F, Appendix 5, § 1.6. Such delegation clauses are separate, antecedent arbitration agreements. *See Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 70 (2010)

Accordingly, where, as here, the parties have "clearly and unmistakably" delegated questions of arbitrability to the arbitrator, the Court's role is further limited to determining the enforceability of the delegation clause. *See Brennan v. Opus Bank*, 796 F.3d 1125, 1132 (9th Cir. 2015). In other words, the sole question before the Court is the enforceability of the parties'

agreement to delegate to the arbitrator "exclusive authority to resolve any Dispute, including . . . disputes . . . related to the interpretation or application of the Arbitration Agreement, including [its] enforceability, revocability, scope, or validity . . . ." Black Decl., Ex. F, Appendix 5, § 1.6.

## V. ARGUMENT

Plaintiffs agreed to Coinbase's 2022 User Agreement, which requires their claims against Coinbase to be submitted to and resolved by an arbitrator. Because the 2022 User Agreement expressly delegates "gateway" arbitration questions to the arbitrator—including questions about the enforceability, scope, and interpretation of the arbitration agreement itself—this Court need not evaluate the agreement's validity or whether its arbitration clause encompasses Plaintiffs' claims against Coinbase. But, even if this Court were to reach those questions, controlling law requires the Court to compel arbitration here.

### A. Plaintiffs and Coinbase Agreed to Final and Binding Individual Arbitration.

"[A]rbitration is a matter of contract," *AT&T Techs., Inc. v. Commc'n Workers of Am.*, 475 U.S. 643, 648 (1986) (citations omitted), and courts apply "general state-law principles of contract interpretation" to determine whether an agreement to arbitrate exists. *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 742 (9th Cir. 2014) (quotation omitted). An arbitration agreement need only be in writing, and no signature by either party is necessary. *See* FAA, 9 U.S.C. § 2; *Nghiem v. NEC Elec., Inc.*, 25 F.3d 1437, 1439 (9th Cir. 1994) ("While the FAA requires a writing, it does not require that the writing be signed by the parties." (internal quotation and citation omitted)).

Under California law, "[m]utual assent, or consent, of the parties is essential to the existence of a contract." *B.D.* v. *Blizzard Ent., Inc.*, 76 Cal. App. 5th 931, 943 (2022) (quotation omitted). Here, each Plaintiff assented to the 2022 User Agreement by affirmatively clicking the prominent blue button indicating their acceptance of the Agreement. Zia Decl. ¶ 8, Exs. G–J. This constitutes a classic "clickwrap" contract, "in which website users are required to click on an 'I agree' box after being presented with a list of terms and conditions of use." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175–76 (9th Cir. 2014). "[C]ourts routinely find [clickwrap agreements] valid and enforceable because the user must affirmatively acknowledge receipt of the terms of the contract." *McLellan v. Fitbit, Inc.*, 2018 WL 1913832, at *2 (N.D. Cal. Jan. 24, 2018); *see also Levin v.*

*Caviar, Inc.*, 146 F. Supp. 3d 1146, 1157 (N.D. Cal. 2015) (finding that contract was formed "when the plaintiff clicked on a button to indicate assent to an agreement in which the terms themselves were accessed by hyperlink" (citation omitted)); *Peter v. DoorDash, Inc.*, 445 F. Supp. 3d 580, 582 (N.D. Cal. 2020) (enforcing arbitration agreement where users were presented with hyperlinked terms and notified that, "[b]y tapping Sign Up . . . you agree to our Terms and Conditions"); *In re Facebook Biometric Information Privacy Litigation*, 185 F. Supp. 3d 1155, 1165 (N.D. Cal. 2016) ("[O]ur Circuit has recognized that the closer digital agreements are to the clickwrap end of the spectrum, the more often they have been upheld as valid and enforceable."); *Savetsky v. Pre-Paid Legal Services, Inc.*, 2015 WL 604767, at *3 (N.D. Cal. Feb. 12, 2015) ("Because '[b]lanket assent to a form contract is still assent, . . .' courts generally find that clickwrap agreements are enforceable." (citation omitted)).

Importantly, the Coinbase process went a step further than the typical "clickwrap" agreements that courts in this district have routinely upheld. Coinbase placed the full text of the updated User Agreement, including the arbitration provision, before the user, rather than making the terms available only via hyperlink. Zia Decl. ¶ 6. Users such as Plaintiffs were thus free to scroll through the entire agreement before deciding whether to accept. *Id.* Such "scrollwrap" agreements are consistently found to be enforceable in California. *See Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 470 (2021), *reh'g denied* (Jan. 18, 2022), *review denied* (Apr. 13, 2022) ("[C]lickwrap agreements, in which website users are required to click on an 'I agree' box after being presented with a list of terms and conditions of use to confirm their assent to the agreement's terms, are generally considered enforceable. Scrollwrap agreements go one step further and place the contractual terms directly in front of the user, requiring them to scroll through the terms before checking a box or clicking a button to indicate their assent, and, therefore, are consistently found to be enforceable.").

The recent opinion from the Northern District of California in *Alfia v. Coinbase Global, Inc.* is instructive. 2022 WL 3205036 (N.D. Cal. July 22, 2022). In *Alfia*, Judge Gilliam held that a Coinbase user assented to the terms of an earlier version of the Coinbase User Agreement where the user affirmatively clicked a check box next to language indicating acceptance of the User

Agreement and the agreement's terms were available by hyperlink. *Id.* at *2. Here, the case for acceptance is even stronger. Plaintiffs had notice of the terms of the User Agreement, including the Arbitration Agreement in Appendix 5: Plaintiffs were provided with a scroll-box containing the text of the updated User Agreement when they logged into their accounts, and the Coinbase mobile app directed them to "review and accept your updated terms and conditions to continue using your Coinbase account." Zia Decl. ¶ 6. Plaintiffs had the option to scroll through the entire text of the updated Agreement, and then clicked the "[a]ccept terms" button at the bottom of the scroll-box. *Id*. ¶¶ 6, 8. By doing so, Plaintiffs affirmatively manifested their assent to the updated User Agreement and a binding contract was formed. *See Nguyen*, 763 F.3d at 1175; *JustAnswer LLC*, 73 Cal. App. 5th at 470 (explaining that scrollwrap agreements are consistently enforced under California law because they place the terms of the contract in front of the user).

### B. The User Agreement Clearly and Unmistakably Delegates Questions of Arbitrability to the Arbitrator.

Parties may delegate "gateway" questions about the existence and scope of an arbitration agreement to the arbitrator. *See Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010). They may also delegate to the arbitrator the question of the arbitration agreement's enforceability. *See id.* at 72 (holding as valid the parties' delegation of exclusive authority to arbitrator to decide arbitration agreement's enforceability). Such clauses constitute "an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." *Id.* at 70. A delegation provision is enforceable so long as it is clear and unmistakable. *See Tiri v. Lucky Chances, Inc.*, 226 Cal. App. 4th 231, 242 (2014) (citing *Rent-A-Center*, 561 U.S. at 68–70, n.1). Where, as here, "the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 528 (2019).

The 2022 User Agreement to which both Plaintiffs assented contains an express delegation provision:

> The arbitrator shall have exclusive authority to resolve any Dispute, including, without limitation, disputes arising out of or related to the interpretation or application of the Arbitration Agreement, including the enforceability, revocability, scope, or validity of the Arbitration Agreement or any portion of the Arbitration Agreement . . . .

Black Decl., Ex. F, Appendix 5, § 1.6 ("Authority of the Arbitrator"). This unambiguous delegation of authority clarifies that the arbitrator, not this Court, must decide any gateway questions regarding the scope or enforceability of the arbitration clause in the 2022 User Agreement. *See Fridman v. Uber Techs., Inc.*, 2019 WL 1385887, at *5 (N.D. Cal. Mar. 27, 2019) (holding that the terms of a similar delegation provision "clearly and unmistakably delegate the gateway question of arbitrability to the arbitrator"); *Britt v. ContextLogic, Inc.*, 2021 WL 1338553, at *6 (N.D. Cal. Apr. 9, 2021) (same); *see also Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1209 (9th Cir. 2016) (holding nearly identical language in delegation clause "clearly delegated the question of arbitrability to the arbitrator").

Moreover, the parties incorporated the AAA Consumer Arbitration Rules into the User Agreement. Those rules—specifically Rule 14(a)—state that the arbitrator has "the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." *See* Black Decl., Ex. F, Appendix 5, § 1.4 ("The arbitration will be administered by the American Arbitration Association ("AAA"), in accordance with the Consumer Arbitration Rules (the "AAA Rules") then in effect."). Courts in this circuit have routinely held that incorporation of AAA or JAMS rules evidences the parties' intent to delegate questions of arbitrability to the arbitrator. *See, e.g.*, *Brennan*, 796 F.3d at 1130; *see also Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1074 (9th Cir. 2013) ("Virtually every circuit to have considered the issue has determined that incorporation of the American Arbitration Association's arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability."). The fact that this is a consumer case makes no difference. *See, e.g.*, *Gerlach v. Tickmark Inc.*, 2021 WL 3191692, at *4

(N.D. Cal. July 28, 2021) (holding that, since the Ninth Circuit in *Brennan* allowed parties to delegate questions of arbitrability to the arbitrator, the "greater weight of authority has concluded that the holding of *Brennan* applies similarly to non-sophisticated parties," including in consumer cases (internal quotation marks, brackets and citation omitted)).

Because the parties clearly and unmistakably intended to delegate "gateway" questions of arbitrability and enforceability to the arbitrator—as evidenced by the 2022 User Agreement's delegation clause as well as its incorporation of the AAA Consumer Arbitration Rules—the Court should refer Plaintiffs' claims against Coinbase to the AAA for arbitration.

### C. The 2022 User Agreement Is Valid, Enforceable, and Encompasses Plaintiffs' Claims.

Even were the Court to decline to enforce the parties' delegation agreement, it should nevertheless compel arbitration because (i) the parties entered into a binding contract containing a valid arbitration clause, and (ii) Plaintiffs' claims against Coinbase fall squarely within the scope of that clause.

#### 1. The 2022 User Agreement Is Presumptively Valid and Enforceable.

As explained above, Plaintiffs and Coinbase consented to final and binding individual arbitration by agreeing to the 2022 User Agreement. Arbitration agreements governed by the FAA are presumed valid and enforceable. *See Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 226–27 (1987). This reflects Congress's intent behind the FAA to reverse longstanding judicial hostility toward arbitration and evince a "liberal federal policy favoring arbitration agreements." *See Gilmer*, 500 U.S. at 25 (citations omitted); *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). The FAA therefore mandates enforcement of an arbitration clause unless grounds exist "at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Similarly, the Supreme Court has held that class action waivers, such as the one in the 2022 User Agreement, are enforceable under the FAA. *See Epic Sys., Corp. v. Lewis*, 138 S. Ct. 1612, 1622 (2018); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). Accordingly, the Coinbase arbitration agreement is presumptively valid and enforceable. *Alfia*, 2022 WL 3205036, at *4 (holding that the arbitration agreement in Coinbase's 2017 User Agreement is "not unconscionable

and is therefore enforceable").

To the extent that Plaintiffs argue otherwise, they bear the burden of showing that the delegation clause of the arbitration agreement is unenforceable. *See Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79, 91–92 (2000) ("[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration."); *Rent-A-Center*, 561 U.S. at 72 ("[U]nless [a plaintiff challenges] the delegation provision specifically, we must treat it as valid under § 2, and must enforce it under §§ 3 and 4, leaving any challenge to the validity of the Agreement as a whole for the arbitrator."). Coinbase anticipates that Plaintiffs will claim that the User Agreement's arbitration provision is unconscionable by pointing to Judge Alsup's decision in *Bielski v. Coinbase, Inc.*, 2022 WL 1062049 (N.D. Cal. Apr. 8, 2022), *appeal docketed*, No. 22-15566 (9th Cir. Apr. 18, 2022). Such an argument would be unavailing. The *Bielski* decision is wrong on the merits because it ignored a clear delegation clause, usurped the arbitrator's role, and misread Coinbase's User Agreement. Coinbase is appealing that decision to the Ninth Circuit. But regardless of *Bielski*'s legal flaws, the *Bielski* decision dealt exclusively with the **2021** User Agreement. This case, however, involves the arbitration provision in the **2022** User Agreement, which contains different language than the language Judge Alsup relied on in *Bielski*. *Bielski* is therefore inapposite.

In *Bielski*, Judge Alsup concluded that the delegation clause in the **2021** User Agreement did "not *generally* delegate the arbitrability of *all* disputes between Coinbase and its users to the arbitrator," but only disputes pertaining to the "Arbitration Agreement" as defined in the **2021** User Agreement. 2022 WL 1062049 at *3. And the "Arbitration Agreement," the *Bielski* court reasoned, applied only to claims brought by users that had not been resolved through the Agreement's "Formal Complaint Process"—a pre-claim dispute resolution process available to address "complaints raised by the consumer, not by Coinbase." *Id.* at *4. The court noted the following language: "*If we cannot resolve the dispute through the Formal Complaint Process*, you and we agree that any dispute arising out of or relating to this Agreement or the Coinbase Services . . . shall be resolved by binding arbitration . . . ." *Id.* (emphasis added). Relying on that language, the court (incorrectly) concluded that "the user agreement imposes no obligation on Coinbase to arbitrate"

its claims against users, and therefore "lacks the requisite modicum of bilaterality." *Id.* at *4–*5. *But see Alfia*, 2022 WL 3205036 at *4 (holding, after *Bielski*, that an earlier version of the Coinbase User Agreement "binds both parties to arbitrate designated claims").

In the **2022** User Agreement, however, the arbitration provision and its delegation clause are unquestionably mutual. The arbitration provision provides that, "Subject to the terms of this Arbitration Agreement, you and Coinbase agree that any dispute, claim, disagreements arising out of or relating in any way to your access or use of the Services . . ., any Communications you receive, any products sold or distributed through the Coinbase Site, the Services, or the User Agreement . . . (each, a '**Dispute**') will be resolved by binding arbitration, rather than in court." Black Decl., Ex. F, Appendix 5, § 1.1. And the 2022 User Agreement's delegation clause states unequivocally that "The arbitrator shall have exclusive authority to resolve any Dispute, including, without limitation, disputes arising out of or related to the interpretation or application of the Arbitration Agreement, including the enforceability, revocability, scope, or validity of the arbitration Agreement or any portion of the Arbitration Agreement," with exceptions not relevant here. Black Decl., Ex. F, Appendix 5, § 1.6. Thus, the parties delegated to the arbitrator "any Dispute," and the agreement defines Disputes to include "any dispute, claim, disagreements arising out of or relating in any way" to the use of Coinbase, communications made by Coinbase, or products purchased from Coinbase. Such provisions are unquestionably bilateral.

In short, the delegation clause is enforceable because it submits any threshold dispute about the application or enforceability of the arbitration agreement to the arbitrator on a bilateral basis. *Bielski*, therefore, does not apply to the 2022 User Agreement.

**2. Plaintiffs' Claims Fall Within the Scope of the Arbitration Clause.**

Claims "arise[] under" an agreement when they "relat[e] to the interpretation and performance of the contract itself." *Tracer Research Corp. v. Nat'l Envtl. Servs. Co.*, 42 F.3d 1292, 1295 (9th Cir. 1994) (citation omitted). And "an agreement that requires the parties to arbitrate 'any dispute arising out of or relating to' an agreement is intended 'to reach all aspects of their relationship.'" *Neurosigma, Inc. v. De Salles*, No. 13-cv-07973-DMG, 2014 WL 12803168, at *3

(C.D. Cal. Jan. 31, 2014) (quoting *Schoenduve Corp. v. Lucent Techs., Inc.*, 442 F.3d 727, 732 (9th Cir. 2006)).

The scope of the arbitration agreement at issue here is broad—Plaintiffs and Coinbase agreed to arbitrate "any dispute, claim, disagreements arising out of or relating in any way to your access to or use of the Services or of the Coinbase Site, any Communications you receive, any product sold or distributed through the Coinbase Site, the Services, or the User Agreement and prior versions of the User Agreement, ***including claims and disputes that arose between us before the effective date of***" the updated Agreement. Black Decl., Ex. F, Appendix 5, § 1.1 (emphasis added); *see Cape Flattery Ltd. v. Titan Maritime, LLC*, 647 F.3d 914, 922 (9th Cir. 2011) ("[W]hen parties intend to include a broad arbitration provision, they provide for arbitration 'arising out of or relating to' the agreement." (citation omitted)).

Plaintiffs' claims against Coinbase fall squarely within the scope of that agreement. That Plaintiffs allege that they placed orders for GYEN in 2021, before agreeing to the 2022 User Agreement, does not matter. The FAA, by its plain language, anticipates that parties may agree "to submit to arbitration an existing controversy"—*i.e.*, a controversy that predates the formation of the arbitration agreement. 9 U.S.C. § 2. And where, as here, an arbitration agreement is broadly worded and does not contain an express temporal limitation excluding certain claims, it applies to claims that accrued prior to assent. *See Jones v. Waffle House, Inc.*, 866 F.3d 1257, 1261–62 n.1 (11th Cir. 2017); *Levin v. Alms & Assocs., Inc.*, 634 F.3d 260, 267–68 (4th Cir. 2011) (holding that arbitration provision applicable to "any dispute" was "broad enough to encompass *all* agreements and *any* disputes, past and present"); *In re Verisign, Inc.*, 531 F. Supp. 2d 1173, 1223–24 (N.D. Cal. 2007) (same); *Jones v. Deja Vu, Inc.*, 419 F. Supp. 2d 1146, 1150 (N.D. Cal. 2005) ("Where an arbitration provision does not contain a temporal limitation, the parties may be compelled to arbitrate despite the fact that the challenged conduct predates the signing of the agreement." (citations omitted)); *Azeveda v. Comcast Cable Comcn's LLC*, 2019 WL 5102607, at *6 (N.D. Cal. Oct. 11, 2019) (same); *Trujillo v. Gomez*, 2015 WL 1757870, at *8–*9 (S.D. Cal. Apr. 17, 2015) (same); *see also Davis v. Einstein Noah Rest. Grp., Inc.*, 2019 WL 6835717, at *3 (N.D. Cal. Oct. 23, 2019) (holding that retroactive application was a question of scope delegated to the arbitrator).

Here, the arbitration agreement not only contains no temporal limitation, but it expressly states that it applies to "claims and disputes that arose between us before the effective date of" the 2022 User Agreement. Black Decl., Ex. F, Appendix 5, § 1.1. Such express retroactivity language is dispositive. *See Trudeau* v. *Google LLC*, 349 F. Supp. 3d 869, 878 (N.D. Cal. 2018) (holding that arbitration provision expressly covering claims that "arose before Customer and Advertiser first accepted any versions of" terms and conditions was applicable to claims arising before the operative arbitration agreement was signed).[4]

The substance of Plaintiffs' claims against Coinbase also fall within the scope of the arbitration agreement because they all arise out of or relate to Coinbase's provision of services to Plaintiffs and communications that Coinbase allegedly made about GYEN. In their claim for negligence against Coinbase, Plaintiffs allege that Coinbase failed to adequately investigate the stability of GYEN, failed to accurately describe and GYEN to its users, and failed to ensure that users would always have access to and control over their GYEN assets through Coinbase's platform. CAC ¶¶ 94, 100–01. In their claim for negligence *per se*, Plaintiffs assert that Coinbase violated various federal and state laws by making misrepresentations about the stability of GYEN, including "falsely representing that GYEN stablecoins were pegged to the Japanese yen, and would remain pegged to the Japanese yen," and otherwise "failing to disclose fully and truthfully all material facts regarding the GYEN stablecoin's nature, purpose, value, volatility, and risk." CAC ¶¶ 105–110. Plaintiffs' claim for negligent misrepresentation similarly asserts that Coinbase materially misrepresented material facts regarding GYEN stablecoin, and knew or reasonably should have known that Plaintiffs would rely on Coinbase's misrepresentations and omissions.

---

[4] Plaintiffs may argue that a prior version of the User Agreement governs the question of arbitrability. That is incorrect because, as explained above, the 2022 User Agreement's arbitration provision to which Plaintiffs agreed makes clear that it applies to Disputes that "arose or involve facts occurring before the existence of this or any prior versions of the User Agreement," Black Decl., Ex. F, Appendix 5, § 1.1. Such express retroactivity language is conclusive. *See supra* at 14–15. But, even if the Court were to conclude that a prior version of the User Agreement applies, Plaintiffs would still be required to arbitrate their claims. The versions of the User Agreement to which each Plaintiff assented when signing up for their accounts, and the version of the User Agreement that governed the parties' relationship between November 16, 2021 and November 21, 2021 (when Plaintiffs purchased GYEN), include arbitration provisions. Like the 2022 User Agreement's provision, they apply broadly to all disputes "arising out of or relating to" the User Agreement "or the Coinbase Services." Black Decl., Exs. C–E, § 8.3.

CAC ¶¶ 116–123. Plaintiffs' claim for conversion charges Coinbase with improperly taking possession of Plaintiffs' GYEN by restricting GYEN trading. CAC ¶¶ 127–129. And Plaintiffs' seventh, eighth, and ninth causes of action assert that Coinbase's alleged misrepresentations about GYEN amount to unfair business practices in violation of California law and violations of federal securities laws. CAC ¶¶ 142–175.

In other words, each of Plaintiffs' claims against Coinbase focuses on Coinbase's provision of services to users, and communications that Coinbase made to its users about GYEN. As a result, those claims plainly arise out of or relate to "use of the Services or of the Coinbase Site, any Communications you receive, [or] any product sold or distributed through the Coinbase Site"—all covered "Disputes" under the arbitration agreement, regardless of whether they "arose . . . before the effective date of" the 2022 User Agreement. *See* Black Decl., Ex. F, Appendix 5, § 1.1. The Court should therefore compel individual arbitration of Plaintiffs' claims.

### D. This Action Should Be Stayed Pending Completion of Plaintiffs' Individual Arbitration Proceedings.

If an issue referable to arbitration under an agreement to arbitrate is brought in federal court, the court must stay the federal action on application of one of the parties. 9 U.S.C. § 3. Because the parties formed a valid arbitration agreement and Plaintiffs' claims against Coinbase fall "within the scope of the arbitration agreement," a stay is mandatory. *BrowserCam, Inc. v. Gomez, Inc.*, 2009 WL 210513, at *3 (N.D. Cal. Jan. 27, 2009); *see also Holl v. United Parcel Service, Inc.*, 2017 WL 11520143, at *3 (N.D. Cal. Sept. 18, 2017) ("[F]ederal district courts are required to stay judicial proceedings and compel arbitration of claims covered by an enforceable arbitration agreement"). Coinbase therefore respectfully requests that the Court stay this action as against Coinbase pending the completion of arbitration.

## VI. CONCLUSION

For the foregoing reasons, Coinbase respectfully requests that the Court compel arbitration of Plaintiffs' claims and stay these proceedings as against Coinbase.

Dated: October 6, 2022

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: */s/ Randall S. Luskey*
Randall S. Luskey
Meredith R. Dearborn

Attorneys for Defendants
COINBASE GLOBAL, INC. AND
COINBASE, INC.