Julie C. Erickson, State Bar No. 293111 (julie@eko.law)
Elizabeth A. Kramer, State Bar No. 293129 (elizabeth@eko.law)
Kevin M. Osborne, State Bar No. 261367 (kevin@eko.law)
**Erickson Kramer Osborne LLP**
44 Tehama Street
San Francisco, CA 94105
Phone: 415-635-0631
Fax: 415-599-8088

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| KENNETH DONOVAN, HUSSIEN KASSFY, and JOHN BRAMBL, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GMO-Z.COM TRUST COMPANY, INC.; COINBASE GLOBAL, INC. and COINBASE, INC.,<br><br>Defendants. | Case No.: 3:22-cv-02826-TLT<br><br>PLAINTIFFS' OPPOSITION TO DEFENDANTS COINBASE GLOBAL, INC. AND COINBASE, INC.'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS<br><br>Date: January 10, 2023<br>Time: 2:00 p.m.<br>Dept. Courtroom 9, 19th Floor<br>Judge: Hon. Trina L. Thompson |

# TABLE OF CONTENTS


I. Introduction ..... 1

II. Factual AND PROCEDURAL Background ..... 1

III. Legal Standards ..... 2

IV. Argument ..... 2

A. The Arbitration Agreement Is Unconscionable ..... 2

1. Procedural Unconscionability ..... 2

2. Substantive Unconscionability ..... 4

a) Lack of Mutuality ..... 4

b) One-Sided Pre-Dispute Resolution Requirements ..... 6

c) Unconscionable Effect of the Class Action Waiver as Modified by the Batch Arbitration Provision ..... 8

d) Limitation of Remedies ..... 12

e) Attorneys' Fees Provisions ..... 14

f) No Right to a Hearing for Claims Under $25,000 ..... 15

3. Severance Is Inappropriate ..... 16

B. The Delegation Clause Is Inapplicable and Unenforceable ..... 18

1. The Exceptions to the Delegation Clause Apply Here ..... 20

2. The Delegation Clause Is Not "Clear and Unmistakable" ..... 20

3. The Delegation Clause Is Unconscionable ..... 23

a) Procedural Unconscionability of Delegation Clause ..... 23

b) Substantive Unconscionability of Delegation Clause ..... 24

c) Severance of Unconscionability from Delegation Clause Is Inappropriate ..... 25

V. Conclusion ..... 25

## TABLE OF AUTHORITIES

**Cases**

*Ahlstrom v. DHI Mortg. Co., L.P.*,
21 F.4th 631 (9th Cir. 2021) .......... 19

*Alkutkar v. Bumble, Inc.*,
2022 WL 4112360 (N.D. Cal. Sept. 8, 2022) .......... 25

*Armendariz v. Found. Health Psychcare Servs., Inc.*,
24 Cal. 4th 83 (2000) .......... passim

*Ashbey v. Archstone Prop. Mgmt., Inc.*,
785 F.3d 1320 (9th Cir. 2015) .......... 2

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011) .......... 17

*Bickel v. Sunrise Assisted Living*,
206 Cal. App. 4th 1 (2012) .......... 15

*Bielski v. Coinbase, Inc.*,
2022 WL 1062049 (N.D. Cal. April 8, 2022) .......... 24

*Brown v. Dow Chem. Co.*,
2019 WL 484211 (N.D. Cal. Feb. 7, 2019) .......... 16

*Carbajal v. CWPSC, Inc.*,
245 Cal. App. 4th 227 (2016) .......... 14

*Carlson v. Home Team Pest Def., Inc.*,
239 Cal. App. 4th 619 (2015) .......... 8

*Carmona v. Lincoln Millenium Car Wash, Inc.*,
226 Cal. App. 4th 74 (2014) .......... 8, 16

*Carver v. JFK Mem'l Hosp., Inc.*,
2020 WL 6269268 (Cal. Ct. App. Oct. 26, 2020) .......... 8

*Davis v. Kozak*,
53 Cal. App. 5th 897 (2020) .......... 16

*Davis v. Nordstrom, Inc.*,
755 F.3d 1089 (9th Cir. 2014) .......... 2

*Dunham v. Env't Chemmical Corp.*,
2006 WL 2374703 (N.D. Cal. Aug. 16, 2006) .......... 7

*Eiess v. USAA Fed. Savings Bank*,
404 F.Supp.3d 1240 (N.D. Cal. 2019) .......... 22

*Embotelladora Electropura S.A. de C.V. v. Accutek Packaging Equip. Co., Inc.*,
2017 WL 3288492 (S.D. Cal. Aug. 2, 2017) .......... 13

*Esquer v. Educ. Mgmt. Corp.*,
292 F.Supp.3d 1005 (S.D. Cal. 2017) .......... 3, 23

*Ferguson v. Countrywide Credit Indust., Inc.*,
298 F.3d 778 (9th Cir. 2002) .......... 6

*First Options of Chicago, Inc. v. Kaplan*,
514 U.S. 938 (1995) .......... 18, 21

*Fitz v. NCR Corp*.,
118 Cal. App. 4th 702 (2004) .......... 6, 24

*Gatton v. T–Mobile USA, Inc*.,
152 Cal. App. 4th 571 (2007) .......... 2

*Graciano v. Robinson Ford Sales, Inc*.,
144 Cal. App. 4th 140 (2006) .......... 14

*Graham Oil Co. v. ARCO Products Co*.,
43 F.3d 1244 (9th Cir. 1994) .......... 13

*Hale v. Brinker Int'l, Inc.*,
2022 WL 2187397 (N.D. Cal. June 17, 2022) .......... 17

*Han v. Synergy Homecare Franchising, LLC*,
2017 WL 446881 (N.D. Cal. Feb. 2, 2017) .......... 19

*Ingle v. Circuit City Stores, Inc.*,
328 F.3d 1165 (9th Cir. 2003) .......... 17

*J.P. on behalf of R.P. v. Educ. Testing Servs*.,
2020 WL 10693044 (C.D. Cal. Oct. 30, 2020) .......... 24

*LaChapelle v. Omni Hotels Mgmt. Corp*.,
2021 WL 3373337 (N.D. Cal. Aug. 3, 2021) .......... 16

*Lim v. TForce Logistics, LLC*,
8 F.4th 992 (9th Cir. 2021) .......... 15, 16, 17

*Lopez v. Bartlett Care Center, LLC*,
39 Cal. App. 5th 311 (2019) .......... 24

*Lozano v. AT & T Wireless*,
216 F.Supp.2d 1071 (C.D. Cal. 2002) .......... 14

*MacClelland v. Cellco Partnership*,
2022 WL 2390997 (N.D. Cal., July 1, 2022) .......... 11, 13

*Meadows v. Dickey's Barbecue Restaurants Inc.*,
144 F. Supp. 3d 1069 (N.D. Cal. 2015) .......... 21

*Merkin v. Vonage Am., Inc.*,
639 F. App'x 481 (9th Cir. 2016) .......... 3

*Mohamed v. Uber Techs.*,
848 F.3d 1201 (9th Cir. 2016) .......... 19

*Mohamed v. Uber Techs., Inc*.,
109 F. Supp. 3d 1185 (N.D. Cal. 2015) .......... 21

*Nagrampa v. MailCoups, Inc.*,
469 F.3d 1257 (9th Cir. 2006) ........................................ 4

*Newton v. Am. Debt Servs., Inc*,
854 F.Supp.2d 712 (N.D. Cal. 2012) ........................................ 13, 14

*Nyulassy v. Lockheed Martin Corp.*,
120 Cal. App. 4th 1267 (2004) ........................................ 4, 7

*Oracle Am., Inc. v. Myriad Group A.G.*,
724 F.3d 1069 (9th Cir. 2013) ........................................ 19

*Ortiz v. Fibreboard Corp.*,
527 U.S. 815 (1999) ........................................ 11

*Pac. Media Workers Guild v. San Francisco Chronicle*,
2017 WL 1861853 (N.D. Cal. May 9, 2017) ........................................ 19

*Patterson v. Sup. Ct.*,
70 Cal. App. 5th 473 (2021) ........................................ 15

*Pinela v. Neiman Marcus Grp., Inc.*,
238 Cal. App. 4th 227 (2015) ........................................ 22, 23

*Pokorny v. Quixtar, Inc.*,
601 F.3d 987 (9th Cir. 2010) ........................................ 4, 7

*Reyes v. Hearst Comms., Inc.*,
2021 WL 3771782 (N.D. Cal. Aug. 24, 2021) ........................................ 17, 25

*Reyes v. United Healthcare Servs., Inc.*,
2014 WL 3926813 (C.D. Cal. Aug. 11, 2014) ........................................ 16

*Saravia v. Dynamex, Inc.*,
310 F.R.D. 412 (N.D. Cal. 2015) ........................................ 14, 24, 25

*Stanfield v. Tawkify, Inc.*,
517 F.Supp.3d 1002 (N.D. Cal. 2021) ........................................ 4, 5, 10

*Storms v. Paychex Inc.*,
2022 WL 2160414 (C.D. Cal. Jan. 14, 2022) ........................................ 15

*Streedharan v. Stanley Industrial & Automotive, LLC*,
2022 WL 4537859 (C.D. Cal. Sept. 27, 2022) ........................................ 13, 16

*Subcontracting Concepts (CT), LLC v. De Melo*,
34 Cal. App. 5th 201 (2019) ........................................ 13

*Ting v. AT&T*,
319 F.3d 1126 (9th Cir. 2003) ........................................ 3

*Tiri v. Lucky Chances, Inc.*,
226 Cal. App. 4th 231 (2014) ........................................ 24

*Tompkins v. 23andMe, Inc.*,
2014 WL 2903752 (N.D. Cal. June 25, 2014) ........................................ 4, 23

*Tompkins v. 23andMe, Inc.*,
840 F.3d 1016 (9th Cir. 2016) .......... 5, 6

*Vargas v. Delivery Outsourcing, LLC*,
2016 WL 946112 (N.D. Cal. Mar. 14, 2016) .......... 22, 23

*Viking River Cruises, Inc. v. Moriana*,
142 S.Ct. 1906 (2022) .......... 17

*Zaborowski v. MHN Gov't Servs., Inc.*,
936 F. Supp. 2d 1145 (N.D. Cal. 2013) .......... 16

*Zullo v. Sup. Ct.*,
197 Cal. App. 4th 477 (2011) .......... 7, 8

**Statutes**

28 U.S.C. § 1407 .......... 9

9 U.S.C. § 2 .......... 2

Cal. Bus. & Prof. Code § 17500 .......... 1

Cal. Civ. Code § 1668 .......... 13

Cal. Civ. Code § 1750 .......... 1

Cal. Civ. Code § 1780 .......... 13, 14

Cal. Gov't Code § 12965 .......... 7

Cal. Gov't. Code § 12900 .......... 15

Fed. R. Civ. P. 42 .......... 9

**Rules**

N.D. Cal. Civ. LR 3-12 .......... 9

**Statement of Issues to Be Decided**

Pursuant to the Local Rules of Practice in Civil Proceedings before the United States District Court for the Northern District of California, Rule 7-4(a)(3), Plaintiffs ask the Court to rule on the following issues:

1. Whether the arbitration provision in Coinbase's User Agreement is unconscionable and therefore should not be enforced.

2. Whether the delegation clause in Coinbase's User Agreement is inapplicable and unenforceable and therefore threshold questions of arbitrability must be resolved by the Court.

## I. INTRODUCTION

Plaintiffs in this case are investors in digital assets who relied on Coinbase's representations about the nature and risk of a purported "stablecoin" called GYEN. Coinbase marketed GYEN as backed by government-issued currency and "pegged" one-to-one in value to the Japanese yen. In reality, the peg was anything but reliable, and, when it failed, Plaintiffs incurred significant losses.

Coinbase now seeks to enforce the arbitration agreement in its January 2022 User Agreement. This agreement is materially different from prior versions and presents a mix of terms that have long been held unconscionable and other novel defendant-friendly provisions that have not yet been evaluated by any state or federal court.

The arbitration agreement is rife with procedural and substantive unconscionability. With eight to ten unenforceable terms, unconscionability permeates the agreement and renders severance impossible. The Court should deem it wholly unenforceable. In this brief, Plaintiffs first identify and analyze each unconscionable term of the arbitration agreement. Plaintiffs then set forth the three independent reasons why judicial determination of all issues is proper.

## II. FACTUAL AND PROCEDURAL BACKGROUND

This case arises from false claims and illegal conduct in the marketing and sale of an unregistered digital security called GYEN. The operative complaint (Dkt. 46) asserts nine causes of action against Defendants Coinbase Global, Inc. and Coinbase, Inc. (collectively, "Coinbase") and GYEN-issuer Defendant GMO-z.com Trust Company, Inc. ("GMO Trust"),[1] but Plaintiffs have sought leave to file a second amended complaint that would add claims under the Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq*., and False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq*. *See* Dkt. 64.

Coinbase now moves to compel arbitration against the two named Plaintiffs who are Coinbase customers (Plaintiffs Kassfy and Brambl). Dkt. 51. Plaintiff Kassfy agreed to the

[1] For a more thorough description of Plaintiffs' factual allegations and claims, see Plaintiffs' Opposition to Defendant GMO-Z.com Trust Company, Inc.'s Motion to Compel Arbitration & Stay Proceeding, filed contemporaneously with this Opposition.

Coinbase User Agreement in 2021; Brambl agreed in 2020. *Id*. at 2:20-3:4. Since Plaintiffs created their accounts, the User Agreement has been unilaterally modified more than 20 times. Declaration of Julie C. Erickson ("Erickson Decl."), ¶ 2. The subject User Agreement was implemented in January 2022. Unless and until Plaintiffs accepted the updated User Agreement, they could not login to, view, or access their Coinbase accounts, even though they held property in those accounts. Dkt. 55, Zia Decl., ¶ 6.

## III. LEGAL STANDARDS

In deciding whether to compel arbitration, a court must determine two "gateway" issues: (1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute. *Ashbey v. Archstone Prop. Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015). The moving party bears the burden of demonstrating that these two elements are satisfied. *Id*. When determining whether a valid contract to arbitrate exists, courts apply ordinary state law principles that govern contract formation. *Davis v. Nordstrom, Inc.*, 755 F.3d 1089, 1093 (9th Cir. 2014). Agreements to arbitrate may be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability. *See* 9 U.S.C. § 2. There is no dispute that California law applies to the interpretation and validity of the arbitration agreement at issue here.

## IV. ARGUMENT

### A. The Arbitration Agreement Is Unconscionable

An arbitration agreement is unenforceable if it is procedurally and substantively unconscionable. *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 99 (2000). "[T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Id*. at 114. The January 2022 Agreement contains a high degree of both.

1. *Procedural Unconscionability*

Procedural unconscionability concerns "the manner in which the contract was negotiated and the circumstances of the parties at that time" and can arise from either oppression or surprise. *Gatton v. T–Mobile USA, Inc.*, 152 Cal. App. 4th 571, 581 (2007). "Oppression arises from an inequality of bargaining power that results in no real negotiation and an absence of meaningful

choice. Surprise is defined as the extent to which the supposedly agreed-upon terms of the bargain are hidden in the prolix printed form drafted by the party seeking to enforce the disputed terms." *Id*. Although a showing of either is sufficient, both are present here.

The arbitration agreement here is indisputably a standardized contract of adhesion, drafted by the party of superior bargaining strength, and offered on a take-it-or-leave-it basis with no ability to negotiate or opt-out. This alone establishes oppression. *Ting v. AT&T*, 319 F.3d 1126, 1148-49 (9th Cir. 2003); *Newton v. Am. Debt Servs.*, 549 Fed. Appx. 692, 694 (9th Cir. 2013). Coinbase's User Agreement has been updated more than twenty times since Plaintiffs opened their Coinbase accounts. Erickson Decl., ¶ 2. Frequent unilateral modification of an agreement shows a high degree of procedural unconscionability. *See Merkin v. Vonage Am., Inc.*, 639 F. App'x 481, 482 (9th Cir. 2016). The only way users could reject these changes was to stop using Coinbase. Dkt. No. 54-6, 2022 User Agreement ("UA"), "Amendment of these Terms." At the time the subject agreement was imposed in early 2022, both Plaintiffs had funds in their Coinbase wallets. Declaration of Hussien Kassfy ("Kassfy Decl."), ¶ 5; Declaration of John Brambl ("Brambl Decl."), ¶ 5. Plaintiffs reasonably believed that if they rejected the terms, they would be locked out of their accounts. Kassfy Decl., ¶ 6; Brambl Decl., ¶ 6. In the world of crypto trading, being denied access to an account, even for a short period of time, can cause major losses. As a result, Plaintiffs were essentially held hostage with no meaningful choice but to agree. *Id*.

Surprise is also present here because the arbitration agreement is inconspicuous, appearing in the same size and type font as all surrounding provisions, and is buried at the end of the 54-page User Agreement. Erickson Decl., Ex. 1 at p. 48.[2] *See Esquer v. Educ. Mgmt. Corp.*, 292 F.Supp.3d 1005, 1015 (S.D. Cal. 2017) (even though some parts of arbitration agreement were in all capital letters, court found it procedurally unconscionable, recognizing that an individual was unlikely to notice where it was otherwise undifferentiated from the rest of the surrounding provisions); *Dougherty v. Roseville Heritage Partners,* 47 Cal. App. 5th 93, 103-04 (2020) (finding a high

[2] The version of the agreement attached to Coinbase's motion appears to be only two pages. Dkt. 54-6. This is not how it appeared to the user. Exhibit 1 to the Erickson Decl. shows the User Agreement as it appeared on Coinbase's website. When printed, it is 54 pages. The arbitration agreement starts on page 48; the delegation clause is on page 51. *Id.*

degree of procedural unconscionability even though agreement was optional where, *inter alia*, arbitration provision was buried in 70-page packet). Making matters worse, the arbitration agreement, located in the separately titled "Appendix 5," incorporates and is informed by provisions located elsewhere in the User Agreement. *See* UA, Appx. 5 ("A5"); *see also* UA, ¶ 7.2 (Formal Complaint Process), ¶ 8 (Limitation of Liability), ¶¶ 3.4, 3.5, 3.9, 4.6, 6.9 (granting Coinbase various remedies that effectively strip the arbitration agreement of mutuality).[3] "To have any hope of discovering [the unconscionability of the arbitration agreement], users would have to piece together" the arbitration agreement with numerous provisions found elsewhere in the User Agreement. *Stanfield v. Tawkify, Inc.*, 517 F.Supp.3d 1002, 1008 (N.D. Cal. 2021). There is substantial surprise in such an "opaque arrangement." *Tompkins v. 23andMe, Inc.*, 2014 WL 2903752, at *14-15 (N.D. Cal. June 25, 2014), *aff'd*, 840 F.3d 1016 (9th Cir. 2016). Additional surprise is present because the 2022 version of the arbitration agreement is significantly different than the prior version (*see* Erickson Decl., Ex. 2), but nothing called this out, either in the User Agreement itself or in the pop-up box where users consented to its terms. *See* Zia Decl., Exs. G-H. The significant oppression and surprise presents a high degree of procedural unconscionability.

2. *Substantive Unconscionability*

Substantive unconscionability focuses on whether an arbitration provision is "'overly harsh' or generates 'one-sided results.'" *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1280 (9th Cir. 2006) (quoting *Armendariz*, 24 Cal. 4th at 114). Numerous harsh and one-sided provisions render Coinbase's arbitration agreement substantively unconscionable.

a) <u>Lack of Mutuality</u>

"The paramount consideration in assessing substantive conscionability is mutuality." *Nyulassy v. Lockheed Martin Corp.*, 120 Cal. App. 4th 1267, 1281 (2004). "Requiring one party to arbitrate its claims but not the other is a paradigmatic form of substantive unconscionability under California law." *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 1001 (9th Cir. 2010).

At first blush, the arbitration agreement may appear bilateral, but the combined effect of numerous, disguised one-sided terms renders the agreement invalid for lack of mutuality. It

[3] Each of these provisions is discussed in the substantive unconscionability analysis below.

provides, for example, that notwithstanding the agreement to arbitrate, either party can bring an action in court to protect their intellectual property rights ("IP claims"). UA, A5, ¶ 1.1. But no Coinbase user would ever realistically have a claim against Coinbase for IP infringement—this exclusion (also known as a "carve out") only benefits Coinbase. While the exclusion for IP claims, by itself, is likely insufficient to render the agreement unenforceable (*see Tompkins v. 23andMe, Inc.*, 840 F.3d 1016, 1031 (9th Cir. 2016)), this is just the tip of the iceberg.

Elsewhere in the User Agreement, Coinbase grants itself a variety of unilateral non-arbitration remedies that effectively exempt from arbitration all other claims Coinbase would ever realistically have against its users. For example, if Coinbase contends a user owes it money, instead of having to go through arbitration like the user does, Coinbase gives itself the right to simply take the money it alleges it is owed from the user's account. UA, ¶ 4.6; *see also id.*, ¶ 3.4. In connection with credit transaction payments, Coinbase reserves the right to "take other steps for our own risk management and business reasons." *Id.* at ¶ 3.5. Coinbase also reserves for itself non-arbitration remedies to address disputes related to a user's potential violation of other Coinbase policies. If Coinbase suspects that a user's activity "relate[s] to a Prohibited Use or a Prohibited Business as set forth in the Prohibited Use Policy," Coinbase may unilaterally unwind the transaction. *Id.* at ¶ 3.9. And Coinbase gives itself the right to suspend, restrict, or terminate a user's access to all Coinbase's services and deactivate or cancel a user's account with immediate effect for any reason at its sole discretion and has no obligation to disclose the details of those actions. *Id.* at ¶ 6.9. Essentially, Coinbase can do anything it wants to remedy problems it has with its users. Users, on the other hand, are forced into formal arbitration should they have a dispute with Coinbase, including if they contend that Coinbase acted improperly or damaged them by exercising any of these unilateral "remedies." This lack of mutuality is substantively unconscionable. *Stanfield*, 517 F.Supp.3d at 1008.[4]

In some cases, courts have found that a legitimate business need can justify a company

[4] Even though these provisions are not located within Appendix 5, they are relevant to and properly considered in assessing the mutuality of the arbitration clause. *See Stanfield*, 517 F.Supp.3d at 1007-08 (in finding arbitration provision lacked mutuality, court looked at effect of terms located elsewhere in Terms of Service that effectively exempted defendant from obligation to arbitrate).

carving out a type of dispute from the scope of its arbitration agreement, even if the type of dispute is one that will only ever be brought by the company against its customers. *See, e.g., Tompkins*, 840 F.3d at 1031. Such cases are limited, however, and only address the exclusion of a single type of dispute. Coinbase's User Agreement excludes numerous types of disputes from Coinbase's obligation to arbitrate. The cumulative effect of these exclusions is to exempt from arbitration every area where Coinbase might initiate a dispute with its users, either expressly (as with IP claims) or in effect by arming Coinbase with unilateral remedies that allow it to avoid formal action altogether. This is unconscionable. *See Armendariz*, 24 Cal.4th at 87 ("the doctrine of unconscionability limits the extent to which a stronger party may, through a contract of adhesion, impose the arbitration forum on the weaker party without accepting that forum for itself"); *see also Ferguson v. Countrywide Credit Indust., Inc.*, 298 F.3d 778, 785 (9th Cir. 2002) ("unfairly one-sided" for drafting party to impose arbitration selectively on the types of claims likely brought against it); *Fitz v. NCR Corp.*, 118 Cal. App. 4th 702, 725 (2004) ("lack of basic fairness" where most disputes likely to be initiated against weaker party "need not be arbitrated"). Moreover, there is no legitimate business need justifying the numerous instances where Coinbase can protect its rights outside of arbitration while the user cannot. Monetary disputes are well suited for resolution after the fact. And any argument that Coinbase must respond quickly to potentially unlawful conduct or cyber-security threats ignores that Coinbase could take the least restrictive action necessary and still hold itself to the same dispute resolution processes imposed on users. The pervasive lack of mutuality here is strong evidence of substantive unconscionability.

b) One-Sided Pre-Dispute Resolution Requirements

The arbitration agreement's unilateral pre-arbitration requirements are also unreasonably harsh and one-sided. Before filing an arbitration, users must complete a two-step process. First, the user must submit information about their dispute through Coinbase's online customer support service "to attempt to resolve any such dispute amicably." UA, ¶ 7.2.1. This involves the user providing comprehensive information about their complaint to Coinbase and waiting for a response and potential resolution. There is no time limit imposed on Coinbase in this process. If the dispute is not resolved, the user must then complete a "Formal Complaint Process," which

requires the user to submit another "complaint form" and provide "as much information as possible" to Coinbase. *Id.*, ¶ 7.2.1. Coinbase then "review[s] and evaluate[s]" the complaint based on the information submitted "and information in the possession of Coinbase." *Id.* Nothing obligates Coinbase to share with the user the information it possesses and uses to evaluate the complaint. The user must wait 45 business days before they can commence an arbitration or a small claims action. *Id.* There is no tolling of any limitations period while the user takes these steps. The penalty for a user failing to complete this process is <u>mandatory dismissal</u>, without exception or room for discretion. *Id.*, ¶ 7.2. This is significantly harsher than the penalty imposed by the previous version of the arbitration agreement, which only gave Coinbase the right to request the claim be dismissed unless and until all steps were completed. *See* Erickson Decl., Ex. 2, p. 18, ¶ 8.2. Finally, the arbitration agreement provides that "in any court action relating to whether either party has satisfied any condition precedent to arbitration," the prevailing party is entitled to recover their attorneys' fees and costs." UA, A5 ¶ 1.7.

Courts have repeatedly found similar one-way pre-arbitration requirements to be substantively unconscionable. *See Nyulassy*, 120 Cal. App. 4th at 1282-83 (finding one-sided pre-arbitration dispute resolution requirement substantively unconscionable because it lacked mutuality and allowed the defendant a "'free peek' at plaintiff's case, thereby [conferring] an advantage [on defendant] if and when plaintiff were to later demand arbitration"); *Pokorny*, 601 F.3d at 998-99 (same); *Dunham v. Env't Chemmical Corp.*, 2006 WL 2374703, at *8 (N.D. Cal. Aug. 16, 2006) ("one-sided duty to exhaust pre-arbitration remedies […] adds to the contract's substantive unconscionability by permitting [the defendant] to preview [the plaintiff's] claims"); *Zullo v. Sup. Ct.*, 197 Cal. App. 4th 477, 487 n.4 (2011) (no tolling during pre-dispute period shows substantive unconscionability) (citing Cal. Gov't Code § 12965(d), (e)).

Here, the pre-dispute resolution terms are expressly one-sided, unreasonably favorable to Coinbase, and shockingly harsh to the users. Only users must comply with these steps or else suffer an end-of-the-road penalty. As a result, only Coinbase is afforded an opportunity to resolve complaints against it before having to retain counsel and face the financial obligations of arbitration. And only Coinbase gets the benefit of a "free preview" of the user's claim and legal

theories with a guaranteed nine-week review period during which Coinbase can assess the complaint and how to respond to it based on information only it has. Users, on the other hand, are not given any opportunity to try to correct or cure problematic conduct prior to Coinbase initiating legal action against them in (or exercising any of the other unilateral remedies that it reserves for itself, *see* § IV.A.2.a, *supra*). All these features are unconscionable. *See Carver v. JFK Mem'l Hosp., Inc.*, 2020 WL 6269268, at *6 (Cal. Ct. App. Oct. 26, 2020) (finding substantively unconscionable a provision that required only employees to engage in a multi-step pre-arbitration process that would give the employer a "free peek" at claims); *Carlson v. Home Team Pest Def., Inc.*, 239 Cal. App. 4th 619, 635 (2015) (same); *Carmona v. Lincoln Millenium Car Wash, Inc.*, 226 Cal. App. 4th 74, 89 (2014) (finding substantively unconscionable term that subjected employees to mandatory pre-arbitration disclosures while "employer ha[d] no corresponding obligation").

The term awarding attorneys' fees to the prevailing party in an action relating to the satisfaction of conditions precedent is also clearly one-sided because, again, the user is the only party who is subject to a condition precedent. It is also unduly harsh to users and unreasonably favorable to Coinbase as it effectively immunizes Coinbase from any challenge to the enforceability of the pre-arbitration requirements since no one will risk having to pay Coinbase's attorneys' fees <u>and</u> have their case dismissed. *See also* § IV.A.2.e, *infra*, discussing attorneys' fees.

There is no reasonable justification for the one-sidedness of these requirements or the shockingly harsh penalty for a user's non-compliance. "A fair agreement would impose the same [requirements] upon both parties." *Zullo,* 197 Cal. App. 4th at 487. The burdens imposed by Coinbase are patently unfair and appear designed only to deter users from making claims.

c) <u>Unconscionable Effect of the Class Action Waiver as Modified by the Batch Arbitration Provision</u>

The arbitration agreement's "Waiver of Class and Other Non-Individualized Relief" states that no dispute can be "arbitrated on a class collective, representative, or mass action basis." A5, ¶ 1.3 ["Class Waiver"]. Unlike typical class action waivers, however, this waiver is expressly limited by Paragraph 1.8, which establishes precisely such a procedure, albeit with the clever

nomenclature "Batch Arbitration." *Id.,* ¶ 1.8. Paragraph 1.8 provides that where 100 or more arbitration demands of a "substantially similar nature" are filed "by or with the assistance of the same law firm, group of law firms, or organizations" the AAA "shall administer the arbitration demands in batches of 100" plus a leftover batch of any remaining demands. *Id.* Paragraphs 1.3 and 1.8 work in tandem to prohibit claimants from coordinating on their own terms, unless and until a numeric threshold is reached, at which point the demands must be consolidated and resolved under terms set by Coinbase. Batch Arbitration is compulsory and expressly one-sided, applying only to claims "filed against Coinbase." *Id.* at ¶ 1.8. These terms and their effect is unconscionable.

As background, there is no other context where a defendant can force a group of plaintiffs to litigate their claims jointly through final resolution. The closest judicial corollaries do not go nearly as far. For instance, deeming cases "related" under federal court local rules simply puts the cases before the same judge and aligns their pretrial schedules (*see, e.g.*, N.D. Cal. Civ. LR 3-12); in cases consolidated under Rule 42, the court maintains discretion as to which matters ought to be joined and which may require separate trials (Fed. R. Civ. P. 42); and cases centralized by the Judicial Panel for Multi-district Litigation are consolidated for pretrial purposes only (28 U.S.C. § 1407). Even in the arbitral forum, the Batch Arbitration procedures depart from the norm of adjudicating demands on an individual basis, or, where mass arbitration procedures have been established, allowing for streamlining mechanisms but preserving an individual merits determination. *See*, *e.g*., FedArb's "MDL Framework"; IICPR's "Mass Claims Protocol"; NAM's "Mass Filing Supplemental Dispute Resolution Rules and Procedures." [5] Even the AAA, Coinbase's designated arbitral forum, provides that, in the mass arbitration context, the arbitrator will "decide each case on its own merits."[6] Coinbase contravenes these norms and its own forum's rules by requiring that all claims in a batch be bound by a single decision. UA, A5 ¶¶ 1.4, 1.8.

Batch Arbitration is designed to deter claims and produce pro-Coinbase outcomes on a

---

[5] Available at https://www.fedarb.com/framework-for-mass-arbitration-proceedings-adr-mdl/ (FedArb); https://www.cpradr.org/resource-center/rules/arbitration/employment-arbitration-procedure/_res/id=Attachments/index=4/ERMCP%20V2.1%20September%202022.pdf (IICPR); https://www.namadr.com/content/uploads/2021/12/SupplementalRules12.22.21.pdf (NAM).

[6] *See* AAA "Supplementary Rules for Multiple Case Filings," available at https://www.adr.org/sites/default/files/Supplementary_Rules_MultipleCase_Filings.pdf

batch-wide basis without the protections afforded to plaintiffs in either litigation or traditional arbitration. "From a defendant's perspective, a class action may well be preferable to a mass arbitration—but nothing would be more preferable than a private dispute-resolution system of the defendant's own design." J. Maria Glover, *Mass Arbitration*, 74 Stan. L. Rev. 1283, 1373 (2022).[7]

*Opacity and Absence of Meaningful Choice*: At the outset of filing an arbitration demand, a claimant has no way of knowing whether she must proceed individually, bound by the Class Waiver, or under the Batch Arbitration regime triggered if her counsel (or anyone affiliated) is retained to bring other demands that bring the total to 100. She may end up in a batch even over her objections if an arbitrator decides the demands are of a "substantially similar nature." A5 ¶ 1.3.

From a claimant's perspective, there is no transparency as to how Batch Arbitration will play out. The arbitration agreement fails to specify the rules and procedures for nearly all but the most basic aspects of a batch arbitration. For example, there are no specifics about how the arbitrator is to decide if the criteria for Batch Arbitration are met; how demands are to be divided into batches (e.g., by date/time filed, alphabetically, randomly); or for the handling of newly filed demands (e.g., if a leftover batch with fewer than 100 demands is on the eve of resolution and additional demands are filed, are those consolidated in?). The lack of transparency "oppresse[s] users by keeping them guessing about" these (and other) aspects of Batch Arbitration. *Stanfield*, 517 F.Supp.3d at 1006 (arbitration agreement was substantively unconscionable where it failed to provide procedural details). Opaque as to whether, when, and how Batch Arbitration will apply, the terms "loom[] over any grievance raised by the user as a heavy unknown" and drastically weaken the ordinary consumer's remedy. *Id*.

Once a claimant's demand is locked into a batch, she has no choice in what procedures will govern and no ability to opt-out except through the expensive, burdensome, and uncertain option of firing her attorneys, finding new counsel with no affiliation to her former representation (lest she get re-batched), and starting from square one. In effect, Batch Arbitration is a mandatory class action where all claims in the batch are resolved by the arbitrator with a single, final, and non-

[7] Available at https://scholarship.law.georgetown.edu/facpub/2252/

appealable ruling. The mandatory nature of class (or batch) proceedings, especially where the claimants have money damages, presents due process risks so grave courts raise concern even where the high bar of class certification is met. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 846 (1999) (noting that certification of a mandatory class that includes money damages potentially compromises the Seventh Amendment and due process rights of individual claimants).

*<u>Discovery and Confidentiality Provisions Harm Claimants and Benefit Coinbase</u>*: The arbitration agreement severely limits discovery, and the confidentiality provision requires all materials exchanged "shall be kept confidential and shall not be shared with anyone except the parties' attorneys, accountants, or business advisors," and thus cannot be used in any other batch or individual arbitration. *See* UA, A5 ¶ 1.4. Applying these terms to "batch" arbitration creates yet another unconscionable aspect of the batch provision. Claimants within a batch have only three depositions in total (as opposed to three depositions <u>each</u> if proceeding individually), and they must remain confidential. *Id.* Absent the confidentiality provision, claimants could exchange information, including deposition testimony, and adduce more evidence. As things stand, however, one batch of claimants is prohibited from sharing information with any other claimant. While Coinbase is also limited to three depositions per batch, it has detailed information about claimants in its records and gains expertise from deposing dozens of claimants across proceedings. Moreover, it is free to arbitrate a select number of claims, then use what it learns to improve its defenses for future claims and anticipate which are more likely to succeed. Coinbase is "able to enjoy all of the advantages that come from being a 'repeat player.'" *MacClelland v. Cellco Partnership*, 2022 WL 2390997, at *13 (N.D. Cal., July 1, 2022) (appeal pending). A claimant, by contrast, is siloed and under a gag order so that no benefits can inure to them. Since claimants, not Coinbase, bear the burden of proof, this provision is acutely unbalanced. *See* Erickson Decl., ¶ 5.

*<u>Unreasonably Favorable Costs and Benefits to Coinbase</u>*: Under Batch Arbitration, Coinbase stands to benefit from far greater cost savings by limiting its per-claimant defense costs once the number of claimants reaches 100. The approximate total fees and expenses that Coinbase

would be responsible for in one individual arbitration are $3,200-$4,700.[8] Ninety-nine arbitrations would cost Coinbase between $316,800 to $465,300. If just one more claim is filed, the Batch Arbitration provision kicks in and Coinbase's financial responsibility plummets 99.9 percent. That is because Coinbase's financial obligation vis-à-vis one "batch" is the same as one individual claim: $4,700. *See* UA, A5 ¶ 1.8. The decrease in costs translates directly to an inferior process for claimants to Coinbase's benefit and adds to the unconscionability of the agreement.

d) <u>Limitation of Remedies</u>

It is well settled that, under California law, an arbitration provision may not limit statutorily imposed remedies. *See Armendariz,* 24 Cal. 4th at 102-03. The agreement here impermissibly prohibits the arbitrator from awarding statutory remedies, including those available the CLRA.[9] The arbitration agreement states: "In any award of damages, the arbitrator shall abide by the 'limitation of liability' section of this User Agreement." UA, A5 ¶ 1.6. There is no exception. The limitation of liability section ("LOL"), located 32 pages earlier in the body of the User Agreement (*see* Erickson Decl., Ex. 1 at p. 19, ¶ 8.2), prohibits an award of punitive damages (UA ¶ 8.2, "you may not recover…punitive or consequential damages"), caps Coinbase's liability at the value of the digital assets in the user's Coinbase wallet at the time of the event giving rise to the dispute "whether based in contract, tort, negligence, strict liability, or otherwise," and forecloses an award in any amount where Coinbase's liability arises from "inaccuracies" on its website (*id.*, "you hereby understand and agree that Coinbase will not be liable for any losses or damages arising out of or relating to…errors, or inaccuracies of any kind in our websites…or any of the Coinbase services"). According to the agreement's own terms, these limitations are "fundamental elements of the basis of the bargain between Coinbase and you." *Id.* Several of Plaintiffs' claims and forthcoming CLRA claim are based on allegations that Coinbase published inaccurate information about the GYEN on its website, for which Plaintiffs seek actual and punitive damages. *See* Dkt.

---

8 *See* AAA Consumer Arbitration Fee Schedule, available at https://www.adr.org/sites/default/files/Consumer_Fee_Schedule_2.pdf (company is responsible for filing fee ($300), case management fee ($1,400), arbitrator fee ($1,500 [documents-only] or $2,500 [hearing]), and, if applicable, hearing fee ($500)).

9 While a CLRA claim is not alleged in the operative complaint, Plaintiffs have satisfied all CLRA notice requirements and have sought leave to amend their complaint to add it. Dkt. 64.

46 (FAC), Prayer for Relief at (e); Dkt. 64-2 (proposed SAC), ¶¶ 159-178; Cal. Civ. Code § 1780(a)(1), (4). The LOL, which the arbitrator must follow without exception, forecloses Plaintiffs' rights to these remedies.[10]

California Civil Code § 1668 declares that is it against "the policy of the law" of the State of California for a party to contract away its liability for fraudulent acts and violations of statutory law. This includes negligent misrepresentations. *Embotelladora Electropura S.A. de C.V. v. Accutek Packaging Equip. Co., Inc.*, 2017 WL 3288492, at *5 (S.D. Cal. Aug. 2, 2017) (also noting "California's long-standing policy against enforcing limitations on liability for fraud or misrepresentation" and collecting cases). The LOL here is unenforceable under section 1668 because it exempts Coinbase from liability arising from misrepresentations about GYEN on its website—the basis of Plaintiffs' claims for negligent misrepresentation and violations of consumer protection statutes. Dkt. 46, ¶¶ 115-125, 142-153; Dkt. 64-2, ¶¶ 159-178.

Additionally, as to Plaintiffs' forthcoming CLRA claim, this limitation of remedies allows Coinbase to evade important California statutory obligations under the CLRA and is unenforceable. *See Armendariz*, 24 Cal. 4th at 103-104 (arbitration provision may not limit statutory punitive damages and attorney fees); *see also Newton v. Am. Debt Servs., Inc.* ("*Newton II*"), 854 F.Supp.2d 712, 724-26 (N.D. Cal. 2012) (limitation of liability impermissibly deprived plaintiffs of punitive damages); *MacClelland*, 2022 WL 2390997, at *1 (prohibiting punitive damages under CLRA substantively unconscionable); *Graham Oil Co. v. ARCO Products Co*., 43 F.3d 1244, 1248 (9th Cir. 1994) (refusing to compel arbitration where punitive damages and attorney fees unavailable); *Subcontracting Concepts (CT), LLC v. De Melo*, 34 Cal. App. 5th 201, 213 (2019) (arbitration clause allowing "actual monetary damages only" substantively unconscionable); *Streedharan v. Stanley Industrial & Automotive, LLC*, 2022 WL 4537859, at *17-18 (C.D. Cal. Sept. 27, 2022) (terms limiting ability to recover statutory penalties substantively unconscionable); *Dougherty*, 47 Cal. App. 5th at 107 (terms limiting right to punitive

[10] The only potential limit to the LOL's operation is with respect to its bar on "incidental [and] consequential damages" in jurisdictions where such limitations are not allowed. UA, ¶ 8.2. This would not limit the LOL's bar on punitive damages and total liability for Plaintiffs' claims here.

damages and attorneys' fees substantively unconscionable). Cases where seemingly similar provisions have been upheld are distinguishable because they included key "fail-safe" language such as "to the extent permissible by applicable law." *See, e.g., Lozano v. AT & T Wireless*, 216 F.Supp.2d 1071, 1076 (C.D. Cal. 2002). No such provision exists here.

e) Attorneys' Fees Provisions

The arbitration agreement contains three provisions relating to the award of attorneys' fees, all of which are unconscionable. First, the arbitration agreement provides that the parties "shall bear their own attorneys' fees and costs in arbitration" unless the arbitrator finds that the claim or request for relief was brought in bad faith or was frivolous. UA, A5 ¶ 1.7. There is no "fail-safe" language that might limit its operation to the extent allowed by applicable law.[11] This term is substantively unconscionable as it strips Plaintiffs of their statutory right to prevailing attorneys' fees and costs under their forthcoming claim under the CLRA, Cal. Civ. Code § 1780 (e). *See Armendariz*, 24 Cal.4th at 101, 104, 121-127 (arbitration provision may not limit statutorily imposed punitive damages and attorney fees); *Newton II,* 854 F.Supp.2d at 725-26 (attorneys' fees provision was substantively unconscionable where it contravened CLRA). It is also unenforceable as contrary to public policy because it impedes Plaintiffs' ability to vindicate their statutory rights under the CLRA by making it much more difficult to find a lawyer willing to represent them. *See* Erickson Decl., ¶ 6. A prevailing plaintiff's entitlement to attorneys' fees under the CLRA is an important substantive right that is critical to the purpose and enforcement of the law because it allows consumers to pursue remedies in cases where compensatory damages are relatively modest. *Graciano v. Robinson Ford Sales, Inc*., 144 Cal. App. 4th 140, 150 (2006). Limiting the fee award—or, in this case, eliminating it all together—impedes the CLRA's legislative purpose. *Id*. Numerous courts have held similar provisions are unenforceable. *See, e.g., Newton II*, 854 F.Supp.2d at 725-26; *Saravia v. Dynamex, Inc*., 310 F.R.D. 412, 422 (N.D. Cal. 2015); *Dougherty*, 47 Cal. App. 5th at 107; *Carbajal v. CWPSC, Inc.*, 245 Cal. App. 4th 227, 251 (2016); *Bickel v.*

[11] The prior version of the arbitration agreement included such language, but Coinbase deleted it from the January 2022 version asserted here. *See* Erickson Decl., Ex. 2, Dec. 2021 UA, ¶ 8.3 (attorneys' fees provision applicable "[t]o the extent permitted by law").

*Sunrise Assisted Living*, 206 Cal. App. 4th 1 (2012).

Second, the agreement provides that, if a party needs to bring legal action to enforce the arbitration agreement and succeeds, it shall be entitled to its attorneys' fees incurred in securing the order compelling arbitration. UA, A5 ¶ 1.7. Under the present circumstances, "a fee-shifting clause directed to a motion to compel arbitration" is unconscionable, as it "denies [Plaintiffs] the rights guaranteed by [the CLRA] with a corresponding chill on access to the courts." *Patterson v. Sup. Ct.*, 70 Cal. App. 5th 473, 477-78, 489 (2021) (analyzing effect of similar fee-shifting clause where plaintiff brought claim under FEHA, Cal. Gov't. Code §§ 12900 *et seq*., which provides same one-way attorneys' fees award as CLRA); *see also Storms v. Paychex Inc*., 2022 WL 2160414, at *14 (C.D. Cal. Jan. 14, 2022) (finding similar provision to be substantively unconscionable).

Finally, the agreement provides that a prevailing party in an action deciding whether either party has satisfied any condition precedent shall be entitled to its attorneys' fees. UA, A5 ¶ 1.7. This is unreasonably one-sided since, as shown above, Coinbase is not subject to any conditions precedent and thus this would only ever come into play by Coinbase challenging a user's failure to comply with the pre-arbitration process. It also deters users from challenging the enforceability of the pre-arbitration process by financially threatening them. *See Storms*, 2022 WL 2160414, at *14; *Lim v. TForce Logistics, LLC*, 8 F.4th 992, 1003 (9th Cir. 2021).

f) <u>No Right to a Hearing for Claims Under $25,000</u>

Under the arbitration agreement, claimants with demands valued under $25,000 are not allowed a hearing, without exception. UA, A5 ¶ 1.4. Once again, Coinbase imposes harsher terms against users than those established by its chosen arbitral forum, AAA. *See* AAA, Consumer Arbitration Rules, Rules R-1(g), R-29, D-1(b) (providing that, for claims under $25,000, any party is able to request a hearing or the arbitrator may decide one is necessary).[12] Even *the opportunity* to plead one's case is out of reach for the average investor—the only people realistically asserting such low value claims. In stark contrast, Coinbase may assert it rights against users unilaterally

---

[12] AAA Consumer Arbitration Rules available at https://www.adr.org/sites/default/files/Consumer_Rules_Web_2.pdf

and outside of arbitration. *See* § IV.A.2.a, *supra*. This is further evidence of unconscionability.

3. *Severance Is Inappropriate*

"Where an arbitration agreement contains more than one unlawful provision, this weighs against severance and indicates a systematic effort to impose arbitration…not simply as an alternative to litigation, but as an inferior forum that works to the stronger party's advantage." *Reyes v. United Healthcare Servs., Inc.*, 2014 WL 3926813, at *6 (C.D. Cal. Aug. 11, 2014) (quoting *Armendariz*, 24 Cal. 4th at 124). Because "several provisions would need to be severed" to remove the unconscionable taint from the arbitration agreement, "the agreement is permeated with unconscionability and should not be enforced." *Streedharan*, 2022 WL 4537859, at *19; *see also Zaborowski v. MHN Gov't Servs., Inc.*, 936 F. Supp. 2d 1145, 1156 (N.D. Cal. 2013).

There are eight to ten unconscionable terms here, putting this case at the extreme end of the spectrum of cases analyzing severability. *See, e.g., Lim*, 8 F.4th at 1006 (refusing to sever three terms); *Davis v. Kozak*, 53 Cal. App. 5th 897, 918 (2020) (refusing to sever two terms); *Carmona*, 226 Cal. App. 4th at 90 (refusing to sever unconscionable terms regarding, *inter alia*, the asymmetrical nature of the agreement, exemption of confidentiality claims, attorneys' fees, and a provision requiring only one party to disclose their claims pre-arbitration); *LaChapelle v. Omni Hotels Mgmt. Corp*., 2021 WL 3373337, at *4 (N.D. Cal. Aug. 3, 2021) (severing a single term); *Brown v. Dow Chem. Co.*, 2019 WL 484211, at *4 (N.D. Cal. Feb. 7, 2019) (severing a single term). These numerous terms infect nearly every facet of, and are inextricably intertwined throughout, the arbitration agreement and evince an intent to use arbitration as a weapon. As unconscionability permeates, severance is inappropriate.

Additionally, several of the terms were clearly unconscionable at the time they were added, which weighs heavily against severance. The Ninth Circuit has explained that district courts properly deny a request to sever an unconscionable term if doing so would encourage persons to "overreach" when drafting an agreement with the fallback expectation that they could later "whittle down to the least offensive agreement if faced with litigation." *Lim*, 8 F.4th at 1003-04. To this end, courts have looked at the date of the arbitration agreement vis-a-vis the year(s) in which controlling case law was issued. *See, e.g., Hale v. Brinker Int'l, Inc.*, 2022 WL 2187397, at *1

(N.D. Cal. June 17, 2022) (appeal pending) (refusing to sever single unconscionable fee-shifting term where California Supreme Court declared such terms unconscionable multiple years before agreement was drafted); *Reyes v. Hearst Comms., Inc.*, 2021 WL 3771782, at *4 (N.D. Cal. Aug. 24, 2021) (same).

Like the fee-splitting terms in *Hale* and *Hearst*, terms prohibiting an arbitrator from awarding statutory remedies like punitive damages and attorneys' fees have been unenforceable under California law since 2000. *See Armendariz*, 24 Cal. 4th at 103-0; *see also Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1180 (9th Cir. 2003) (waiver of statutory attorneys' fees evinces an intent to "make the arbitration process itself an offensive weapon in [the defendant's] arsenal"). Coinbase is undoubtedly aware of this law, as its arbitration agreements have been heavily litigated. *See* Erickson Decl., ¶ 2. Yet, in January 2022, Coinbase chose to <u>add</u> multiple terms that violated these well-established rules. This can only be viewed as a knowing overreach. The Court should not indulge such an abuse of the severability doctrine. *See Lim,* 8 F.4th at 1003-04.

Finally, several of the provisions cannot be severed, either by their own terms or because doing so would change a fundamental aspect of the agreement to arbitrate. First, by its own terms, the LOL cannot be severed because it represents "fundamental elements of the basis of the bargain." UA, ¶ 8.2; A5 ¶ 1.6. Second, severing the Batch Arbitration Provision would have the effect of converting the <u>limited</u> class action waiver into an <u>unlimited</u> one, which would fundamentally change the agreement. Such a change can only be imposed on parties with their consent. *See Viking River Cruises, Inc. v. Moriana*, 142 S.Ct. 1906, 1922 (2022); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 347-48 (2011) ("changes brought about by the shift from bilateral arbitration to class-action arbitration" are "fundamental"). While *Viking River* and *Concepcion* addressed the reverse scenario, their holdings support the conclusion that striking the Batch Arbitration provision would have a fundamental impact on the nature of the proceedings, rendering severance inappropriate. *See Armendariz*, 24 Cal.4th at 124 (severance appropriate only if term is collateral). In light of the multiple unconscionable provisions and evidence of bad faith, the Court should refuse to enforce the arbitration agreement wholesale.

### B. The Delegation Clause Is Inapplicable and Unenforceable

When it comes to the question of who decides arbitrability—a court or an arbitrator—the usual presumption that exists in favor of arbitration is reversed. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944-45 (1995) (presumption is that courts, not arbitrators, determine threshold questions of arbitrability). A provision delegating questions of arbitrability to an arbitrator is therefore enforceable only if it is "clear and unmistakable." *Id.* In making that determination, courts are to construe any ambiguities against the drafting party. *Id.*

Despite repeatedly asserting that the arbitration agreement delegates to the arbitrator all questions related to the interpretation, scope, and enforceability of the arbitration agreement, Coinbase acknowledges that "exceptions" <u>to the delegation clause</u> exist but omits them from the Motion, unilaterally declaring they are "not relevant here." Mot. at 13:10-14. The four exceptions, however, are highly relevant, and Coinbase's omission raises a red flag.

The delegation clause provides that the arbitrator has exclusive authority to resolve any dispute related to the interpretation or application of the arbitration agreement, including its enforceability, "except[13] for the following:"

> (1) all Disputes arising out of or relating to the Section entitled "Waiver of Class and Other Non-Individualized Relief," including any claim that all or part of the Section entitled "Waiver of Class and Other Non-Individualized Relief" is unenforceable, illegal, void or voidable, or that such Section entitled "Waiver of Class and Other Non-Individualized Relief" has been breached, shall be decided by a court of competent jurisdiction and not by an arbitrator;
>
> (2) except as expressly contemplated in the subsection entitled "Batch Arbitration," all Disputes about the payment of arbitration fees shall be decided only by a court of competent jurisdiction and not by an arbitrator;
>
> (3) all Disputes about whether either party has satisfied any condition precedent to arbitration shall be decided only by a court of competent jurisdiction and not by an arbitrator; and
>
> (4) all Disputes about which version of the Arbitration Agreement applies shall be decided only by a court of competent jurisdiction and not by an arbitrator.

UA, A5 ¶ 1.6. The Court should reject any argument that these are exclusions to the overarching

---

[13] Coinbase's Motion quotes the delegation clause but ends the quote directly before the word "except." *See* Mot. at pp. 10, 13. Coinbase's lack of candor should be viewed skeptically and as a failure to meet its burden in establishing a "clear and unmistakable" delegation provision.

arbitration agreement as opposed to the delegation clause. Such an argument defies arbitration jurisprudence and basic cannons of interpretation. First, the exceptions can only be reasonably interpreted as carving out issues from the delegation clause, as they cover recognized "gateway questions of arbitrability," rather than merits-based "Disputes" covered by the general arbitration agreement. *See* A5, ¶ 1.1; *see also Mohamed v. Uber Techs.*, 848 F.3d 1201, 1208 (9th Cir. 2016) (term reserving for judicial determination "any claims that all or part of [class action waiver] is invalid, unenforceable, unconscionable, void or voidable" was a "carve[] out" to the "delegation provision"); *Pac. Media Workers Guild v. San Francisco Chronicle*, 2017 WL 1861853, at *3 (N.D. Cal. May 9, 2017) ("whether a contractual grievance procedure has been followed" is a "question[] of arbitrability"); *Ahlstrom v. DHI Mortg. Co., L.P.*, 21 F.4th 631, 634 (9th Cir. 2021) (issues of validity are "gateway" questions of arbitrability). Second, the qualifying phrase "…except for the following" is most reasonably read as modifying the immediately preceding language (the delegation clause), notwithstanding the words "without limitation" earlier in the sentence. A5, ¶ 1.6. If the four exceptions were intended to exempt substantive "Disputes" from the scope of the overarching arbitration agreement, they would have been included in ¶ 1.1 with the other substantive carve outs, like the one for IP claims. In *Han v. Synergy Homecare Franchising, LLC*, 2017 WL 446881, at *6 (N.D. Cal. Feb. 2, 2017), in assessing whether a carve out applied only to the arbitration provision or both the arbitration provision and delegation provision, the court found that it appeared to apply to both because it appeared in a single sentence. This distinguished the case from *Oracle Am., Inc. v. Myriad Group A.G.*, 724 F.3d 1069, 1071, 1076 (9th Cir. 2013), where the parties clearly distinguished between the arbitration provision and the delegation provision by using separate sentences. *Han*, 2017 WL 446881 at *6. The same holds true here where, whether intentionally or due to "poor drafting," the single sentence in ¶ 1.6 that contains the delegation clause and the four exceptions strongly implies that those exceptions apply to the delegation clause. *Id*. At best, it fails to distinguish between the delegation clause and the arbitration clause and thus is not clear and unmistakable. *Id.* For the reasons set forth below, the Court is the proper trier of fact to decide all questions raised in Plaintiffs' Opposition.

1. *The Exceptions to the Delegation Clause Apply Here*

The majority (if not all) of the issues Plaintiffs raise in this brief relating to the unconscionability of the arbitration agreement are expressly reserved for judicial determination by way of the four exceptions set forth above. Exception 1 is broadly worded as encompassing "all Disputes arising out of or relating to" the Class Waiver, including "any claim that all or part of [it] is unenforceable, illegal, void or voidable." *Id.* Whether the Batch Arbitration provision is unconscionable (and therefore unenforceable) falls into Exception 1 because it is fundamentally intertwined with the Class Waiver—each provision expressly incorporates the terms of the other in defining the limits of their reach. *See* § IV.A.2.c. In resolving this issue, the Court must necessarily also consider the enforceability of numerous other terms, including the confidentiality provision, discovery provision, and pre-dispute resolution process. *See id*. Thus, the unconscionability of these issues also falls into Exception 1. Exception 3, regarding conditions precedent to arbitration, independently exempts Plaintiffs' arguments in Section IV.A.2.b regarding the unconscionability of the agreement's Formal Complaint Process: To resolve whether either party has satisfied any condition precedent, the Court necessarily must first answer whether an enforceable condition precedent even exists (it does not). And, as Plaintiffs did not comply with the Formal Complaint Process, these questions are at issue. Kassfy Decl., ¶ 9; Brambl Decl., ¶ 9. Exception 4, about which version of the arbitration agreement applies, is also triggered here. *See* Mot. at pp. 12-15 (arguing that January 2022 version, as opposed to earlier versions, applies to Plaintiffs' claims).[14]

2. *The Delegation Clause Is Not "Clear and Unmistakable"*

Even if the Court finds there are issues raised herein that are not encompassed by one of the four exceptions, judicial determination of those issues is proper because the delegation clause fails the "clear and unmistakable" test. The clear and unmistakable test is meant to ensure there was an unambiguous meeting of the minds as to the agreement to arbitrate arbitrability, as a "party often might not focus …upon the significance of having arbitrators decide the scope of their own

[14] Despite directly raising the issue of which version of the arbitration agreement applies, Coinbase nevertheless claimed the exceptions were "not relevant." Mot. at p. 13.

powers." *First Options*, 514 U.S. at 945. "[W]hether the language of a delegation clause is "clear and unmistakable" should be viewed from the perspective of the particular parties to the specific contract at issue. What might be clear to sophisticated counterparties is not necessarily clear to less sophisticated employees or consumers." *Mohamed v. Uber Techs., Inc.*, 109 F. Supp. 3d 1185, 1202 (N.D. Cal. 2015), *aff'd in part, rev'd in part*, 848 F.3d 1201 (9th Cir. 2016). The Court cannot find that the parties have clearly and unmistakably manifested their intent to delegate the issue of arbitrability when the delegation clause uses double- and triple-negative exceptions sure to confuse average consumers. *Meadows v. Dickey's Barbecue Restaurants Inc.*, 144 F. Supp. 3d 1069, 1078-79 (N.D. Cal. 2015).

Paragraph 1.6 begins by referring to the arbitrator's exclusive authority to resolve any "Dispute." UA, A5 ¶ 1.6. The term "Dispute" is defined several pages earlier in ¶ 1.1, which specifically encompasses various disputes but also exempts others from its definition. Back in ¶ 1.6, the delegation clause tacks on more disputes (those "regarding the interpretation, applicability..."), before exempting others ("except [(1)-(4)]") from the scope of arbitrable disputes. If the reader's head is not spinning by this point, it surely will be by the time they reach Exception 2, which excludes disputes about the payment of arbitration fees "<u>*except* as expressly contemplated in the subsection entitled 'Batch Arbitration</u>.'" *Id.*, ¶ 1.6. The reader is, thus, faced with deciphering exceptions to exceptions to exceptions. This is an impossible task for the average consumer, especially given that the Batch Arbitration subsection includes three separate references to "fees" and it is unclear which of these Exception 2 is referring to as being "expressly contemplated." *Id.*, ¶ 1.8. Further muddying the waters about fees, paragraph 1.4 provides, "[y]our responsibility to pay any AAA fees and costs will be solely as set forth in the applicable AAA Rules." UA, A5 ¶ 1.4. If a dispute arises as to the apparent conflict between the fee-related terms in ¶ 1.4 and ¶ 1.8, who decides that? These are just a few examples of how these exceptions create significant confusion and are impossible to enforce on a practical level.

Adding more to the puzzle, Exception 3 provides that a court, not an arbitrator, shall decide any disputes "about whether either party has satisfied any condition precedent to arbitration." UA, A5 ¶ 1.6. By saying "either party," this exception implies there may be disputes as to whether

Coinbase has satisfied its condition precedent to arbitration. But, as discussed above, Coinbase has no conditions precedent to arbitration. This raises a question mark as to what "condition precedent" Exception 3 is referring to with respect to Coinbase. Coinbase, no doubt, used the words "either party" to make the unilateral exception appear bilateral but, in doing so, rendered the scope of this exception (and, in turn, the entire delegation clause) unintelligible.

In *Pinela v. Neiman Marcus Grp., Inc*., 238 Cal. App. 4th 227, 243 (2015), the court found that the meaning and import of a delegation clause far less convoluted than the one here was "beyond the ken of most anyone" except a highly trained lawyer. Here, as in *Pinela*, Plaintiffs are not lawyers versed in arbitration matters—they are average consumers—and these "obscure, difficult to comprehend" clauses operate "as traps for the unwary in mandatory arbitration agreements." *Id.*; Kassfy Decl., ¶ 7; Brambl Decl., ¶ 7. "Although the delegation clause was not hidden from [Plaintiffs,] it might as well have been." *Pinela*, 238 Cal. App. 4th at 243.

"[E]ven broad arbitration clauses that expressly delegate the enforceability decision to arbitrators may not meet the clear and unmistakable test, where other language in the agreement creates an uncertainty in that regard." *Vargas v. Delivery Outsourcing, LLC*, 2016 WL 946112, at *6 (N.D. Cal. Mar. 14, 2016). Here, several instances of conflicting terms render the delegation clause uncertain. First, ¶ 1.2 provides that "all Disputes shall be resolved by arbitration under this Arbitration Agreement *except as specified in the subsection entitled 'Applicability of Arbitration Agreement' above*," referring to ¶ 1.1. UA, A5 ¶ 1.2 (emphasis added). There is no mention of the additional exceptions set forth in ¶ 1.6. As such, ¶ 1.2 is inconsistent with the language of ¶ 1.6's delegation provision. Second, the delegation clause conflicts with the AAA Rules, which the agreement incorporates by reference. *See* UA, A5 ¶ 1.4. The AAA Rules say <u>all</u> questions of arbitrability, without exception, are to be decided by the arbitrator. *See* Mot. at 10. This obviously conflicts with the nuanced delegation clause in ¶ 1.6.[15] At minimum, it is unclear whether the

[15] Plaintiffs do not concede that the incorporation of the AAA Rules constitutes a clear and unmistakable delegation of questions of arbitrability. Quite the opposite. *See Eiess v. USAA Fed. Savings Bank*, 404 F.Supp.3d 1240, 1252 (N.D. Cal. 2019) (no clear and unmistakable delegation based on incorporation of AAA rules where consumer is not sophisticated). They point them out only to highlight the conflict they create with the delegation clause.

AAA's delegation provision or the one in ¶ 1.6 governs.[16] *See Tompkins*, 2014 WL 2903752, at *10-13 (incorporation of AAA rules was not clear and unmistakable where it was unclear whether other rules would apply and plaintiff was unsophisticated party). The AAA Rules breed further doubt about the delegation clause, as AAA provides that disputes about the payment of arbitration fees are to be resolved by an arbitrator,[17] whereas ¶ 1.6 says a court is to resolve such disputes. Again, it is unclear which rule governs. These conflicts, which must be construed against Coinbase, render the delegation clause uncertain. *Vargas*, 2016 WL 946112, at *6.

Lastly, Coinbase's reliance on *Fridman*, *Britt*, and *Mohamed* is misplaced. Coinbase claims these cases involved "nearly identical" or "similar" delegation clauses. Mot. at 10. This is quite misleading, as those delegation clauses did not involve the complexity or quantity of exceptions present here. *Britt* (at *6) did not involve any exceptions; *Fridman* (at *3) and *Mohamed* (at 1207-08) involved just one. The <u>four</u> exceptions here put this case in a class of its own.

3. *The Delegation Clause Is Unconscionable*

a) <u>Procedural Unconscionability of Delegation Clause</u>

The delegation clause is procedurally unconscionable for the same reasons as the arbitration agreement—it is a standardized contract of adhesion, presenting terms in inconspicuous font, buried in lengthy text. *See* § IV.A.1, *supra*; *see also Esquer*, 292 F.Supp.3d at 1014 (unconscionability arguments as to arbitration agreement were "no less applicable to the delegation clause" where they were asserted as to "arbitration provisions" (plural)). Like the arbitration agreement, the delegation clause in the 2022 UA introduced significant changes compared to the prior version. Yet these self-serving amendments were not called out in the User Agreement or the pop-up box requiring user consent. And as discussed in depth above, the meaning and import of the delegation clause (as modified by its exceptions) is beyond the ken of average consumers. *Pinela*, 238 Cal. App. 4th at 243; *Esquer*, 292 F.Supp.3d at 1015 (delegation clause was

---

[16] *See* UA, A5 ¶ 1.4, Rules and Forum (providing that arbitrations will be administered in accordance with AAA Rules "except as modified by *<u>this section</u>* of *<u>this Arbitration Agreement</u>*.) (emphasis added). The phrase "this section of this Arbitration Agreement" refers to ¶ 1.4 only.

[17] AAA Supp. Rule MC-6 (applicable in the event of 25 or more arbitration demands) available at https://www.adr.org/sites/default/files/Supplementary_Rules_MultipleCase_Filings.pdf

procedurally unconscionable where, *inter alia*, court found it was highly unlikely that "an unsophisticated layperson like [plaintiff] would understand the significance of the delegation clause.") *Tiri v. Lucky Chances, Inc.*, 226 Cal. App. 4th 231, 246 (2014) (same).

b) Substantive Unconscionability of Delegation Clause

Many of the above provisions above operate to render the delegation clause substantively unconscionable. "A delegation clause lacking mutuality imposes an unfair burden that qualifies as unconscionable." *Bielski v. Coinbase, Inc.*, 2022 WL 1062049, at *2 (N.D. Cal. April 8, 2022) (appeal pending); *see also Savaria*, 310 F.R.D. at 421 (same); *Fitz*, 118 Cal. App. 4th at 725 (exemption for claims more likely to be brought by employer rendered arbitration agreement substantively unconscionable). As explained in Section IV.A.2.b, Exception 3 to the delegation clause for questions regarding conditions precedent is unilateral, as only users are subject to a condition precedent. It is also unreasonably favorable to Coinbase by letting it skirt the arbitration fees it would otherwise have to pay for an arbitrator to determine whether users' claims should be dismissed for failure to comply with the pre-arbitration process. Instead, Coinbase can ask a court to make that decision (for free) and retain appellate rights. Exception 2 for disputes regarding the payment of fees also only serves to benefit Coinbase as it is the one with the lion's share of the financial obligation in arbitration. These exceptions strip the delegation clause of mutuality. *See J.P. on behalf of R.P. v. Educ. Testing Servs*., 2020 WL 10693044, at *6 (C.D. Cal. Oct. 30, 2020) (delegation clause was substantively unconscionable based in part on exception that favored defendants); *Lopez v. Bartlett Care Center, LLC*, 39 Cal. App. 5th 311, 321-22 (2019) (same).

Other terms as applied to the delegation clause render it unconscionable by impeding Plaintiffs' ability to arbitrate the threshold issue of whether the arbitration agreement as a whole is unconscionable. Because all disputes—including those gateway disputes encompassed by the delegation provision—are subject to Coinbase's unilateral pre-arbitration procedures, these procedures contribute to the substantive unconscionability of the delegation provision, as well as the broader agreement to arbitrate. *See* § IV.A.2.b, *supra*. Similarly, should the pre-arbitration process prove unsuccessful, the threshold dispute must proceed via arbitration governed by the Class Waiver and Batch Arbitration provision. Thus, all the arguments made above as to the

unconscionability of those terms apply with equal force to the delegation clause, rendering it unenforceable. *See* § IV.A.2.c, *supra*; *Alkutkar v. Bumble, Inc.*, 2022 WL 4112360, at *8, n. 3 (N.D. Cal. Sept. 8, 2022) (unconscionability arguments as to arbitration clause were analyzed specifically as to delegation clause where plaintiff argued delegation clause was unconscionable for the same reasons arbitration clause was unconscionable).

The attorneys' fees provisions, especially the right to recover fees if successful in compelling arbitration, also apply with one-sided harshness to the delegation clause. *See* § IV.A.2.e, *supra*.; *Saravia*, 310 F.R.D. at 421 (delegation clause substantively unconscionable where attorneys' fees provision imposed on plaintiff the risk of having to pay attorneys' fees if he lost "even as to the limited issue of arbitrability" and noting that plaintiff "would not face such a risk if he is permitted to vindicate his rights to be free from an unconscionable contract in court"); *Hearst Comm's., Inc*., 2021 WL 3771782, at *4 (same).

Finally, the confidentiality provision as applied to the delegation clause is one-sided and unconscionable. While Coinbase retains information regarding what strategies and arguments succeed in convincing arbitrators of the enforceability of the arbitration agreement, claimants have no access to this information. Absent the ability to obtain and analyze the results of other proceedings, claimants must re-start from square one with each argument on this issue.

c) <u>Severance of Unconscionability from Delegation Clause Is Inappropriate</u>

"Severing [multiple] unenforceable provisions of an arbitration clause (or as here, a delegation clause) would allow [Coinbase] to draft one-sided agreements and then whittle down to the least-offensive agreement if faced with litigation, rather than drafting fair agreements in the first instance." *Saravia,* 310 F.R.D. at 421. As in *Saravia*, the multiple unconscionable provisions applicable to the delegation clause here "suggest that the overall intention of the arbitration agreement was to force [the party of lesser bargaining power] into unfair arbitration" *Id.* (declining to sever the three unconscionable terms from delegation clause). Severance is therefore improper. *See also* § IV.A.3, *supra* (discussing severance as to arbitration agreement).

## V. <u>CONCLUSION</u>

For all the reasons stated herein, the Court should deny Coinbase's Motion.

Dated this November 17, 2022.

Erickson Kramer Osborne, LLP

/s/ Julie C. Erickson

Julie Erickson
Elizabeth Kramer
Kevin Osborne
Attorneys for Plaintiffs Kenneth Donovan, Hussien Kassfy, and John Brambl