## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KENNETH DONOVAN, HUSSIEN KASSFY, and JOHN BRAMBL, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GMO-Z.COM TRUST COMPANY, INC.<br><br>Defendant. | Case No. 1:23-cv-08431-AT<br><br>Hon. Analisa Torres<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Lead Plaintiffs Kenneth Donovan, Hussien Kassfy, and John Brambl (collectively, "Plaintiffs"), by and through their attorneys and on behalf of all others similarly situated, allege the following upon information and belief, except as to those allegations concerning each Plaintiff, which are alleged upon his personal knowledge, against Defendant GMO-Z.com Trust Company, Inc. ("GMO Trust" or "Defendant"). Plaintiffs' information and belief are based on, among other things, their counsel's investigation, which includes: (i) a review and analysis of press releases and other public statements about the GYEN cryptocurrency and by and about Defendant GMO Trust, (ii) a review and analysis of press releases and public statements by and about non-parties GMO Internet Group, Inc. ("GMO Internet Group"), GMO Trust's Chief Executive Officer ("CEO"), Ken Nakamura ("Nakamura"), Coinbase Global, Inc. and Coinbase, Inc. (together, "Coinbase"),[1] and Binance Holdings Ltd. ("Binance"); (iii) a review and analysis

---

[1] This case was originally commenced in the Northern District of California in the case captioned *Donovan, et al. v. GMO-Z.Com Trust Company, Inc., et al.*, No. 3:22-cv-02826-TLT, against GMO-Z.com Trust Company, Inc.; Coinbase Global Inc.; and Coinbase Inc. The Honorable Trina L. Thompson entered an order on January 6, 2023 compelling the claims against Coinbase to arbitration (DE 78) and those proceedings are stayed. On July 13, 2023, Judge Thompson

of media reports about the GYEN cryptocurrency, Defendant, GMO Internet Group, Coinbase, and Binance; (iv) other publicly disclosed reports and information about the GYEN cryptocurrency, Defendant, GMO Internet Group, Coinbase, and Binance; and (v) consultation with consulting experts.

## I.    SUMMARY OF ACTION

1.    This is a class action on behalf of all persons or entities who purchased or otherwise acquired the GYEN cryptocurrency issued between December 29, 2020 through the present and were damaged as a result.  Lead Plaintiffs bring claims for violations of Sections 5(a), 5(c), and 12(a)(1) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77e(a), 77e(c), and 77l(a)(1); the New York General Business Law §§ 349 and 350; the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*; and the California False Advertising Law, Cal. Bus. & Prof. Code § 17500 *et seq*.

2.    Since the introduction of Bitcoin in late 2008, digital assets have evolved from a technological curiosity into a market of over 9,000 digital financial instruments transacted in by millions of ordinary Americans.  Today there are over 15,000 separate digital asset tokens in existence, with a market capitalization of over $2.5 trillion.  An estimated 60-90 million Americans own Bitcoin and other digital assets, and that number is growing rapidly.

3.    GYEN is a cryptocurrency issued by GMO Trust, as well as GMO Internet Group through its subsidiary GMO Trust, that can be bought, sold, and exchanged on proprietary platforms.  The GYEN trades globally on public exchanges, including the exchange operated by Coinbase, and formerly on the exchange operated by Binance.  It is in a class of cryptocurrency

---

entered an order, pursuant to a stipulation of the parties, severing the claims against GMO-Z.com Trust Company, Inc. and transferring them to this Court pursuant to 28 U.S.C. § 1404(a). DE 84.

referred to as a "stablecoin" because, unlike Bitcoin, it is claimed to be (and sometimes is) collateralized with an actual underlying hard asset and marketed as a digital asset intended to maintain a stable value against other "fiat" or government-issued currencies—here, the Japanese yen.

4.      GYEN is purportedly "pegged" to the Japanese yen at a rate of 1-to-1.  Because Defendant claims to actively back it by a fiat currency, and specifically one that is historically considered steady, Defendant markets it as a type of investment that can "virtually eliminate volatility" and be used by institutional and retail traders alike to "earn meaningful yields" and realize profits from trading strategies such as hedging and arbitrage.[2]

5.      Although marketed as a "stablecoin," in the three years since it was first issued, GYEN has been anything but stable.  Defendant failed to disclose to buyers that the GYEN asset is susceptible to wild fluctuations in value.  While the Japanese yen has fluctuated only 7 percent against the U.S. dollar since January 2021, GYEN fluctuated *over 200 percent against the U.S. dollar*.  Understandably, some central banks and international trade organizations have deemed the term "stablecoin" confusing and even misleading.[3]  Indeed, the European Central Bank

---

[2] *See, e.g.*, White Paper issued by GMO Trust, Version 1.1 (Jan. 14, 2021) ("GYEN White Paper"), at 7, https://web.archive.org/web/20210311041456/https://stablecoin.z.com/assets/pdf/Whitepaper.pdf (archived Mar. 11, 2021).

[3] Larry Cermak, Mike Rogers, Lars Hoffmann, *Stablecoins: Bridging the Network Gap Between Traditional Money and Digital Value*, p. 22, The Block Research, Commissioned by GMO-Z.com Trust Company, Inc. (Mar. 10, 2021), https://www.tbstat.com/wp/uploads/2021/03/20210310_Stablecoin_Report_v1.0.pdf (citing *Financial Action Task Force Report to the G20 Finance Ministers and Central Bank Governors on So-called Stablecoins*, p. 2 (June 2020)).

Financial Action Task Force, for example, "considers that the term 'stablecoin' is not a clear legal or technical category, but is primarily a marketing term used by promoters of such coins."[4]

6.      Defendant receives interest and other earnings on fiat currency paid to it by GYEN purchasers, and, on information and belief, its partnerships with Binance, Coinbase, and other cryptocurrency exchanges allowed Defendant to drive demand for the GYEN and issue GYEN to more investors, thereby generating profits for Defendant and its partners.

7.      In this case, Plaintiffs bought GYEN tokens with the expectation that Defendant's efforts to maintain the GYEN's 1-to-1 peg to the Japanese yen would allow it to realize profits on its GYEN investments.  The profits would come from the efforts of Defendant to create, promote, operate, and maintain the GYEN, and would be realized either through direct redemption with Defendant or in the secondary market.  Defendant was solely responsible for maintaining the GYEN's 1-to-1 peg to the Japanese yen and for effectuating partnerships with cryptocurrency exchanges that allowed GYEN purchasers to earn yield on their GYEN investments, and Plaintiffs and the Class were entirely dependent on the managerial and entrepreneurial efforts of Defendant, both when they initially purchased GYEN and when they later deposited and sold them on secondary exchanges.  Indeed, whether GYEN purchasers earn income on their purchases primarily depends on Defendant's efforts to maintain the GYEN's 1-to-1 peg to the Japanese yen.

8.      To drive demand for GYEN, and thereby increase the profits it can derive from selling GYEN, Defendant advertised, and its website linked to, various "partner" exchanges,

---

[4] *Id.*

including Binance and Coinbase,[5] which Defendant used to create markets where GYEN could

be traded, and to allow GYEN investors to more readily earn yield on their GYEN investments.

9.      On or around May 12, 2021, when Binance first allowed GYEN trading on its

exchange, the asset immediately came untethered from the yen and rose sharply in value.  As

would happen again later, those GYEN purchasers whose orders took time to fill after opening

on Binance, or who mistakenly bought when the asset was untethered from the yen, lost as much

as 99 percent of their purchase value within hours.

10.     On November 16, 2021, when Coinbase first allowed GYEN trading on its

exchange, the asset again immediately came untethered from the yen and rose sharply in value.

Investors placed orders believing the coin's value was, as Defendant advertised, equal to the yen.

However, the tokens they were purchasing were worth up to *seven times more than the yen*.  Just

as suddenly, the GYEN's value plunged back to the peg—falling 80 percent in one day.

11.     Defendant has since disclaimed any responsibility for losses sustained from these

events.  However, at all relevant times, Defendant advertised its partnerships with exchanges as

among the GYEN's primary benefits—as platforms on which potential GYEN purchasers could

buy, sell, and exchange their GYEN on a 1-to-1 basis with the Japanese yen.  Among the

GYEN's "Key Product Features and Benefits" promoted in Defendant's January 14, 2021 and

September 9, 2021 versions of the "GYEN White Paper"—its key writing on the GYEN—was

the fact that GYEN is both "highly liquid," and could be purchased and redeemed on a 1-to-1

---

[5] Coinbase holds itself out as a centralized marketplace for cryptocurrency traders, where it
appears to act as an unregistered broker-dealer of financial instruments that are claimed to be
unregulated.  Centralized exchanges such as Coinbase remain the most popular way for retail
traders to purchase cryptocurrencies such as GYEN.  *See* Cy Watsky, Jeffrey Allen, *Primary and
Secondary Markets for Stablecoins*, Board of Governors of the Federal Reserve System (Feb. 23,
2024), https://www.federalreserve.gov/econres/notes/feds-notes/primary-and-secondary-markets-
for-stablecoins-20240223.html.

basis with the Japanese yen, either from Defendant directly, "or by trading with other digital assets on exchanges that list stablecoins."  In these same disclosures, Defendant touted its partnerships with these "liquidity provider" exchanges as places where investors could purchase, sell, and trade their GYEN.  The first identified version of the GYEN White Paper from which these statements were removed is dated August 3, 2022—almost a year after the last depegging event that occurred on Coinbase in November 2021.  Even so, Defendant continues to tout the partner exchanges as viable avenues for buying, selling, and trading GYEN—as of the date of this Second Amended Complaint, Defendant advertises on its website that GYEN—which it states is stable and pegged to the Japanese yen—can be traded at 15 retail and institutional exchanges.[6]

12.    Plaintiffs and the Class, composed of thousands of GYEN purchasers, bought GYEN as a result of Defendant's national marketing campaign wherein Defendant made numerous and widespread public statements about the GYEN and Defendant's efforts to stabilize it on a 1-to-1 basis with the Japanese yen, as well as the GYEN's uses as an investment vehicle to earn yield, protect against downside risk, and to provide other profit-generating opportunities across Defendant's partner exchanges, and, as a result, collectively lost untold millions.

## II.    JURISDICTION AND VENUE

13.    This Complaint is filed, and these proceedings are instituted, to recover damages and to obtain other relief to which Plaintiffs are entitled due to Defendant's unregistered and unqualified offers and sales of securities in violation of Sections 5(a), 5(c), and 12(a)(1) of the

---

[6] *See* GMO Trust, GYEN Digital JPY, https://stablecoin.z.com/gyen/ (last visited Mar. 11, 2024).

Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), and 77l(a)(1); and due to Defendant's false advertising, and unfair competition under California and New York law.

14.    This Court has subject matter jurisdiction over claims under the Securities Act pursuant to 28 U.S.C. § 1331 and Section 22 of the Securities Act, 15 U.S.C. § 77v, and supplemental jurisdiction over the entire action under 28 U.S.C. § 1367.

15.    This Court has personal jurisdiction over Defendant as a result of its acts occurring in or aimed at New York State in connection with the unregistered offers and sales of securities in violation of Sections 5 and 12(a)(1) of the Securities Act, 15 U.S.C. §§ 77e and 77l.

16.    This Court also has personal jurisdiction over Defendant because its principal place of business is in New York, New York.

17.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), (c), and (d), and Section 22 of the Securities Act, 15 U.S.C. § 77v, because many of Defendant's acts and practices that give rise to this Complaint substantially occurred in this District.  At all relevant times, GMO Trust had an office in New York, New York, where it oversaw the issuance, redemption, and maintenance of the GYEN token, and where it conducted its corporate, financial and accounting, marketing, sales, and other functions.  In addition, GMO Trust stipulated to have this matter transferred to this District from the Northern District of California where the case was initially filed.

18.    In connection with the wrongful acts alleged in this Complaint, Defendant, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of national cryptocurrency exchanges.

III.    **PARTIES AND RELEVANT NON-PARTIES**

A.    **Plaintiffs**

1.    **Kenneth Donovan**

19.    Plaintiff Kenneth Donovan ("Donovan") is a resident of the state of New York. Plaintiff Donovan paid more than $335,000 to order GYEN tokens in 2021 as a result of Defendant's national marketing campaign and representations promoting the GYEN and the fact that it was pegged 1-to-1 to the Japanese yen.  Unknown to Plaintiff Donovan, at the time his order was placed, the GYEN's value was not pegged to the Japanese yen.  Within hours after the order was filled, his GYEN tokens lost more than 90 percent of their value, which was never recovered.

2.    **Hussien Kassfy**

20.    Plaintiff Hussien Kassfy ("Kassfy") is a resident of the state of California. Plaintiff Kassfy paid approximately $113,000 to order GYEN tokens in 2021 as a result of Defendant's national marketing campaign and representations promoting the GYEN and the fact that it was pegged 1-to-1 to the Japanese yen.  Unknown to Plaintiff Kassfy, at the time his order was placed, the GYEN's value was not pegged to the Japanese yen.  Within hours after the order was filled, his GYEN tokens lost more than 70 percent of their value, which was never recovered.

3.    **John Brambl**

21.    Plaintiff John Brambl ("Brambl") is a resident of the state of New Mexico. Plaintiff Brambl paid approximately $175,000 to order GYEN tokens in 2021 as a result of Defendant's national marketing campaign and representations promoting the GYEN and the fact that it was pegged 1-to-1 to the Japanese yen.  Soon after the order was filled, his GYEN tokens lost more than 66 percent of their value, which was never recovered.

### B.    Defendant GMO-Z.com Trust Company, Inc.

22.    Defendant GMO-Z.com Trust Company, Inc. ("GMO Trust") is a New York

Limited Purpose Trust Company engaged in financial services for retail customers, organized

and existing under the laws of the State of New York, with its principal place of business located

at 150 East 52nd Street, Suite 7003, New York City, New York.  GMO Trust was incorporated in

the state of New York under New York State banking laws and regulated by the New York State

Department of Financial Services since December 29, 2020.  It is a wholly owned subsidiary of

GMO Internet Group.  On information and belief, at all relevant times, GMO Trust assented to

GMO Internet Group's manifestation of intent to grant GMO Trust the authority to act on its

behalf, and did act on GMO Internet Group's behalf in carrying out the misconduct alleged

herein.

### C.    Non-Parties

#### 1.    GMO Internet Group

23.    GMO Internet Group, Inc. ("GMO Internet Group"), headquartered in Tokyo,

Japan, with its principal place of business located at Cerulean Tower 4-14F, 26-1

Sakuragaokacho, Shibuya-ku, Tokyo 150-8512, Japan, is an internet services industry company

founded in 1991.  It is one of the largest internet conglomerates in the world.  It owns or operates

over 100 companies worldwide with over 5,000 employees and combined revenues exceeding $1

billion annually.  The conglomerates' services range from web hosting to online advertising.

GMO Internet Group operates the world's largest online foreign exchange trading platform, as

well as a large-sized Bitcoin mining operation.

24.    Defendant's dedicated website for the GYEN shows that GMO Trust's "team"

consists of at least one director who also serves as an executive officer of GMO Internet Group,

one board member/Chief Commercial Officer who "join[ed] GMO Internet Group in 2018[,]"

and one Chief Information Security Officer ("CISO") who is also the CISO of GMO Internet Group.  In addition, GMO Internet Group is displayed prominently on Defendant's dedicated website for the GYEN, with links to GMO Internet Group's website made available under "corporate profile" and "investor relations" buttons.  Further, as alleged herein, on at least three occasions, GMO Internet Group was named as a party to and/or was responsible for issuing news about Defendant's partnerships with cryptocurrency exchanges, including their partnership with Binance.  *See, e.g.*, ¶¶ 67, 70, 73-75.

### 2.    Ken Nakamura

25.    Ken Nakamura ("Nakamura") is and was at all relevant times GMO Trust's CEO. On information and belief, Nakamura is a resident of New York State.  According to his biography listed on Defendant's dedicated website for the GYEN, Defendant Nakamura "has served GMO Internet Group for over thirty years with a proven track record in developing and executing new businesses.  He has established the first U.S.-based entity for GMO Internet Group and completed multiple strategic partnership deals in different business verticals such as mobile gaming, web hosting, online advertising, domain registry, and onboarding new businesses to GMO Internet Group.  Previously, he was the Chief Marketing Officer with GMO-Z.com Switzerland AG, where he oversaw Bitcoin mining business strategy, sales, and partnership development."[7]

### 3.    Coinbase Entities

26.    Coinbase Global, Inc. is a Delaware corporation.

---

[7] GMO Trust, *About GMO-Z.com Trust Company*, https://stablecoin.z.com/company/ (last visited Mar. 11, 2024).

27.    Coinbase, Inc. is a Delaware corporation headquartered in San Francisco, California.  Coinbase, Inc. is a wholly-owned subsidiary of Coinbase Global, Inc.

28.    Coinbase Global, Inc. and Coinbase, Inc. are operated as a single company and users have no visibility into which entity they are transacting with.  Coinbase refers to the two entities jointly as the "Company" in its SEC filings.  Coinbase created and operates a website from which customers can buy and sell digital assets—the Coinbase platform—on which GYEN was traded.

29.    This Complaint refers to both Coinbase Global, Inc. and Coinbase, Inc. as "Coinbase."

### 4.    Binance Holdings Ltd.

30.    Binance Holdings Ltd. ("Binance") is a global cryptocurrency company founded in 2017 by Chinese-born Canadian businessman Changpeng Zhao.  Initially headquartered in Shanghai, Binance has since moved its holding company to the Cayman Islands, but purports to be without a headquarters and has reportedly declined to state the location of the main Binance exchange.[8]  Binance is widely credited as operating the world's largest cryptocurrency exchange by volume.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Cryptocurrencies and Cryptocurrency Exchanges

31.    Cryptocurrency is a digital medium of exchange designed to work like fiat currency but without the control or oversight of a centralized government authority.  It is referred

---

[8] Tom Wilson & Hannah Lang, *Binance, world's top crypto exchange, at Center of US Investigations*, Reuters (June 5, 2023), https://www.reuters.com/technology/binance-worlds-top-crypto-exchange-center-us-investigations-2023-03-27/; Katelyn Peters, *Binance Exchange*, Investopedia (updated Nov. 22, 2023), https://www.investopedia.com/terms/b/binance-exchange.asp.

to as a "digital asset" and is issued or transferred using a distributed blockchain ledger—a peer-to-peer database spread across a network of thousands of computers and that records all transactions publicly.

32.    The earliest decentralized cryptocurrency, Bitcoin, was created in late 2008 and first became available in 2009.  Bitcoin is a collection of theoretical coins that, when generated or acquired, go into an owner's digital "wallet."  The wallet serves the same function as a bank or brokerage account but is maintained by the owner and not by a bank.  The coins can, in theory, be used to buy and sell goods and services with no involvement from banks or other intermediaries.

33.    Blockchains—those peer-to-peer-network public ledgers that track ownership and transfers—stand at the core of many crypto assets.  While their technical protocols may vary, blockchains are generally designed to achieve similar goals of decentralization and transparency.

34.    Accordingly, blockchains are designed as a framework of incentives that encourages people to do the work of validating transactions on the network.  In the case of Bitcoin, those engaged in validation must solve a "Proof of Work" mathematical problem by expending computational resources.  The first person to solve the "Proof of Work" problem is rewarded in newly minted Bitcoin.  This process is known as "mining" Bitcoin.

35.    Mining is one method of acquiring cryptocurrencies such as Bitcoin.  Another is simply to buy cryptocurrencies from another party, typically on decentralized or centralized online cryptocurrency exchanges.[9]

---

[9] Merkeleon, *Centralized Exchanges VS Decentralized Exchanges*, LinkedIn (Oct. 19, 2023), https://www.linkedin.com/pulse/centralized-exchange-vs-decentralized-merkeleon-software-q70uf/.

36.     Centralized exchanges, or CEXs, are online platforms that act as intermediaries between buyers and sellers of digital assets.  These exchanges function as the most important vehicles for transacting in the cryptocurrency market.

37.     Decentralized exchanges, often referred to as DEXs, are peer-to-peer marketplaces where cryptocurrency traders make transactions directly without handing over management of their funds to an intermediary or custodian.  Unlike centralized exchanges, decentralized exchanges operate without a central authority, allowing users to trade directly with each other through self-executing agreements written in code called *smart contracts*.  *Peer-to-peer* refers to a marketplace that links buyers and sellers of cryptocurrencies.  They are usually non-custodial, which means that users keep control of their wallets' private keys.  A private key is a type of advanced encryption that enables users to access their cryptocurrencies.  Users can immediately access their crypto balances after logging into the decentralized exchange with their private keys.[10]  On many decentralized exchanges, including several with whom GMO Trust and GMO Internet Group partnered, users are able to earn yield by serving as "liquidity providers" to traders, sometimes referred to as adding to the decentralized exchange's "liquidity pool."[11]

### B.    Stablecoins Generally

38.     While Bitcoin and other cryptocurrencies have generally failed to gain acceptance as a means of payment in ordinary commerce, cryptocurrency has thrived in other ways.  For example, cryptocurrencies have, in recent times, been an investment darling for market speculators.  Those generating cryptocurrency are required to dedicate a tremendous amount of

---

[10] Cointelegraph, *What are decentralized exchanges, and how do DEXs work?*, https://cointelegraph.com/learn/what-are-decentralized-exchanges-and-how-do-dexs-work (last visited Mar. 11, 2024).

[11] David Kemmerer, *The 5 Best Decentralized Exchanges in 2024 (Reviewed by Experts)*, CoinLedger, https://coinledger.io/tools/best-decentralized-exchanges (last visited Mar. 11, 2024).

computing resources to the endeavor, making the coins both scarce and expensive. Additionally, as mentioned, the value of cryptocurrency relative to fiat currency is often highly volatile, with many of the most traded cryptocurrencies fluctuating more than 100 percent in value in a single year. These fluctuations give daredevil investors opportunities to amass fortunes overnight.

39.     In an apparent attempt to bring stability to cryptocurrency, in 2014 companies began marketing a type of cryptocurrency called "stablecoins." Stablecoin issuers market stablecoins as an asset that counteracts the instability of cryptocurrency by tethering the asset's value to an underlying "hard" asset, such as a commodity or fiat currency. For each coin issued, the issuer provides the managerial and technological service of maintaining a pegged value by, among other things, holding an equal value of underlying hard asset in reserve. As some central banks and international trade organizations have opined, however, the term "stablecoin" can be confusing and, in some circumstances, downright misleading.[12] Indeed, the European Central Bank's Financial Action Task Force "considers that the term 'stablecoin' is not a clear legal or technical category, but is primarily a marketing term used by promoters of such coins."[13]

### C.     GMO Trust, GMO Internet Group, and the GYEN Stablecoin

40.     GMO Internet Group is a Tokyo-based internet conglomerate—one of the largest in the world. Among other things, it also operates the world's largest online foreign exchange trading platform, as well as a large-sized Bitcoin mining operation.

---

[12] *Stablecoins: Bridging the Network Gap Between Traditional Money and Digital Value*, p. 22, The Block Research, Commissioned by GMO-Z.com Trust Company, Inc. (Mar. 10, 2021), https://www.tbstat.com/wp/uploads/2021/03/20210310_Stablecoin_Report_v1.0.pdf (citing *Financial Action Task Force Report to the G20 Finance Ministers and Central Bank Governors on So-called Stablecoins*, p. 2 (June 2020)).

[13] *Id.*

41.     In 2020, GMO Internet Group created GMO Trust.  GMO Trust is a limited purpose trust company formed in the State of New York under the Department of Financial Services' Virtual Currency Law.  GMO Trust was the seventh company to be granted this charter by the Department.  On information and belief, GMO Internet Group created GMO Trust solely to carry out operations in the United States that GMO Internet Group would have otherwise carried out itself.

42.     After it received its charter on December 29, 2020, GMO Trust began a nationwide marketing campaign for GYEN, which it called the "world's first regulated Japanese YEN-pegged stablecoin."  Defendant touted the GYEN as offering the anonymity and freedom of cryptocurrency with additional advantages for those who would usually seek the benefits of investing in and hedging foreign currencies.

43.     On February 17, 2021, Defendant announced on its website that customers would soon be able to purchase GYEN directly through their website and that it was "expanding [its] partnerships network with exchanges that operate globally, which allows you to trade GYEN . . . with your familiar digital assets anywhere in the world."[14]

44.     On March 1, 2021, Defendant announced the official launch of the GYEN in the United States.  The asset was sold directly by Defendant and on third-party exchanges dealing in cryptocurrencies throughout the country.

45.     After receiving its license in December 2020, Defendant engaged in a national marketing campaign promoting the GYEN as a digital asset that, subject to its managerial efforts, would remain pegged 1-to-1 in value to the Japanese yen.

---

[14] GMO Trust, *The First Regulated JPY-pegged Stablecoin, GYEN* (Feb. 17, 2021), https://medium.com/gmo-z-com-trust-company/introducing-the-first-regulated-jpy-pegged-stablecoin-gyen-c3d1a80c91ee.

46.     In a report authored by The Block Research and commissioned and published by

GMO Trust in March 2021, stablecoins were described as follows:

> Stablecoins are mostly viewed as bearer monetary assets designed to
> mimic the price of fiat currencies by utilizing a stabilization mechanism.

47.     According to the GYEN White Paper, GYEN anchors its value to the price of the

Japanese Yen:

> [P]egged 1-to-1 with fiat currency, we can virtually eliminate volatility,
> while still benefiting from the advantages of digital assets, such as high
> transaction speeds matched with low costs.[15]

48.     Prior to offering GYEN to U.S. investors, Defendant distributed promotional

videos on LinkedIn and YouTube promoting GYEN's stability and 1-to-1 peg to the Japanese

yen:

> GYEN is the first stablecoin pegged 1:1 to the Japanese YEN and is fully
> regulated by the New York Department of Financial Services (NYDFS).
> Enjoy the YEN, while trading with dozens of liquidity venues across the
> globe – both retail and institutional.



---

[15] GYEN White Paper, *supra* note 2.

GYEN is the first stablecoin pegged 1:1
to the Japanese YEN and is fully
regulated by the New York Department of Financial Services

49.     Defendant published numerous statements and documents on the *stablecoin.z.com*
website repeating the claims that the asset is pegged at a rate of 1-to-1 to the Japanese yen.
These include a statement on the landing page that GMO Trust is "The World's First Regulated
JPY-Pegged Stablecoin Issuer," and a carousel of linked articles titled "New York Regulator
Licenses GMO Internet to Issue the First JPY-Pegged Stablecoin" and "Japanese Internet Giant
Licensed to Issue First JPY-Pegged Stablecoin in New York."  The site's "FAQ" page includes
the statement that "the exchange rate for GYEN/JPY … will always be 1:1 through GMO-Z.com
Trust Company's official Purchase/Redemption process."[16]  The site further posted several
"independent accountant report" documents from May 2021 to April 2022 stating GYEN is "the
world's first regulated Japanese yen-pegged stablecoin," and is "pegged 1:1 to the Japanese
yen."  The report notes that this information is "provided by GMO-Z.com Trust Company, Inc."

50.     Defendant also advertised the use of partner exchanges in earlier versions of the
GYEN White Paper as among the GYEN's "Key Product Features and Benefits" and promoted
these partnerships as "liquidity providers" where potential investors could purchase GYEN in the
open market.[17]

51.     Even more, at all relevant times through both the May and November 2021
depegging event, Defendant touted in the GYEN White Paper (Defendant's key marketing and

---

[16] GMO Trust, *Can I always redeem it here with the ratio of 1:1?*,
https://support.stablecoin.z.com/hc/en-us/articles/360053460033-Can-I-always-redeem-it-here-with-the-ratio-of-1-1 (last visited Mar. 11, 2024).

[17] *See* GYEN White Paper (Jan. 14, 2021 and Sept. 9, 2021), at 5-6.

sales disclosure for the GYEN) the parity between GYEN and the Japanese yen—*that one could "always redeem 1 GYEN for 1 JPY . . . directly with GMO Trust, or by trading with other digital assets on exchanges that list the stablecoins*" (emphasis added).

52.    In a subsequently issued GYEN White Paper dated August 3, 2022—almost a year after the last depegging event that occurred in November 2021—the clause about 1-to-1 pegging on exchanges was removed from the list of GYEN's purported "Key Product Features and Benefits" and an entire paragraph promoting its partnerships with exchanges was deleted.[18]

53.    In sum, Defendant's marketing materials omitted facts that were critically important and would be material to any potential GYEN purchaser.  Defendant omitted from its GYEN White Paper, marketing, disclosures, and public documents that the asset's value was likely to fall out-of-line with the 1-to-1 peg to the Japanese yen.  Purchasers seeing Defendant's marketing would believe the value of a GYEN token was necessarily equal to the value of one Japanese yen.  In truth, the value of GYEN had little connection at all to the value of the yen.  This general fact was true because of a litany of other facts omitted from Defendant's disclosures, including:

- The value of GYEN was subject to fluctuations completely independent of the Japanese yen when traded on third-party exchange platforms;

- An insufficient supply of minted GYEN to meet demand for the asset subjected the asset to low liquidity, particularly when it was first made available for purchase on third-party exchanges;

- When the asset's low liquidity coincided with a period of high demand, such as when it was initially promoted and introduced on a third-party

---

[18] *See* GYEN White Paper (Aug. 3, 2022), at 5-6.

exchange, its value was prone to rise relative to the Japanese yen such that it became "unpegged";

- Investors could place buy orders for GYEN at a time when the asset's value appeared pegged to the Japanese yen, but delays in filling the order could cause the price they actually paid for the asset to be higher than the value of the yen;

- Purchasers of GYEN who entered into purchase contracts when the asset was unpegged were purchasing an asset that was not, in fact, valued at a ratio of 1 GYEN to 1 Japanese yen; and

- Purchasers whose orders for GYEN were filled at times when the asset was unpegged from the Japanese yen had no right to redeem the asset at the price they had paid for it, which they had been misled to believe was valued at a 1-to-1 ratio with the Japanese yen when they purchased it.

**D.    Defendant Marketed GYEN as a Security**

**1.    Regulatory Background**

54.    At the most basic level, a security is a financial asset or instrument that has value and can be bought, sold, or traded.  Some of the most common examples of securities include stocks, bonds, options, mutual funds, and exchange-traded funds ("ETFs").  Securities are interests representing rights in something else of value.  Securities differ significantly from other things that are traded in commerce to the extent that they are intangible and are neither produced nor consumed.

55.    The Securities Act controls the registration and sale of securities.  The Securities Exchange Act of 1934, 15 U.S.C. § 78u-4 (the "Exchange Act") controls trading of those

securities after issue.  Both are governed by the U.S. Securities & Exchange Commission ("SEC").

56.    Under the Securities Act, a "security" has an exceptionally broad definition, encompassing the instruments detailed above, and more.  Notably, under Section 2(a)(1) of the Exchange Act, an "investment contract" is considered a security, 15 U.S.C. § 77b(a)(1).

57.    The Supreme Court has adopted a test to determine if an instrument is an investment contract and likewise a security in *SEC v. W.J. Howey, Co.*, 328 U.S. 293 (1946). Under *Howey*, an investment contract is defined as "a contract, transaction, or scheme whereby a person invests [their] money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise."  *Id.* at 298–99.

58.    The SEC published a "Framework for 'Investment Contract' Analysis of Digital Assets" (the "Framework") in April 2019, providing "a framework for analyzing whether a digital asset is an investment contract and whether offers and sales of a digital asset are securities transactions."[19]  GYEN tokens are securities under the SEC's Framework.

59.    The Framework explains the basics of the *Howey* test:

> The U.S. Supreme Court's *Howey* case and subsequent case law have found that an "investment contract" exists when there is the investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others.  The so-called "*Howey* test" applies to any contract, scheme, or transaction, regardless of whether it has any of the characteristics of typical securities.  The focus of the *Howey* analysis is not only on the form and terms of the instrument itself (in this case, the digital asset) but also on the circumstances surrounding the digital asset and the

---

[19] SEC, *Framework for "Investment Contract" Analysis of Digital Assets*, https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets (last visited Mar. 11, 2024).

manner in which it is offered, sold, or resold (which includes secondary marker sales). Therefore, issuers and other persons and entities engaged in the marketing, offer, sale, resale, or distribution of any digital asset will need to analyze the relevant transactions to determine if the federal securities laws apply.[20]

60.    GYEN is a security because it is a crypto asset, alienable instantaneously, issued and maintained by Defendant and sold on secondary partner exchanges that Defendant markets, promotes, and supports. On information and belief, as a byproduct of demand or through monetary benefits that have been agreed to in forming partnerships with such secondary exchanges, Defendant continues to make profits from sales of GYEN made on secondary exchanges. Moreover, the overall price of GYEN is dependent on Defendant's efforts and ability to maintain the GYEN's 1-to-1 peg to the Japanese yen, and investors in GYEN are only able to realize profits on their investments through Defendant's managerial and entrepreneurial efforts.

### 2.    GYEN Purchasers Invested Money

61.    Investors purchasing GYEN made an investment of money or other valuable consideration for the purposes of the *Howey* test. As the SEC stated in its Framework regarding cryptocurrency: "The first prong of the *Howey* test is typically satisfied in an offer and sale of a digital asset because the digital asset is purchased or otherwise acquired in exchange for value, whether in the form of real (or fiat) currency, another digital asset, or other type of consideration."[21]

---

[20] *Id.*

[21] SEC, *Framework, supra* note 19.

### 3.    GYEN Investors Participated in a Common Enterprise

62.    The SEC Framework states: "In evaluating digital assets, we have found that a 'common enterprise' typically exists."[22]  This is "because the fortunes of digital asset purchasers have been linked to each other or to the success of the promoter's efforts."[23]

63.    Investors who buy GYEN are passive participants in the Defendant's enterprise, with the potential profits of each investor deeply intertwined with the fate of Defendant and its ability to create, promote, operate, and maintain the GYEN.  Unlike Bitcoin, which is decentralized, here, Defendant controls the enterprise, sharing in both profits and risks, by marketing and maintaining GYEN in hopes of maximizing their own owner profits, which are derived, in part, by Defendant's pooling of fiat currency deposits it receives from direct sales of GYEN tokens and receiving "interest and/or other earnings" on these deposits and, relatedly, benefiting investors by maximizing their potential returns and otherwise protecting the value of their investments.  This pooling of assets demonstrates the common enterprise in which all investors of GYEN contribute.  Moreover, after an investor purchases GYEN tokens, the investor's potential to profit from its investment is entirely reliant on Defendant's managerial efforts to maintain the GYEN's peg to the Japanese yen, and on their marketing and promotional efforts to provide GYEN investors with opportunities to earn yield on their GYEN investments through Defendant's partner exchanges.  If Defendant went out of business, there would be no centralized entity in existence to maintain the GYEN's 1-to-1 peg to the Japanese yen and, at best, it would trade according to supply and demand, if it was deemed to have any value at all. Moreover, there is a significant likelihood that, without Defendant and its efforts, partner

---

[22] *Id.*

[23] *Id.*

exchanges would no longer list GYEN on their platforms and the value of the GYEN would

plummet and/or become worthless.  Indeed, no more would be minted or redeemed, and there

would be no fiat currency backing it.  Accordingly, investors in GYEN participate in a common

enterprise in which their digital asset fortunes are linked to each other and to the success of the

Defendant's promoters' efforts.

      **4.**     **Defendant's Promotion of the GYEN Created in Investors a Reasonable Expectation of Profit**

         **a.**     **Defendant Touted the GYEN's Utility as an Investment That Could Profit From Arbitrage and Hedging Strategies**

64.    One of the stated purposes of GYEN was to offer speculators benefits generally

available for those who seek to profit from short-term tactical or long-term strategic

opportunities related to changing exchange rates.  According to the GYEN White Paper:

> Currency trading strategies are popular methods to gain yield and/or hedge
> for institutional and retail traders.  As we expand currency pairs, traders will
> be able to leverage these strategies ….[24]

65.    Noting "[v]olatility [h]edging" as one of GYEN's "Near Term Potential Use

Cases," the White Paper further explained:

> Institutional and retail traders often protect downside movements by
> converting into a stable value asset during periods of extreme volatility.  The
> vast majority of digital assets are highly volatile, with GYEN and ZUSD
> providing a solution to hold digital asset with more flexibility while
> addressing the fees and inefficiencies of fiat conversion.[25]

66.    During a January 28, 2021 cryptocurrency roundtable hosted by public relations

and brand-building firm JConnelly, GMO Trust's CEO, Nakamura, expanded on GYEN's

purported use as an investment to hedge against the U.S. dollar in times of uncertainty:

---

[24] GYEN White Paper, *supra* note 2, at 7.

[25] *Id.*

> It's an interesting environment where it's a global crisis, and looking at the US, for example, they're issuing trillions of dollars of new US dollars, there's a potential devaluation of the dollar, and historically speaking, the Japanese yen it's often seen as sort of a safe haven currency when the US dollar starts devaluating. In this environment under the coronavirus, the Japanese yen might get devaluated as well, who knows, but in general, I think it's a good hedge currency against the US dollars.[26]

67.    In a March 1, 2021 press release issued by GMO Internet Group, GMO Trust and GMO Internet Group advertised "hedging" and "arbitrage" among the many purported benefits of investing in GYEN:

> Institutional firms and retail traders can leverage GYEN for trading, institutional hedging, arbitrage, settlements and payments with lower fees and near instant settlement.[27]

68.    Around the same time, Defendant advertised on its website that it was "Building Financial-Grade Digital Assets" that interested investors could "seamlessly trade across our **high-speed, global network** of partner exchanges" (emphasis in original).[28] Noted benefits of GYEN included the ability to "[h]edge volatility and experience digital fiat trading with ease."

69.    In a March 1, 2021 YouTube video, Defendant announced that GYEN purchasers would be able to trade "with dozens of liquidity venues across the globe—both retail and institutional"—and that the GYEN would allow investors to "hedge volatility and experience digital fiat trading with ease across [its] high speed, global network of partner exchanges." The

---

[26] GMO Trust, *Roundtable | Cryptocurrency: A Boom or Bust?*, Medium (Jan. 28, 2021), https://medium.com/gmo-z-com-trust-company/roundtable-cryptocurrency-a-boom-or-bust-3ccd389fc54b.

[27] Press Release, GMO Internet Group, *GMO.Z.com Trust Company Launches First Regulated JPY-Pegged Stablecoin*, PR Newswire (Mar. 1, 2021), https://www.prnewswire.com/news-releases/gmo-zcom-trust-company-launches-first-regulated-jpy-pegged-stablecoin-301237388.html.

[28] GMO Trust, *An Overview of Stablecoins*, Medium (Mar. 24, 2021), https://medium.com/gmo-z-com-trust-company/an-overview-of-stablecoins-245dc5ddfd02.

video further explained that purchasers could "always purchase or redeem GYEN from us, or simply trade on the exchanges you are familiar with."[29]

70.    On September 21, 2021, GMO Trust, GMO Internet Group, and the cryptocurrency exchange INX Limited issued a press release announcing a partnership that would "bring NYDFS Regulated Stablecoins to Retail and Institutional Investors."  In the press release, GMO Trust, GMO Internet Group, and INX Limited stated:

> The introduction of this Japanese Yen stablecoin on INXD provides an innovative asset class and new trading venue with no closing times for the millions of retail, and thousands of institutional FX traders to invest and speculate.[30]

### b.    Defendant Promoted Opportunities for GYEN Purchasers to Earn Yield on Their GYEN Investments Through Defendant's Partnerships With Cryptocurrency Exchanges

71.    To jump start demand and expand GYEN's liquidity, Defendant created "partnerships" with both centralized and decentralized cryptocurrency exchanges, at times offering purchasers incentives to buy through exchanges, such as 7 percent interest returns on GYEN deposits and rewards of up to 12% annual percentage yield ("APY").[31]

---

[29] GMO Trust, *GMO-Z.com Trust Company Launches First Regulated JPY-Pegged Stablecoin GYEN*, YouTube (Mar. 1, 2021), https://www.youtube.com/watch?v=r3g4E4do8JQ.

[30] Press Release, INX Limited, *INX Limited partners with Japanese Financial Giant GMO Internet Group to bring NYDFS Regulated Stablecoins to Retail and Institutional Investors*, PR Newswire (Sept. 21, 2021), https://www.prnewswire.com/news-releases/inx-limited-partners-with-japanese-financial-giant-gmo-internet-group-to-bring-nydfs-regulated-stablecoins-to-retail-and-institutional-investors-301381995.html.

[31] Troy Record, *Nexus Markets Expands Partnership with GMO-Z.com Trust Company by Offering Japanese Yen Stablecoin 'GYEN' and 'ZUSD' Interest-Earning Vaults*, The Record (May 25, 2021), https://www.troyrecord.com/2021/05/25/nexus-markets-expands-partnership-with-gmo-z-com-trust-company-by-offering-japanese-yen-stablecoin-gyen-and-zusd-interest-earning-vaults/.

72.    For example, in as early as May 2021, Defendant advertised on its website that GYEN purchasers could earn interest by holding GYEN at certain of the Company's partner exchanges.  Defendant explained that holders of GYEN could "Earn With Ease" and "Start Earning Today" via the cryptocurrency platforms Celsius and Nexus, which Defendant described as, "[t]he most reputable lending platforms that offer competitive returns for your GMO stablecoins.  Leverage this passive earning strategy."[32]

73.    On March 3, 2021, Defendant advertised the benefits of trading GYEN at the decentralized cryptocurrency exchange Liquid:

> GYEN can be used to access Liquid's most liquid orderbook BTC/JPY, on which one can apply a trading arbitrage strategy to take profit in the market . . .
>
> Liquid plans to make all stablecoins such as USDT, USDC, ZUSD, GYEN, IDRT, and XSGD available via Liquid Earn where stablecoins can be used to earn reward[s] of up to12% APY.[33]

74.    In a May 25, 2021 press release issued by GMO Internet Group, it was announced that GMO Trust and GMO Internet Group had "expanded [their] partnership with Nexus Markets, a retail and institutional exchange partner, to offer JPY-pegged 'GYEN' . . . stablecoin Vaults[,]" which offered "7% interest on GYEN . . . deposits (rates subject to

---

[32] GMO Trust, *GYEN Digital JPY*, https://web.archive.org/web/20220603073717/https:/stablecoin.z.com/gyen/ (archived June 3, 2022); Press Release, GMO Trust, *Nexus Markets Expands Partnership with GMO-Z.com Trust Company by Offering Japanese Yen Stablecoin 'GYEN' and 'ZUSD' Interest-Earning Vaults*, PR Newswire (May 25, 2021), https://www.prnewswire.com/news-releases/nexus-markets-expands-partnership-with-gmo-zcom-trust-company-by-offering-japanese-yen-stablecoin-gyen-and-zusd-interest-earning-vaults-301299017.html.

[33] Liquid, *Everything to know about GYEN and ZUSD listing on Liquid*, https://web.archive.org/web/20230606234726/https://www.blog.liquid.com/gyen-zusd-faq (archived on June 6, 2023).

change)[,]" and were lauded as "the first in the market that allow retail and institutional clients to earn positive yields on their GYEN . . . assets."[34]

75.    In the same May 25, 2021 press release, Nakamura was quoted as saying that "[i]t provides a less volatile and compelling way to earn meaningful yield in today's interest rate world simply by holding historical safe have[n] currencies like JPY and USD in digitized form."

76.    On September 19, 2022, Nakamura reposted on his Twitter account a tweet from the decentralized cryptocurrency exchange DFX Finance announcing that GYEN "liquidity pools" were now available for GYEN investors to begin trading against on its exchange.  The tweet linked to an "AMA" (*i.e.*, "ask me anything") interview with  Nakamura wherein the partnership was discussed further.



77.    Two days later, on September 21, 2022, Nakamura reposted a tweet from DFX Finance listing GMO Trust as one of its partners and touting "APRs[35] of 9%–77%."

---

[34] Troy Record, *Nexus Markets Expands Partnership with GMO-Z.com Trust Company by Offering Japanese Yen Stablecoin 'GYEN' and 'ZUSD' Interest-Earning Vaults*, *supra* note 31.

[35] APR stands for annual percentage rate.



78.  On September 22, 2022, GMO Trust tweeted a link (reposted by Nakamura) touting "liquidity pools" created on decentralized exchanges such as DFX Finance.



79.  On September 26, 2022, Nakamura tweeted that "[l]iquidity providers on @DFXFinance's #USDC/#GYEN pool are earning 63% APY in #DFC tokens when staked."[36] In the same tweet, Nakamura issued a congratulations "on getting this listed on [non-US based cryptocurrency exchange] @HuobiGlobal."

---

[36] "Staking" refers to the process by which a cryptocurrency holder can receive rewards and/or interest by "locking up" a certain amount of their cryptocurrency tokens to support a proof-of-stake network's operations. *See, e.g.*, MK Manoylov, *How does staking work and where does the yield come from?*, The Block (Mar. 3, 2024), https://www.theblock.co/learn/271529/how-does-staking-work-and-where-does-the-yield-come-from.



80.    On October 7, 2022, Nakamura reposted a tweet from DFX asking the question,

"WHERE ARE ALL THE #STABLECOIN MAXIS[37] LOOKING FOR SOME HUGE

#YIELD? (ALL PAIRED WITH #USDC)."



81.    On October 11, 2022, Nakamura reposted an article on Twitter explaining how

cryptocurrency liquidity pools operate to allow owners of cryptocurrencies such as GYEN to

earn yield by serving as liquidity providers to traders on decentralized exchanges such as DFX

Finance.  In the same tweet, Nakamura noted that the U.S. Dollar/GYEN liquidity pool on the

DFX Finance was earning 36.28%.

---

[37] "Maxis" is a colloquial term in the cryptocurrency industry referring to a person who is a
strong believer and supporter of a particular cryptocurrency or blockchain project.



82.     On November 11, 2022, noting price volatility with the U.S. dollar and Japanese yen, Nakamura posted a screenshot showing that depositors in GYEN's liquidity pool on the cryptocurrency exchange Uniswap had "hit the 40% [APY] earning 42.50%+ mark."



---

[38] @GMO_KenNakamura, Twitter (Oct. 11, 2022 6:00 AM),
https://twitter.com/GMO_KenNakamura/status/1579819120899809280.

[39] @GMO_KenNakamura, Twitter (Oct. 7, 2022 12:05 PM),
https://twitter.com/DFXFinance/status/1578461478494949376.

[40] @GMO_KenNakamura, Twitter (Nov. 11, 2022 6:43 AM),
https://twitter.com/GMO_KenNakamura/status/1591079249355894785.

83.    On November 9, 2022, Nakamura reposted a tweet linking to a GMO Trust press release announcing the GYEN's introduction on the Stellar Network—"a leading blockchain, which has grown to over 7 million accounts and handles millions of transactions each day."

84.    On June 21, 2023, Nakamura reposted a tweet from the GMO Trust Twitter account promoting the cryptocurrency platform Convex Finance and "the role of stablecoins in the game of elevating yield returns."

85.    On September 6, 2023, GMO Trust posted a link to an article on its LinkedIn page promoting opportunities for potential investors to "easily" trade GYEN and to "diversify their portfolios" using the exchanges Uniswap and Curve.[41]

### E.    Defendant's Stated Profit-Generating Uses of GYEN Are Only Possible Through Defendant's Managerial and Entrepreneurial Efforts

86.    Defendant's stated uses of GYEN as an asset capable of providing purchasers profits from arbitrage, hedging, and/or yield on deposits are entirely dependent on Defendant's "off-chain" efforts to ensure that the GYEN remains pegged to the yen.

87.    As GYEN's issuer, Defendant assured the public through the GYEN White Paper that it would "maintain the necessary licenses and registrations to lawfully issue and redeem its stablecoins" and committed "that the amount of tokens issued will always be equal to the deposits held in our partner bank(s), which is (are) based in the U.S., with publicly available monthly audit reports completed and issued by a nationally-recognized, public independent audit firm in order to fulfill our commitment of transparency."[42]

---

[41] GMO Trust, *The Multi-chain Edge of GYEN and ZUSD Stablecoins*, Medium (Sept. 6, 2023), https://medium.com/gmo-z-com-trust-company/the-multi-chain-edge-of-gyen-and-zusd-stablecoins-aca7585ee495.

[42] GYEN White Paper, *supra* note 2, at 4.

88.    The GYEN White Paper stated that Defendant is exclusively responsible for the GYEN's maintenance and operability.  Differentiating GYEN from cryptocurrencies like Bitcoin, the GYEN White Paper describes GMO Trust's role in the GYEN's operability and underlying systems as follows:

> Unlike Bitcoin[,] which is trustless and decentralized, trust still plays an important role for centralized digital assets since the centralized issuer has considerable impact on the stablecoin's operability and underlying systems.[43]

89.    Indeed, unlike a cryptocurrency such as Bitcoin, which is mined by those validating transactions on decentralized networks, all GYEN in existence were and are created and controlled by Defendant using Ethereum technology, which the GYEN White Paper described as "the most well-known standard for smart contracts in the digital asset community."[44]  Defendant maintains GYEN's 1-to-1 peg to the Japanese yen through its efforts to mint, burn, and redeem GYEN tokens.

90.    As the GYEN White Paper explained, GYEN is issued via an "ERC-20 based smart contract, ensuring that our stablecoins operate under specified rules in a computer-programmed sequence, helping to eliminate human error."[45]

91.    The GYEN White Paper included a link to the ERC-20 protocol that Defendant developed to create the GYEN, noting that the contract code had been audited by "[l]eading smart-contract auditing firm Quantstamp."[46]  The link contained Quantstamp's February 13, 2021 "Final Report," which states that, while the GYEN contract code "adheres to some best

---

[43] *Id.*

[44] *Id.* at 5.

[45] *Id.* at 6.

[46] *Id.* at 5-6.

practices, . . . it features a centralization of power (minter and capper could perform unlimited token minting at any time)."[47]

92.    As explained in Quantstamp's February 13, 2021 Final Report, Defendant's team:

> provided detailed explanations regarding the mechanics by which [GYEN] tokens are minted, burned, and capped.  The mechanism does rely on a centralized entity controlling the process, which cannot be enforced by the smart contract code.  The maintenance of the 1:1 peg between fiat and tokens is maintained off-chain.

93.    Quantstamp's Final Report cited to a document Defendant prepared in response to Quantstamp's initial audit.  The document, titled "README.md," explains the process by which Defendant maintains GYEN's 1-to-1 peg to the Japanese yen, in part, through its efforts to mint, burn, and redeem GYEN tokens.

94.    As the Quantstamp Final Report made clear, it is only through Defendant's managerial efforts as the sole, "centralized power" responsible for maintaining GYEN's 1-to-1 peg to the Japanese yen that GYEN can operate as a "stablecoin."  It is therefore only through the GYEN's purported operation as a stablecoin that purchasers are able to realize profits on their GYEN investments through hedging or arbitrage.

95.    It is similarly only through Defendant's marketing, technological, and entrepreneurial efforts that investors are able to earn yield on GYEN through deposits or "staking" their deposits on Defendant's partner exchanges.

---

[47] Quantstamp, *GYEN & ZUSD Contracts*, GitHub (Feb. 13, 2021), https://github.com/trust-zcom/gmotrust-stablecoin-contract/blob/master/audit_reports/20210212%20-%20GYEN%20%26%20ZUSD%20Contracts%20-%20Final%20Report.pdf.

### F.    The Binance Cryptocurrency Exchange and the GYEN Peg Breaking Immediately After Trading Begins on Binance

96.    Binance is a global cryptocurrency company founded in 2017.  Binance is widely credited as operating the world's largest cryptocurrency exchange by volume.

97.    On May 11, 2021, GMO Trust, GMO Internet Group, and Binance publicly announced their partnership "to bring 'GYEN', the world's first regulated Japanese yen (JPY) stablecoin, to [the Binance] exchange."  The headline from Binance read, "Japanese Financial and Tech Giant, GMO Internet Group, Partners with Binance to Bring World's First Regulated JPY-Pegged Stablecoin 'GYEN' to the Masses."[48]

98.    The same day, Binance issued the following announcement via its website:

> Binance will list GYEN and open trading for BTC/GYEN and USDT/GYEN trading pairs at 2021-05-12 7:00 AM (UTC).  Users can now start depositing GYEN in preparation for trading.[49]

99.    On May 12, 2021, when Binance first allowed GYEN trading on its exchange, the asset immediately came untethered from the yen and rose sharply in value.  At approximately 7:34 a.m. (UTC), a mere thirty-four minutes after the time Binance announced GYEN would begin trading on the exchange, Binance suspended trading for GYEN "due to the large volatility of GYEN's price."[50]

---

[48] Binance, *Japanese Financial and Tech Giant, GMO Internet Group, Partners with Binance to Bring World's First Regulated JPY-Pegged Stablecoin 'GYEN' to the Masses, Binance Blog* (May 11, 2021), https://www.binance.com/en/blog/all/japanese-financial-and-tech-giant-gmo-internet-group-partners-with-binance-to-bring-worlds-first-regulated-jpypegged-stablecoin-gyen-to-the-masses-421499824684902052.

[49] Binance, *Binance Will List GYEN* (May 11, 2021), https://www.binance.com/en/support/announcement/binance-will-list-gyen-0ef69e1d334c4d8c9ffbd088843bf2dd.

[50] Binance, *Notice on Trading Suspension for GYEN* (May 12, 2021), https://www.binance.com/en/support/announcement/notice-on-trading-suspension-for-gyen-bc9f313c04cc40d2b7e598c831fd721f.

100.    Hours later, Binance issued an update on the GYEN trading suspension, noting

that the exchange had:

> suspended trading for all GYEN trading pairs starting from 2021-05-12
> 11:15 AM (UTC) due to insufficient liquidity and abnormal volatility of
> GYEN's price.  A further announcement will be posted once trading is
> resumed.  Deposits and withdrawals will not be affected during this period.
> We apologize for any inconvenience caused and thank you for your
> patience.  **Please note**: GYEN is a stablecoin that is 1:1 pegged to the
> Japanese Yen.[51]

101.    As would happen again later, those GYEN purchasers whose orders took time to

fill after opening on Binance, or who mistakenly bought when the asset was untethered from the

yen, lost as much as 99 percent of their purchase value within hours.

### G.    The Coinbase Cryptocurrency Exchange and the GYEN Peg Breaking Immediately After Trading Begins on Coinbase

102.    Coinbase is California-based centralized online marketplace for cryptocurrency

traders.  Through its website, Coinbase operates two digital-asset exchanges, "Coinbase" and

"Coinbase Pro," where its customers place orders to buy and sell cryptocurrencies.

103.    When Coinbase offers trading of a cryptocurrency, it publicly posts information

regarding the asset.  This information includes a description of what the asset is and which

Coinbase products support it (*i.e.*, Coinbase, Coinbase Pro, or Coinbase Wallet); Coinbase also

provides links to the asset's white paper and website, where applicable.

104.    On information and belief, on or around the beginning of November 2021,

Defendant entered into an agreement with California-based Coinbase that would allow

Defendant to offer GYEN to Coinbase users nationwide.

---

[51] Binance, *Update on Trading Suspension for GYEN* (May 12, 2021),
https://www.binance.com/en/support/announcement/update-on-trading-suspension-for-gyen-2291f02b964f45b195fd6d4685db80bb.

105.    On November 10, 2021, Defendant introduced GYEN on Coinbase.  At first, only Coinbase Pro customers were allowed to transfer GYEN tokens they already owned into their Coinbase accounts; they could not buy or sell the asset on the exchange.  Coinbase claimed it would open trading to all Coinbase customers for GYEN once it had confirmed adequate supply.

106.    On November 16, 2021, GYEN became fully open for trading on Coinbase. Almost immediately, its value came completely untethered from the yen.  GYEN's liquidity was so low that the value of the asset rose to more than seven times the value of the yen.  The peg was broken.  At one point, Coinbase reported that the value of a single GYEN token reached $5,353.87 (this statement was later removed by Coinbase, which now claims the all-time high value was $0.34).  The yen, meanwhile, was completely stable, never rising above a value of $0.0087.



107.    While the GYEN was untethered, investors who bought what they believed were GYEN tokens equal in value to the Japanese yen were actually buying tokens worth far more than the yen—and paying for them at correspondingly high prices.

108.    By November 19, 2021, the price of the GYEN plummeted back to the value of the yen, losing its value by orders of magnitude.  Those left holding the stablecoin lost as much as 80 percent of their investment in hours.

109.    Amidst the turbulence, Coinbase compounded the problem by restricting its customers' ability to trade GYEN.  At 4:00 p.m. (EST) on November 19, 2021, Coinbase suspended all GYEN trading activity.

110.    When halting trading of GYEN, Coinbase issued an "alert" and warning to its customers: "Due to unusual market activity for GYEN, you may have trouble trading GYEN on Coinbase.com.  We apologize for any inconvenience caused by this."  By the time of the alert, however, many Coinbase customers who saw the asset's instability were already restricted by Coinbase from placing orders to sell their GYEN.  Instead, they had to watch as the GYEN's value plunged back to the yen, and the value of their investments with it.

111.    While Coinbase was at first silent about the debacle, it eventually acknowledged that it had restricted GYEN trading and then suspended it completely.

> [B]etween 15th – 19th November 2021, GYEN on Coinbase experienced unexpected behavior due to unusual market conditions.  On 19th November, this was further complicated and for technical reasons, Coinbase disabled trading for GYEN.

112.    Coinbase later claimed in an "incident post-mortem" report that the break in parity, which peaked on November 17th and 18th, 2021, was unrelated to the total suspension of trading on November 19th, 2021.  The reason for the blanket suspension on November 19th, according to Coinbase, was an isolated technical issue.  According to the incident report, a data

source update caused customers to see a decimal error in their web interface showing either 100x or 1/100[th] of the actual amount of GYEN in their account, and this error, not the break in the peg, triggered the trading suspension.

113.    Coinbase accepted no responsibility for GYEN's collapse, indicating it was caused by the nature of GYEN.  Coinbase informed the purchasers it had no control over the assets sold on its platforms and issued a statement through its blog claiming:

> When Coinbase listed GYEN, there was significant demand for GYEN that could not be matched by supply.  The surge in buyer demand for GYEN, coupled with the insufficient supply of GYEN across all markets (not just Coinbase), ultimately caused the break in parity. …  The break in parity occurred because of these market conditions specific to the GYEN digital asset unrelated to Coinbase operations.[52]

114.    Defendant was similarly unwilling to accept fault or reimburse loss.  CEO Nakamura stated, "[W]e have no visibility to what happens within the exchange."  Alex Russell, deputy Chief Compliance Officer ("CCO") at GMO Trust, stated that the transactions were "through an exchange," and thus GMO Trust had "no role" in the matter and the activity was "not associated with GMO Trust."

115.    Investors realized they had invested in GYEN based on a completely false promise of stability.  Those who reached out to Coinbase found no means of live customer support and had to send instant messages or emails to an automated help desk that took days to respond.  Defendant was similarly unresponsive.  Thus, investors had to watch helplessly as their investments plummeted, and when they then sought explanations and help, they found both Defendant and Coinbase unresponsive.  Over the coming days, investors started online groups to draft petitions demanding explanations and refunds from Defendant and from Coinbase.

---

[52] Coinbase, *Incident Post-Mortem: November 19, 2021* (Jan. 14, 2022), https://www.coinbase.com/pt/blog/incident-post-mortem-november-19-2021.

116.    Prior to the November 2021 collapse, Defendant withheld from investors the fact that GYEN was likely to break from its peg to the yen.  Indeed, even after the May 2021 price shock, Defendant kept all claims that GYEN was pegged 1-to-1 to the yen on its website content, marketing materials, video content, and publications, and continued to promote the use of its partner cryptocurrency exchanges as locations where retail and institutional investors could buy, sell, trade, and earn interest on their GYEN deposits.

117.    Because of Defendant's material misrepresentations of GYEN's purported 1-to-1 peg to the yen, and their omission of the material fact that GYEN was not designed to hold a value pegged to the yen, several hundred purchasers lost vast sums, some losing hundreds of thousands of dollars in just hours.

## V.    CLASS ALLEGATIONS

118.    Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure action on behalf of all persons or entities who purchased or otherwise acquired the GYEN between December 29, 2020 through the present and were damaged as a result.  Excluded from the Class are: (i) GMO Trust, GMO Internet Group, and Coinbase, (ii) members of the immediate families of GMO Trust, GMO Internet Group, and Coinbase, (iii) the subsidiaries and affiliates of GMO Trust, GMO Internet Group, and Coinbase, (iv) any person who is an officer, director, or controlling person of GMO Trust, GMO Internet Group, or Coinbase, (v) any entity in which GMO Trust, GMO Internet Group, or Coinbase have a controlling interest, (vi) GMO Trust and GMO Internet Group's, and Coinbase's directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof, and (vii) the legal representatives, heirs, successors, or assigns of any such excluded party.

119.    The members of the Class are so numerous that joinder of all members is

impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class. Indeed, according to Coinmarketcap.com, as of March 14, 2024, there were 2.1 billion GYEN tokens in circulation.

120.    Members of the Class may be identified from records maintained by Defendant, the Ethereum blockchain, Coinbase, and other cryptocurrency exchanges where GYEN is traded, and, as necessary, may be notified of the pendency of this action by mail and other methods using a form of notice customarily used in class action lawsuits.

121.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class, including: (i) whether GYEN is a security under the Securities Act; (ii) whether Defendant's offerings and sales of GYEN violate the registration provisions of the Securities Act; (iii) whether Defendant's advertisements and statements regarding the nature of GYEN were materially misleading or omitted material facts, (iv) whether Defendant's acts or practices as alleged herein were deceptive in violation of the New York General Business Law, N.Y. Gen. Bus. § 349; (v) whether Defendant's advertisements and statements regarding the GYEN violated the false advertising provisions of the New York General Business Law, N.Y. Gen. Bus. § 350; (vi) whether Defendant's conduct as alleged herein violated the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*; (vii) whether Defendant's conduct as alleged herein violated the California False Advertising Law, Cal. Bus. & Prof. Code § 17500 *et seq.*; and (viii) the type and measure of losses and/or damages suffered by Plaintiffs and the Class.

122.    Plaintiffs' claims are typical of the claims of all Class members, as all members of the Class are similarly affected by Defendant's wrongful conduct in violation of federal

securities laws, as well as California's and New York's false advertising and unfair competition laws.

123.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation.  Plaintiffs have no interests antagonistic to, or in conflict with, those of the Class.

124.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VI.    CAUSES OF ACTION

<u>**FIRST CAUSE OF ACTION**</u>
**Unregistered Offer and Sale of Securities in Violation of
Sections 5(a), 5(c) and 12(a)(1) of the Securities Act**

125.    Plaintiffs repeat and reallege each and every allegation contained *supra* as if fully set forth herein.

126.    Section 5(a) of the Securities Act states:

> Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

15 U.S.C. § 77e(a).

127.    Section 5(c) of the Securities Act states:

It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title.

15 U.S.C. § 77e(c).

128.    GYEN tokens are, and at all relevant times have been, securities within the meaning of Section 2(a)(1) of the Securities Act. 15 U.S.C. § 77b(a)(1).  No registration statements have been filed with the SEC or have been in effect with respect to any of the offerings or sales alleged herein.

129.    Defendant promoted, solicited, offered, and sold GYEN to Plaintiffs and members of the Class.  Defendant was highly active in promoting GYEN directly to Plaintiffs and the Class, as demonstrated by their dissemination of the GYEN White Paper (which was on Defendant's website and on Coinbase's website) and its advertising and marketing of GYEN on various platforms aimed directly at investors, including GMO Trust's website, LinkedIn, Twitter, YouTube, and through an interview by CEO Nakamura on a website popular with retail investors.  Plaintiffs and the Class saw and relied on solicitations by Defendant.

130.    In addition, by offering GYEN to Plaintiffs and members of the Class, Defendant solicited these purchases, and in doing so was motivated at least in part by a desire to serve its own financial interests.  Defendant received a direct financial benefit from each purchase of GYEN.  Defendant further benefits from purchases of GYEN because such purchases support a trading market for GYEN tokens, which in turn makes GMO Trust a more competitive, lucrative, attractive, and credible issuer.  Defendant also receives a direct financial benefit because it receives "interest and/or other earnings" on all fiat currencies paid to it by direct purchasers,

which are held in reserve for purposes of maintaining the GYEN's 1-to-1 peg to the Japanese yen.

131.    Defendant thus directly and/or indirectly made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell unregistered securities, or to carry or cause such unregistered securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

132.    Section 12(a)(1) of the Securities Act provides in relevant part:

> Any person who offers or sells a security in violation of section 77e of this title ... shall be liable ... to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

15 U.S.C. § 77*l*(a)(1).

133.    Accordingly, Defendant has violated Sections 5(a), 5(c), and 12(a)(1) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), 77*l*(a)(1), and are therefore liable for rescission and/or compensatory damages.

## SECOND CAUSE OF ACTION
### Violation of the New York General Business Law § 349

134.    Plaintiffs repeat and reallege each and every allegation contained *supra* as if fully set forth herein.

135.    Plaintiffs and Class members are "persons" within the meaning of N.Y. Gen. Bus. § 349(g).

136.    Defendant is a "person, firm, corporation, or association" within the meaning of N.Y. Gen. Bus. § 349(b).

137.    Defendant engaged in deceptive acts and practices in the conduct of business, trade, and commerce by falsely representing that GYEN tokens were pegged to the Japanese yen,

would remain pegged to the Japanese yen at a 1-to-1 ratio, and therefore constituted a safe investment with virtually no volatility.

138.    Defendant further engaged in deceptive acts and practices by omitting that the GYEN stablecoins were in fact not pegged to the Japanese yen, or had the propensity to become unpegged from the Japanese yen.  Defendant thereby misleadingly failed to disclose fully and truthfully all material facts regarding the GYEN stablecoin's nature, purpose, value, volatility, and risk.

139.    A reasonable consumer, and a reasonable investor, would be misled by these deceptive acts and practices.

140.    Plaintiffs and the Class purchased a digital token product, the GYEN, and paid for it with the expectation that Defendant would provide the necessary services—including overseeing, managing, monitoring, and auditing appropriate processes, controls, policies, procedures, protocols, and software and hardware systems—to ensure that GYEN maintained a stable link to the Japanese yen, as advertised.

141.    These deceptive acts and practices were consumer-oriented because they were directed to the consuming public and marketplace and had a broad impact on consumers at large. Defendant made GYEN available to the general public, including through websites (public, online services, not unique to the parties), and through marketing and sales not limited to a single transaction, but instead aimed at a robust consumer and investor base and the marketplace in general.

142.    These alleged deceptive acts and practices occurred (at least in part) in the state of New York, where GMO Trust operates its principal place of business.  Moreover, the New York Department of Financial Services granted the license pursuant to which GMO Trust issued

GYEN, and thus New York has a significant interest in enforcing the regulations associated with that license, including New York Codes, Rules and Regulations, Title 23, § 200 *et seq.*, and in enforcing its consumer protection statutes, including New York General Business Law § 349.

143.    Plaintiffs and Class members were injured as a direct and proximate result of Defendant's deceptive acts and practices because, among other reasons, they lost money in connection with purchasing GYEN.  Absent Defendant's deceptive acts and practices, Plaintiffs and Class members would not have purchased GYEN, or would not have purchased GYEN at the price paid.

144.    Plaintiffs and Class members are entitled to injunctive relief and to actual damages or fifty dollars per violation (at their election) because of GMO Trust's deceptive acts and practices.  *See* N.Y. Gen. Bus. § 349(h).  Plaintiffs and Class members are also entitled to treble damages because these actions were willful and knowing.

145.    Plaintiffs and Class members are entitled to reasonable costs and attorney's fees. *See* N.Y. Gen. Bus. § 349(h).

**THIRD CAUSE OF ACTION**
**False Advertising in Violation of**
**New York General Business Law § 350**

146.    Plaintiffs repeat and reallege each and every allegation contained *supra* as if fully set forth herein.

147.    Defendant violated New York General Business Law § 350 because its conduct as alleged herein constituted false advertising in the conduct of a business, trade, or commerce in the State of New York.

148.    Defendant acts as alleged herein were consumer oriented under New York General Business Law § 350 because its deceptive acts and practices were directed to the consuming public and marketplace at large.

149.    Defendant's acts and practices were "deceptive in a material way" and include but are not limited to the acts and practices alleged in paragraphs 4, 11, 12, 42-43, 45, 47-53, 65, 72-73, 75, 92-95, 97, 114-117 herein.

150.    Defendant's deceptive acts and practices as alleged in paragraphs 4, 11, 12, 42-43, 45, 47-53, 65, 72-73, 75, 92-95, 97, 114-117 caused actual harm to Plaintiffs and the Class and Plaintiffs the Class have been injured as a result of those deceptive acts and practices.

151.    Plaintiffs and Class members are entitled to injunctive relief and to actual damages or five-hundred dollars per violation, whichever is greater, because of GMO Trust's deceptive acts and practices.  *See* N.Y. Gen. Bus. § 350-e(3).  Plaintiffs and Class members are also entitled to treble damages because these actions were willful and knowing.

152.    Plaintiffs and Class members are entitled to reasonable costs and attorney's fees. *See* N.Y. Gen. Bus. § 350-e(3).

**FOURTH CAUSE OF ACTION**
**Unfair Competition in Violation of**
**California Business and Professions Code § 17200 *et seq*. ("UCL")**

153.    Plaintiffs repeat and reallege each and every allegation contained *supra* as if set forth fully herein.

154.    Defendant qualifies as a "person" as defined by California Business and Professions Code section 17201.

155.    By engaging in the above-described unlawful and unfair business acts and practices, Defendant committed and continue to commit one or more acts of unlawful, unfair, and fraudulent conduct within the meaning of California Business and Professional Code section 17200 *et seq*. ("UCL").  These acts and practices constitute a continuing and ongoing unlawful business activity defined by the UCL, and justify the issuance of an injunction, restitution, and other equitable relief pursuant to the UCL.

46

156.    Defendant's acts and practices constitute a continuing and ongoing unlawful business activity defined by the UCL.  Defendant has violated the unlawful prong of the UCL by their violations of the following state and federal laws:

- Violations of Section 5(a) of the Securities Act, 15 U.S.C. § 77e(a);

- Violations of Section 5(c) of the Securities Act, 15 U.S.C. § 77e(c);

- Violations of Section 12(a)(1) of the Securities Act, 15 U.S.C. § 77*l*(a)(1);

- Violations of California's False Advertising Act, Cal. Bus. & Prof. Code § 17500 *et seq.*; and

- Violations of the New York General Business Law, N.Y. Gen. Bus. §§ 349 and 350.

157.    Defendant's acts and practices alleged herein also constitute a continuing and ongoing unfair business activity defined by the UCL.  Defendant's conduct is contrary to the public welfare as it transgresses civil statutes (including those of the State of California, designed to protect individuals' statutory right to fair and honest business practices), violates established public policy, including the policies underlying the statues and laws identified in the preceding paragraph and has been pursued to attain an unjustified monetary advantage for Defendant by creating personal disadvantage and hardship to GYEN purchasers.  As such, Defendant's business practices and acts have been immoral, unethical, oppressive, and unscrupulous, and have caused injury to customers far greater than any alleged countervailing benefit.

158.    Defendant's acts and practices constitute a continuing and ongoing fraudulent business activity as defined by the UCL.  Defendant made and continues to make the material misrepresentations and omissions set forth above as part of an extensive and long-term advertising campaign, including that GYEN tokens are pegged to the Japanese yen, remain pegged to the Japanese yen at a 1-to-1 ratio, and therefore constitute a safe investment with virtually no volatility.

159.    These misrepresentations and omissions were, and continue to be, material, and likely to deceive the public and reasonable consumers.  Plaintiffs reasonably relied on these statements and omissions by Defendant when transacting in GYEN.

160.    Much of Defendant's acts, practices, and omissions at issue in this matter were directed at and caused harm to California and to California residents.

161.    Defendant generated revenue by way of GYEN transactions and through proceeds received from GYEN purchasers.  Absent Defendant's acts, practices, and omissions, Plaintiffs and members of the Class would not have purchased GYEN, or would not have purchased GYEN at the price paid.

162.    As a direct and proximate consequence of the actions as identified, Plaintiffs and members of the Class suffered and continue to suffer injury in fact, including but not limited to, economic loss and loss of property.

163.    Plaintiffs seek an order of this Court awarding restitution and injunctive relief and all other relief allowed under the UCL, including interest and attorneys' fees pursuant to, *inter alia*, California Code of Civil Procedure section 1021.5, and to such other and further relief as this Court may deem just and proper.  Plaintiffs and the Class are entitled to such relief under the UCL because they lack adequate legal remedies at law.

<u>**FIFTH CAUSE OF ACTION**</u>
**False Advertising in Violation of**
**California Business and Professions Code § 17500 *et seq.* ("FAL")**

164.    Plaintiffs repeat and reallege each and every allegation contained *supra* as if fully set forth herein.

165.    Defendant's conduct as described herein constitutes deceptive or false advertising in violation of California Business and Professions Code section 17500 *et seq.* ("FAL") and was directed at Plaintiffs and the Class, many of whom purchased GYEN from within California.

Defendant's misrepresentations were seen and relied upon by Plaintiffs and the Class who experienced financial harm resulting from Defendant's conduct.

166.    The FAL prohibits deceptive or misleading practices in connection with advertising or representations made for the purpose of inducing, or which are likely to induce, consumers to purchase products.

167.    It is also unlawful under the FAL to disseminate statements concerning property or services that are "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

168.    Defendant violated the FAL when it marketed, advertised, and promoted GYEN and their services related thereto by, among other things as alleged herein: (i) misleading Plaintiffs and the Class about the nature and characteristics of GYEN, (ii) omitting material facts about the volatility and risks of GYEN, and (iii) mischaracterizing GYEN as a stablecoin when it lacks the qualities and benefits of a stablecoin.

169.    At the times of their misrepresentations and omissions, Defendant was either (i) aware of the risks of mischaracterizing GYEN as a stablecoin, (ii) aware that it lacked the information and knowledge required to truthfully make this representation, and/or (iii) aware that its statements were false in light of the prior GYEN destabilizing event.

170.    Plaintiffs reasonably relied on statements by Defendant when transacting in GYEN.

171.    In reliance on the statements made in Defendant's advertising and marketing materials, and Defendant's omissions and concealment of material facts regarding the quality and characteristics of GYEN, Plaintiffs and the Class transacted in GYEN.  Had Defendant

disclosed the true nature and characteristics of GYEN, Plaintiffs and the Class would not have purchased GYEN.

172.    As a direct and proximate result of Defendant's false advertising, Plaintiffs and the Class suffered injury in fact, harms, and losses.  Also, as a direct and proximate result of Defendant's actions, as set forth herein, Defendant has received ill-gotten gains and profits.

173.    Plaintiffs and the Class seek an order of this Court awarding injunctive and equitable relief, restitution, and disgorgement of the funds by which Defendant was unjustly enriched, as well as all other relief allowed under the FAL (including interest and attorneys' fees pursuant to, *inter alia*, California Code of Civil Procedure section 1021.5) and as this Court may deem just and proper.  Plaintiffs and the Class are entitled to such relief under the FAL because they lack adequate legal remedies at law.

## VII.    PRAYER FOR RELIEF

174.    Plaintiffs, on behalf of themselves and the Class, pray for relief and judgment against Defendant as follows:

(a)    For an order certifying the proposed Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(b)    For an order enjoining the conduct of Defendant described herein, including making misrepresentations and deceiving the Class and the public regarding the asset described in this complaint;

(c)    For actual and compensatory damages or other equitable relief according to proof;

(d)    For damages or other equitable relief, as provided by the applicable federal securities law statutes invoked above;

(e)     For damages or other equitable relief, as provided by the applicable state consumer protection statutes invoked above;

(f)     For pre-judgment and post-judgment interest;

(g)     For punitive damages;

(h)     For an award of attorneys' fees, costs, and expenses as authorized by applicable law; and

(i)     For such other and further relief as this Court may deem just and proper, whether in law or equity.

## VIII.  DEMAND FOR TRIAL BY JURY

175.    Plaintiffs, on behalf of themselves and the Class, demand a trial by jury on all issues so triable.

Dated:  April 5, 2024                          Respectfully Submitted,

**ERICKSON KRAMER OSBORNE LLP**

By:     */s/ Elizabeth A. Kramer*
            Elizabeth A. Kramer (*pro hac vice*)

Julie C. Erickson
Kevin M. Osborne (*pro hac vice*)
44 Tehama Street
San Francisco, CA 94105
Telephone: (415) 635-0631
Facsimile: (415) 599-8088
Email:    julie@eko.law
              elizabeth@eko.law
              kevin@eko.law

*Counsel for Lead Plaintiffs and Lead Counsel for the Class*

Daniel E. Barenbaum
Jeffrey V. Rocha
**BERMAN TABACCO**
425 California Street, Suite 2300
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email:    dbarenbaum@bermantabacco.com
              jrocha@bermantabacco.com

*Additional Counsel for Plaintiffs*