UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KENNETH DONOVAN, HUSSIEN KASSFY, and JOHN BRAMBL, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GMO-Z.COM TRUST COMPANY, INC.<br><br>Defendant. | Case No. 1:23-cv-08431-AT<br><br>Hon. Analisa Torres |

**LEAD PLAINTIFFS' MEMORANDUM IN OPPOSITION TO GMO-Z.COM TRUST COMPANY, INC.'S MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**PAGE**


I. INTRODUCTION ..... 1

II. FACTUAL BACKGROUND ..... 2

III. ARGUMENT ..... 5

A. The Complaint Adequately Alleges Defendant Is Liable Under Section 12(a)(1) of the Securities Act ..... 5

1. Plaintiffs' Allegations Sufficiently Show That GYEN is a Security Under *Howey* ..... 5

(a) The Complaint Sufficiently Alleges Plaintiffs Invested Money by Purchasing GYEN Tokens ..... 7

(b) The Complaint Adequately Alleges That Plaintiffs Invested in a Common Enterprise, Which Defendant Does Not Dispute in its Motion ..... 8

(c) The Complaint Adequately Alleges That GYEN Investors Held a Reasonable Expectation of Profits Derived Primarily From GMO Trust's Managerial and Entrepreneurial Efforts ..... 8

(d) Defendant's Focus on Plaintiffs' Subjective Intent is Misdirected in Light of *Howey's* Objective Standard ..... 11

(e) This Court's Decision in *Ripple I* is Readily Distinguishable ..... 13

2. The Complaint Adequately Alleges Defendant is a Statutory Seller Under Section 12(a)(1) ..... 15

3. Plaintiffs' Section 12(a)(1) Claim is Not Subject to Rule 9(b)'s Heightened Pleading Standard ..... 18

B. The Complaint Adequately That Alleges Defendant Is Liable Under the New York GBL ..... 19

C. The Complaint Adequately Alleges Defendant Is Liable Under California's UCL and FAL ..... 23

D. The Court Has Jurisdiction Over Plaintiffs' State Law Claims Based Upon Supplemental Jurisdiction and Under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2) ..... 27

IV. CONCLUSION ........................................................................................................ 28

# TABLE OF AUTHORITIES

**PAGE(S)**

**Cases**

*Anderson v. Unilever United States, Inc.*,
607 F. Supp. 3d 441 (S.D.N.Y. 2022) .......... 22

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 5

*Audet v. Fraser*,
605 F. Supp. 3d 372 (D. Conn. 2022) .......... 12

*Balestra v. ATBCOIN LLC*,
380 F. Supp. 3d 340 (S.D.N.Y. 2019) .......... 6, 11, 12

*Barron v. Helbiz Inc.*,
No. 20 CIV. 04703 (LLS), 2023 WL 5672640 (S.D.N.Y. Sept. 1, 2023), *motion to certify appeal granted*, No. 20 CIV. 04703 (LLS), 2023 WL 8622204 (S.D.N.Y. Dec. 13, 2023) .... 20

*Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*,
3 N.Y.3d 200 (2004) .......... 19

*Caldwell v. Nordic Nats., Inc.*,
No. 23-cv-02818-EMC, 2024 WL 24325 (N.D. Cal. 2024) .......... 27

*Capri v. Murphy*,
856 F.2d 473 (2d Cir. 1988) .......... 16

*Chapman v. Skype Inc.*,
220 Cal. App. 4th 217, (2013) .......... 24, 25

*Cosgrove v. Or. Chai, Inc.*,
520 F. Supp. 3d 562 (S.D.N.Y. 2021) .......... 19

*Cruz v. FXDirectDealer, LLC*,
720 F.3d 115 (2d Cir. 2013) .......... 23

*Downey Surgical Clinic, Inc. v. Ingenix, Inc.*,
No. CV 09-5457 PSG (CTX), 2014 WL 12558848 (C.D. Cal. May 30, 2014) .......... 26

*Eberhardt* v. *Waters*,
901 F.2d 1578 (11th Cir. 1990) .......... 6

*Edmar Fin. Co., LLC v. Currenex, Inc.*,
No. 21-CV-6598 (LAK), 2023 WL 3570017 (S.D.N.Y. May 18, 2023) .......... 19, 20

*F.W. Webb v. State Bank & Tr. Co.*,
2010 WL 3219284 (S.D.N.Y. Aug. 12, 2010) ............................................................. 17

*Friel v. Dapper Labs, Inc.*,
657 F. Supp. 3d 422 (S.D.N.Y. 2023) ................................................................. 6, 8, 11

*Glen-Arden Commodities, Inc. v. Costantino*,
493 F.2d 1027 (2d Cir. 1974) ........................................................................................ 6

*Griffin v. PaineWebber, Inc.*,
No. 99 CIV. 2292 (VM), 2001 WL 740764 (S.D.N.Y. June 29, 2001) .................................. 18

*Hector v. Wiens*,
533 F.2d 429 (9th Cir. 1976) ........................................................................................ 8

*Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co., Inc.*,
37 N.Y.3d 169 (2021) ............................................................................................ 20, 22

*Holsworth v. BProtocol Found.*,
No. 20 CIV. 2810 (AKH), 2021 WL 706549 (S.D.N.Y. Feb. 22, 2021).................................. 17

*In re Ethereummax Inv.*,
No. CV2200163MWFSKX, 2023 WL 6787827 (C.D. Cal. June 6, 2023) .................. 24, 25, 26

*In re Longfin Corp. Sec. Class Action Litig.*,
No. 18-cv-2933 (DLC), 2019 WL 1569792 (S.D.N.Y. Apr. 11, 2019) .................................. 18

*In re Mattel, Inc.*,
588 F. Supp. 2d 1111 (C.D. Cal. 2008) ................................................................... 26, 27

*In re Ripple Labs, Inc. Litigation*,
No. 18-CV-06753-PJH, 2024 WL 3074379 (N.D. Cal. June 20, 2024)............................ 13, 15

*In re Take-Two Interactive Sec. Litig.*,
551 F. Supp. 2d 247 (S.D.N.Y. 2008) ........................................................................... 28

*In re Tobacco II Cases*,
46 Cal. 4th 298 (2009) .................................................................................................. 25

*In re Vivendi Universal, S.A.*,
381 F. Supp. 2d 158 (S.D.N.Y. 2003) ........................................................................... 16

*Int'l Bd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Daniel*,
439 U.S. 551 (1979)......................................................................................................... 8

*IOP Cast Iron Holdings, LLC v. J.H. Whitney Capital Partners, LLC*,
91 F. Supp. 3d 456 (S.D.N.Y. 2015) ............................................................................... 5

*Jeong v. Nexo Cap. Inc.*,
No. 21-CV-02392-BLF, 2022 WL 3590329 (N.D. Cal. Aug. 22, 2022)................................. 25

*Jonna v. Latinum*,
617 F. Supp. 3d 758 (E.D. Mich. 2022)........................................................................ 27

*LiMandri v. Judkins*,
52 Cal. App. 4th 326 (1997) ........................................................................................ 25

*MacNaughton v. Young Living Essential Oils, LC*,
67 F.4th 89 (2d Cir. 2023) .......................................................................................... 27

*Marine Bank v. Weaver*,
455 U.S. 551 (1982)...................................................................................................... 7

*Noa v. Key Futures, Inc.*,
638 F.2d 77 (9th Cir. 1980) ......................................................................................... 11

*Orlander v. Staples, Inc.*,
802 F.3d 289 (2d Cir. 2015) ........................................................................................ 23

*Owen v. Elastos Found.*,
No. 1:19-CV-5462-GHW, 2021 WL 5868171 (S.D.N.Y. Dec. 9, 2021) ..................... 15, 16, 17

*Pelman v. McDonald's Corp.*,
396 F.3d 508 (2d Cir. 2005) ................................................................................... 19, 23

*Pinter v. Dahl*,
486 U.S. 622 (1988)...................................................................................................... 16

*Rivera v. Navient Sols., LLC*,
2020 WL 4895698 (S.D.N.Y. Aug. 19, 2020)................................................................ 22

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004) ........................................................................................ 18

*Rosendale v. Mr. Cooper Grp. Inc.*,
No. 19-CV-9263 (NSR), 2021 WL 4066821 (S.D.N.Y. Sept. 7, 2021)....................... 19, 20, 22

*S.E.C. v. Coinbase, Inc.*,
No. 23 CIV. 4738 (KPF), 2024 WL 1304037 (S.D.N.Y. Mar. 27, 2024) ......................... passim

*S.E.C. v. W.J. Howey Co.* (*Howey*),
328 U.S. 293 (1946)................................................................................................ passim

*Salveson v. JP Morgan Chase & Co.*,
166 F. Supp. 3d 242 (E.D.N.Y.), *aff'd*, 663 F. App'x 71 (2d Cir. 2016) ................................ 28

*SEC v. Belmont-Reid*,
794 F.2d 1388 (9th Cir. 1986) .......... 11

*SEC v. Edwards*,
540 U.S. 389 (2004) .......... 6

*SEC* v. *Scoville*,
913 F.3d 1204 (10th Cir. 2019) .......... 6

*SEC* v. *Telegram Grp. Inc.*,
448 F. Supp. 3d 352 (S.D.N.Y. 2020) .......... 6, 12

*Sec. & Exch. Comm'n v. Genesis Glob. Cap., LLC*,
No. 23-CV-00287 (ER), 2024 WL 1116877 (S.D.N.Y. Mar. 13, 2024) .......... 6

*Sec. & Exch. Comm'n v. LBRY, Inc.*,
639 F. Supp. 3d 211 (D.N.H. 2022) .......... 13

*Sec. & Exch. Comm'n v. Terraform Labs Pte. Ltd. (Terraform I)*,
684 F. Supp. 3d 170 (S.D.N.Y. 2023) .......... 10, 12, 13, 14

*Sec. & Exch. Comm'n v. Terraform Labs Pte. Ltd. (Terraform II)*,
No. 23-CV-1346 (JSR), 2023 WL 8944860 (S.D.N.Y. Dec. 28, 2023) .......... 10, 12

*Sec. & Exch. Comm'n v. Ripple Labs, Inc. (Ripple I)*,
682 F. Supp. 3d 308 (S.D.N.Y. 2023), *motion to certify appeal denied*, *Sec. & Exch. Comm'n v. Ripple Labs, Inc. (Ripple II)*, 697 F. Supp. 3d 126, 2023 WL 6445969 (S.D.N.Y. Oct. 3, 2023) .......... passim

*Sec. & Exch. Comm'n v. Ripple Labs, Inc.* (*Ripple II*),
No. 20 Civ. 10832 (AT), 697 F. Supp. 3d 126, 2023 WL 6445969 (S.D.N.Y. Oct. 3, 2023) .......... 2, 14

*Shain v. Duff & Phelps Credit Rating Co.*,
915 F. Supp. 575 (S.D.N.Y. 1996) .......... 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) .......... 5

*Underwood v. Coinbase Glob., Inc.*,
654 F. Supp. 3d 224 (S.D.N.Y. 2023), *aff'd in part, rev'd in part and remanded sub nom. Oberlander v. Coinbase Glob. Inc.*, No. 23-184-CV, 2024 WL 1478773 (2d Cir. Apr. 5, 2024) .......... 18

*Van Buskirk v. United Grp. of Cos., Inc.*,
935 F.3d 49 (2d Cir. 2019) .......... 28

*Williams v. Gerber Prod. Co.*,
552 F.3d 934 (9th Cir. 2008) .......... 25

*Wilson v. Hewlett-Packard Co.*,
668 F.3d 1136 (9th Cir. 2012) .......... 24

*Wurtz v. Rawlings Co., LLC*,
761 F.3d 232 (2d Cir. 2014) .......... 28

*Youngers v. Virtus Inv. Partners Inc.*,
195 F. Supp. 3d 499 (S.D.N.Y. 2016) .......... 17

*Zakinov v. Ripple Labs, Inc.*,
No. 18-CV-06753-PJH, 2020 WL 922815 (N.D. Cal. Feb. 26, 2020) .......... 16, 24

*Zakinov v. Ripple Labs, Inc.*,
No. 18-CV-06753-PJH, 2023 WL 4303644 (N.D. Cal. June 30, 2023) .......... 16

**Statutes**

15 U.S.C. § 771(a)(1) .......... 1

15 U.S.C. § 77e(a) .......... 1

15 U.S.C. § 77e(c) .......... 1

28 U.S.C. § 1332(d)(2) .......... 27, 28

28 U.S.C. § 1653 .......... 28

Cal. Bus. & Prof. Code § 17200 .......... 5, 24, 26

Cal. Bus. & Prof. Code §17500 .......... 5, 24

New York GBL § 349 .......... passim

New York GBL § 350 .......... 5, 19, 26

Securites Act § 11 .......... 18

Securities Act § 12 .......... 18

Securities Act § 12(a)(1) .......... passim

Securities Act § 12(a)(2) .......... 16

Securities Act § 5(a) .......... 1

Securities Act § 5(c) .......... 1

**Rules**

Fed. R. Civ. P. 12(b)(1)........................................................................................................ 1

Fed. R. Civ. P. 12(b)(6)..................................................................................................... 1, 5

Fed. R. Civ. P. 9(b) ........................................................................................ 18, 19, 26, 27

**Docketed**

*Donovan, et al. v. GMO-Z.Com Trust Company, Inc., et al.*,
No. 3:22-cv-02826-TLT (N.D. Cal.) ....................................................................... 2

Lead Plaintiffs Kenneth Donovan, Hussien Kassfy, and John Brambl (collectively, "Plaintiffs") respectfully submit this memorandum of law in opposition to the motion to dismiss the Second Amended Class Action Complaint (the "Complaint") filed by Defendant GMO-Z.com Trust Company, Inc. ("GMO Trust" or "Defendant") (ECF Nos. 113-115) pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Defendant's Motion").[1]

## I. INTRODUCTION

Plaintiffs bring this class action lawsuit on behalf of all persons or entities who purchased or otherwise acquired Defendant's proprietary GYEN crypto asset between December 29, 2020 through the present (the "Class Period") and were damaged as a result (the "Class"). ¶118. Plaintiffs' Complaint is, at its core, relatively straightforward: Plaintiffs allege that Defendant offered and sold GYEN as an unregistered security in violation of Sections 5(a), 5(c), and 12(a)(1) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77e(a), 77e(c), and 771(a)(1), and that, in marketing GYEN to the public as a low-volatility, purportedly stable asset pegged 1-to-1 to the Japanese yen ("JPY"), Defendant committed deceptive acts or practices in violation of New York and California consumer protection laws. *See, e.g.*, ¶¶1, 125-173. As a result of Defendant's representations about the nature of GYEN and its marketing and sales efforts targeting U.S. retail consumers, Plaintiffs allege that they and the Class purchased GYEN and were damaged as a result. *Id*.

In its Motion, Defendant asserts that GYEN cannot be considered a security under federal securities laws because it does not meet the U.S. Supreme Court's definition of an "investment contract" under *S.E.C. v. W.J. Howey Co.* (*Howey*), 328 U.S. 293 (1946), while at the same time arguing that it cannot be held accountable under state consumer protection laws for any deceptive practices related to GYEN because "[c]omprehensive regulatory systems already exist for *securities . . . transactions*." Def. Mem. 21-23. Through this paradoxical framing of each cause

[1] The "Complaint" (ECF No. 109) is cited herein as "¶__." GMO Trust's brief (ECF No. 115) is cited as "Def. Mem." All capitalized terms not otherwise defined herein have the same meaning as set forth in the Complaint. For cited case law, unless otherwise indicated, all emphasis is added and all alterations, internal quotation marks, and citations are omitted.

of action, Defendant seeks to evade both federal securities laws and state consumer protection laws, urging that GYEN does not perfectly fit under any of these statutory schemes. The Court should reject Defendant's proposed framework.

Moreover, throughout its Motion and as critical lynchpins in support of its arguments, Defendant repeatedly argues its own interpretations of facts alleged in Plaintiffs' Complaint, though those conclusions are supposition at best. Even if they were clear (and they are not), such interpretations are arguments typically reserved for a summary judgment motion and are not appropriate at the motion to dismiss stage where the court must accept all well-pled allegations as true and draw all reasonable inferences in Plaintiffs' favor. *See Sec. & Exch. Comm'n v. Ripple Labs, Inc.* ("*Ripple II*"), No. 20 Civ. 10832 (AT), 697 F. Supp. 3d 126, 2023 WL 6445969 (S.D.N.Y. Oct. 3, 2023).

For the reasons that follow, Defendant's Motion should be denied because the Complaint plausibly alleges that Defendant offered and sold GYEN as an unregistered security, resulting in damage to Plaintiffs and the Class, and, separately, that Defendant's public statements about GYEN, disseminated through an extensive national marketing campaign targeting retail investors, constituted deceptive acts and practices under both New York and California consumer protection laws.

## II. FACTUAL BACKGROUND

Plaintiffs commenced this Action on May 12, 2022 in the Northern District of California in the case captioned *Donovan, et al. v. GMO-Z.Com Trust Company, Inc., et al.*, No. 3:22-cv-02826-TLT (N.D. Cal.), against Defendants GMO Trust, Coinbase Global Inc., and Coinbase Inc. (together, "Coinbase"). ECF No. 1. Following an order compelling the claims against Coinbase to arbitration (ECF No. 78), and pursuant to a stipulation of the parties, the case against Defendant GMO Trust was transferred to this Court on July 13, 2023 (ECF No. 84). On April 8, 2024, this Court entered an order permitting Plaintiffs to file their proposed Second Amended Complaint (ECF No. 108) and, on May 23, 2024, Defendant filed the instant Motion (ECF Nos. 113-115).

Defendant is a New York Limited Purpose Trust Company that offers services to retail

customers and is the issuer of a crypto asset called GYEN. ¶22. GMO Trust was incorporated in New York under New York State banking laws and has been continuously regulated by the New York State Department of Financial Services since December 29, 2020. *Id*.

GYEN is referred to as a "stablecoin" because, unlike crypto assets such as Bitcoin, Defendant claimed that it was collateralized by an underlying asset and marketed it as maintaining a stable value against "fiat" currencies—here, the JPY. *See, e.g.*, ¶¶3, 39. Defendant markets GYEN as a safe asset backed by a historically stable fiat currency, claiming it can "virtually eliminate volatility" and be used by both institutional and retail traders to earn yields through currency trading strategies aimed at profiting from changing exchange rates. ¶¶4, 47, 64-70.

After receiving its charter on December 29, 2020, Defendant began a nationwide marketing campaign promoting GYEN as a "stablecoin" that, subject to Defendant's managerial efforts, would remain pegged 1-to-1 in value to the JPY and, through its efforts to secure partnerships with secondary crypto asset exchanges, would allow GYEN purchasers to profit or "earn meaningful yields" simply by holding their GYEN investments with one of Defendant's partner exchanges. ¶¶4, 7-8, 12, 37, 39, 42, 45, 47-49, 63, 71-85, 97. To drive demand for GYEN, and thereby increase the profits it can derive from selling GYEN, Defendant advertised, and its website linked to, various "partner" crypto asset exchanges, including Coinbase and Binance Holdings Ltd. ("Binance"),[2] with which Defendant partnered to create markets where GYEN could be traded. ¶¶6, 8, 11, 24, 37, 43, 50-52, 60, 63, 68-85, 95, 97. Defendant receives interest and other earnings on fiat currency paid to it by GYEN purchasers and, on information and belief, also profits from its relationships with its partner exchanges. ¶¶6, 63, 130.

Beginning in 2020 and continuing through the Class Period, Defendant launched a national marketing campaign for GYEN, targeting retail investors through various online channels, including Twitter, YouTube, LinkedIn, Defendant's website, its partner exchanges' (including

[2] Binance is a global cryptocurrency company widely credited as operating the world's largest cryptocurrency exchange by volume. ¶30. Coinbase is a Delaware corporation which created and operates a centralized cryptocurrency exchange on which customers can buy and sell digital assets, including GYEN. ¶¶8, 27-28.

Binance's and Coinbase's) websites, and other popular crypto asset websites, as well as through its key marketing document—the GYEN White Paper. *See, e.g.*, ¶¶12, 42-45, 47-52, 64-85, 87, 97, 103, 129-130. On March 1, 2021, Defendant announced the official launch of GYEN in the United States. ¶44.

Although marketed as a "stablecoin," in the three years since it was first issued, GYEN has been anything but stable. ¶5. While the JPY has fluctuated only 7% against the U.S. dollar ("USD") since January 2021, GYEN has fluctuated *over 200%* against the USD. *Id*. Understandably, some central banks and international trade organizations have deemed the term "stablecoin" to be confusing and even misleading. *Id.*; ¶39.

On or around May 12, 2021, when Binance first allowed GYEN trading on its exchange, the asset came untethered from the JPY and rose sharply in value. As would happen again later, GYEN purchasers whose orders were delayed on Binance, or who bought when it was untethered from the JPY, lost up to 99% of their purchase value within hours. ¶¶9, 97-101. Months later, on November 16, 2021, when Coinbase first offered trading of GYEN, the asset again came untethered from the JPY, rising sharply in value. ¶¶10, 104-117. GYEN purchased by investors were not, as Defendant advertised, equal to the JPY, but, rather, worth up to *7 times more than the JPY*. Just as suddenly, GYEN's value plunged back to the peg—falling 80% in one day. *Id*.

Defendant has disclaimed any responsibility for losses sustained from these events (¶11); however, at all relevant times, Defendant advertised its partnerships with exchanges as among GYEN's primary benefits—as platforms through which potential GYEN purchasers could buy, sell, and exchange their GYEN on a 1-to-1 basis with the JPY. ¶¶51-52. Indeed, among GYEN's "Key Product Features and Benefits" promoted in Defendant's January 14, 2021 and September 9, 2021 versions of the "GYEN White Paper"—its key writing on GYEN—was the fact that GYEN could be purchased and redeemed on a 1-to-1 basis with the JPY, either from Defendant directly, "or by trading with other digital assets on exchanges that list stablecoins." *Id.*; *see also* Exhibits 1-3 (ECF Nos. 114-1 to 114-3) of the Declaration of Nowell D. Bamberger in support of Defendant's Motion. In these same disclosures, Defendant touted its partnerships with these

"liquidity providers" as places where investors could purchase, sell, and trade their GYEN. *Id*. The first identified version of GYEN White Paper from which these statements were removed is dated August 3, 2022—almost a year after the November 2021 Coinbase depegging event and approximately 3 months after this action was filed in the Northern District of California. Even still, Defendant continues to tout its partner exchanges as viable avenues for buying, selling, and trading GYEN. ¶11.

Plaintiffs and the Class, composed of thousands of GYEN purchasers, bought GYEN as a result of Defendant's national marketing campaign, which included widespread statements about stabilizing GYEN at a 1-to-1 ratio with the JPY, and its use as an investment vehicle for earning yield and generating profits. As a result, they collectively lost millions. ¶12.

## III. ARGUMENT

Under Federal Rule of Civil Procedure 12(b)(6), a court must consider the complaint in its entirety, "accept all factual allegations . . . as true," and construe them in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). A complaint should not be dismissed if, when construed in the most favorable light, it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When claims cross the line from conceivable to plausible, they suffice to survive a motion to dismiss. *IOP Cast Iron Holdings, LLC v. J.H. Whitney Capital Partners, LLC*, 91 F. Supp. 3d 456, 467 (S.D.N.Y. 2015).

As described below, the Complaint here plausibly alleges claims against Defendant for violations of the Securities Act, the New York General Business Law ("GBL") (NYGBL § 349-350), California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, and California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §17500 *et seq*.

### A. The Complaint Adequately Alleges Defendant Is Liable Under Section 12(a)(1) of the Securities Act

#### 1. Plaintiffs' Allegations Sufficiently Show That GYEN is a Security Under *Howey*

The Securities Act broadly defines "security" to include "investment contracts," with the

aim of regulating a wide range of investment instruments regardless of their designation. *Howey*, *supra*, 328 U.S. 293; *S.E.C. v. Coinbase, Inc.*, No. 23 CIV. 4738 (KPF), 2024 WL 1304037, at *18 (S.D.N.Y. Mar. 27, 2024) ("Congress' purpose in enacting the securities laws was to regulate investments, in whatever form they are made and by whatever name they are called" (citing *SEC v. Edwards*, 540 U.S. 389, 390 (2004))).

The determination of whether a particular asset is an "investment contract"—and, in turn, a "security"—depends on whether it meets the three-pronged test set forth in *Howey*: whether there is "(i) an investment of money; (ii) in a common enterprise; (iii) with the expectation of profits to be derived solely from the efforts of others." *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 352 (S.D.N.Y. 2019). For the third prong, the Second Circuit advises that "solely" should not be interpreted strictly. Rather courts should consider if, in the overall context, the scheme was primarily marketed as an investment. *Id*. at 355.

The *Howey* analysis is one of substance over form with no across-the-board edict—each potential security and situation is uniquely analyzed considering the totality of circumstances, with a focus on the economic reality of the offer or sale. *See Sec. & Exch. Comm'n v. Genesis Glob. Cap., LLC*, No. 23-CV-00287 (ER), 2024 WL 1116877, at *5 (S.D.N.Y. Mar. 13, 2024). Thus, under *Howey*, the definition of an investment contract is flexible and adaptable to various schemes to broadly protect investors in line with the Securities Act's purpose. *See, e.g.*, *Edwards*, 540 U.S. 389 (payphones); *SEC* v. *Scoville*, 913 F.3d 1204 (10th Cir. 2019) (bundled internet ad services); *Eberhardt* v. *Waters*, 901 F.2d 1578 (11th Cir. 1990) (cattle embryos); *Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027 (2d Cir. 1974) (whiskey casks); *SEC* v. *Telegram Grp. Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020) (crypto assets); *Friel v. Dapper Labs, Inc.*, 657 F. Supp. 3d 422 (S.D.N.Y. 2023) (non-fungible tokens ("NFTs")).

Here, the Complaint adequately alleges that GYEN qualifies as a security under *Howey* because it involves the investment of money in a common enterprise, where it is marketed by Defendant as an asset capable of generating future profits largely dependent on Defendant's managerial efforts to maintain GYEN's 1-to-1 peg with the JPY and its entrepreneurial efforts to

secure and maintain partnerships with crypto asset exchanges. *See, e.g.*, ¶¶60-95.

**(a) The Complaint Sufficiently Alleges Plaintiffs Invested Money by Purchasing GYEN Tokens**

As an initial matter, Plaintiffs adequately allege that they invested money to purchase GYEN tokens; no more is required under *Howey*. *See, e.g.*, ¶¶19-21, 61; *see also Sec. & Exch. Comm'n v. Ripple Labs, Inc. (Ripple I)*, 682 F. Supp. 3d 308, 325 (S.D.N.Y. 2023) (holding that the "proper inquiry" was whether purchasers "provided the capital," "put up their money," or "provided cash"), *motion to certify appeal denied*, *Ripple II*, 697 F. Supp. 3d 126, 2023 WL 6445969. While Defendant claims that Plaintiffs must plead a "risk of loss" (Def. Mem. 11), by so arguing, Defendant seeks to impose a non-existent requirement under *Howey*. But even if such an interpretation were correct, Defendant's argument ignores Plaintiffs' well-pled allegations detailing the ways in which GYEN investors are put at a risk of loss and did in fact suffer loss. *See, e.g.*, ¶¶5, 9-10, 38 (noting GYEN's wild price fluctuations since its issuance and the inherent volatility of crypto assets generally); ¶¶53, 137-38, 158, 168 (highlighting Defendant's omissions about GYEN's likelihood of deviating from the JPY); ¶¶99-101, 106-117, 143 (describing the two depegging events that led to massive investor losses); ¶114 (describing Defendant's Chief Executive Officer ("CEO") Ken Nakamura's ("Nakamura") claim in response to the depegging events that GMO Trust has no way of protecting investors against price irregularities on exchanges). Moreover, the Complaint explicitly alleges that if Defendant were to go out of business, GYEN would, in all likelihood, lose much of its value (and pegging), if not fail completely. *See, e.g.*, ¶63. Therefore, even under Defendant's rubric, Plaintiffs sufficiently allege that they and the Class were exposed to a risk of loss and did, in fact, suffer losses as a result of purchasing GYEN. *See, e.g.*, ¶¶12, 19-21.

The cases that Defendant relies upon for this argument are inapposite. *Marine Bank v. Weaver*, 455 U.S. 551 (1982) rested on the notion that federal banking regulations and insurance eliminated investor risk in the purchase of certificates of deposits; here, there are no federal regulations governing crypto assets that eliminate the risk of loss (and, moreover, Defendant

explicitly disclaims that it offered GYEN with any promise of stability (*see, e.g.*, Def. Mem. 2, 5, 25), or that it had any control over irregular pricing on exchanges (*id.* at 5), let alone that it offered or sold GYEN as a riskless investment). In *Int'l Bd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Daniel*, 439 U.S. 551, 558 (1979), the noncontributory pension plans at issue were not securities, in part, because no tangible consideration was exchanged, unlike here where Plaintiffs invested money to purchase GYEN tokens. And like in *Hector v. Wiens*, 533 F.2d 429 (9th Cir. 1976), where plaintiff would still be liable even if the promissory-note deal at issue failed (*id*. at 432), here Plaintiffs would suffer great losses if GYEN sharply declined in value or lost all value completely (*see*, *e.g*., ¶63).

**(b) The Complaint Adequately Alleges That Plaintiffs Invested in a Common Enterprise, Which Defendant Does Not Dispute in its Motion**

Defendant does not challenge Plaintiffs' allegations regarding the second prong of *Howey*—that Plaintiffs and the Class invested in a common enterprise—and the Court should therefore deem this point conceded for purposes of this motion. *See, e.g.*, *Coinbase*, 2024 WL 1304037, at *20 (declining to examine elements of *Howey* that Coinbase did not challenge). Nevertheless, Plaintiffs have sufficiently alleged that, by purchasing GYEN, they invested in a common enterprise. *See* ¶¶60, 63; *Dapper Labs*, 657 F. Supp. 3d at 439 (allegations that a basketball NFT's value depended on the success or failure of the company that issued the NFTs were sufficient to meet *Howey's* second prong, which made the NFT distinguishable from traditional sports trading cards where, if the companies that had printed those cards went "out of business, the value of the cards they sold would be wholly unaffected").

**(c) The Complaint Adequately Alleges That GYEN Investors Held a Reasonable Expectation of Profits Derived Primarily From GMO Trust's Managerial and Entrepreneurial Efforts**

To meet *Howey's* third and final prong, a plaintiff must adequately plead that the defendant's offer or sale created a "reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others … or, whether, under all the circumstances, the scheme was being promoted primarily as an investment." *Dapper Labs, Inc.*, 657 F. Supp. 3d at

442. And, as discussed *supra* § III.A.1, the focus turns on the economic realities of the investment, looking at the "totality of the circumstances surrounding the offer[.]" *Coinbase*, 2024 WL 1304037, at *18.

Here, the Complaint alleges that Defendant promoted GYEN as an investment, asserting that Defendant's marketing materials and public statements objectively led purchasers to expect potential future profits from their GYEN investments in at least two ways.

**First**, Plaintiffs allege that, to jump start demand and expand GYEN's liquidity, in as early as March 2021 and continuing throughout the Class Period, Defendant engaged in a national marketing campaign—through various online channels, including Twitter, YouTube, LinkedIn, Defendant's website, its partner exchanges' websites, and other popular crypto asset websites, as well as through the GYEN White Paper—advertising that GYEN purchasers could earn significant return, or "yield," by holding GYEN with one of Defendant's partner-exchanges. Defendant's marketing did not suggest that GYEN's yield opportunities were limited to purchasers on those specific exchanges; rather, earning yield was presented as an opportunity available to anyone who purchased GYEN. *See, e.g.*, ¶¶71-85. Throughout the Class Period, Defendant touted that GYEN investors could leverage this "passive earning strategy" with its partner exchanges, "Earn With Ease," and "Start Earning Today." ¶72. Defendant boasted potential yields ranging from 7% to 77%, depending upon which of Defendant's partner exchanges that investors held and traded their GYEN tokens. ¶¶73-77. In a May 25, 2021 press release, Defendant's CEO Nakamura described GYEN as a promising yield opportunity, explaining that "[i]t provides a less volatile and compelling way to earn meaningful yield in today's interest rate world simply by holding historical safe have[n] [sic] currencies like JPY and USD in digitized form." ¶¶74-75. On social media, GMO Trust further described how investors could "stake"[3] their GYEN investments and serve as "liquidity providers" with Defendant's partner exchanges—affording GYEN investors the

[3] "Staking" refers to the process by which a cryptocurrency holder can receive rewards and/or interest by "locking up," or lending, a certain amount of their cryptocurrency tokens. ¶79 n.36; *Coinbase*, 2024 WL 1304037, at *5 (explaining that Coinbase's Staking Program "allows customers to earn financial returns with respect to certain blockchain protocol").

opportunity to earn upwards of between 40% and 63% on their GYEN investments. ¶¶79-82. In one instance, Nakamura retweeted a link from Defendant's partner exchange DFX Finance boasting "HUGE #yield" for GYEN investors. ¶80. Throughout the Class Period, Defendant persisted in promoting secondary exchanges as places where GYEN could be purchased and with the ability to obtain high yield. ¶¶83-85.

Accordingly, Defendant's statements about GYEN's significant yield opportunities and its efforts to secure partnerships to effectuate those opportunities are sufficient allegations that Defendant created a reasonable expectation of potential profits based on the efforts of others, or, put another way, show that Defendant promoted GYEN as an investment. *See Coinbase*, 2024 WL 1304037, at *32 ("retaining third parties to stake participant assets" and "maintaining 'liquidity pools' (or reserves)" among allegations sufficient to meet *Howey's* third prong); *Sec. & Exch. Comm'n v. Terraform Labs Pte. Ltd. (Terraform I)*, 684 F. Supp. 3d 170, 194, 196-97 (S.D.N.Y. 2023) (yield-bearing stablecoin UST "touted as being capable of being able to generate future profits of as much as 20%" deemed a security under *Howey*); *Sec. & Exch. Comm'n v. Terraform Labs Pte. Ltd. (Terraform II)*, No. 23-CV-1346 (JSR), 2023 WL 8944860, at *13-14 (S.D.N.Y. Dec. 28, 2023) (motion for summary judgment denied on same grounds).

**Second**, the Complaint alleges that Defendant promoted GYEN as an investment vehicle capable of generating profits through strategic currency management, including for hedging against the USD, engaging in arbitrage, and employing strategies generally available to spectators seeking to profit from short-term tactical or long-term strategic opportunities related to changing exchange rates. ¶¶64-70. Defendant described these "hedging," "arbitrage," and "speculative" opportunities in its White Paper, on its website, on at least one of its partner exchanges' websites, in press releases, during a cryptocurrency roundtable, and in a March 1, 2021 YouTube video. *Id*. While Defendant argues that Plaintiffs "fail to plausibly allege how that activity translates into an expectation of profits" (Def. Mem. 13), GYEN White Paper—Defendant's key marketing document on GYEN—expressly described these strategies as "popular methods *to gain yield* and/or hedge for institutional and retail traders[,]" which investors would be able to "leverage" by

purchasing GYEN tokens (¶64). And, as the Complaint alleges, these strategies rely on GMO Trust's "off-chain" managerial efforts to ensure that GYEN remained pegged to the JPY. ¶¶86-94. *See Balestra*, 380 F. Supp. 3d at 355 ("[T]he third prong of the *Howey* test is satisfied when the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.").

Defendant's reliance on *Noa v. Key Futures, Inc.*, 638 F.2d 77 (9th Cir. 1980) and *SEC v. Belmont-Reid*, 794 F.2d 1388 (9th Cir. 1986) for its "efforts of others" argument is misplaced. Unlike commodities such as silver and gold, which derive their value solely from independent economic factors, the value of GYEN is actively managed by Defendant's centralized, technological, and managerial efforts to maintain a consistent peg to the JPY. *See, e.g.*, ¶¶86-94 (detailing Defendant's significant "off-chain" efforts and central role in GYEN's operations); *see also Balestra*, 380 F. Supp. 3d at 357 (distinguishing *Noa v. Key Futures, Inc.*, noting that unlike an investment in silver which still has value based on the national market for silver, the value of the crypto asset at issue was dictated largely by the defendant's efforts). In addition, while it is possible that forces outside of Defendant's control may influence the price of GYEN, "the presence of external market forces should not be dispositive of whether a scheme is or is not a security." *Dapper Labs*, 657 F. Supp. 3d at 448.

Thus, for the foregoing reasons, Plaintiffs allege a reasonable expectation of profits from the investment in GYEN, meeting *Howey's* third prong.

#### (d) Defendant's Focus on Plaintiffs' Subjective Intent is Misdirected in Light of *Howey's* Objective Standard

Contrary to Defendant's assertion, under *Howey* and its progeny, Plaintiffs are not required to plead (i) personal use of profit-generating trading strategies, (ii) purchase of GYEN through Defendant's partner exchanges where yield was advertised, or (iii) their own expectations or earnings of yield. Under *Howey*, courts are directed to focus on whether the entire scheme, as a whole, was marketed and operated in a way that would lead a reasonable investor to expect profits. *See Coinbase*, 2024 WL 1304037, at *20. Thus, under *Howey's* third prong, the critical inquiry is

whether "an objective investor would have perceived the defendants' statements and actions as promising the possibility of such returns[.]" *Terraform I*, 684 F. Supp. 3d at 196; *see also Ripple I*, 682 F. Supp. 3d at 329 ("[t]he inquiry is an objective one focusing on the promises and offers made to investors; it is not a search for the precise motivation of each individual participant" (quoting *Telegram*, 448 F. Supp. 3d at 371)); *Audet v. Fraser*, 605 F. Supp. 3d 372, 398 n.7 (D. Conn. 2022) ("Because the *Howey* test is an objective one—based upon what purchasers were "led to expect" …—the subjective intent of individual plaintiffs in purchasing Paycoin is not determinative of the issue of whether Paycoin purchasers had a reasonable expectation of profit.").

In assessing the circumstances surrounding a crypto asset's offer and sale, courts consider how and to whom issuers market the crypto asset. *See Coinbase*, 2024 WL 1304037, at *20. In *Coinbase*, Judge Failla noted that this assessment requires examining the "full set of contracts, expectations, and understandings," often referred to the asset's "ecosystem," and looked to social media posts, investor materials, and other promotional content to identify investors' expectations. *Id.* Similarly, in both *Terraform* opinions, Judge Rakoff analyzed "investor materials," "readouts of investor meetings," the defendant's white paper, and "social media posts," including tweets from the defendant's founder that UST would generate "by far the highest stablecoin yield in the market." *Terraform I*, 684 F. Supp. 3d 197; *Terraform II*, 2023 WL 8944860, at *13-14; *see also Balestra*, 380 F. Supp. 3d at 355 (finding that investors' expectation of profits came from "a marketing campaign," a "press release," "advertisements," and the promoter's website).

Here, Defendant extensively promoted GYEN's yield opportunities through various channels, including social media, its website, other cryptocurrency websites, and its widely distributed White Paper, highlighting that investors could "earn with ease," leverage "passive earning strategies," "start earning today," and achieve "huge yields" ranging from 7% to 77%. *See* ¶¶71-85. These yield opportunities were not limited to a select group of GYEN investors; rather, they were presented as potential profits within GYEN's comprehensive ecosystem, available to all GYEN purchasers, both retail and institutional. It makes no difference that not all investors participated in those GYEN yield opportunities. *See Terraform II*, 2023 WL 8944860, at *14

(holding that, with regard to the yield-opportunities made available for the UST stablecoin through the defendants' "Anchor Protocol," it was "of no legal consequence that not all holders of UST deposited tokens in the Anchor Protocol, and thus that some holders chose not to accept the full offer of an investment contract"); *see also Coinbase*, 2024 WL 1304037, at *24 ("One need go no further than *Howey* itself, where investors purchased tracts of orange groves pursuant to land sale agreements; all were offered, but only a certain percentage entered into, a separate service contract whereby the defendants committed under state law to undertake efforts to cultivate the land for the investors' benefit." (quoting *Howey*, 328 U.S. at 296-99)).

In short, Plaintiffs' subjective intent is of "limited relevance" under *Howey's* objective standard. *See Sec. & Exch. Comm'n v. LBRY, Inc.*, 639 F. Supp. 3d 211, 220 (D.N.H. 2022) (focus is not on subjective intent of purchasers, but rather, on "what the purchasers were offered or promised[,] for a contrary ruling would thwart the Securities Act's ability to "adapt to the countless and variable schemes devised by those who seek the use of the money of others on the promise of profit"). What matters is whether an objective investor would understand Defendant's statements as offering the potential for investment returns. *See Terraform I*, 684 F. Supp. 3d at 195 (focusing on fact that UST was "touted as being capable of being able to generate future profits of as much as 20%"); *In re Ripple Labs, Inc. Litigation*, No. 18-CV-06753-PJH, 2024 WL 3074379, at *10 (N.D. Cal. June 20, 2024) (relying on evidence that Ripple's internet "promotional materials" and other publicly disseminated statements were widely distributed to the general public).

**(e) This Court's Decision in *Ripple I* is Readily Distinguishable**

Inquiries under *Howey* are individualized, instrument by instrument. *Terraform I*, 684 F. Supp. 3d at 193. There is no bright line rule to follow. Although Defendant invites the Court to find similarities between the allegations in the Complaint and the undisputed facts presented by the SEC in *Ripple I* regarding Programmatic Sales, the two cases differ in several material respects.

**<u>First</u>**, this Court in *Ripple* specifically declined to address whether secondary market crypto asset transactions met the *Howey* test because the question was not properly before the

Court. *Ripple I*, 682 F. Supp. 3d at 329 n.16. The Court concluded that, "[w]hether a secondary market sale constitutes an offer or sale of an investment contract would depend on the totality of circumstances and the economic reality of that specific contract, transaction, or scheme." *Id.* And, as detailed herein, the circumstances alleged in the Complaint plausibly plead that GYEN was offered and sold as a security.

**Second**, and more fundamentally, the procedural posture of the two cases is markedly different, where *Ripple I* was at summary judgment, while this motion to dismiss simply tests the sufficiency of the pleadings. This Court made a similar distinction when addressing Judge Rakoff's ruling in *Terraform I*, noting that, unlike *Ripple I's* summary judgment posture arrived at with the full benefit of fact and expert discovery, *Terraform I* was a decision on a motion to dismiss requiring Judge Rakoff to "accept all well-pleaded allegations and to draw all reasonable inferences … in the SEC's favor." *Ripple II*, 2023 WL 6445969, at *5-6.

As discussed *supra* § III.A.1.(c), like the SEC in *Terraform I*, Plaintiffs here allege that Defendant's marketing materials promoted potential yield opportunities and profit-generating trading strategies that were available for all GYEN purchasers, both retail and institutional, regardless of where they initially purchased their tokens. *See supra* § III.A.1.(c). And, accepting all well-pled allegations as true and drawing all reasonable inferences in [Plaintiffs'] favor—"as [the Court] must at the motion to dismiss stage," *Ripple II*, 2023 WL 6445969, at *5—the Complaint plausibly demonstrates that Defendant offered and sold GYEN as a security.

**Finally**, in its *Ripple* decisions, this Court observed that Ripple's marketing efforts were not directed at Programmatic Buyers, as Ripple did not know who they were, and the buyers did not know who Ripple was. *See Ripple I*, 682 F. Supp. 3d at 329; *Ripple II*, 2023 WL 6445969, at *6 ("based on the totality of circumstances," and "after a close examination of the extensive factual record and expert reports," the "undisputed record" established that "Ripple's key promotional materials—such as the 'Ripple Primer'" and the 'Gateways' brochure," were only distributed to Institutional Buyers, and not more broadly to Programmatic Buyers"). The same cannot be said here where the Complaint alleges that Defendant and its CEO widely and

specifically directed their marketing efforts to *both* retail and institutional investors, promoting potentially significant yields on GYEN investments and the GYEN's "passive earning strategies" through Twitter, YouTube, Defendant's website, its partner exchanges' websites, and other popular cryptocurrency websites, as well as through the GYEN White Paper, which is and was publicly available on Defendant's and Coinbase's websites. *See supra* § III.A.1.(c).

Therefore, the posture of, and the facts presented in, this Court's *Ripple* decisions are meaningfully distinguishable from the instant procedural posture and facts alleged in the Complaint.[4]

### 2. The Complaint Adequately Alleges Defendant is a Statutory Seller Under Section 12(a)(1)

Defendant argues that Plaintiffs cannot maintain this action because they do not allege GMO Trust was a "statutory seller" under the Securities Act. *See* Def. Mem. 14-18. Not so. Although it is true that Plaintiffs do not allege purchasing GYEN tokens directly from GMO Trust, they sufficiently allege that GMO Trust acted as a "solicitor seller," which is sufficient to maintain a cause of action under Section 12(a)(1). *See Owen v. Elastos Found.*, No. 1:19-CV-5462-GHW, 2021 WL 5868171, at *14-16 (S.D.N.Y. Dec. 9, 2021) (collecting cases and holding that "violations of Section 5—and by extension Section 12(a)(1)—may result from initial *or secondary sales of securities*").[5]

The *Owen* case is instructive. In *Owen*, Judge Woods highlighted the extensive, nationwide case law finding Section 12(a)(1) applicable to secondary market transactions and determined that the defendants could potentially be liable as "solicitor sellers" based on the complaint's allegations that the defendants actively solicited secondary market sales for their own

[4] The difference in the outcomes of this Court's decision in *Ripple I* and Judge Hamilton's recent decision in *In re Ripple Labs, Inc. Litig.*, 2024 WL 3074379, at *10—despite both Courts presumably reviewing the same or similar evidentiary record—underscores the complexity and variability inherent in crypto asset cases. This disparity supports denying Defendant's Motion, as it demonstrates that reasonable minds can differ on the interpretation of the evidence and legal standards applied, warranting a full exploration of the facts through discovery.

[5] *Owen* also establishes that Plaintiffs have standing to pursue claims on behalf of those who purchased directly from Defendant. *See Owen*, 2021 WL 5868171, at *11.

financial benefit and that the plaintiff relied on those solicitations in purchasing defendants' crypto asset in the secondary market. 2021 WL 5868171, at *14-16 (citing *Pinter v. Dahl*, 486 U.S. 622, 647 (1988)). The types of marketing and representations alleged in the *Owen* case are similar to those alleged in the instant Complaint, *i.e.*, an intensive online marketing campaign, defendant's positive tweets about its crypto asset, and various interviews given by the crypto asset's co-founders. *See id*. at *15.

Likewise, the defendants in *Owen* raised similar arguments to those that Defendant raises here, *i.e.*, that their alleged solicitations needed to be "directly" or "personally" made to potential buyers to qualify them as statutory sellers and that their actions were "too far removed from the secondary market transactions to be considered to have sold or solicited the sale of the [crypto asset]." *See Owen*, 2021 WL 5868171, at *16; *see also* Def. Mem. 16-18. Judge Woods disagreed, reasoning that "even indirect solicitation efforts are sufficient to state a claim under Section 12." *Id*. at *16 (indirect solicitations suffice under Section 12(a)(2) and "the language of sections 12[a](1) and 12[a](2) is identical in meaning" (citing *Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir. 1988)); *In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 186-87 (S.D.N.Y. 2003) (noting that it is "well settled in this Circuit that the seller need not have 'personal' contact with the purchaser" for liability to attach and crediting plaintiffs' allegations that defendant "regularly appeared before investors and financial news agencies to tout the financial vitality of [the company] and thereby encouraged investors to purchase [the company's] securities"); *Zakinov v. Ripple Labs, Inc.*, No. 18-CV-06753-PJH, 2020 WL 922815, at *1 (N.D. Cal. Feb. 26, 2020) (defendants qualified as sellers where it was alleged that they received a direct financial benefit from secondary market transactions and "that defendants published various tweets, interviews, and articles pushing the adoption of XRP"); *Zakinov v. Ripple Labs, Inc.*, No. 18-CV-06753-PJH, 2023 WL 4303644, at *4 (N.D. Cal. June 30, 2023) (citing its own docket and *Owen* to conclude that "this court and others have held that a plaintiff can bring an unregistered securities claim against solicitor sellers").

Here, the Complaint sufficiently alleges that Defendant qualifies as a solicitor seller under Section 12(a)(1) because it actively solicited secondary market sales for its own financial gain and

Plaintiffs relied on those solicitations when making their GYEN investments. *See Owen*, 2021 WL 5868171, at *14-16; *see also* ¶¶129, 19-21, 43-45, 51-52, 64-85, 87, 97, 158, 168, 171 (Defendant was highly active in promoting GYEN to retail investors such as Plaintiffs and the Class through the dissemination of the GYEN White Paper; advertising on GMO Trust's website, LinkedIn, Twitter, and YouTube; and a CEO interview on a popular retail investor website and Plaintiffs saw and relied on those solicitations); ¶¶130, 6, 8, 12, 60, 63, 104 (Defendant's solicitations were motivated by a desire to serve its own financial benefit, which included receiving a direct financial interest in each purchase of GYEN tokens, receiving financial benefits through its partnerships with secondary exchanges where retail investors such as Plaintiffs and the Class purchased and traded GYEN tokens, and earning interest on money paid to it by GYEN investors).

All of the cases that Defendant cites in support of its position that it is not a statutory seller are inapposite. To begin, Defendant's reliance on cases such as *Shain v. Duff & Phelps Credit Rating Co.*, 915 F. Supp. 575 (S.D.N.Y. 1996) and *F.W. Webb v. State Bank & Tr. Co.*, 2010 WL 3219284 (S.D.N.Y. Aug. 12, 2010) for the proposition that solicitation efforts must be "direct" and "personal" is misplaced because those cases do not account for the consistent recognition by courts in the Second Circuit that allegations of "indirect solicitations" suffice under Section 12(a)(1). *See Owen*, 2021 WL 5868171, at *16. Similarly, *Holsworth v. BProtocol Found.*, No. 20 CIV. 2810 (AKH), 2021 WL 706549 (S.D.N.Y. Feb. 22, 2021) does not support Defendant's argument either, as it merely found that the plaintiff failed to show *either* that he was "directly contacted" *or* that he purchased securities as a result of the defendants active solicitations of investors generally. *Id.* at *3. The other cases Defendant cites similarly fail to align with Defendant's claims, given they involved distinct circumstances not present here. *See Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499 (S.D.N.Y. 2016) (active solicitation not found where plaintiffs only alleged that wholesalers marketed the investment to brokers, unlike here where Defendant is alleged to have conducted its own marketing campaign targeting retail investors across multiple online platforms for financial gain.); *see also* ¶¶129-30; *Lozada v. TaskUs, Inc.*, No. 22 CIV. 1479 (JPC), 2024 WL 68571 (S.D.N.Y. Jan. 5, 2024) (active solicitation not

established where defendants merely signed or assisted in preparing the registration statement, but could be if defendants were alleged to have participated in investor-focused "road shows").

Defendant's argument that its alleged solicitation efforts fail to establish a solicitation "of an offer to buy" is a red herring. *See* Def. Mem. 17-18. Defendant cites *Underwood v. Coinbase Glob., Inc.*, 654 F. Supp. 3d 224, 239 (S.D.N.Y. 2023), *aff'd in part, rev'd in part and remanded sub nom. Oberlander v. Coinbase Glob. Inc.*, No. 23-184-CV, 2024 WL 1478773 (2d Cir. Apr. 5, 2024), which involved non-issuer Coinbase's collateral activities, which sharply differ from the Complaint's allegations related to Defendant's direct marketing campaign specifically targeting retail investors from whom it sought to profit. *See supra* § III.A.1.(c). Defendant also misinterprets *Griffin v. PaineWebber, Inc.*, No. 99 CIV. 2292 (VM), 2001 WL 740764 (S.D.N.Y. June 29, 2001), which unremarkably held that the plaintiff only had standing against the seller from whom he alleged he was solicited, and not against third parties such as brokers from whom members of the class may have been solicited. *Id*. at *2. *Griffin* does not support Defendant's position that its statements about GYEN's yield opportunities could only be construed as solicitations to those who may have deposited or purchased their GYEN tokens on specific exchanges. Moreover, as discussed *supra* § III.A.1.(c), and, *e.g.*, ¶¶71, 74-75, Defendant never limited GYEN's ability to "earn" or provide yield opportunities to initial purchases on specific exchanges.

#### 3. Plaintiffs' Section 12(a)(1) Claim is Not Subject to Rule 9(b)'s Heightened Pleading Standard

Despite Defendant's argument to the contrary (Def. Mem. 9-10), the Complaint's allegations do not contemplate fraudulent conduct and therefore need not meet the threshold for heightened pleading under Federal Rule of Civil Procedure's 9(b). *See, e.g., Rombach v. Chang*, 355 F.3d 164, 178 (2d Cir. 2004) (Section 11 and 12 claims not premised on fraud "are not subject to the heightened pleading requirements of Rule 9(b)"); *In re Longfin Corp. Sec. Class Action Litig.*, No. 18-cv-2933 (DLC), 2019 WL 1569792, at *5 (S.D.N.Y. Apr. 11, 2019) ("To state a claim under Section 12(a)(1) of the Securities Act, a plaintiff need not plead scienter, reliance, or

fraud."). Nonetheless, to the extent the Court requires Plaintiffs' Section 12(a)(1) claim to meet Rule 9(b), the Complaint satisfies this requirement by specifically alleging Defendant used interstate commerce to offer and sell GYEN securities without an effective registration statement. *See, e.g.*, ¶¶125-133.

### B. The Complaint Adequately That Alleges Defendant Is Liable Under the New York GBL

Plaintiffs have adequately alleged a claim against Defendant under the New York GBL §§ 349-350. New York GBL section 349 "is a consumer protection statute designed to protect against deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York] state[.]" *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*, 3 N.Y.3d 200, 205 (2004). "[T]he scope of the statute is intentionally broad, applying to virtually all economic activity." *Id.* To state a claim under GBL section 349, a plaintiff must allege (1) a defendant's act or practice was consumer-oriented; (2) the alleged act or practice was misleading in a material respect; and (3) the plaintiff was injured as a result. *Edmar Fin. Co., LLC v. Currenex, Inc.*, No. 21-CV-6598 (LAK), 2023 WL 3570017, at *19 (S.D.N.Y. May 18, 2023). "The deceptive act may be a representation or omission[,]" *Rosendale v. Mr. Cooper Grp. Inc.*, No. 19-CV-9263 (NSR), 2021 WL 4066821, at *19 (S.D.N.Y. Sept. 7, 2021), and the Second Circuit has held that GBL section 349 actions do not require proof of reliance similar to common-law fraud and thus are not subject to Rule 9(b). *See Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005); *see also Cosgrove v. Or. Chai, Inc.*, 520 F. Supp. 3d 562, 575 (S.D.N.Y. 2021) (noting the extension of the Second Circuit's reasoning to false advertising claims under GBL § 350).

The "consumer-oriented requirement is to be liberally construed[,]" *Rosendale*, 2021 WL 4066821, at *19, and New York's high court has established that whether an act or practice is "consumer-oriented" does "not depend on the use of a good or service. . . . Rather, 'what matters is whether the defendant's allegedly deceptive act or practice is directed to the consuming public and the marketplace.'" *Currenex, Inc.*, 2023 WL 3570017, at *20 (citing *Himmelstein, McConnell,*

*Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co., Inc.*, 37 N.Y.3d 169, 176-77 (2021)). Thus, the controlling law is that GBL section 349 covers not only deceptive practices targeting household consumers, but deceptive practices "directed to the consuming public and the marketplace" generally. *Himmelstein*, 37 N.Y.3d at 178; *see also Currenex, Inc.*, 2023 WL 3570017, at *19 (foreign exchange case rejecting pre- and post-*Himmelstein* cases holding that securities transactions were not "consumer-oriented").[6]

Here, the Complaint alleges that Defendant engaged in deceptive acts and practices by misrepresenting that GYEN was pegged to the JPY at a 1-to-1 ratio, by omitting that GYEN was not pegged to the JPY or that it could become unpegged from the JPY (particularly after the first depegging event), and by failing to fully disclose GYEN's nature, volatility, and risk. *See, e.g.*, ¶¶137-138, 4, 11, 42, 47-49, 51-53, 97, 114-117. The Complaint plausibly alleges these deceptive acts and practices were consumer-oriented, because they were directed to the consuming public and marketplace and had a broad impact on consumers at large. *See id*.; ¶141. And, similar to the allegations the *Himmelstein* court deemed sufficient to demonstrate consumer-oriented conduct, which related to the offering and sale of a legal handbook to legal professionals, the Complaint here plausibly pleads consumer-oriented conduct by alleging that Defendant engaged in extensive marketing and sales efforts aimed at a broad consumer and investor base and made GYEN available for purchase to the general public through its website and partner-exchanges. *Id*.

The Complaint also plausibly alleges GBL section 349's second requirement—that Defendant's acts and practices were misleading in a material respect—because it alleges that Defendant's alleged misrepresentations and omissions about GYEN were likely to deceive a reasonable consumer or investor under the circumstances. *See Rosendale*, 2021 WL 4066821, at *20; ¶139; *see also* ¶¶4, 47 (Defendant claims to back GYEN with a historically stable fiat

[6] *But see Barron v. Helbiz Inc.*, No. 20 CIV. 04703 (LLS), 2023 WL 5672640, at *15 (S.D.N.Y. Sept. 1, 2023) (baldly concluding, without considering the New York Court of Appeal's *Himmelstein* case, that GBL section 349 was inapplicable to the crypto asset under consideration because it was purchased "as an investment, not as a purchase of traditional consumer goods"), *motion to certify appeal granted*, No. 20 CIV. 04703 (LLS), 2023 WL 8622204 (S.D.N.Y. Dec. 13, 2023).

currency and markets it as a stable asset that can "virtually eliminate volatility"); ¶11 (among GYEN's "Key Product Features and Benefits" promoted in its January 14, 2021 and September 9, 2021 "GYEN White Paper" was the claim that GYEN could be purchased and redeemed on a 1-to-1 basis with the JPY, either directly from Defendant or by trading with other digital assets on exchanges listing stablecoins); ¶¶42, 47-49, 97 (engaging in a national marketing campaign touting GYEN as a "stablecoin" that would remain pegged 1-to-1 with the JPY); ¶¶114-117 (following the May 2021 depegging event, Defendant continued to tout GYEN's stability and withheld from investors that GYEN was likely to break from its peg to the JPY). Moreover, the Complaint further alleges that, at all relevant times through both the May and November 2021 depegging events, the GYEN White Paper—Defendant's key marketing and sales disclosure—explained *that one could "always redeem 1 GYEN for 1 JPY* . . . directly with GMO Trust, *or by trading with other digital assets on exchanges that list the stablecoins*." ¶51. However, in a subsequently issued GYEN White Paper dated August 3, 2022—almost a year after the November 2021 depegging event and less than three months after this action was filed—the clause about 1-to-1 pegging on exchanges was removed from the list of GYEN's purported "Key Product Features and Benefits" and an entire paragraph promoting its partnerships with exchanges was deleted. ¶52.

The Complaint alleges that potential GYEN purchasers seeing Defendant's above-described marketing and sales disclosures would reasonably believe the value of GYEN was necessarily equal to the value of one JPY, while, in reality, GYEN's value had little connection to the JPY due to numerous undisclosed factors including, *inter alia*, (1) an insufficient supply of minted GYEN to meet demand for the asset subjected the asset to low liquidity, particularly when it was first made available for purchase on major third-party exchanges such as Binance and Coinbase; (2) low liquidity and high demand caused GYEN to become unpegged from the JPY; and (3) potential purchasers could place buy orders for GYEN at a time when the asset's value appeared pegged to the JPY, but delays in filling the order could cause the price they actually paid for the asset to be exponentially higher than the value of the JPY. ¶53.

While Defendant makes much of Plaintiffs' individual interpretations and transactions (*see*

Def. Mem. 23-25), the law is clear that how "Plaintiff[s] … interpreted the statements is irrelevant to the analysis under Section 349 because section 349 focuses on whether the Defendant's act or practice would be confusing or misleading to a reasonable consumer, not on how the Plaintiffs before the Court personally interpreted the statements "based on his or her own idiosyncratic facts." *Rivera v. Navient Sols., LLC*, 2020 WL 4895698, at *10 (S.D.N.Y. Aug. 19, 2020).

Further, Defendant's argument that it is not alleged to have actually misrepresented anything (*see* Def. Mem. 23) is incorrect, overlooking the fact that the failure to disclose material information when speaking can cause the overall impression of a Defendant's advertising and marketing to be deceptive even where it does not necessarily contain false information. *Himmelstein*, 37 N.Y.3d at 180 (holding that it is "the overall impression of the representations [being] misleading" that matters for Section 349 purposes)). Here, the Complaint plausibly alleges that Defendant's marketing and sales disclosures gave the overall impression that GYEN was "stable" and would remain pegged 1-to-1 to the JPY while omitting material facts that it was almost certain to break its peg, thus leading to potential order fills at exponentially higher prices than the JPY when it first became available for trading on major exchanges such as Coinbase and Binance. *See, e.g.*, ¶53.

Moreover, "courts have generally held that since the materially misleading conduct factor requires a reasonableness analysis best suited for a jury, it cannot be resolved on a motion to dismiss." *Rosendale*, 2021 WL 4066821, at *20; *Anderson v. Unilever United States, Inc.*, 607 F. Supp. 3d 441, 452 (S.D.N.Y. 2022). Therefore, Defendant's claim that consumers would not be misled by the alleged misrepresentations and omissions is not suitable for determination at this stage of the litigation.

As to section 349's third element—that Plaintiffs and the Class were injured by Defendant's deceptive conduct—the Complaint meets this requirement by alleging that Plaintiffs purchased GYEN "as a result of Defendant's national marketing campaign and representations promoting GYEN and the fact that it was pegged 1-to-1 to the Japanese yen" (¶¶12, 19-21), that Plaintiffs and the Class incurred monetary losses because of Defendant's deceptive acts and

practices, and that they would not have purchased GYEN tokens, or would not have purchased at the price paid, absent Defendant's deceptive acts and practices (¶143; *Orlander v. Staples, Inc.*, 802 F.3d 289, 302 (2d Cir. 2015) (injury under Section 349 is properly pled where plaintiff alleges it incurred losses as a result of the defendant's deceptive acts or practices, or where it is alleged the plaintiff paid more than it would have "but for" the defendant's deceptive practices)).

Because Plaintiffs have adequately pled their GBL section 349 claim, they also satisfy the pleading requirements for their GBL section 350 claim. *See Orlander*, 803 F.3d at 300. To the extent Defendant argues Plaintiffs must allege reliance—an element that is generally not required to be pled for sections 349 and 350 claims (*see Pelman v. McDonald's Corp.*, 396 F.3d at 511)—Plaintiffs plausibly plead that they and the Class purchased their GYEN tokens "as a result of" Defendant's extensive national marketing and sales campaign wherein Defendant made numerous and widespread public statements promoting GYEN's stability and 1-to-1 proxy to the JPY. *See, e.g.*, ¶¶12, 19-21.

Finally, contrary to Defendant's assertion (*see* Def. Mem. 21 n.8), Plaintiffs allege a sufficient nexus to the state of New York to maintain their GBL claims by alleging that Defendant's alleged deceptive acts and practices "occurred (at least in part) in the state of New York, where GMO Trust operates its principal place of business." *See* ¶142; *see also* ¶19 (Plaintiff Donovan is a New York resident who sustained losses purchasing GYEN as a result of Defendant's allegedly deceptive acts and practice); ¶¶41, 48-49 (Defendant is licensed and resides in New York and advertised that it was a New York regulated stablecoin issuer); *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 124 (2d Cir. 2013) (sufficient to plead that "some part of the underlying transaction ... occur[red] in New York State," to confer standing under the GBL).

### C. The Complaint Adequately Alleges Defendant Is Liable Under California's UCL and FAL

Incredibly, while having argued with regard to Plaintiffs' Securities Act claim that GYEN *is not* a *security* under *Howey*, Defendant now simultaneously asserts that Plaintiffs' consumer protection claims should be dismissed because "comprehensive regulatory systems already exist"

for *securities transactions*. Def. Mem. 21-23. Giving credence to this argument would lead to an absurd result where Defendant seeks to evade liability under the Securities Act because, in its view, GYEN *is not a security*, and evade liability under the consumer protection laws because, also in its view, GYEN *is a security*. In any event, as recognized by at least two California district courts analyzing crypto assets, Plaintiffs assert their UCL and FAL claims in the alternative in the event this court finds GYEN is not a security. *See Zakinov*, 2020 WL 922815, at *23 (allowing plaintiffs to replead violations of the UCL and FAL in the alternative in the event the Court "factually determined" that the cryptocurrency was not a security); *In re Ethereummax Inv.*, No. CV2200163MWFSKX, 2023 WL 6787827, at *16 (C.D. Cal. June 6, 2023) (plaintiffs allowed to plead in the alternative without using "the magic words 'in the alternative'" given the "genuine uncertainty about the legal status of the [crypto] asset involved").[7]

Plaintiffs have properly alleged their UCL and FAL claims. California's UCL prohibits "any unlawful, unfair or fraudulent business act or practice" "and any act prohibited by the false advertising law." *Chapman v. Skype Inc.*, 220 Cal. App. 4th 217, 226, (2013) (citing Cal. Bus. & Prof. Code § 17200). The UCL's "coverage is sweeping, embracing anything that can properly be called a business practice and that at the same time is forbidden by law." *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012). Complimenting the UCL, the FAL specifically targets false or misleading advertisements and generally prohibits advertising that contains "any statement ... which is untrue or misleading, and which is known, or ... should be known, to be untrue or misleading...." *Chapman*, 220 Cal. App. 4th at 226; Cal. Bus. & Prof. Code § 17500.

"[T]o state a claim under either the UCL [fraudulent prong] or the FAL based on affirmative representations, it is necessary only to show that members of the public are likely to be deceived." *Ethereummax*, 2023 WL 6787827, at *26. Whether members of the public are "likely to be deceived" is assessed from the perspective of a reasonable consumer "who is neither the most vigilant and suspicious of advertising claims nor the most unwary and unsophisticated,

[7] Further, Plaintiffs should also be permitted to plead their New York GBL claims in the alternative, similar to their California claims.

but instead is the ordinary consumer within the target population." *Chapman*, 220 Cal. App. 4th at 226; *Jeong v. Nexo Cap. Inc.*, No. 21-CV-02392-BLF, 2022 WL 3590329, at *13 (N.D. Cal. Aug. 22, 2022); *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009). Similar to the GBL, the question of whether reasonable consumers would be misled by a defendant's allegedly deceptive business practice under California's UCL and FAL "will usually be a question of fact not appropriate for decision on [a motion to dismiss]." *Williams v. Gerber Prod. Co.*, 552 F.3d 934, 938 (9th Cir. 2008). Further, for purposes of pleading violations of the UCL's fraudulent prong or the FAL, a plaintiff is not required to plead actual falsity, that the defendant had knowledge of the alleged falsity of its statements, or that the defendant intended to deceive or induce reliance. *See Ethereummax*, 2023 WL 6787827, at *26. And, the Ninth Circuit has consistently emphasized that a defendant's purportedly misleading statement must be evaluated within the complete context of the advertising or promotional materials in which it appeared. *Id.* at *27. Omissions may be actionable under the FAL and the UCL's fraudulent prong when, *inter alia*, the defendant exclusively possesses material facts unknown to the plaintiff or when the defendant makes partial representations while suppressing other material facts. *See id.* at *30 (citing *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997)).

Here, the Complaint adequately pleads claims under both the FAL and the UCL's fraudulent prong based on Defendant's affirmative misrepresentations and omissions made in its extensive advertising campaign, wherein Defendant claimed that GYEN is pegged to the JPY at a 1-to-1 ratio and is a safe investment with virtually no volatility while omitting the fact that it lacks the qualities and benefits of a stablecoin and was not a stable investment with "virtually no volatility" when it traded on secondary exchanges. ¶¶158-159; 168-169. Plaintiffs further allege that they and the Class purchased their GYEN investments "as a result of" these misrepresentations and omissions and that, absent these misrepresentations and omissions, they would not have purchased GYEN, or would not have purchased GYEN at the price they paid. ¶¶159, 161, 170-171. And, while not required, Plaintiffs further allege that, at the time Defendant made these misrepresentations and omissions, it was either aware of facts that ran counter to its

characterizations or it lacked sufficient information to make these representations truthfully. ¶169.

The Complaint also adequately pleads that Defendant violated the UCL's unfairness prong because, *inter alia*, it plausibly alleges Defendant's misrepresentations and omissions were "immoral, unethical, oppressive, unscrupulous *or* substantially injurious to consumers and the that 'utility' of the [D]efendant's conduct [does not outweigh] the gravity of the harm to [Plaintiffs and the Class]." *Ethereummax*, 2023 WL 6787827, at *37 (emphasis in original); *see also* ¶157. Indeed, the Complaint plausibly pleads that Plaintiffs and the Class suffered substantial losses as a result of Defendant's misrepresentations and omissions (¶¶12, 19-21), and Defendant points to no "utility" of marketing GYEN as a safe, stable investment, pegged 1-to-1 to the JPY, while also omitting that it is and has been subject to wild fluctuations when traded on secondary exchanges.

Because the Complaint plausibly alleges violations of the FAL and GBL sections 349 and 350, so too does it plausibly allege Defendant violated the UCL's unlawful prong. *See Ethereummax*, 2023 WL 6787827, at *34 (applying UCL's "borrowing" principle and upholding claim based on plaintiff's well-pleaded allegations that defendant violated other statutes).

Finally, contrary to Defendant's protestations, Plaintiffs are not required to plead any of their claims with heightened particularity because the Complaint does not "sound in fraud." *See, e.g., In re Mattel, Inc.*, 588 F. Supp. 2d 1111, 1114-18 (C.D. Cal. 2008). While Defendant references *Zakinov* to argue that Plaintiffs must plead their California claims with particularity (Def. Mem. at 19), *Zakinov* asserted this position without citing any authority and without any argument from the parties. *See* 2020 WL 922815, at *22. And, although Plaintiffs allege that Defendant violated the UCL's fraudulent prong, as the court in *In re Mattel, Inc.* reasoned, "'fraudulent' under section 17200 is not the same as common law fraud—as section 17200 does not require a plaintiff to plead all of the elements of fraud." *Id*. at 1118; *see also Downey Surgical Clinic, Inc. v. Ingenix, Inc.*, No. CV 09-5457 PSG (CTX), 2014 WL 12558848, at *10 (C.D. Cal. May 30, 2014) (federal courts in the Ninth Circuit frequently hold that, "for a misrepresentation to rise to the level of a *fraudulent* misrepresentation [for purposes of Rule 9(b)], the alleged statement must be made with explicit intent to deceive, or pursuant to an overarching fraudulent scheme"

(citing *Mattel*, 588 F. Supp. 2d at 1114-18) (UCL claims not subject to Rule 9(b) where plaintiffs only alleged that the misrepresentations were "likely" to deceive the public)) (emphasis in original). Here, the Complaint "neither specifically alleges fraud nor alleges facts that necessarily constitute fraud," *Mattel*, 588 F. Supp. 2d at 1118, and thus, is not required to be pled with particularity. Like the plaintiffs in *Mattel*, Plaintiffs here "merely allege that [Defendant's] representations [and omissions] were likely to deceive and that Plaintiffs were damaged by the deception; they make no effort to allege common law fraud elements such as intent to deceive or any overarching fraudulent scheme…." *Id.*; *see also* ¶¶158-159.

Nonetheless, were the Court to require heightened pleading under Rule 9(b) for the California causes of action, Plaintiffs meet that standard. Rule 9(b) is meant to require pleading of "who, what, where, when, and how" to provide defendants with sufficient information to prepare a defense. *See Caldwell v. Nordic Nats., Inc.*, No. 23-cv-02818-EMC, 2024 WL 24325, at *8 (N.D. Cal. 2024); *MacNaughton v. Young Living Essential Oils, LC*, 67 F.4th 89, 99 (2d Cir. 2023). Here, while not required, Plaintiffs meet this standard by alleging Defendant (the "who") made false statements about GYEN (the "what") in a nationwide advertising campaign on various online platforms directed at retail consumers (the "where") during the Class Period (the "when") by claiming it was a safe, low-volatility investment pegged to the JPY (the "how"). *See Jonna v. Latinum*, 617 F. Supp. 3d 758, 778 (E.D. Mich. 2022) (allegedly misleading statements made on a crypto issuer's website met heightened level of particularity in securities fraud claim). Thus, Plaintiffs' California claims satisfy Rule 9(b)'s primary objective by giving the Defendant more than enough information to prepare an adequate defense against Plaintiffs' allegations.

### D. The Court Has Jurisdiction Over Plaintiffs' State Law Claims Based Upon Supplemental Jurisdiction and Under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2)

Defendant's jurisdictional arguments fail because, even if the Court dismisses Plaintiffs' federal claim, the Complaint alleges sufficient facts to establish that this Court has original jurisdiction over all of Plaintiffs' state law claims under CAFA, 28 U.S.C. § 1332(d)(2), by alleging that (1) defendant and at least one plaintiff are citizens of different states (¶¶20-22);

(2) "several hundred purchasers lost vast sums, some losing hundreds of thousands of dollars in just hours" (¶117); (3) investors "collectively lost untold millions" (¶12); (4) "Plaintiffs believe that there are thousands of members in the proposed Class" (¶119); and (5) "according to Coinmarketcap.com, as of March 14, 2024, there were 2.1 billion GYEN tokens in circulation" (*id*.). *See Salveson v. JP Morgan Chase & Co.*, 166 F. Supp. 3d 242, 253 (E.D.N.Y.) (federal courts have original jurisdiction over a class action where "the class has more than 100 members, the parties are minimally diverse, and the 'matter in controversy exceeds the sum or value of $5,000,000'" (quoting 28 U.S.C. § 1332(d)(2))), *aff'd*, 663 F. App'x 71 (2d Cir. 2016); *Wurtz v. Rawlings Co., LLC*, 761 F.3d 232, 239-40 (2d Cir. 2014) (federal jurisdiction under CAFA proper where pleadings establish "reasonable probability" elements are met). Here, the above-recited facts make it reasonably plausible that this case meets CAFA's requirements.

In light of these allegations, to the extent the Court credits Defendant's jurisdictional arguments, Plaintiffs respectively request that the Court exercise its discretion under 28 U.S.C. § 1653 to amend the Complaint's jurisdictional allegations *sua sponte* so as to prevent dismissal on technical grounds. *See Van Buskirk v. United Grp. of Cos., Inc.*, 935 F.3d 49, 55 (2d Cir. 2019) (noting courts have discretion under 28 U.S.C. § 1653 to consider the whole record to effectively amend "defective allegations of jurisdiction . . . to avoid dismissal on purely technical grounds").

## IV. CONCLUSION

For all these reasons, Defendant's Motion should be denied. However, if the Court finds any of Defendant's arguments for dismissal persuasive, Plaintiffs request permission to amend the Complaint as necessary to fix any perceived deficiencies. *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 312 (S.D.N.Y. 2008).

Dated: July 22, 2024

Respectfully submitted,

**BERMAN TABACCO**

By: *__/s/ Daniel E. Barenbaum__*
Daniel E. Barenbaum (*pro vac vice*)

Jeffrey V. Rocha (*pro hac vice*)
425 California Street, Suite 2300
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: dbarenbaum@bermantabacco.com
jrocha@bermantabacco.com

*Additional Counsel for Plaintiffs*

Elizabeth A. Kramer (*pro hac vice*)
Julie C. Erickson
Kevin M. Osborne (*pro hac vice*)
**ERICKSON KRAMER OSBORNE LLP**
44 Tehama Street
San Francisco, CA 94105
Telephone: (415) 635-0631
Facsimile: (415) 599-8088
Email: julie@eko.law
elizabeth@eko.law
kevin@eko.law

*Counsel for Lead Plaintiffs and Lead Counsel for the Class*