UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KENNETH DONOVAN, HUSSIEN KASSFY,
and JOHN BRAMBL, individually and on behalf
of all others similarly situated,

Plaintiffs,

-against-

GMO-Z.COM TRUST COMPANY, INC.,

Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___2/17/2025___

23 Civ. 8431 (AT)

**OPINION
AND ORDER**

ANALISA TORRES, District Judge:

Plaintiffs, Kenneth Donovan, Hussien Kassfy, and John Brambl, bring this putative class

action against Defendant, GMO-Z.com Trust Company, Inc. ("GMO Trust"), alleging that GMO

Trust violated federal securities laws and state consumer protection laws in connection with the

"offer" of a digital asset known as "GYEN." *See generally* Second Am. Compl. (the

"complaint" or "SAC"), ECF No. 109.  Plaintiffs bring claims under Section 12(a)(1) of the

Securities Act of 1933 (the "Securities Act" or "Act"), 15 U.S.C. § 77l(a)(1), for alleged

violations of Sections 5(a) and 5(c) of the Act, *id.* §§ 77e(a), (c), as well as claims under New

York General Business Law ("GBL") §§ 349 and 350, the California Unfair Competition Law

("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, and the California False Advertising Law

("FAL"), *id.* § 17500 *et seq.*  SAC ¶ 1; *see also id.* ¶¶ 125–73.

Before the Court is GMO Trust's motion to dismiss the complaint under Federal Rules of

Civil Procedure 12(b)(1) and 12(b)(6).  ECF No. 113; *see also* Def. Mem., ECF No. 115; Pl.

Mem., ECF No. 117; Def. Reply, ECF No. 118.  For the reasons stated below, the motion is

granted in part and denied in part.

## BACKGROUND

I.    <u>Factual Background</u>[1]

A.  GMO Trust and GYEN

GMO Trust is a New York Limited Purpose Trust Company.  SAC ¶ 22.  It is a wholly

owned subsidiary of GMO Internet Group, Inc. ("GMO Internet Group"), an internet services

company founded in 1991 based in Tokyo, Japan.  *Id.* ¶¶ 22–23.  GMO Internet Group is one of

the largest internet conglomerates in the world and operates the world's largest foreign

exchange-trading platform.  *Id.* ¶ 23.

GMO Trust is the issuer of a digital asset known as GYEN, described by GMO Trust and

others as a "stablecoin."  *Id.* ¶ 3.  So-called stablecoins are distinct from traditional digital assets

like Bitcoin, the value of which can be "highly volatile" and may "fluctuat[e] more than 100

percent . . . in a single year."  SAC ¶ 38.  Stablecoins, by contrast, are designed to "mimic" the

value of government-issued (*i.e.*, "fiat") currencies through price stabilization mechanisms,

ideally achieving a more stable and predictable value than traditional digital assets.  Larry

Cermak, Mike Rogers & Lars Hoffman, The Block Resch., *Stablecoins: Bridging the Network*

*Gap Between Traditional Money and Digital Value* 23 (Mar. 10, 2021); SAC ¶ 5 n.3

(incorporating Cermak, Rogers & Hoffman, *supra*, by reference).[2] "Essentially, stablecoins are []

digital representation[s] of fiat currency that live[] on blockchains."  Cermak, Rogers &

Hoffman, *supra*, at 23.

Not all stablecoins are made the same, however.  Some are designed to be

"fiat-collateralized," such that one unit of the stablecoin is backed by one unit of fiat currency,

---

[1] The following facts are taken from the complaint, which the Court must accept as true for the purposes of this motion.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

[2] *Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 776 (2d Cir. 2002) (explaining that, on a motion to dismiss, the Court may consider "documents incorporated within the complaint by reference").

with the underlying fiat currency held as collateral in bank reserves to ensure adequate supply in the event of customer redemption. *Id.* at 26–27. Others are designed to be "crypto-collateralized." Users who purchase such coins effectively "borrow" the coins and put up other digital assets as collateral, while algorithmically determined interest rates and mechanics for the liquidation of the collateral seek to stabilize the coin's value. *See id.* at 27–28. Other stablecoins are "non-collateralized." Their price and supply are algorithmically manipulated in an effort to maintain an artificial price peg without the backing of collateral. *See id.* at 28. The non-collateralized variety is generally considered highly unstable (in spite of its "stablecoin" nomenclature), and most efforts to launch non-collateralized stablecoins "have either failed or remain theoretical." *Id.* at 28. Fiat-collateralized stablecoins are considered the "most stable." *Id.* at 26.

According to GMO Trust, GYEN is a "100% fiat-collateralized stablecoin" designed to be anchored to the value of the Japanese yen ("JPY"), such that one GYEN is always redeemable for one JPY. GMO Trust, *Whitepaper: GYEN Digital JPY, ZUSD Digital USD* (the "Whitepaper") 4 (Jan. 14, 2021), ECF No. 114-1;[3] SAC ¶ 4 n.2; *see also* SAC ¶ 51. When a user purchases GYEN from GMO Trust, the JPY used to purchase the GYEN "is placed in custody with a third-party trustee," here GMO Trust, which is organized under New York state banking laws pursuant to a limited purpose trust charter granted by the New York State Department of Financial Services. Whitepaper at 4–5. GMO Trust segregates the JPY delivered by customers from its proprietary assets, holding the pooled collateral in FDIC-insured U.S. bank

---

[3] "A whitepaper is a document that explains the purpose of a project and how it works. For a cryptocurrency, the whitepaper is a guide to its technology, features, and goals. It's designed to introduce the project to a new audience of prospective users and investors." Lyle Daly, *What Is a Whitepaper?*, Motley Fool (Feb. 8, 2024, 9:48 A.M.), https://www.fool.com/terms/w/whitepaper/#:~:text=By%20Lyle%20Daly%20–%20Updated%20Feb,cryptocurrency%20and%20its%20underlying%20technology. According to Plaintiffs, the Whitepaper was GMO Trust's "key marketing and sales disclosure for [] GYEN." SAC ¶ 51.

accounts "solely for the purpose of maintaining reserve balances for the . . . GYEN stablecoins." *Id.* at 4; *see id.* at 5. It also hires "an independent registered public accounting firm to examine . . . the underlying currency reserves" and publish a public, monthly report attesting to the reserves. *Id.* at 4. GMO Trust retains for itself any interest generated by the bank accounts where it deposits customer collateral. *See* SAC ¶ 6; Whitepaper at 4. As a limited purpose trust company, GMO Trust is a fiduciary under New York law. *See* N.Y. Banking Law § 2(2).

GMO Trust represents that, in addition to purchasing and redeeming GYEN from GMO Trust directly—*i.e.*, on the primary market—users may also acquire and sell GYEN on secondary markets "by trading with other digital assets on [third-party] exchanges that list the stablecoin[]." Whitepaper at 5; *see* SAC ¶¶ 3, 50. GMO Trust may receive monetary benefits from third-party exchanges as consideration for agreeing to list GYEN on their platforms. *See* SAC ¶ 60.

As with other digital assets, GYEN can be used as an alternative to and substitute for fiat currency to purchase goods and services, pay for other digital assets, and transfer money, all in a decentralized manner and with faster settlement periods and lower transaction fees than the traditional global payment and money-transfer system. *See* Whitepaper at 7–9.

B. GMO Trust's Marketing of GYEN

GMO Trust launched a marketing campaign to promote GYEN in advance of the coin's early 2021 release. The company and its CEO, Ken Nakamura, made numerous and widespread public statements about GYEN and GMO Trust's efforts to stabilize the digital asset's value on a one-to-one basis with JPY. SAC ¶¶ 12, 25, 42–45. GMO Trust published the Whitepaper on its website, in which it touted GYEN as "a global currency solution" that can "virtually eliminate [the] volatility" associated with traditional digital assets such as Bitcoin "while still benefitting

from the advantages of digital assets, such as high transaction speeds matched with low costs." Whitepaper at 4.  The Whitepaper promoted both "near-term" and "longer[-]term use cases" for GYEN, including that the coin could be used as a stable store of value to aid in "volatility hedging . . . without the fees and inefficiencies of fiat conversion;" for "payment for other digital assets . . . including both hard assets and traditional securities;" as a substitute for JPY in foreign currency trading; for "cross-border remittance[s]" to and from those participating in the "[y]en-based economy;" for "peer-to-peer [] energy trading transactions;" and as "a trustworthy store of value" for "unbanked individuals" and individuals in "countries [that] are suffering from financial crises or hyperinflation."  Whitepaper at 7–8 (capitalization altered).  GMO Trust made similar statements in promotional videos shared on LinkedIn and YouTube.  SAC ¶ 48.

To drive demand for GYEN and thereby enhance the ability of GMO Trust to earn interest on the customer collateral it held in reserve, GMO Trust advertised, and its website linked to, various "partner" exchanges, including Binance and Coinbase, where GYEN could be purchased or traded for other digital assets.  *Id.* ¶¶ 8, 43–44, 50; Whitepaper at 6.  Some of the third-party exchanges advertised special incentives, such as "rewards," "yield," "interest," or "annual percentage rate[s]" ("APRs"), for users who purchased and held GYEN on their platforms.  SAC ¶¶ 71–79.  In order for users to receive those incentives, at least some of the third-party exchanges required users to "lock up" (*i.e.*, dedicate) their GYEN in certain exchange-specific protocols that would support the exchange's operations, or to offer their GYEN as "liquidity providers to traders" on the exchange.  *Id.* ¶¶ 79 & n.36, 81.

As part of its own marketing campaign, GMO Trust promoted the third-party exchanges that offered these rewards.  It advertised on its website and in press releases that GYEN purchasers could "[l]everage [a] passive earning strategy" on Celsius and Nexus, two third-party

exchanges, which GMO Trust claimed "offer[ed] competitive returns for [] GMO [Trust] stablecoins." *Id.* ¶ 72; *see id.* ¶ 74 (May 2021 press release describing "7% interest on GYEN . . . deposits" in Nexus); *see also id.* ¶ 73 (March 2021 advertisement stating that GYEN holders could "earn reward[s] of up to 12% [annual percentage yield]" on Liquid, another third-party exchange). From September 2022 through June 2023, Nakamura repeatedly used his Twitter account (now known as X) to promote "huge []yield[s]" and other monetary incentives purportedly offered to GYEN holders by various third-party exchanges, including DFX Finance, Curve Finance, Convex Finance, and Uniswap, as long as users abided by certain exchange-specific protocols. *Id.* ¶¶ 76–82, 84.

Although it promoted the third-party exchanges where users could purchase and trade GYEN and, in some instances, obtain rewards, GMO Trust consistently maintained in its promotional materials that purchasers could "always redeem 1 GYEN for 1 JPY . . . directly with GMO Trust," *id.* ¶ 51 (quoting Whitepaper at 5), by using "GMO [Trust's] official Purchase/Redemption process" on GMO Trust's platform, *id.* ¶ 49. It also indicated that purchasers could redeem one GYEN for the value of one JPY on any third-party exchanges that listed the digital asset. *See id.* ¶ 51 (quoting Whitepaper at 5).

C.  Plaintiffs' Purchases and GYEN Price Fluctuations on Coinbase and Binance

GMO Trust launched GYEN for purchase and redemption in March 2021. *Id.* ¶ 44. A few months later, GMO Trust partnered with Binance and Coinbase—two of the world's largest digital asset exchanges—to make GYEN available for trading on their platforms. *Id.* ¶¶ 26–30, 96–97, 105–06.

Binance listed GYEN for purchase and trading on its exchange beginning on May 12, 2021. *Id.* ¶ 99. Almost immediately, the price of GYEN on Binance rose sharply, untethering

GYEN from the value of JPY on the Binance platform. *Id.* Within thirty-four minutes, Binance suspended all trading of GYEN on the exchange. *Id.* After Binance resumed trading of GYEN, the price of the coin returned to its peg with JPY. *See id.* ¶¶ 9–10. Plaintiff Kenneth Donovan purchased GYEN for the first time on May 12, 2021. ECF No. 33-1; SAC ¶ 51. He paid more than $335,000 for tokens at an elevated price that, unbeknownst to him, did not reflect the value at which the coins could be redeemed. *See* SAC ¶ 19. Within hours after Donovan's order was filled, the price of GYEN on Binance returned to its peg with JPY, causing Donovan's GYEN to lose more than 90 percent of its value on Binance, which was not recovered. *Id.* GYEN purchasers whose orders on Binance took time to fill, or who mistakenly bought GYEN when the price on Binance was untethered from the value of JPY, lost as much as 99 percent of their purchase value within hours. *Id.* ¶ 101.

A similar event occurred on the Coinbase exchange. On November 16, 2021, Coinbase publicly listed GYEN for purchase and trading on its exchange. *Id.* ¶ 10. Almost immediately, the price of GYEN on Coinbase skyrocketed, untethering GYEN from the value of JPY on the Coinbase platform. *Id.* Amidst the turbulence, Coinbase restricted its customers' ability to trade GYEN and, thereby, to recoup any potential losses. *See id.* ¶ 109. By November 19, 2021, GYEN's value on Coinbase had returned to its peg with JPY, falling 80 percent in a matter of days. *Id.* ¶¶ 10, 108. Coinbase reports that, at the peak of the turbulence, the value of one GYEN on Coinbase was $0.34, while the value of one JPY did not rise above $0.0087. *Id.* ¶ 106.

Plaintiffs John Brambl and Hussien Kassfy purchased GYEN for the first time on November 16 and 17, 2021, respectively. ECF Nos. 33-2 to -3. Brambl paid approximately $175,000 for tokens at an elevated price that, unbeknownst to him, did not reflect the value at

which the coins could be redeemed. *See* SAC ¶ 21. Shortly after Brambl's order was filled, his GYEN lost more than 66 percent of its value on Coinbase, which was not recovered. *Id.* Kassfy paid approximately $113,000 for tokens at an elevated price that, unbeknownst to him, did not reflect the value at which the coins could be redeemed. *See id.* ¶ 20. Within hours after Kassfy's order was filled, his GYEN lost more than 70 percent of its value on Coinbase, which was not recovered. *Id.*

II.    Procedural History

Plaintiffs Donovan and Kassfy filed this action in the Northern District of California on May 12, 2022, bringing claims against Coinbase Global, Inc., and Coinbase Inc. (collectively, "Coinbase"), as well as GMO Trust.[4] SAC at 1 n.1; ECF No. 1. On August 25, 2022, Plaintiffs amended their complaint, naming Brambl as an additional plaintiff. ECF No. 46. According to Plaintiffs' second amended complaint, they purport to bring their claims on behalf of a class of "all persons or entities who purchased or otherwise acquired the GYEN cryptocurrency issued between December 29, 2020[,] through the present and were damaged as a result." SAC ¶ 1.

By order dated January 6, 2023, the Honorable Trina L. Thompson granted Coinbase's motion to compel Plaintiffs' claims against Coinbase to arbitration and to stay the federal district court proceedings as to Coinbase pending the arbitration. *Id.* at 1 n.1; ECF No. 78. On July 13, 2023, by stipulation of Plaintiffs and GMO Trust, Judge Thompson severed Plaintiffs' claims against GMO Trust from those against Coinbase and transferred the claims against GMO Trust to this Court under 28 U.S.C. § 1404(a). SAC at 1 n.1; *see also* ECF Nos. 83–84.

---

[4] The case number as filed was 22 Civ. 2826 (N.D. Cal.).

**DISCUSSION**

I.    Legal Standard

To withstand a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (quoting *Twombly*, 550 U.S. at 556). Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to a presumption of truth. *Id*. On a motion to dismiss, the Court must draw all reasonable inferences in the non-movant's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

Under Federal Rule of Civil Procedure 12(b)(1), a claim must be dismissed where it is apparent that the Court lacks subject matter jurisdiction—that is, the statutory or constitutional power to adjudicate it. *Thomas v. Metro. Corr. Ctr.*, No. 09 Civ. 1769, 2010 WL 2507041, at *1 (S.D.N.Y. June 21, 2010). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

II.    Whether Plaintiffs Purchased Securities

Under Section 5 of the Securities Act, it is "unlawful for any person, directly or indirectly, . . . to offer to sell, offer to buy or purchase[,] or sell" a "security" unless a registration statement is in effect or has been filed with the United States Securities and Exchange

9

Commission ("SEC") as to the offer and sale of such security to the public. *See generally* 15 U.S.C. § 77e. Any person who offers or sells an unregistered security in violation of Section 5 "shall be liable," under Section 12(a), "to the person purchasing such security from him." 15 U.S.C. § 77l(a). That liability extends not only to the offeror or seller of an unregistered security, but also to those who "successfully solicit[] the purchase" of the security "motivated at least in part by a desire to serve [their] own financial interests or those of the securities owner." *Pinter v. Dahl*, 486 U.S. 622, 647 (1988).

Plaintiffs argue that they purchased an unregistered security—GYEN—not directly from GMO Trust, but as a direct result of GMO Trust's solicitation of GYEN purchases on secondary markets for its own financial gain. *See* Pl. Mem. 1, 15; Compl. ¶¶ 125–33. GMO Trust contends that even if Plaintiffs' factual allegations are true, the GYEN that Plaintiffs purchased was not a "security" as defined by the Act. Def. Mem. 10.

A.  The *Howey* Test

Section 2 of the Securities Act defines "security" to include a wide variety of financial instruments, including "commonly known documents traded for speculation or investment" such as stocks, bonds, and certificates of deposit, as well as "'securities' of a more variable character," such as "investment contract[s]." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 297 (1946) (quoting 15 U.S.C. § 77b(a)(1)). Whether Plaintiffs have alleged that they purchased GYEN pursuant to investment contracts—and, therefore, as unregistered securities—is at the heart of the parties' dispute.

The Supreme Court gave meaning to the term "investment contract" in in its 1946 decision in *Howey*. The facts of the case are illustrative. A company that owned large tracts of citrus groves in Florida offered the groves for sale to prospective buyers. 328 U.S. at 294–95.

The company told buyers that, if they purchased any of the citrus groves, they would also have the opportunity to enter into a services agreement whereby the company would, for a fee, cultivate the groves, harvest the crops, and pool the harvested crops together for purposes of marketing and sale, allocating profits back to landowners on a *pro rata* basis.  *Id.* at 294–97.  A few of the company's customers purchased only land from the company, perhaps with the intent to cultivate the crops themselves or to contract with others for the harvest and sale of the crops. *See id.* at 295, 300–01.  The majority of those who purchased land, however, opted to enter into the services agreements offered by the company, and most of the land purchases were for small tracts of land that would not be profitable on their own.  *Id.* at 295.  Those who purchased the company's land and entered into the services arrangement were "predominantly business and professional people" who lived outside of Florida and "lack[ed] the knowledge, skill[,] and equipment necessary for the care and cultivation of citrus trees."  *Id.* at 296.  What they cared about, rather, was the "substantial profits" they expected to earn by contributing their capital to "a large citrus fruit enterprise . . . managed by [a company] with adequate personnel and equipment."  *Id.* at 296, 299–300.

The SEC charged the company with offering and selling the land and services agreement as a packaged "investment contract" without registration statements in violation of Section 5 of the Act.  *Id.* at 294.  The company argued that it was merely offering "fee simple interests in . . . a farm or orchard coupled with management services," nothing out of the ordinary in the agricultural world.  *Id.* at 299.  The Supreme Court disagreed.  It found that any "transfer of rights in land [was] purely incidental" to what was plainly "a profit-seeking business venture." *Id.* at 300.  The Court emphasized that the company marketed the land and services agreements as a package to "persons who reside in distant localities and who lack the equipment and

experience requisite to the cultivation, harvesting and marketing of the citrus products," who "have no desire to occupy the land or to develop it themselves" and are "attracted solely by the prospects of a return on their investment." *Id.* at 299–300. The Court underscored that the small plots of land offered and sold by the company "would seldom be economically feasible" to cultivate on their own, unless they were "developed as component parts of a larger area," making the "common enterprise" offered by the company "essential" for purchasers to "achieve their paramount aim of a return on their investments." *Id.* at 300. The Court found that, "regardless of the legal terminology" used by the company to describe its contracts with purchasers, each of "the essential ingredients of an investment contract" were present: Investors "provide[d] capital and share[d] in the earnings and profits," while promoters "manage[d], control[led] and operate[d] the enterprise." *Id.* at 300–01.

The Court did not find it significant that "some purchasers [chose] not to accept the full offer of an investment contract"—*i.e.*, that some purchased citrus grove tracts but declined to enter into the services agreement offered by the company. *Id.* For the SEC to pursue the Section 5 violation, it needed only to show that the company *offered* unregistered, non-exempt securities to prospective customers—not that all customers purchased such securities. *Id.* The Court found this condition satisfied because the scheme involved offers for buyers to make "[1] an investment of money [2] in a common enterprise [3] with profits to come solely from the efforts of others." *Id.* at 301.

To this day, courts continue to assess investment contracts by applying the three prongs of *Howey*. *See Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994). As the Supreme Court wrote more recently, "the 'touchstone' of an investment contract [is] 'the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived

from the entrepreneurial or managerial efforts of others.'" *SEC v. Edwards*, 540 U.S. 389, 395 (2004) (quoting *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975)). Following *Howey*'s lead, courts evaluating whether a contract, transaction, or scheme constitutes an investment contract focus on the "economic reality" of the alleged scheme and the "totality of [the] circumstances" surrounding it. *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967); *Glen-Arden Commodities, Inc. v. Constantino*, 493 F.2d 1027, 1034 (2d Cir. 1974); *see also Howey*, 328 U.S. at 299 (explaining that the term "investment contract" "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits").

GMO Trust contends that Plaintiffs cannot satisfy *Howey*'s first prong (an investment of money) or third prong (profits to be derived solely from the efforts of others). Def. Mem. at 11. The Court agrees with GMO Trust as to *Howey*'s third prong. Because that issue is dispositive of Plaintiffs' claim under Section 12(a), the Court addresses only that issue.

B. *Howey*'s Third Prong

*Howey*'s third prong reflects an objective standard of reasonableness. *SEC v. Telegram*, 448 F. Supp. 3d 352, 371 (S.D.N.Y. 2020). It asks whether, in the totality of the circumstances, a reasonable participant in the alleged scheme, contract, or transaction would have been "led to expect profits solely from the efforts of the promoter" or other third parties. *Howey*, 328 U.S. at 299; *see Forman*, 421 U.S. at 852. The Second Circuit has stated that "the word 'solely'" in *Howey* "should not be construed as a literal limitation; rather, [courts] consider whether, under all the circumstances, the scheme was being promoted primarily as an investment." *United States v. Leonard*, 529 F.3d 83, 88 (2d Cir. 2008) (citation omitted). To do so, "courts examine how, and to whom, issuers or promoters market[ed] the crypto-asset." *SEC v. Coinbase, Inc.*,

726 F. Supp. 3d 260, 289–90 (S.D.N.Y. 2024) (collecting cases), *motion to certify appeal granted*, 2025 WL 40782 (S.D.N.Y. Jan. 7, 2025).  The focus is on "what the purchasers were offered or promised," *SEC v. LBRY, Inc.*, 639 F. Supp. 3d 211, 220 (D.N.H. 2022), and whether a reasonable purchaser under the circumstances would have expected "profits" derived primarily from the efforts of others, *Forman*, 421 U.S. at 852; *Leonard*, 529 F.3d at 88.  "Profits" in this context means "either capital appreciation resulting from the development of the initial investment, . . . or a participation in earnings resulting from the use of investors' funds." *Forman*, 421 U.S. at 852; *see also Edwards*, 540 U.S. at 394 (adding that "profits" means "income or return, to include, for example, dividends, other periodic payments, or the increased value of the investment").

By purporting to bring a class action "on behalf of all persons or entities who purchased or otherwise acquired the GYEN cryptocurrency issued between December 29, 2020[,] through the present and were damaged as a result" without regard for the manner of purchase or the identity of the parties to the purchase, Plaintiffs effectively allege that any GYEN that has ever been purchased or otherwise acquired since the digital asset was created constitutes an unregistered security.  SAC ¶ 1; *see id.* at ¶ 60 (alleging that GYEN itself "is a security").  "But the subject of a contract, transaction, or scheme is not necessarily a security on its face."  *SEC v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308, 323 (S.D.N.Y. 2023).  Anything of value—from digital assets to "ordinary assets" like citrus groves, "gold, silver, and sugar"—may or may not be sold pursuant to investment contracts, "depending on the circumstances of [their] sales."  *Id.* at 323– 24 (citing *Glen-Arden*, 493 F.2d at 1033, 1035); *see SEC v. Binance Holdings Ltd.*, 738 F. Supp. 3d 20, 43–44 (D.D.C. 2024) ("Obviously, [citrus] groves are not securities, yet the seminal case on this point found the set of contracts and expectations surrounding their sale to be an

investment contract for purposes of the Act.").  The test for an investment contract requires Plaintiffs to identify a transaction, contract, or scheme pursuant to which a thing of value was offered or sold.  *See Howey*, 328 U.S. at 298–99.  It is not enough for Plaintiffs to allege in conclusory terms that a digital asset is an investment contract disconnected from the circumstances and arrangement of its offer or sale.  Accordingly, "courts presented with SEC enforcement actions involving [digital assets] have taken pains to differentiate the alleged investment contracts from the [digital] tokens themselves," *Binance*, 738 F. Supp. 3d at 43 (collecting cases).  To demonstrate the existence of an investment contract, Plaintiffs must point to a "contract, transaction[,] or scheme"—that is, an arrangement—through which GYEN, as the subject of the arrangement, exchanged hands.  *Howey*, 328 U.S. at 298–99.

The Court's inquiry is necessarily limited to the alleged contracts, transactions, or schemes in which Plaintiffs themselves engaged.  Unlike the SEC in *Howey* and other enforcement cases, Plaintiffs sue under Section 12(a) of the Act as private litigants.  Accordingly, Plaintiffs may establish GMO Trust's liability only as to the unregistered securities that Plaintiffs purchased.  *See* 15 U.S.C. § 77l(a); *Emps.' Ret. Sys. of the Gov't of the Virgin Is. v. J.P. Morgan Chase & Co.*, 804 F. Supp. 2d 141, 150–51 (S.D.N.Y. 2011); *Thomas v. Roblin Indus., Inc.*, 520 F.2d 1393, 1398 (3d Cir. 1975) ("When securities are offered or sold in violation of Section 5, Section 12 explicitly affords a civil remedy only to a purchaser of such securities.").

Plaintiffs' filings indicate that their purchases of GYEN occurred on the third-party exchanges Binance and Coinbase.  ECF Nos. 33-1 to -3; Def. Mem. at 7–8 & n.3.  Plaintiffs do not allege that they purchased GYEN directly from GMO Trust or on any exchange other than Binance or Coinbase.  Applying *Howey*'s third prong, the question, then, is whether Plaintiffs'

complaint alleges that a reasonable purchaser of GYEN on Binance or Coinbase would expect to earn profits derived from the entrepreneurial or managerial efforts of others. *Forman*, 421 U.S. at 852.

Courts in this Circuit have found that purchasers of digital assets may reasonably expect to earn profits based on the efforts of others under certain circumstances. In *Balestra v. ATBCOIN LLC*, for example, the court considered the offer and sale of a digital asset known as ATB, which the defendants sold to raise capital to launch a new blockchain on which ATB would operate. 380 F. Supp. 3d 340, 346–47 (S.D.N.Y. 2019). Based on the coin issuer's alleged statements in marketing materials, the plaintiffs argued that a reasonable purchaser of ATB would have expected the value of the coins to increase as more users adopted the ATB blockchain, which ATB's issuer promised would be "the fastest blockchain-based cryptographic network in the Milky Way galaxy." *Id.* at 347. The court found that such statements would have led a reasonable purchaser to view ATB as an investment "that would generate profits for investors without any effort on their part." *Id.* at 355. Such profit "would be the result of the [the] [d]efendants' efforts to commercialize the ATB [b]lockchain and ATB [c]oins," and the amount of profit, if any, would be "entirely dependent on [the] [d]efendants' following through on their promise to launch and improve the ATB [b]lockchain." *Id.* at 355–56. The alleged offers and sales of ATB, therefore, satisfied the third prong of *Howey*'s definition of an investment contract. *Id.* at 357.

Other decisions finding a reasonable expectation of profits based on the efforts of others in the digital asset world have involved similar facts: The issuer and/or promoters of a newly-issued digital asset represent to potential investors that the asset's ability to appreciate in value will depend on its widespread adoption, which, in turn, will turn on the popularity and

efficacy of the blockchain technology on which it operates, which ultimately, and almost exclusively, will depend upon the efforts of the blockchain developer which is also the coin issuer.  *See, e.g.*, *SEC v. Telegram*, 448 F. Supp. 3d 352, 371 (S.D.N.Y. 2020) (finding a reasonable expectation of profits where purchasers of Telegram's "Grams" were led to believe that Grams would increase in value based on the expansion of the "TON Blockchain, which would be developed by Telegram and the success of which would be implicitly guaranteed post-launch by Telegram"); *Ripple*, 682 F. Supp. 3d at 326 (finding, based on "Ripple's communications, marketing campaign, and the nature" of its sales of the XRP digital asset, that a reasonable institutional investor would have understood that "Ripple would use capital received from its [i]nstitutional [s]ales [of XRP] to improve the market for XRP and develop uses for the XRP [blockchain], thereby increasing the value of XRP"); *Coinbase*, 726 F. Supp. 3d at 292–93 (collecting additional cases, and finding a reasonable expectation of profits derived from the efforts of others where token issuers touted the efforts they would take to develop their blockchains and attract users to the technology, thereby enhancing the value of the issued tokens).

The facts alleged here share little in common with the facts presented in those cases. Plaintiffs allege that they purchased a fiat-collateralized digital asset that was explicitly marketed and advertised as holding a "stable" value, "'pegged' to [JPY] at a rate of 1-to-1."  SAC ¶¶ 3–4. Plaintiffs do not allege that a reasonable person would expect to earn any "income or return, to include, for example, dividends, other periodic payments, or [an] increased value of [GYEN]" derived from the popularization of the digital asset or the development of the Ethereum blockchain on which it operates.  *Edwards*, 540 U.S. at 394.  That makes sense:  "[W]here a stablecoin is designed exclusively to maintain a one-to-one peg with another asset, there is no

reasonable basis for expecting that the tokens—if used as stable stores of value or mirrored shares traded on public stock exchanges—would generate profits through a common enterprise." *SEC v. Terraform Labs Pte. Ltd.*, 684 F. Supp. 3d 170, 194 (S.D.N.Y. 2023).  Indeed, if a GYEN purchaser on Binance or Coinbase were to believe GMO Trust's marketing of the coin, they would believe that the value of their GYEN would be wholly dependent on the value of JPY, a fiat currency subject to market forces and national and international monetary policy.  No matter how many users purchased GYEN or adopted the Ethereum blockchain on which it operates (and which Plaintiffs do not allege was created by GMO Trust), the value of GYEN would remain tied to JPY.  *See* SAC ¶ 89.  Any purchaser could not, therefore, reasonably expect to earn a profit derived primarily from the entrepreneurial or managerial efforts of GMO Trust or any other third parties promoting the asset or the blockchain technology on which it operates.  Any increase in the value of a purchaser's GYEN would directly correspond to a rise in the value of JPY.

Plaintiffs argue that a reasonable purchaser of GYEN on Binance or Coinbase would nevertheless expect to earn profits derived from the efforts of GMO Trust because the company advertised that the asset could be used as a stable store of value to hedge against volatility in other markets or to engage in arbitrage—*i.e.*, as leverage against fluctuating currency-exchange rates for short- or long-term profit.  Pl. Mem. at 10–11; *see, e.g.*, SAC ¶¶ 4, 42, 64–69; Whitepaper at 7–8.  Such allegations do not suffice to establish an expectation of profits based on the efforts of others.  Any asset—including minerals, commodities, real estate, or fiat currency—can be used for hedging or arbitrage purposes without converting the sale or purchase of the asset into an investment contract.  *See Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 253 F. Supp. 359, 367 (S.D.N.Y. 1966).  What matters is whether the hedging or

arbitrage strategy relies on others' managerial or entrepreneurial efforts, as opposed to the purchaser's own investment strategy and/or general market forces. *Ripple*, 682 F. Supp. 3d at 329; *see Sinva*, 253 F. Supp. at 367 ("The mere presence of a speculative motive on the part of the purchaser . . . does not evidence the existence of an 'investment contract.'"). That certain purchasers of GYEN were led to believe that they could—individually, and with their own investment acumen—employ arbitrage strategies leveraging fluctuations in currency exchange rates or hedging strategies relying on GYEN's purported stability does not suggest that such purchasers were reasonably led to expect profits based on others' managerial or entrepreneurial efforts.

Plaintiffs contend that a purchaser's belief that the value of their GYEN could increase based on a concomitant rise in the price of JPY—or the belief that a purchaser may be able to employ a profitable hedging or arbitrage strategy using GYEN—would nevertheless arise from the efforts of GMO Trust because the company advertised that it takes steps critical to maintaining GYEN's one-to-one peg to JPY. Pl. Mem. at 11; SAC ¶ 94. Specifically, the complaint alleges that GMO Trust "is exclusively responsible for . . . GYEN's maintenance and operability," and the company uses a centralized, complex, and off-blockchain protocol to "mint," "burn," and "cap" GYEN tokens to carefully maintain the peg with JPY. *Id.* ¶¶ 88, 92. Without those significant efforts, Plaintiffs contend, no person could ever achieve—or reasonably believe that they might achieve—profits as a result of their purchase of GYEN.

It is not sufficient under *Howey*'s third prong for Plaintiffs to merely allege that another's efforts are "necessary" for a purchaser to turn a profit. Ministerial, technical, and clerical tasks often are "necessary" for an investment scheme to operate and thereby generate a profit, but courts have long found such efforts to be insufficient under *Howey*'s third prong. *Coinbase*, 726

F. Supp. 3d at 303; *see, e.g.*, *First Fin. Fed. Sav. & Loan Ass'n v. E.F. Hutton Mortg. Corp.*, 834

F.2d 685, 689 (8th Cir. 1987); *Union Planters Nat'l Bank of Memphis v. Comm. Credit Bus.*

*Loans, Inc.*, 651 F.2d 1174, 1185 (6th Cir. 1981).  As courts of appeals outside this Circuit have

articulated, *Howey*'s third prong requires a showing that the efforts of others are the "undeniably

significant ones, those essential managerial efforts which affect the failure or success of the

enterprise."  *SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973); *SEC v.*

*Sethi*, 910 F.3d 198, 203 (5th Cir. 2018) (citation omitted); *see Lino v. City Investing Co.*, 487

F.2d 689, 692 (3d Cir. 1973).  Plaintiffs here focus on the "essential" component, arguing that

GMO Trust's maintenance of the peg is necessary for any purchaser to engage in a successful

hedging or arbitrage strategy.  Pl. Mem. at 11.  What Plaintiffs ignore is that the efforts of others

must be the "undeniably significant ones," and they must be geared toward the success of the

"enterprise."  *Glenn W. Turner*, 474 F.2d at 482.  As *Howey* and its progeny illustrate, that

means that the efforts of others must involve exercising entrepreneurial or managerial control

over the investment vehicle with an eye toward enhancing its value or generating returns—*i.e.*,

with the goal of advancing the greater profit-seeking "enterprise" to which the purchaser has

contributed their capital.  *Id.*; *see Howey*, 328 U.S. at 300–01.

The Supreme Court emphasized in *Howey* that the company exercised complete

managerial and entrepreneurial discretion and control over the citrus groves that were the subject

of the investment contracts—seeding, cultivating, harvesting, pooling, marketing, and selling the

fruit in a manner that would maximize the profits of the overall enterprise—to the benefit of both

the landowners and the company.[5]  *See* 328 U.S. at 299–300.  It may be that lesser managerial or

---

[5] Plaintiffs emphasize throughout their complaint that GMO Trust's advertising, partnerships, and efforts to maintain the peg to JPY were all conducted in furtherance of *its* profits.  *See* SAC ¶¶ 6, 8, 60, 63.  That fact has no bearing on whether a GYEN purchaser would reasonably expect to profit from GMO Trust's efforts.  *See Edwards*, 540 U.S. at 394 ("[W]hen we held that 'profits' must 'come solely from the efforts of others,' we were speaking of the profits

entrepreneurial efforts could satisfy *Howey*'s third prong.  But an objectively reasonable purchaser in any case must believe that the efforts of others will be geared toward generating profits, enhancing the value of the asset underlying the investment contract, or growing the enterprise—not merely facilitating individual purchasers' speculative schemes.  *See Sinva*, 253 F. Supp. at 367.  "Such a requirement helps distinguish between investment contracts that are securities and investment contracts that are simply investments."  *Coinbase*, 726 F. Supp. 3d at 303.  GMO Trust's technical efforts to maintain GYEN's peg—maintaining GYEN's operability and "minting" and "burning" GYEN tokens through a complex, off-blockchain protocol—are a far cry from the entrepreneurial or managerial efforts required for an objectively reasonable purchaser to believe that they would derive a profit solely from the efforts of others.  SAC ¶ 88, 92.  The complaint does not, therefore, allege facts sufficient to establish that offers or sales of GYEN on Binance or Coinbase constituted investment contracts.

Plaintiffs nevertheless argue that the Court should not confine its reasonable-purchaser inquiry to the contracts or transactions in which Plaintiffs engaged.  They argue that GMO Trust and its CEO, Nakamura, promoted opportunities for GYEN holders to earn financial incentives on third-party exchanges other than Coinbase and Binance, and they contend that a reasonable purchaser on Binance or Coinbase would have expected to share in those rewards.  Pl. Mem. at 9–10.  Plaintiffs argue, in essence, that their transactions on Binance and Coinbase were part of a broader GYEN "ecosystem" in which all GYEN was promoted generally as an investment opportunity.  *Id.* at 9–10, 12.

---

that investors seek on their investment, not the profits of the scheme in which they invest."); *Sinva*, 253 F. Supp. at 367 ("The mere presence of a speculative motive on the part of . . . [a] seller does not evidence the existence of an 'investment contract.").  Plaintiffs do not allege that GMO Trust offered GYEN purchasers a cut of its revenue or any other financial benefit tied to its earnings.

This theory also fails.  As a threshold matter, the majority of the alleged statements regarding the incentives offered on third-party platforms are posts written or shared by Nakamura on Twitter.  *See* Compl. ¶¶ 75–84.  The complaint offers no information, however, as to the extent or nature of Nakamura's online following.  Absent more information, the Court cannot reasonably infer that Nakamura's statements reached large audiences of prospective GYEN purchasers.  *Compare In re Ripple Labs, Inc. Litig.*, No. 18 Civ. 6753, 2024 WL 3074379, at *9 (N.D. Cal. June 20, 2024) (describing an evidentiary record replete with "numerous promotional materials that were distributed to the general public [by a digital asset issuer] via widely-viewed Internet posts and videos"), *and Owen v. Elastos Found.*, No. 19 Civ. 5462, 2021 WL 5868171, at *4, *15 (S.D.N.Y. Dec. 9, 2021) (describing allegations that the defendants participated in "more than 15 events and speaking engagements in at least eight cities across the United States" hawking a digital asset to potential purchasers), *with* SAC ¶¶ 76–82 (providing screenshots of Nakamura tweets showing that his posts, or those he shared, received no more than 53 "likes" and were viewed by an unknown number of users).

Even assuming that Nakamura's public statements and those of GMO Trust were viewed by prospective GYEN purchasers, the allegations surrounding GYEN's offer and sale do not establish a common scheme for the sale or offering of unregistered investment contracts that spanned across platforms and exchanges such that a GYEN purchaser on one platform would reasonably expect profits based on offerings made to purchasers on other platforms.  As stated, this is not like other digital-asset cases in which cryptocurrencies were marketed as part of a profit-seeking "ecosystem."  *Coinbase*, 726 F. Supp. 3d at 292.  In *Coinbase*, the court declined to distinguish among primary- and secondary-market sales of certain digital assets because all prospective customers were told "that profits from the continued sales of the tokens would be fed

back into further development of the token's ecosystem, which would, in turn, increase the value of the token" for all holders. *Id.*; *see id.* at 293. The same was true in *Terraform*, in which the "defendants said that sales from purchases of *all* [of the offered digital assets at issue]—no matter where the coins were purchased—would be fed back into the Terraform blockchain and would generate additional profits for *all* [] asset holders." 684 F. Supp. 3d at 198 (emphases in original).[6]

No such facts are presented here. Plaintiffs do not allege that GYEN's issuer or promoters advertised, or even suggested, that purchasers would benefit from increased GYEN sales across platforms and exchanges irrespective of the manner of sale. Because the value of GYEN was purportedly pegged to the value of JPY—rather than the distribution of GYEN or the popularity of the blockchain on which it operates—no GYEN purchaser could reasonably expect that sales of GYEN generally would enhance the value of their purchase. Nor do Plaintiffs allege statements suggesting that any GYEN purchaser would be able to access the special "yields," rewards, or returns offered by certain third-party platforms outside of those platforms. Indeed, it would be unreasonable for a GYEN purchaser on Binance or Coinbase to interpret advertisements or promotions of other exchanges' yield-bearing protocols to mean that *any* GYEN holder would earn income, yields, or rewards no matter where their GYEN was

---

[6] The "stablecoin" at issue in *Terraform* bears no resemblance to GYEN. The *Terraform* court found that offers and sales of the UST "stablecoin" on the *Terraform* platform were investment contracts because, unlike GYEN, the non-collateralized UST conferred rights on purchasers to "convert" the token to a different type of digital asset offered by Terraform, which was "pitched to investors . . . primarily as [a] yield-bearing investment[] whose value would grow in line with [adoption of] the Terraform blockchain ecosystem." 684 F. Supp. 3d at 194–95. The *Terraform* court found that UST was, therefore, for all practical purposes, indistinguishable from, and part of the same overall scheme, as the yield-bearing digital asset to which it was designed to be readily converted. *Id.* The *Terraform* court further found that UST coins were offered and sold pursuant to investment contracts because the coins were promoted in connection with Terraform's so-called "Anchor Protocol," which was "touted as being capable of being able to generate future profits of as much as 20%" for depositors of UST. *Id.* at 194. No such allegations are present here. Plaintiffs do not allege that GMO Trust created a native protocol designed to capture nearly all deposits of GYEN and bear yield in return, nor that GYEN was created and advertised as part of a multi-asset blockchain system that would enhance the value of the scheme's assets as the blockchain developed.

purchased or in which wallet it was held.  A person who holds cash in a savings account at their local bank cannot reasonably expect to earn profits when some other bank begins advertising that *its* customers can open high-yield savings accounts.

It may be the case that the third-party exchanges that advertised special "yields" or incentives associated with GYEN were offering investment contracts, which may have been solicited by GMO Trust.  That issue is not before the Court.  Plaintiffs are not the SEC, and they are not entitled to enforce the securities laws as applied to investment contracts into which they did not enter.  Plaintiffs contend that, in *Howey*, it did not matter to the Court that not all who agreed to purchase land from the company also agreed to the company's services arrangement. *See* Pl. Mem. at 13 (citing *Coinbase*, 726 F. Supp. 3d at 294).  But *Howey* was an SEC enforcement action, and the sole issue was whether the company offered investment contracts without registration in violation of Section 5.  328 U.S. at 300–01.  Plaintiffs here are private litigants who bring their action under Section 12(a).  Accordingly—and unlike the SEC—they may only sue for relief in connection with the unregistered securities that they purchased.  They may not sue for damages over an alleged scheme or "ecosystem" in which unregistered investment contracts were allegedly offered, but only some customers—and not Plaintiffs— agreed to them.  To allow such a case to proceed would be as if the landowners in *Howey* who declined the company's offer of a services agreement were permitted to sue for recission of the investment contracts into which they did not enter.

Put simply, Plaintiffs have not established that they personally purchased securities, nor that GYEN was offered in an investment-contract "ecosystem," in which a reasonable purchaser would expect to earn profits based on the efforts of others regardless of where or how they purchased GYEN or what they did with it.  The Court, therefore, finds that the allegations of the

complaint fail to state a claim under Section 12(a) of the Securities Act because they do not establish that a reasonable purchaser of GYEN on Binance or Coinbase would expect to earn profits derived solely from the efforts of others.

Accordingly, GMO Trust's motion to dismiss Plaintiffs' first cause of action is granted.[7]

III.    <u>State Law Claims</u>

A.  Jurisdiction Under the Class Action Fairness Act

Ordinarily, where the federal claims in an action are dismissed, the remaining state law claims should be dismissed as well. *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998); Def. Mem. at 19. Plaintiffs contend, however, that the complaint contains sufficient factual matter for the Court to exercise jurisdiction over their remaining state law claims under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2). Pl. Mem. at 27. The Court agrees.

CAFA "confer[s] original federal jurisdiction over any class action involving (1) 100 or more class members, (2) an aggregate amount in controversy of at least $5,000,000, exclusive of interest and costs, and (3) minimal diversity, *i.e.*, where at least one plaintiff and one defendant are citizens of different states." *Blockbuster, Inc. v. Galeno*, 472 F.3d 53, 56 (2d Cir. 2006) (citing 28 U.S.C. § 1332(d)(2), 5(b), (6)). The party seeking to invoke federal jurisdiction bears

---

[7] Plaintiffs have not sought leave to amend the complaint in the event of dismissal, and further amendment to address Plaintiffs' Section 12(a) claim may well be futile for the reasons stated. *See Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) ("[N]o court can be said to have erred in failing to grant a request that was not made."). Nevertheless, there may be allegations unknown to the Court that could cure the deficiencies described herein. The Court will therefore grant Plaintiffs until 21 days after the date of this order to seek leave to amend the complaint to address the deficiencies described in this order. Any such request shall be made by letter motion that attaches a proposed third amended complaint and a redline and that explains both why the additional allegations "might lead to a different result" and why they were previously unavailable to Plaintiffs. *Id.* Should Plaintiffs fail to seek leave to amend the complaint within the time allotted, the Court's dismissal of Plaintiffs' Section 12(a) claim shall be with prejudice.

the burden to establish "to a reasonable probability" that jurisdiction is proper.  *Id.* at 58 (quotation omitted).

Although Plaintiffs do not specifically allege CAFA jurisdiction within the complaint, it appears that the requirements of CAFA are satisfied based on the allegations of the complaint. Plaintiffs allege that GMO Trust and at least one plaintiff are citizens of different states.  *See* SAC ¶¶ 20–22.  They purport to bring claims on behalf of "thousands of GYEN purchasers."  *Id.* ¶ 12; *see also id.* ¶ 119 ("Plaintiffs believe that there are thousands of members in the proposed Class.").  And, according to Plaintiffs, the members of their proposed class "collectively lost untold millions" when the price of GYEN on Binance and Coinbase became untethered from the value of JPY.  *Id.* ¶ 12; *see also id.* ¶ 117 (alleging that "several hundred purchasers lost vast sums, some losing hundreds of thousands of dollars in just hours").  Based on these allegations, the Court finds it reasonably probable that CAFA jurisdiction is proper.[8]

### B.  Violations of GBL §§ 349 and 350

Plaintiffs' second and third causes of action assert that GMO Trust's representations and omissions with respect to GYEN were deceptive acts and practices in violation of GBL § 349 and false and misleading advertising in violation of GBL § 350.  SAC ¶¶ 134–52.

GBL § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade[,] or commerce or in the furnishing of any service" in New York.  GBL § 349(a).  "Deceptive acts" are those "likely to mislead a reasonable consumer acting reasonably under the circumstances."

---

[8] Although Plaintiffs failed to seek leave to amend their complaint to assert CAFA jurisdiction and did not raise the issue until they filed their opposition to GMO Trust's motion, the Court exercises its discretion to "amend [the] defective allegations of jurisdiction" *sua sponte* as the Second Circuit has directed courts to do "where necessary to avoid dismissal on purely technical grounds."  *Van Buskirk v. United Grp. of Cos., Inc.*, 935 F.3d 49, 55 (2d Cir. 2019) (quotations omitted).  Should facts come to light over the course of the litigation that reasonably call into question the Court's continuing exercise of jurisdiction, the parties are directed to raise the issue before the Court. *See Filsaime v. Ashcroft*, 393 F.3d 315, 317 (2d Cir. 2004) (explaining that the Court's duty to ensure the proper exercise of jurisdiction continues throughout the litigation).

*Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013). "To make out a prima facie case under [§] 349, a plaintiff must demonstrate that (1) the defendant's deceptive acts were directed at consumers, (2) the acts [were] misleading in a material way, and (3) the plaintiff [was] injured as a result." *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000).

GBL § 350 "prohibits '[f]alse advertising in the conduct of any business, trade[,] or commerce,'" in New York, and claims under § 350 are "analyzed under the same 'reasonable consumer' standard as [§] 349." *Grossman v. Simply Nourish Pet Food Co. LLC*, 516 F. Supp. 3d 261, 278 (E.D.N.Y. 2021) (quoting *Maurizio*, 230 F.3d at 521); *see Andre Strishak & Assocs., P.C. v. Hewlett Packard Co.*, 752 N.Y.S.2d 400, 403 (App. Div. 2002) ("[T]he test is whether the advertisement is likely to mislead a reasonable consumer acting reasonably under the circumstances." (quotation omitted)). To succeed on a § 350 claim, "[a] plaintiff must demonstrate that the advertisement (1) had an impact on consumers at large, (2) was deceptive or misleading in a material way, and (3) resulted in injury." *Strishak*, 752 N.Y.S.2d at 403. Because "[t]he standard for recovery under [GBL] § 350, while specific to false advertising, is otherwise identical to [§] 349," courts and parties—including the parties here—often "merge [their] analysis of the two claims." *Cosgrove v. Oregon Chai, Inc.*, 520 F. Supp. 3d 562, 575 (S.D.N.Y. 2021) (citation omitted).

GMO Trust moves to dismiss Plaintiffs' claims under GBL §§ 349 and 350 for failure to state a claim. It argues that Plaintiffs have failed to plead facts sufficient to establish that they relied upon any of the deceptive practices or false advertisements alleged in the complaint. Def. Mem. at 20. Because neither statute imposes such a requirement to establish a defendant's liability, the Court rejects GMO Trust's argument. *See Koch v. Acker, Merrall & Condit Co.*, 967 N.E.2d 675 (N.Y. 2012). Under both §§ 349 and 350, Plaintiffs must allege "only that the

practice [or advertisement] complained of was objectively misleading or deceptive and that [they] . . . suffered injury 'as a result.'" *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 n.4 (2d Cir. 2005) (quoting *Stutman v. Chem. Bank*, 731 N.E.2d 608, 611 (N.Y. 2000)).

GMO Trust argues that Plaintiffs fail to satisfy that standard because they have not alleged any deceptive or misleading acts or practices, or false advertisements that would mislead a consumer acting reasonably in the circumstances.  Def. Mem. at 23.  The Court disagrees. Plaintiffs allege that GMO Trust targeted consumers with statements and advertisements representing that GYEN would always remain pegged to the value of a historically stable fiat currency; omitted the risk that the asset's value could become untethered from JPY on certain of GMO Trust's "partner" platforms; and continued to make such representations and omissions even after the price of GYEN on Binance temporarily untethered from the value of JPY in May 2021.  *See, e.g.*, SAC ¶¶ 11, 42, 45, 47–50, 51–53, 66, 69, 71–74, 99, 116.  Indeed, Plaintiffs allege that GMO Trust not only omitted the risk that the price of GYEN could become untethered on third-party platforms, but it affirmatively stated that consumers would "always" be able to purchase GYEN at a one-to-one value with JPY on GMO Trust's "partner" exchanges. *Id.* ¶ 51 (quoting a statement from the Whitepaper that users may "always redeem 1 GYEN for 1 JPY . . . directly with GMO Trust, or by trading with other digital assets on exchanges that list the stablecoin[]" (emphasis omitted)); *id.* ¶ 69 (quoting from a YouTube video in which GMO Trust represented that consumers may "always purchase or redeem GYEN from us, or simply trade on the exchanges you are familiar with"); *id.* ¶ 74 (quoting from a GMO Trust advertisement stating that "*JPY-pegged 'GYEN'*" would be listed on GMO Trust's "retail and institutional exchange partner" Nexus Markets' platform (emphasis added)).

Plaintiffs have alleged that these statements were objectively misleading, deceptive, and false because the value of GYEN in fact could—and allegedly did—become untethered from the value of JPY on third-party exchanges. *See, e.g.*, *id.* ¶¶ 9–10.  Plaintiffs allege that in its first year, GYEN's value was anything but "stable;" it fluctuated over 200 percent against the U.S. dollar, apparently as a result of the untethering that occurred on Binance and Coinbase in May and November 2021.  *See id.* ¶ 5.  Given that GMO Trust held GYEN out to consumers as a "stable" counterweight to the extreme volatility of the digital asset market, and held itself out as a regulated and licensed entity offering a product backed by fiat currency held in FDIC-insured U.S. bank accounts and monitored by independent auditors, *see id.* ¶¶ 87–90; Whitepaper at 2–4, 7, a reasonable consumer, acting reasonably in the circumstances, could have been misled or deceived by GMO Trust's statements, acts, practices, omissions, and advertisements.[9]

Plaintiffs further allege that they purchased GYEN "as a result" of GMO Trust's marketing campaign, and that they were harmed because of their purchase.  SAC ¶¶ 12, 19–21. Plaintiffs state that they would not have purchased GYEN, or would not have purchased GYEN when they did or in the amount that they did, but for GMO Trust's deceptive conduct and false advertising.  *See id.* ¶ 143.  If such allegations are true, as the Court must assume them to be on a motion to dismiss, it reasonably follows that Plaintiffs saw GMO Trust's misleading statements, purchased GYEN on the basis of such statements, and were denied the full value of the product they were promised.  *See Orlander v. Staples, Inc.*, 802 F.3d 289, 302 (2d Cir. 2015).  Plaintiffs'

---

[9] GMO Trust contends that even if its statements were objectively deceptive or misleading in some other context, no reasonable consumer would have believed the statements in the precise moment when GYEN's value was clearly and obviously untethered from the value of JPY.  *See* Def. Mem. 24–25.  The Court, however, is not concerned with only that precise moment.  The question is whether, under all the circumstances, GMO Trust made representations or took actions that were likely to mislead a reasonable consumer at any point in the period alleged in the complaint resulting in harm to consumers.  Plaintiffs' allegations establish that it did for the reasons stated herein.

allegations establish, therefore, that they "suffered injury as a result" of GMO Trust's deceptive conduct and false advertising. *Pelman*, 396 F.3d at 511 n.4 (quotation omitted).[10]

The complaint's allegations suffice to make out violations of GBL §§ 349 and 350. Accordingly, GMO Trust's motion to dismiss claims two and three of the complaint is denied.

### C.  Violations of the California UCL and FAL

Plaintiffs' fourth and fifth causes of action allege that GMO Trust's representations and omissions with respect to GYEN constituted unlawful, unfair, and fraudulent conduct in violation of the California UCL and false advertising in violation of the California FAL.  SAC ¶¶ 153–73.

The UCL prohibits "any unlawful, unfair[,] or fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200.  A plaintiff may establish liability under the UCL by showing that a business act or practice was unlawful, unfair, fraudulent, or any combination thereof.  *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 540 (Cal. 1999); *Rubio v. Cap. One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010) ("Each of th[e] three adjectives captures a separate and distinct theory of liability." (citation omitted)).  Conduct is "unlawful" under the UCL's first prong if the conduct violates some other law.  *See Prakashpalan v. Engstrom, Lipscomb & Lack*, 167 Cal. Rptr. 3d 832, 855–56 (Ct. App. 2014) ("[T]he UCL borrows violations of other laws . . . and makes those unlawful practices actionable under the UCL.").  With respect to the

---

[10] GMO Trust contends that Plaintiffs have failed to plead that any of the relevant conduct at issue took place in New York as required by GBL §§ 349 and 350.  *See* Def. Mem. at 21 n.8; Def. Reply at 14.  Not so.  Plaintiffs allege that deceptive statements were made by GMO Trust in New York, where the company has its principal place of business.  SAC ¶ 142.  They further allege that at least one plaintiff was deceived by those statements and purchased GYEN as a result while residing in New York.  *Id.* ¶ 19.  These allegations are sufficient to establish at the pleadings stage that "the deception of a consumer . . . occur[ed] in New York" for the purposes of §§ 349 and 350.  *Goshen v. Mut. Life Ins. Co. of N.Y.*, 774 N.E.2d 1190, 1196 (N.Y. 2002); *see also* Pl. Mem. at 23 (explaining that the complaint alleges that GMO Trust "is licensed and resides in New York and advertised that it was a New York regulated stablecoin issuer" (citing SAC ¶¶ 41, 48–49)).

"unfair" prong, California appellate courts do not agree on how to define "unfair" business acts or practices in the specific context of UCL consumer actions. *Rubio*, 613 F.3d at 1204–05; *see also Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 735–36 (9th Cir. 2007). Most appear to define unfair acts or practices as those which are "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers," or whose utility and motivation are outweighed by the gravity of the harm they cause to consumers. *See State Farm Fire & Cas. Co. v. Super. Ct.*, 53 Cal. Rptr. 2d 229, 234–35 (Ct. App. 1996) (citation omitted); *Saunders v. Super. Ct.*, 33 Cal. Rptr. 2d 438, 441 (Ct. App. 1994). Finally, courts define a "fraudulent" act or practice to include "misrepresentations" that, even if they are "accurate on some level," "tend to mislead or deceive" a reasonable consumer. *McKell v. Wash. Mut., Inc.*, 49 Cal. Rptr. 3d 227, 239 (Ct. App. 2006) (citation omitted).[11]

"[T]o obtain a remedy for deceptive advertising, a UCL plaintiff need only establish that members of the public were likely to be deceived by the advertising." *Yumul v. Smart Balance, Inc.*, 733 F. Supp. 2d 1117, 1125 (C.D. Cal. 2010) (quoting *In re Vioxx Class Cases*, 103 Cal. Rptr. 3d 83, 95 (Ct. App. 2009)). "The same standard applies" to false advertising claims under the FAL. *Id.* (citing *Colgan v. Leatherman Tool Grp., Inc.*, 38 Cal. Rptr. 3d 36, 48 (Ct. App. 2006)). Neither UCL nor FAL claims require a plaintiff to demonstrate reliance. *See id.*

---

[11] GMO Trust argues that Plaintiffs' claims are subject to the heightened pleading standard for fraud under Federal Rule of Civil Procedure 9(b). Def. Mem. at 19. The Court disagrees. Although Plaintiffs bring a claim under the UCL's "fraud" prong, that prong "has been understood to be distinct from common law fraud." *In re Tobacco II Cases*, 207 P.3d 20, 29 (Cal. 2009). Whereas "[a] common law fraudulent deception must be actually false, known to be false by the perpetrator[,] and reasonably relied upon by a victim who incurs damages . . . [n]one of these elements are required" under the UCL. *Id.* (alteration adopted) (citation omitted). Accordingly, courts hold plaintiffs raising UCL fraud claims to Rule 9(b)'s heightened pleading standard only when the plaintiff's complaint sounds in common law fraud. *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009). The complaint here does not. *Cf. In re Mattel, Inc.*, 588 F. Supp. 2d 1111, 1118 (C.D. Cal. 2008) (declining to apply Rule 9(b)'s pleading standard to a UCL fraud claim where the plaintiffs "merely allege that [the defendant's] representations were likely to deceive and that [the] [p]laintiffs were damaged by the deception; [plaintiffs] make no effort to allege common law fraud elements such as intent to deceive or any overarching fraudulent scheme to defraud the individual [p]laintiffs or the public").

The Court finds that Plaintiffs have alleged statements or conduct likely to deceive members of the public for the reasons already stated. *See infra* Section III.B.  Accordingly, Plaintiffs have stated claims under the FAL and under the UCL's "fraud" prong.  Because Plaintiffs have established a cause of action for business acts or practices in violation of the FAL, they have necessarily made out a claim under the "unlawful" prong of the UCL. *See Prakashpalan*, 167 Cal. Rptr. 3d at 855–56.  Additionally, the Court finds that Plaintiffs have sufficiently pleaded that the "harm to the consumer[s]" alleged in the complaint outweighs any "utility" associated with GMO Trust's allegedly false advertising or misleading practices. *Rubio*, 613 F.3d at 1205 (quoting *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 735 (9th Cir. 2007)).  Based on Plaintiffs' allegations that thousands of consumers have collectively lost "untold millions," SAC ¶¶ 12, 117, it is also plausible that the harm caused by GMO Trust's alleged acts or practices was "substantially injurious" to consumers, *State Farm*, 53 Cal. Rptr. 2d at 235 (citation omitted).  The Court finds, therefore, that Plaintiffs have stated a claim under the UCL's "unfair" prong.

In sum, the Court finds that Plaintiffs have stated claims under the California FAL and each independent prong of the California UCL.  GMO Trust's motion to dismiss Plaintiffs' fourth and fifth causes of action is, therefore, denied.

## CONCLUSION

For the reasons stated above, GMO Trust's motion is GRANTED IN PART and

DENIED IN PART.  Plaintiffs' claim under Section 12(a)(1) of the Securities Act is

DISMISSED for failure to state a claim, with leave to amend to be sought within 21 days of the

date of this order.  GMO Trust's motion is DENIED in all other respects.

The Clerk of Court is respectfully directed to terminate the motion at ECF No. 113.

SO ORDERED.

Dated: February 17, 2025
      New York, New York

                                          ANALISA TORRES
                              United States District Judge