**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KENNETH DONOVAN, HUSSIEN KASSFY, and JOHN BRAMBL individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GMO-Z.COM TRUST COMPANY, INC.,<br><br>Defendant. | Case No. 1:23-cv-08431-SDA<br><br>Honorable Stewart D. Aaron |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**

## INTRODUCTION

Following extensive, good-faith negotiations between experienced counsel, the parties have agreed to settlement terms that they believe will fairly resolve this action; avoid protracted, expensive, and uncertain litigation; and provide adequate relief for the Class.

This matter arises out of alleged misrepresentations by defendant GMO-Z.com Trust Company, Inc. ("GMOT" or "Defendant") regarding the "pegging" of its cryptocurrency stablecoin GYEN to the Japanese yen ("JPY"). In short, the Complaint alleges that GMOT represented that the price of GYEN would always match the price of the JPY 1-to-1. However, when GYEN launched on partner crypto exchanges such as Binance and Coinbase, it quickly de-pegged from the JPY. *See* ECF 109. Plaintiffs Kenneth Donovan and Hussien Kassfy ("Plaintiffs") represent a putative class of individuals who purchased or acquired GYEN between December 29, 2020 and October 10, 2025 in either New York or California[1] at a time when the GYEN was unpegged from the Japanese yen and lost money as a result. Plaintiffs allege claims under the New York General Business Law ("GBL") §§ 349 and 350 and the California Unfair Competition and False Advertising Laws, California Business and Professions Code §§ 17200 *et seq*. ("UCL") and 17500 *et seq*. ("FAL").

This matter was vigorously litigated over the course of several years. The parties engaged in several rounds of motions to dismiss and discovery efforts. In September 2025, with the close of discovery quickly approaching, the parties engaged in a court-ordered settlement conference.

[1] Plaintiff John Brambl, who is not a resident of California or New York and thus not part of the Settlement Class, entered into a separate individual settlement with GMOT in exchange for releasing his claims against Defendant. Declaration of Elizabeth A. Kramer ("Kramer Decl."), ¶ 3. His individual settlement does not affect the relief to the class. *Id.*

Following extensive, arms-length negotiations between experienced counsel led by a federal magistrate judge, the parties reached agreement. The terms of the proposed Settlement[2] are reasonable, fair, and adequate. The Settlement provides for a monetary fund of $6,750,000, which will be distributed to class members using an allocation plan that tailors their recovery to their damages. The proposed class notice (S.A. Ex. A[3]), is comprehensive, and the notice program provides the best practicable notice under the circumstances.

Given the uncertainty of litigation, obstacles to Plaintiffs' success on the merits, and difficulties inherent in achieving and maintaining certification of a liability class for purposes of trial, the substantial benefits that the proposed Settlement provides represent a favorable result for the class. Accordingly, Plaintiffs move this Court for an order: (1) granting preliminary approval of the proposed Settlement; (2) conditionally certifying the class for settlement purposes; (3) appointing Plaintiffs Donovan and Kassfy as Settlement Class Representatives and appointing Erickson Kramer Osborne LLP and Berman Tabacco as Class Counsel; (4) approving the Notice and directing that it be disseminated to the class; (5) appointing Simpluris, Inc. ("Simpluris") as the Claims Administrator to administer the notice and claims process; and (6) scheduling a fairness hearing.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. GYEN and Its De-pegging from the Yen

GYEN is a cryptocurrency issued by Defendant that can be bought, sold, and exchanged online. It is in a class of cryptocurrency referred to as a "stablecoin" because it is (or claims to be) collateralized with and pegged in value to an actual underlying "fiat," or government-issued,

---

[2] All capitalized terms referenced in this motion have the same meaning ascribed to them in the Stipulation and Agreement of Settlement (the "Stipulation and Agreement" or "S.A."), attached to the Kramer Decl., as Exhibit 1.

[3] There are four exhibits to the S.A.: Ex. A, Notice of Proposed Class Action Settlement; Ex. B, Proof of Claim and Release Form ("Claim Form"); Ex. C, Proposed Preliminary Approval Order; and Ex. D, Proposed Final Approval Order.

currency—here, the Japanese yen. ECF 109, ¶ 3. During the relevant period, GYEN traded globally on public exchanges, including exchanges operated by "partner" exchanges Binance and Coinbase.

Plaintiffs and the class, composed of thousands of GYEN purchasers in New York and California, allege that they bought GYEN as a result of GMOT's national marketing campaign wherein it made numerous public statements about GYEN and its 1-to-1 peg with the Japanese yen, as well as its investment uses, such as protecting against other downside risk and providing other profit-generating opportunities. ECF 109, ¶¶ 12, 45, 47-50. Plaintiffs further allege that GMOT made these promises before and after a de-pegging on Binance in May 2021. *Id.* at ¶¶ 9, 97-101. On November 16, 2021, GYEN became fully open for trading on Coinbase. Almost immediately, its value came untethered from the yen. GYEN's liquidity was so low that the value of the asset rose to more than seven times the value of the yen. The yen, meanwhile, was completely stable. *Id.* at ¶ 106. While GYEN was untethered, investors who bought what they believed were GYEN tokens equal in value to the Japanese yen were actually buying tokens worth far more than the yen—and paying for them at correspondingly high prices. *Id.* at ¶ 107. By November 19, 2021, the price of GYEN returned to parity with the yen, losing its prior inflated value by orders of magnitude. Those left holding the stablecoin purchased at artificially inflated prices lost as much as 80 percent of their investment in hours. *Id.* at ¶¶ 5, 10, 107-08.

**B. The Pleadings and Motions to Dismiss**

On May 13, 2022, Plaintiffs filed a class action complaint in the United States District Court for the Northern District of California, captioned as *Donovan, et al. v. GMO-Z.com Trust Co., Inc., et al.*, Case No. 3:22-CV-02826-TLT (N.D. Cal.), against GMOT and former co-defendants Coinbase Global, Inc. and Coinbase Inc. (collectively, "Coinbase"), alleging violations of, *inter alia*, Section 349 of the New York GBL, the California UCL, Sections 5 and

12 of the Securities Act of 1933, 15 U.S.C. §§ 77e(a), 77e(c), and 77l(a)(1) (the "Securities Act"), and multiple common law claims. ECF 2. In July 2022, Plaintiffs successfully moved for appointment as lead plaintiffs (and Plaintiffs' counsel as lead counsel) pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 77z-1(a)(3)(B), (ECF 33, 43, 45) and filed an amended complaint on August 25, 2022 (ECF 46).

On October 6, 2022, GMOT and Coinbase each filed motions to dismiss and motions to compel arbitration, and Plaintiffs opposed. Upon the filing of these motions, all discovery was automatically stayed pursuant to the PSLRA. Kramer Decl., ¶ 4. In November 2022, Plaintiffs moved for leave to file an amended complaint to add claims under the California Consumers Legal Remedies Act, Cal. Civ. Code § 1750, and the California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.* ("FAL"). ECF 64. On January 6, 2023, the district court granted Coinbase's motion to compel arbitration. ECF 78. The Court denied the motion as to GMOT and stayed the entire action pending arbitration proceedings. *Id.*

Pursuant to that order, Plaintiffs Kassfy and Brambl spent the next nine months actively engaged in arbitral proceedings against Coinbase and litigating the arbitrability issue. Kramer Decl., ¶ 5. As Plaintiffs' claims against GMOT were not subject to arbitration, after extensive meet and confer efforts, Plaintiffs and GMOT reached agreement and filed a joint stipulation seeking an order severing and transferring the claims against GMOT to the United States District Court for the Southern District of New York. *Id.* ¶ 6. The Northern District of California court granted the order on July 13, 2023 (ECF 84), and, on September 25, 2023, the action was transferred to this District and assigned to the Honorable Analisa Torres.

Given the ongoing arbitrations against Coinbase in California, in an order dated January 26, 2024, Judge Torres granted the parties' joint stipulation to lift the stay and enter a stipulated

briefing schedule relating to Plaintiffs' proposed second amended complaint. ECF 102. After meeting and conferring, GMOT ultimately consented to the filing of a second amended complaint in early April 2024. Kramer Decl., ¶ 7; ECF 107.

On April 8, 2024, Plaintiffs filed their Second Amended Complaint against GMOT, asserting claims under Sections 5 and 12 of the Securities Act, Sections 349 and 350 of New York's GBL ("New York Claims"), and California's UCL and FAL ("the California Claims"). ECF 109 ("SAC"). On May 23, 2024, GMOT moved to dismiss the SAC in its entirety, and Plaintiffs opposed. ECF 113, 117. On February 17, 2025, the Court granted in part and denied in part GMOT's motion, dismissing Plaintiffs' Securities Act claims and allowing the New York Claims and the California Claims to proceed. *Id.*

Under the GBL, Plaintiffs seek to recover actual damages suffered by the class, but no less than the $550 minimum statutory damages per violation,[4] as well as trebled damages of up to $1,000 per claim based on their allegations that GMOT knew of the falsity of its representations. ECF 109, ¶¶ 144, 151. They also seek injunctive relief. *Id.* Under the UCL and FAL, Plaintiffs seek restitution and injunctive relief in the form of an order enjoining GMOT's ongoing misrepresentations. *Id.* at ¶¶ 162-163, 172-173, 174(b).

### C. Investigation and Discovery

Crypto data of the nature required to litigate Plaintiffs' claims is essentially in a black box and not regularly available from the defendant or public sources. Nonetheless, prior to initiating this action, Plaintiffs' counsel conducted a significant investigation including: (i) a review and analysis of press releases and other public statements about the GYEN and GMOT; (ii) a review and analysis of media reports about the GYEN, GMOT, Coinbase, and Binance; (iii)

[4] Section 349 of the GBL provides for $50 minimum statutory damages per violation and Section 350 provides for $500 minimum statutory damages per violation. N.Y. Gen. Bus. §§ 349(h) & 350-e(3).

other publicly disclosed reports and information about the GYEN, including publicly available GYEN pricing, trade volume, and transaction data; (iv) interviews with more than 50 GYEN investors who claimed losses caused by the GYEN de-peg; and (v) consultation with expert consultants. Kramer Decl., ¶ 9.

On March 20, 2025, the Court set a schedule with a fact discovery deadline of September 18, 2025. ECF 127. Shortly thereafter, the parties commenced fact and class discovery. In addition to discovery from Defendant GMOT, Plaintiff served third party discovery on the exchanges on which GYEN traded. Kramer Decl., ¶ 12.

### D. Settlement Negotiations

On September 10, 2025, pursuant to the Court's July 9, 2025 order (ECF 142), the parties participated in settlement conference before Magistrate Judge Hon. Stewart D. Aaron. Kramer Decl., ¶ 13. Prior to the settlement conference, the parties prepared and submitted mediation statements detailing their respective positions. Plaintiffs' counsel also provided a settlement demand to GMOT. During the settlement conference, each side presented its view of the matter, including the likelihood of success at class certification and summary judgment and the strengths and weaknesses of Plaintiffs' claims and GMOT's defenses. *Id*. While the action did not settle at the settlement conference, over the next several weeks the parties continued shuttle negotiations with Judge Aaron's oversight. The parties ultimately agreed on terms to resolve the case in October 2025. *Id.* at ¶ 13. On October 2, 2025, to facilitate Rule 23 approval and with the consent of the parties, the case was reassigned to Judge Aaron. On October 10, 2025, the parties executed a term sheet setting forth the principal terms of the Settlement documented herein. *Id.*

## TERMS OF THE PROPOSED SETTLEMENT

Subject to the Court's approval, the parties have reached a Settlement to resolve all class claims pending in the litigation. *See* Ex. 1, the S.A. The proposed Settlement Class is defined as:

All persons who purchased or acquired GYEN in New York or California at a time when the GYEN was unpegged from the Japanese yen between December 29, 2020 and October 10, 2025, inclusive, and lost money thereby. S.A., § 1.41.[5] Class membership will be determined through different methods based on the source or exchange through which the Settlement Class Member transacted, as set forth in detail below.

**A. Monetary Relief**

Under the proposed Settlement, GMOT will pay $6,750,000. S.A. § 1.40. This fund will be used to compensate Settlement Class Members, as well as to pay for the cost of notice and settlement administration, attorneys' fees and expenses, and service awards to the Settlement Class Representatives. S.A., § 6. After all Court-approved deductions are made from the settlement amount, the remainder will be distributed to Settlement Class Members.

Plaintiffs' counsel worked with a damages consultant to develop a fair and efficient plan to allocate the funds available to Settlement Class Members under the Settlement. Kramer Decl., ¶ 16. Under the Plan of Allocation, each Settlement Class Member will be entitled to receive a payment derived from their "Recognized Loss Amount." Ex. 2 at ¶ 3. Recognized Loss Amounts are determined by calculating the difference between the price each class member paid for the GYEN they purchased in U.S. dollars and the actual U.S. dollar/JPY exchange rate. *Id*. at ¶ 6. If a Settlement Class Member sold their GYEN for a price above the U.S. dollar/JPY exchange rate, their Recognized Loss Amount is reduced accordingly. *Id*. After each Settlement Class Member's Recognized Loss Amount is calculated, the Claims Administrator will determine their *pro rata* share of the Settlement funds. *Id*. at ¶ 8. The actual amount of any *pro rata* share will be calculated by the Claims Administrator after the Settlement becomes effective. *Id.* Any *de*

[5] The remaining causes of action under the New York GBL and California UCL and FAL relate only to New York and California transactions.

*minimis* amount remaining in the Settlement Fund after payments are distributed will, with Court approval, be directed to an appropriate *cy pres* beneficiary. S.A. § 6.9.

**B. Release of Claims**

In exchange for the relief provided by the Settlement, the Settlement Class Members will release GMOT and affiliated persons and entities (*see* S.A. § 1.12) from all claims that were or could have been asserted in the SAC and as well as claims that could in the future be asserted that both arise out of or relate to any of the allegations, transactions, facts, matters or occurrences, representations or omissions involved, set forth or referred to in the SAC and that relate, in any way, to the purchase, acquisition, holding, sale, or disposition of GYEN during the class period. S.A. § 1.37. The release also includes claims which Plaintiffs or any other Settlement Class Members do not know or suspect to exist in their favor at the time of the release of such claims, which, if known by it, might have affected their decisions with respect to this Settlement. *Id.* at § 1.49.

**C. Class Notice and Settlement Administration**

A large majority of Settlement Class Members traded on the centralized exchange Coinbase from which Plaintiffs expect that contact information and account-level transaction data will be made available by Coinbase for the Claims Administrator. S.A. § 1.48; Kramer Decl., ¶ 18. Direct notice will be provided to potential class members via email to the email addresses maintained by GMOT or Coinbase. Kramer Decl., ¶ 19; S.A. § 4.2.

Some Settlement Class Members likely traded outside of the centralized exchanges and their contact information and transaction data is presently unknown. Kramer Decl., ¶ 18. For these individuals, notice will be provided through a press release issued to publications focused on crypto investing, paid social media notice targeting users whose demographics and online behaviors are similar to known class members, and potentially a digital, non-fungible token

("NFT") "airdrop" notice directly to the cryptocurrency "wallets" of known GYEN investors who bought off-exchange. Simpluris Decl., ¶¶ 14-15. These notice methods are commonly used by settlement administrators in effectively reaching cryptocurrency investors. *Id*. at ¶ 6. This group of individuals will be able to self-identify and provide their GYEN transaction information through the Settlement Website or a hard-copy Claim Form. S.A. §§ 1.6, 1.48; S.A. Ex. B.

The Settlement Notices provide information to the Settlement Class regarding, among other things: (1) the nature of the claims; (2) the scope of the Settlement Class; (3) the terms of the Settlement; (4) Settlement Class Members' right to object to the Settlement and the deadline for doing so; (5) the class release; (6) the identity of Class Counsel and the amount of compensation they will seek in connection with the Settlement; (7) the amount of the proposed Class Representative service awards; (8) the date, time, and location of the final approval hearing; and (9) Settlement Class Members' right to appear at the final approval hearing and object. S.A. Ex. A.

To the extent that Settlement Class Members would like more information, the Claims Administrator will establish a Settlement Website on which it will post the S.A., Notices, and relevant case documents, including the Complaint and a copy of all Court orders related to the Settlement. Simpluris Decl., ¶ 16. The Claims Administrator also will establish a toll-free telephone line. *Id.* at ¶ 17.

**D. Attorneys' Fees, Litigation Expenses, and Notice and Administration Costs**

The Settlement requires that Class Counsel file their motion for Attorneys' Fees and Litigation Expenses at least 14 days before the deadline for objections to the proposed Settlement. S.A., Ex. C; ECF 158. The requested fees will not exceed $2,250,000, or approximately one-third of the Settlement Amount, and the requested Litigation Expenses will not exceed $110,000. In addition, the Settlement provides for recovery of Notice and

Administrative Costs related to the Settlement, and for service awards up to $7,500 for Plaintiffs Donovan and Kassfy as well as Brambl. S.A. § 7. The Settlement is not conditioned on the award of any such amounts, and the denial of any of these awards shall not prevent the Settlement from becoming effective, nor shall it be grounds for termination of the Settlement. *Id*. Plaintiffs further request that a maximum of $150,000 from the Net Settlement Fund be available for claims administration, with payments to the Claims Administrator allowed prior to the Effective Date. *Id*.

**THE COURT IS LIKELY TO GRANT FINAL APPROVAL OF THE PROPOSED SETTLEMENT**

Under Rule 23(e), any settlement agreement that will bind absent class members must receive judicial approval through a two-step process. *In re NASDAQ Market-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997). In the first step, the Court considers whether the settlement warrants preliminary approval, such that notice of the settlement may be sent to the class members. *Id.*[6] In the second step, after notice of the proposed settlement has been issued and class members have had an opportunity to be heard, the Court considers whether the settlement warrants final court approval. *Id*.

Deciding whether to approve a class action settlement is a matter of judicial discretion, *see Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1079 (2d Cir. 1995), but there is a "strong judicial policy in favor of settlements, particularly in the class action context." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (quotation omitted). As a

---

[6] A motion for preliminary approval involves only an "initial evaluation" of the fairness of the proposed settlement. *Clark v. Ecolab Inc.*, 2009 WL 6615729, at *3 (S.D.N.Y. Nov. 27, 2009) (quoting 4 NEWBERG ON CLASS ACTIONS ("NEWBERG") § 11:25 (4th ed. 2002)). To grant preliminary approval, the Court need only find that there is "probable cause" to submit the settlement to class members and hold a full-scale hearing as to its fairness. *In re Traffic Exec. Ass'n*, 627 F.2d 631, 634 (2d Cir. 1980).

result, "courts should give proper deference to the private consensual decision of the parties … [and] should keep in mind the unique ability of class and defense counsel to assess the potential risks and rewards of litigation." *Clark*, 2009 WL 6615729, at *3 (quotations omitted).

Under Rule 23(e)(1), as amended in 2018, courts are authorized to grant preliminary approval of a proposed settlement so long as the court will "likely be able to" grant final approval of the settlement and certify the class for purposes of settlement. Fed. R. Civ. P. 23(e)(1)(B); *In re GSE Bonds Antitrust Litig.*, 2019 WL 6842332, at *1 (S.D.N.Y. Dec. 16, 2019).

To approve a settlement under Rule 23(e)(2), the Court must consider four factors: (1) adequacy of representation, (2) existence of arm's-length negotiations, (3) adequacy of relief, and (4) equitableness of treatment of class members. Fed. R. Civ. P. 23(e)(2). These Rule 23 factors supplement the *Grinnell* factors traditionally considered in the Second Circuit when evaluating the substantive fairness of a settlement during the preliminary approval process. *In re GSE Bonds Antitrust Litig.*, 2019 WL 6842332, at *1. Under the Second Circuit's holding in *City of Detroit v. Grinnell Corporation*, the Court is to weigh the following factors to determine whether a proposed settlement is fair, reasonable, and adequate: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. 495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d

43 (2d Cir. 2000).[7] Consistent with the intent of the 2018 amendments, only those *Grinnell* factors that are relevant to this Settlement are addressed here. *See* Fed. R. Civ. P. 23(e)(2) advisory committee note (2018) (observing that the new Rule 23(e) factors are intended to help the court and counsel focus on the most pertinent considerations). As demonstrated below, the Settlement warrants preliminary approval because it is both procedurally and substantively fair under Rule 23(e)(2) and the relevant *Grinnell* factors.

### A. Plaintiffs and Their Counsel Have Adequately Represented the Class [Rule 23(e)(2)(A) & *Grinnell* Factor #3]

The first procedural concern asks whether the proposed Settlement was the result of adequate representation. Fed. R. Civ. P. 23(e)(2)(A). "Rule 23(e)(2)(A) requires a Court to find that 'the class representatives and class counsel have adequately represented the class before preliminarily approving a settlement." *GSE Bonds*, 2019 WL 6842332, at *2.

Here, Plaintiffs have adequately represented the Settlement Class. Each of them has recognized their duties as class representatives and sought to fulfill those duties throughout the course of this case. Kramer Decl., ¶ 20. Among other things, Plaintiffs have reviewed the allegations in all versions of the complaint, provided information and documents to counsel to assist in the investigation and prosecution of the action, made themselves available answer questions from counsel and to stay informed on the status of the action, and conferred with counsel regarding the potential strengths and weaknesses of the claims asserted in this action and the potential risks and rewards of the Settlement compared to pursuing further litigation. *Id.*

---

[7] *Grinnell* factor #2 (the reaction of the settlement class) is generally inapplicable prior to disseminating notice. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986 F. Supp. 2d 207, 221 (E.D.N.Y. 2013) (declining to address "the reaction of the class to the settlement"), *rev'd & vacated on other grounds*, 827 F.3d 223 (2d Cir. 2016); *see also In re Warner Chilcott Ltd. Sec. Litig.*, No. 06 Civ. 11515 (WHP), 2008 WL 5110904, at *2 (S.D.N.Y. Nov. 20, 2008) ("Since no notice has been sent, consideration of this factor is premature."). Thus, this analysis will not include this factor.

Plaintiffs fall within the proposed Settlement Class and are not aware of any conflicts between themselves and any other class members. *Id.* at ¶ 20. Thus, Plaintiffs are adequate class representatives, who have diligently pursued this action on behalf of the class.

Plaintiffs' counsel are also more than adequate. As detailed in the firm resumes submitted herewith, the attorneys from Erickson Kramer Osborne LLP and Berman Tabacco have decades of experience in the management and litigation of complex nationwide class actions, including cases on behalf of consumers and investors arising from financial fraud and violations of consumer protection laws and cases involving cryptocurrency and stablecoins specifically. *See* Kramer Decl. ¶ 22; Exs. 3, 4.

"[T]he stage of the proceedings and the amount of discovery completed" are also pertinent to the Court's review. *Kemp-DeLisser v. Saint Francis Hosp. & Med. Ctr.*, 2016 WL 6542707, at *8 (D. Conn. Nov. 3, 2016) (quotation omitted). Indeed, one of the hallmarks of adequate representation is a thorough investigation and assessment of the class members' claims such that counsel has sufficient information to make informed decisions at the bargaining table. *See* Fed. R. Civ. P. 23(e)(2)(A), Adv. Comm. Note; *see also In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 2006 WL 903236, at *10 (S.D.N.Y. Apr. 6, 2006) ("whether the plaintiffs have obtained a sufficient understanding of the case to gauge the strengths and weaknesses of their claims and the adequacy of the settlement" is relevant to settlement approval).

Here, Plaintiffs' counsel were well prepared to negotiate a beneficial settlement for class members due to their knowledge of the merits and potential weaknesses of Plaintiffs' claims, honed through years of litigation and informed by extensive experience. By the time the parties reached a settlement in principle, the following actions had already occurred:

1. Plaintiffs' counsel undertook an extensive investigation of the factual and legal bases for Plaintiffs' claims prior to commencing the action;
2. The parties' factual and legal contentions were staked out and tested in connection with the motions to dismiss;
3. Judge Torres dismissed Plaintiffs' Securities Act claims, and upheld the New York GBL and California UCL/FAL claims;
4. GMOT produced over 3,000 pages of documents, Plaintiffs produced hundreds of pages of documents, and Coinbase produced files containing tens of millions of data points;
5. Plaintiffs' counsel had engaged damages experts, who analyzed millions of GYEN transactions found in publicly available blockchain data and files produced by Coinbase; and,
6. Plaintiffs' counsel had the necessary experience and qualifications to evaluate the parties' legal positions and the discovery that was produced.

Through those efforts and events, Plaintiffs' counsel were well apprised of the strengths and weaknesses of Plaintiffs' claims and secured a settlement entitling each class member to meaningful relief. This work further demonstrates that the class has been adequately represented and favors settlement. *See Kemp-DeLisser*, 2016 WL 6542707, at *8 ("Although formal discovery had yet to occur at the time the parties engaged in settlement negotiations, Class Counsel conducted extensive investigation into the facts, circumstances, and legal issues associated with this case before agreeing to the Settlement.").

**B. The Proposed Settlement Was Negotiated at Arm's Length [Rule 23(e)(2)(B)]**

A class action settlement "will enjoy a presumption of fairness" where the settlement "is the product of arm's length negotiations conducted by experienced counsel knowledgeable in

complex class litigation[.]" *In re Excess Value Ins. Coverage Litig.*, 2004 WL 1724980, at *10 (S.D.N.Y. July 30, 2004) (quotation omitted); *see also Wal-Mart*, 396 F.3d at 116.

The Settlement was reached after formal, non-collusive, arm's-length negotiations before the Honorable Stewart Aaron. Prior to reaching the Settlement, the parties vigorously litigated this action for over three years and conducted thorough investigation and discovery. The parties, therefore, had sufficient information about the case to assess the strengths and weaknesses of the claims and the adequacy of the Settlement. *See Kemp-DeLisser*, 2016 WL 6542707, at *8 (stage of proceedings and amount of discovery is relevant to judicial approval of class settlement).

Based on the knowledge obtained through discovery, formal and informal investigation, and their experience litigating consumer and securities class actions, Plaintiffs' counsel believe that the Settlement is fair, reasonable, and adequate. Kramer Decl., ¶¶ 23-26. This assessment weighs in favor of approval. *See Clark*, 2009 WL 6615729, at *3 (courts "should keep in mind the unique ability of class and defense counsel to assess the potential risks and rewards of litigation"). Further, the involvement of Judge Aaron in the parties' robust mediation efforts, and the extensive negotiations that took place over the course of numerous weeks following the settlement conference, support a finding that the Settlement is not the product of collusion. *See In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 66 F. Supp. 3d 477, 482 (S.D.N.Y. 2015); *see also Henry v. Little Mint, Inc.*, 2014 WL 2199427, at *6 (S.D.N.Y. May 23, 2014) ("If the settlement was achieved through experienced counsels' arm's-length negotiations, '[a]bsent fraud or collusion, [courts] should be hesitant to substitute [their] judgment for that of the parties who negotiated the settlement.'"). This factor therefore favors preliminary approval.

### C. The Proposed Settlement Provides Adequate Relief to Class Members [Rule 23(e)(2)(C) and Grinnell Factors # 1, 4-9]

The Settlement's terms reflect an excellent result for the Settlement Class Members, who will receive *pro rata* shares of over four million dollars. The relief offered by the Settlement is even more favorable when considered in light of the factors delineated in Rule 23(e)(2)(C): (i) the costs, risks, and delay of trial and appeal[8]; (ii) the effectiveness of the proposed distribution and claims process; (iii) the terms of any proposed award of attorneys' fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3).

#### *1) The Costs, Risks, and Delay Drawbacks Associated with Further Litigation Are Substantial [Rule 23(e)(2)(C)(i) & Grinnell Factors # 1, 4-6]*

In contrast to the benefits conferred by the Settlement, continued litigation would have carried significant costs, risks, and delay. *See In re WorldCom, Inc. ERISA Litig.*, 2004 WL 2338151, at *6 (S.D.N.Y. Oct. 18, 2004) (noting the "general risk inherent in litigating complex claims such as these to their conclusion."); *In re PaineWebber Ltd. Partnerships Litig.*, 171 F.R.D. 104, 126 (S.D.N.Y. 1997) (same), *aff'd sub nom. In re PaineWebber Inc. Ltd. Partnerships Litig.*, 117 F.3d 721 (2d Cir. 1997).

Absent settlement, GMOT would have advanced numerous defenses to the merits of Plaintiffs' claims. Based on arguments it has already advanced, Plaintiffs anticipate GMOT would argue that Plaintiffs cannot show they actually relied on statements made about GYEN, that GMOT made no false or misleading statements or omissions, and that there was no causal link between the GMOT's statements or omissions and Plaintiffs' harm. Dkt. No. 115, pp 20-26. While Plaintiffs believe they would be able to prove misrepresentations and causation as required under

[8] This factor subsumes *Grinnell* factors #1, 4, 5 and 6. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 36 (E.D.N.Y. 2019).

any remaining claims, success was far from guaranteed. Indeed, GMOT had already been successful in dismissing Plaintiffs' Securities Act claims. *See* ECF 121.

Additionally, while Plaintiffs are confident the Court would certify the proposed class, GMOT was certain to mount formidable defenses to class certification. Thus, the risk of achieving and maintaining class certification through trial and likely appeals was significant and weighs in favor of approval. *See Garland v. Cohen & Krassner*, No. 08-CV-4626, 2011 WL 6010211, at *8 (E.D.N.Y. Nov. 29, 2011) (risks relating to class certification support settlement approval). The losing party would have undoubtedly sought interlocutory review by the Second Circuit, thus further extending the timeline of the litigation. *See Payment Card*, 986 F. Supp. 2d at 222 n.13 ("In the *Wal-Mart* case, twenty months elapsed between the order certifying the class and the Second Circuit's divided opinion affirming that decision.").

The risks of prevailing at trial on the merits are likewise considerable. A jury trial might well turn on questions of proof, many of which would be the subject of dueling expert testimony, making the outcome of trial uncertain for both parties. Even if Plaintiffs prevailed at trial, they would face the delay and risk associated with potential appeals. In sum, "[t]here can be no doubt that this class action would be enormously expensive to continue, extraordinarily complex to try, and ultimately uncertain of result." *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 477 (S.D.N.Y. 1998). In contrast, the proposed resolution of this Action provides significant, immediate, and certain monetary recovery for the Settlement Class.

***2) Defendant's ability to withstand a greater judgment [Grinnell Factor #7]***

"'[I]n any class action against a large corporation, the defendant entity is likely to be able to withstand a more substantial judgment, and, against the weight of the remaining factors, this fact alone does not undermine the reasonableness of the instant settlement.'" *In re Vitamin C Antitrust Litig.*, 2012 WL 5289514, at *6 (E.D.N.Y. Oct. 23, 2012) (internal

citation omitted); *see also In re Tronox Inc.*, 2014 WL 5825308, at *6 (S.D.N.Y. Nov. 10, 2014) ("The law does not require a defendant to completely empty its pockets before a settlement may be approved—indeed, if it did, it is hard to imagine why a defendant would ever settle a case."). Here, the financial obligation the Settlement imposes on GMOT is significant. That GMOT might be able to withstand a greater judgment does not undermine the reasonableness of the Settlement here.

***3) The range of reasonableness of the Settlement Fund in light of both the best possible recovery [Grinnell Factor #8] and the attendant risks of litigation [Grinnell Factor #9]***

The range of reasonableness factor is satisfied when there are no obvious doubts as to the adequacy of the settlement amount. *See, e.g.*, *Yim v. Carey Limousine NY, Inc*., No. 14-CV-5883, 2016 WL 1389598, at *4 (E.D.N.Y. Apr. 7, 2016) (granting preliminary approval of settlement without submission of "a specific number as [plaintiffs'] best possible recovery, particularly at this stage of preliminary approval, where the level of inquiry is more lenient than at final approval"). In applying this factor, "[d]ollar amounts [in class settlement agreements] are judged not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case." *In re "Agent Orange" Prod. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984), *aff'd* 818 F.2d 145 (2d Cir. 1987).

The amount that Settlement Class Members will receive from this Settlement is fair and reasonable when compared to what they could reasonably expect to recover if they were to win a favorable trial verdict. To illustrate this point, Plaintiffs invite the Court to consider the maximum likely recovery available at trial.

On the Coinbase exchange, for instance, GYEN was first traded (and first de-pegged) in November 2021. Using data subpoenaed from Coinbase recording each GYEN transaction made in New York and California during that time, Plaintiffs calculate investor losses for residents of

these two states caused by the GYEN de-peg are approximately $31 million.[9] Kramer Decl., ¶ 17. While the full universe of GYEN transactions in these two states is unknowable (thus is the nature of cryptocurrency transactions), this sum likely represents the vast majority of potential damages in this case. *Id*. at ¶ 18. As is true in any litigation, Plaintiffs would face significant obstacles, delays, and costs in obtaining any recovery whatsoever.

In Plaintiffs' counsel's view, GMOT's payment of $6.75 million is an excellent result for the Settlement Class Members. *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. 1997) (stating "'great weight' is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation"). Given the risks, cost, and delay of further litigation, the proposed Settlement is fair, adequate and reasonable.

### D. The Proposed Method of Distributing Relief to the Class, Including the Process for Handling Class Member Claims, Is Designed to Be Effective [Rule 23(e)(2)(C)(ii)]

"[T]he goal of any distribution method is to get as much of the available damages remedy to class members as possible and in as simple and expedient a manner as possible." Newberg § 13:53. Here, none of the $6.75 million Settlement Fund will revert to GMOT. Instead, after Court-approved deductions for payment of notice and administration costs, attorneys' fees and litigation expenses, and service awards to the class representatives, the entirety of the Net Settlement Fund will be disbursed to the Settlement Class Members in accordance with the allocation plan. Ex. 2. Settlement Class Members can select their desired form of payment through the Claims Administrator. Simpluris Decl., ¶ 24.

If the sum of the settlement payments made is ultimately less than the balance in the Net Settlement Fund (for example, due to uncashed checks), and the balance is large enough to

[9] Plaintiffs arrive at this value through consultation with a securities damages expert and expressly reserve the right to amend this estimate after further review and analysis, if necessary. *Id.*

feasibly distribute, a second distribution of *pro rata* payments will be made, or, if the amount is not feasible to distribute, Plaintiffs' Counsel will seek Court approval of an appropriate *cy pres* beneficiary. S.A. Ex. D, Final Approval Order. No monies will revert to Defendant. This method of distribution is fair, effective, and efficient.

### E. The Request for Attorneys' Fees is Reasonable

Plaintiffs' counsel will seek attorneys' fees through a separate motion that will be supported by documentation of their hours, rates, and expenses. Kramer Decl., ¶ 22. Under the terms of the Settlement, Plaintiffs' Counsel will request an award of attorneys' fees in an amount not to exceed $2,250,000, or approximately one-third of the Settlement Amount, S.A., § 7.6, and the Court will not be asked to approve the fee award until the final approval stage. *Id.* A request of approximately one-third of the common fund created by their efforts is well within the benchmark range and in line with what is routinely awarded in this Circuit. *Kohari v. MetLife Grp., Inc.*, 2025 WL 100898, at *11 (S.D.N.Y. Jan. 15, 2025); *see also, e.g.*, Mol*oney v. Shelly's Prime Steak, Stone Crab & Oyster Bar*, 2009 WL 5851465, at *5 (S.D.N.Y. Mar. 31, 2009) (collecting cases and noting that "Class Counsel's request for 33% of the Settlement Fund is typical in class action settlements in the Second Circuit."); *Anwar v. Fairfield Greenwich Ltd.*, 2012 WL 1981505, at *3 (S.D.N.Y. June 1, 2012) (33% fee request of the approximate $7.7 million settlement fund "is well within the percentage range that courts within the Second Circuit have awarded in other complex litigations"); *Puddu v. 6D Glob. Techs., Inc.*, 2021 WL 1910656, at *6 (S.D.N.Y. May 12, 2021) (one-third of the settlement fund is within the range for rates in this district and thus reasonable).

### F. There Are No Undisclosed Side Agreements

Rule 23(2)(2)(C)(iv) requires that the parties identify any side agreements. Other than a standard agreement allowing for Defendant to terminate the Settlement if a certain level of

exclusions occur (*See* S.A., § 8.3), no other agreements were made in connection with the proposed Settlement that impacts relief to the class. Kramer Decl., ¶ 15. This factor therefore also weighs in favor of approval. *See* Fed. R. Civ. P. 23(e)(2)(C)(iv).

### G. The Proposed Settlement Treats Class Members Equally

Finally, the Settlement treats Settlement Class Members equitably, as the same allocation formula is used to calculate settlement payments for all eligible individuals. As explained above, the allocation plan accounts for each class member's individual facts by calculating individual payment amounts based on their actual losses. Ex. 2. This fair and reasonable distribution plan further supports approval of the Settlement.

## THE SETTLEMENT CLASS IS LIKELY TO BE CERTIFIED

If at the preliminary approval stage, "a class has not been certified, the parties must ensure that the court has a basis for concluding that it likely will be able, after the final hearing, to certify the class." Fed. R. Civ. P. 23(e), 2018 Advisory Committee Note. Here, the parties' proposed class meets all the requirements of Rule 23(a) and Rule 23(b)(3), and can be certified by the Court at the final approval stage.

### A. The Class Meets the Requirements of Rule 23(a)

#### *1) Numerosity*

The class consists of thousands of presently identifiable individuals, Kramer Decl., ¶¶ 17-18, making "joinder of all members impracticable." Fed. R. Civ. P. 23(a)(1). *See Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) ("numerosity is presumed at a level of 40 members").

#### *2) Commonality*

"Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Johnson v. Nextel Comms. Inc.*, 780

F.3d 128, 137 (2d Cir. 2015). Here, each class member's claims against GMOT arise from the same alleged conduct and practices by GMOT, namely that GMOT materially misrepresented the nature of GYEN and failed to take necessary steps to keep it pegged to the JPY. *See*, *e.g.*, ECF 109, ¶¶ 134-145, 153-163. Each of those contentions depend only on what GMOT knew, did, or refused or failed to do, and could be established (or not established) with generalized evidence applicable to the entire class. As such, this lawsuit raises numerous common questions, including: (1) whether GMOT's advertisements and statements regarding the nature of GYEN were false and misleading or omitted material facts; (2) whether GMOT's acts or practices were deceptive in violation of section 349 of the GBL; (3) whether GMOT's advertisements and statements regarding the GYEN violated the false advertising provisions of the GBL, N.Y. Gen. Bus. § 350; (4) whether GMOT's conduct violated the UCL; (5) whether GMOT's conduct violated the California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*; (6) the proper form of equitable and injunctive relief; and (7) the proper calculation of monetary relief. Questions such as these are routinely found to satisfy the commonality requirement in consumer protection and false advertising cases. *See, e.g., Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 565 (S.D.N.Y 2014) (common questions included whether defendant's alleged misrepresentations about its olive oil product were false or constituted negligent misrepresentations and whether defendant's conduct violated section 349 of the GBL and other states' consumer fraud laws).

***3) Typicality***

Rule 23(a)(3) requires a finding that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor

variations in the fact patterns underlying individual claims." *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993). "Consumers of the same product, exposed to the same marketing and packaging, will have almost entirely the same claims with at most 'minor variations' in the facts surrounding their purchase of the products." *Goldemberg v. Johnson & Johnson Consumer Cos., Inc*., 317 F.R.D. 374, 400 (S.D.N.Y. 2016).

Here, typicality is easily satisfied, as Plaintiffs' claims are consistent with those of other class members. Plaintiffs' claims are based on GMOT's deceptive practices, representations, and omissions regarding the nature of GYEN that are precisely the same practices, representations, and omissions that give rise to the claims of other class members, and all class members are asserting claims based on the same legal theory. *See* ECF 109. Plaintiffs do not have any unique claims against GMOT beyond those shared with the Settlement Class. Kramer Decl., ¶ 21. Their claims are, therefore, typical. *See Price v. L'Oreal USA, Inc*., 2018 WL 3869896, at *4 (S.D.N.Y. Aug. 15, 2018) (typicality met where plaintiffs were exposed to the same marketing as every other consumer who purchased the products); *Ebin v. Kangadis Food Inc*., 297 F.R.D. 561, 566-67 (S.D.N.Y. 2014) (plaintiff purchasers of mislabeled olive oil products were typical of other potential class members despite any differences relating to their individual purchasing decisions).

***4) Adequacy of Representation***

Where the "class representatives are prepared to prosecute fully the action and have no known conflicts with any class member," the adequacy requirement is met. *Shahriar v. Smith & Wollensky Restaurant Group*, 659 F.3d 234, 253 (2d Cir. 2011). Plaintiffs have demonstrated their commitment to prosecuting this action for over three years, dedicating significant time supervising the litigation, reviewing and approving the complaints, responding to written discovery requests, producing documents relating to their claims, and working with counsel.

Kramer Decl., ¶ 20; Moreover, nothing in the record suggests that Plaintiffs' interests are antagonistic to those of absent class members. Kramer Decl., ¶ 21. This supports Plaintiffs' adequacy. *Price*, 2018 WL 3869896, at *4. Plaintiffs have also retained experienced counsel to vigorously prosecute the class's claims. *Id.* Plaintiffs' counsel have decades of experience representing plaintiffs in complex class action litigation, including in cases involving violations of consumer protection laws and investment losses. Kramer Decl., ¶ 22; Exs. 3, 4 (firm CVs). They have demonstrated the qualifications, experience, and expertise to adequately represent the class.

### B. The Class Meets the Requirements of Rule 23(b)(3)

#### *1) Predominance*

The predominance requirement is satisfied when class members' claims can be proven predominantly using common, class-wide evidence rather than evidence that varies from class member to class member. *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). Here, each class member's claims under the GBL and/or UCL/FAL arise from the same representations, omissions, and practices by GMOT with respect to GYEN. The similarity of the elements of Plaintiffs' New York claims and California claims readily supports a finding of predominance. Sections 349 and 350 of the GBL, the UCL, and the FAL all use an objective standard whereby deceptive acts and representations are defined as those likely to mislead a reasonable consumer acting reasonably under the circumstances. *See Goldemberg*, 317 F.R.D. at 388-90 (describing elements of sections 349 and 350 of GBL and noting they are "identical"); *Price*, 2018 WL 3869896, at * 6 (describing elements UCL and FAL and collecting cases). As such, the class's claims depend on generalized and objective evidence of GMOT's representations and practices with respect to GYEN and whether they were likely to mislead a reasonable consumer. Cases involving similar consumer protection claims under New York and

California law have routinely been found to satisfy the predominance requirement. *See, e.g., Goldemberg*, 317 F.R.D. at 388-90 (certifying claims under GBL §§ 349-350, UCL, and FAL) *Price*, 2018 WL 3869896, at *6 (same); *In re Amla Litig.,* 282 F.Supp.3d 751, 768 (S.D.N.Y. 2017) (certifying claims under section 349 of the GBL); *Ebin*, 297 F.R.D. at 568 (finding common issues regarding the deceptive nature of defendant's representations predominated claims under the GBL § 349 and other states' consumer protection laws). Predominance is satisfied.

***2) Superiority***

Superiority is satisfied for many of the same reasons predominance is met. Because common issues predominate over individual ones, class members do not have a strong interest in controlling their individual actions. Additionally, because of the difficulty and expense of prevailing and due to the relatively low individual damages involved, it is highly unlikely that many members of the class would be able to bring individual lawsuits. Kramer Decl., ¶ 17; *Price*, 2018 WL 3869896, at *11; *see also Ebin*, 297 F.R.D. at 567 ("[T]he class action device, at its very core, is designed for cases like this where a large number of consumers have been defrauded but no one consumer has suffered an injury sufficiently large as to justify bringing an individual lawsuit."); *Amgen*, 568 U.S. at 478 (same).

**THE PROPOSED NOTICE PLAN SHOULD BE APPROVED**

According to Rule 23, "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). The notice must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Lomeli v. Sec. & Inv. Co. Bahrain*, 546 Fed. App'x 37, 41 (2d Cir. 2013) (quotation omitted). Here, the proposed notice of settlement satisfies Rule 23 and the requirements of due process.

### A. The Notice Plan Adequately Informs Class Members of Their Rights and Options Under the Settlement

First, the form and content of the notice is substantively adequate. The notice is written in plain language and will appraise class members of the nature and pendency of the litigation, the scope of the class and the class claims, as well as the option to request exclusion or to object to the Settlement (and the time and manner for doing so). *See* S.A. Ex. A. Settlement Class Members are advised that if they do not opt out, they will be bound by final approval of the Settlement, including the release of any claims they may have had arising from the facts alleged in the SAC. *Id.* The notice also explains that Plaintiffs' counsel will file a motion requesting up to $2,250,000 in attorney's fees and costs, as well as $7,500 service awards to Plaintiffs Donovan, Kassfy, and Brambl, that the anticipated motion will be posted on the Settlement website at the time it is filed, and that class members may review and comment upon that motion. *Id.* Lastly, the notice will include the time and place of the final approval hearing and advise as to how to check for any changes to the scheduling of that hearing on the Settlement website. *Id.* The notice therefore contains all the necessary content. *See In re Michael Milken & Assocs. Sec. Litig.*, 150 F.R.D. 57, 60 (S.D.N.Y. 1993) (class notice "need only describe the terms of the settlement generally").

### B. The Notice Plan Uses the Best Practicable Means to Reach Class Members

Second, the manner of notice complies with Rule 23 and due process. As described above, the S.A. provides that the Claims Administrator will provide direct notice and targeted notice by publication. Simpluris will use industry-standard processes to determine and verify addresses then send the notice via email/U.S. Mail to all class members with known addresses. S.A., § 4.2; Kramer Decl., ¶ 19. Additionally, the notice will be posted on the Settlement website

and provided through a press release, a targeted social media campaign, and possibly an NFT "airdrop." S.A., § 1.45; Kramer Decl., ¶ 19; Simpluris Decl., ¶¶ 12-15.

The manner of notice complies with due process and constitutes the "best notice that is practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B); *Phillips Petrol. Co. v. Shutts*, 472 U.S. 797, 812 (1985). Accordingly, the Court should approve the proposed notice and notice program.

### C. The Proposed Claims Administrator Is Qualified and Experienced

The Settlement proposes to appoint Simpluris as the Claims Administrator in this matter. S.A., § 1.8. Simpluris has been recognized as one of the best administrators in the country and has served as administrator in dozens of complex class actions and mass tort cases, including cases involving cryptocurrency. Simpluris Decl., ¶¶ 2, 4, 6. Plaintiffs request that Simpluris be appointed as Claims Administrator and be authorized to effect notice.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully move this Court for an order: (1) granting preliminary approval of the proposed Settlement; (2) provisionally certifying the class for settlement purposes; (3) appointing Plaintiffs Donovan and Kassfy as Settlement Class Representative and Lead Counsel as Class Counsel for the Settlement Class; (4) approving the notice and directing that it be disseminated to the class within 30 days after the entry of an order approving this motion; (5) appointing Simpluris as Claims Administrator; and (6) scheduling a fairness hearing. A proposed order providing this requested relief is attached as Exhibit 3 to the Settlement and submitted with this filing.

Respectfully submitted,

ERICKSON KRAMER OSBORNE LLP

Dated: December 30, 2025

By: */s/ Elizabeth A. Kramer*
Elizabeth A. Kramer

Julie C. Erickson (*pro hac vice*)
Elizabeth A. Kramer (*pro hac vice*)
Kevin M. Osborne (*pro hac vice*)
959 Natoma St.
San Francisco, CA 94103
Telephone: 415-635-0631
julie@eko.law
elizabeth@eko.law
kevin@eko.law

Daniel E. Barenbaum (*pro hac vice*)
BERMAN TABACCO
425 California Street, Suite 2300
San Francisco, CA 94104
Telephone: 415-433-3200
dbarenbaum@bermantabacco.com

Steven J. Buttacavoli (*pro hac vice*)
BERMAN TABACCO
One Liberty Square
Boston, MA 02109
Telephone:
sbuttacavoli@bermantabacco.com

*Attorneys for Plaintiffs and the Proposed Class*

**CERTIFICATE OF COMPLIANCE WITH WORD COUNT LIMITATION**

I hereby certify that the foregoing Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement complies with this District's rules on word count limitations. S.D.N.Y. Civ. L.R. 7.1(c). The word count of this memorandum, exclusive of the caption, index, table of contents, table of authorities, signature blocks, and any required certificates, is: 8,587. In calculating this word count, I relied on the word-processing program used to prepare this document.

By: *\/s/ Elizabeth A. Kramer*
Elizabeth A. Kramer

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of December 2025, the foregoing **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT** was filed and served using the CM/ECF system, which will serve as notification of such filings on all counsel of record.

/s/ *Elizabeth A. Kramer*
Elizabeth A. Kramer
ERICKSON KRAMER OSBORNE LLP
959 Natoma St.
San Francisco, CA 94103
Phone: 415-635-0631
Fax: 415-599-8088
elizabeth@eko.law